UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KALSHIEX LLC,

Plaintiff,

-against-

BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG, in his official capacity as Attorney General of Connecticut,

Defendants.

**MEMORANDUM & ORDER**

25-CV-2016 (VDO)

**VERNON D. OLIVER**, United States District Judge:

Before the Court is Plaintiff KalshiEX LLC's ("Kalshi") Motion for a Preliminary Injunction (the "Motion"). Kalshi seeks an order enjoining Defendants, various Connecticut officials, and the Connecticut Department of Consumer Protection ("DCP"), from enforcing Connecticut's gaming regulatory scheme against Kalshi. Kalshi contends that federal law preempts Connecticut's gaming regulatory regime and related statutes. For the reasons that follow, the Motion is **DENIED**.

# I. BACKGROUND

## A. Factual Background

### 1. Derivatives, Swaps, and Event Contracts Under the CEA

Derivative contracts, some types of which are at issue in this case, are financial tools that traders use to mitigate risk. "A derivative is a financial instrument or contract whose price is directly depending upon (i.e., derived from) the value of one or more underlying assets–for

example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025) (cleaned up). In a classic example of a derivatives contract, a farmer may enter into an agreement with a buyer to trade a crop, like wheat, at a predetermined price on a specific future date, effectively locking in value and removing the risk of unexpected price drops.[1] A "future" is a type of derivative contract between parties to buy or sell an asset at a predetermined price on a future date that is listed on an organized exchange. *See generally,* Beylin, *supra* n.1.

Congress regulates many derivatives through the Commodity Exchange Act ("CEA"), a federal statute that provides a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). "The CEA was enacted during the Great Depression in response to concerns about manipulation, speculation, and other abuses that could arise from trading derivatives." *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (cleaned up). Originally enacted to regulate futures contracts in agricultural commodities, the CEA has since "expanded well beyond its agricultural-commodity roots." *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026). "In 1974, Congress created the Commodity Futures Trading Commission (CFTC) and gave this agency the authority to

---

[1] To shed some further light on how such a contract would play out, "a farmer could go 'short' through the futures contract (i.e., sell the grain under the contract) to neutralize her risk that grain prices fluctuate. Through selling wheat under the futures contract, the farmer effectively sells at a price fixed at the time of execution with settlement taking place in the future through an exchange of the referenced commodity for cash. If prices for wheat increase, the farmer will (i) lose money under the futures contract because the price of wheat at the time of delivery under the futures contract exceeds what she sold it for, but (ii) experience increased revenues from the harvest. If, on the other hand, prices fall, the farmer will (i) profit under the futures contract, and (b) suffer offsetting losses as she sells her harvest at the lower price." Ilya Beylin, *Event Contracts Are a Step Too Far for Derivatives Regulation*, 4 U. Chi. Bus. L. Rev. 77, 78–79 (2025).

regulate all futures contracts . . ." *Id.* (citing 7 U.S.C. § 2(a)(1)(A); Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1395).

Among other extensive regulatory changes, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act of 2010") "brought much of the swaps market within the CFTC's purview for the first time." *Phillips*, 155 F.4th at 113. As part of the Dodd-Frank Act of 2010, Congress expanded the CEA's reach to include "swap[ ]" contracts, 7 U.S.C. § 2(a)(1)(A), which it defined within the CEA as contracts in which a party's "payment" depends on the "occurrence, nonoccurrence, or [ ] extent of the occurrence of an event" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Swaps generally involve "the exchange of cash flows from financial instruments," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013), allowing parties to trade risky or variable returns for more certain ones and vice versa. "For instance, parties might agree to swap future interest payments at different rates, or future payments in one currency for payments in another."[2] Unlike futures and options, "which contemplate delivery of or performance related to a commodity at some future time, swaps are pure financial instruments based on the difference between two fluctuating values." *Phillips*, 155 F.4th at 112 (cleaned up).

The contracts involved in this case are commonly referred to as event contracts, another category of derivative contracts regulated by the CEA. Although the CEA repeatedly uses the term "event contract," it does not define it; nor do any regulations issued by the CFTC. Courts have used the term to describe financial instruments that identify a future event with several

---

[2] ECF No. 46 at 7.

possible outcomes, a payment schedule for the outcomes, and an expiration date. *See KalshiEX LLC v. CFTC*, No. 23-CV-3257, 2024 WL 4164694, at *2 (D.D.C. Sep. 12, 2024). Event contracts are typically traded on an exchange, and their value is determined by market forces. This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a unique financial instrument that tracks real-world market perceptions. *Id.* The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *Id.* For example, one might purchase a position on an event contract titled "Will it rain tomorrow?" with a $1 fixed payout.[3] If that person purchased a 70-cent "yes" position "and it rained the next day, [that person] would earn a 30-cent profit when the contract settles" while the person "who didn't predict correctly would lose their [30-cent] investment."[4]

**2. CFTC Regulation of Swaps and Event Contracts**

The CEA "gives the CFTC 'exclusive jurisdiction' 'with respect to,' among other covered contracts, 'transactions involving swaps' 'traded or executed on a contract market' that the agency has designated." *Schuler*, 2026 WL 1295806, at *1 (quoting 7 U.S.C. § 2(a)(1)(A)). An entity that seeks to list and publicly trade its event contracts must apply to the CFTC to be a designated contract market ("DCM"). *See* 7 U.S.C. §§ 2(e), 7(a). Once the CFTC designates an entity as a DCM, the entity must comply with the CEA's "core principle[s]" and the CFTC's regulations. *Id.* § 7(d)(1)(A). Of note, the CFTC has promulgated regulations that

---

[3] Commodity Futures Trading Comm'n, Understanding Prediction Markets and Event Contracts, https://www.cftc.gov/LearnandProtect/PredictionMarkets.

[4] *Id.*

govern the "access requirements" that a DCM must follow. *Id.* § 7(d)(2)(A)(i). These regulations require a DCM to "provide its members . . . with impartial access to its markets and services." 17 C.F.R. § 38.151(b); *see also id.* § 37.202(a). The DCM must both follow "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner" and set "[c]omparable fee structures." *Id.* § 38.151(b); *see also id.* § 37.202(a).

The CEA also contains a "[s]pecial rule for review and approval of event contracts and swap contracts" created by Congress as part of the 2010 amendments to the Dodd-Frank Act (the "Special Rule"). 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule applies to contracts in certain excluded commodities. As relevant here, the CEA defines an excluded commodity to include "an occurrence, extent of an occurrence, or contingency" that is both "beyond the control" of the contracting parties and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).[5]

Under the Special Rule, DCMs may list relevant contracts without prior CFTC approval by self-certifying that those contracts comply with applicable law and regulations. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2) (listing submission requirements). If a DCM lists contracts "in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," the CFTC can then review and prohibit these contracts when they are "contrary to the public interest" because they involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest." 7 U.S.C.

[5] *Cf.* 7 U.S.C. § 1a(47)(A) (defining "swap" as "any agreement, contract, or transaction" "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence").

§ 7a-2(c)(5)(C)(i).[6] Contracts contrary to the public interest "may [not] be listed or made available for clearing or trading on or through a registered entity," such as a DCM. *Id.* § 7a-2(c)(5)(C)(ii).

### 3. Kalshi's Registration as a CFTC-Designated Contract Market

Kalshi is a financial services company that operates a prediction market, which allows users to buy and sell event contracts on its platform.[7] The CFTC certified Kalshi as a DCM in 2020. *KalshiEX*, 2024 WL 4164694, at *4. Kalshi initially offered event contracts about technology, health, crypto, popular culture, politics, and economics. *Schuler*, 2026 WL 1295806, at *2. But in January 2025, Kalshi self-certified several contracts related to sporting events and began to list them on its exchange.[8] These sports-event contracts allow users to place positions on "for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship."[9] But they may also ask:

> Will Michigan win by more than 7.5 points? Or will Michigan and UConn score more than a combined 144.5 points? Or will a specific player score more than 10 points? Or pretty much anything else that might happen during a sporting event.
>
> *Schuler*, 2026 WL 1295806, at *2.

As of February 11, 2026, the date of the hearing on the Motion, Kalshi's value sat at around $11 billion.[10] The vast majority of the contracts listed on Kalshi's site—between 80%

---

[6] Effective as of 2011, the CFTC issued a similar regulation, providing that a "registered entity shall not list for trading" contracts contrary to the public interest—the same types of contracts enumerated above. 17 C.F.R. § 40.11(a)(1).

[7] Compl., ECF No. 1 ¶ 18.

[8] *Id.* ¶ 43.

[9] *Id.*

[10] Oral Arg. Tr., ECF No. 82 at 68:21–69:3.

and 90%—were sports-events contracts;[11] between 80% and 90% of Kalshi's revenue came from its sports-events contracts;[12] and the CFTC had not subjected a single one of these contracts to review under the Special Rule, let alone prohibited any contract after such review.[13]

**4. The Connecticut Regulatory Scheme for Gaming**

The Gaming Division of the DCP "regulates gaming in the state of Connecticut by licensing or permitting all individuals and entities that are involved with legalized gaming, and by monitoring and educating to ensure compliance with [the state's] gaming laws."[14] It does so pursuant to Connecticut's long-held police powers. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a State …."); *Marvin v. Trout*, 199 U.S. 212, 224 (1905) ("The power of the state to enact laws to suppress gambling cannot be doubted …."); *Murphy v. NCAA*, 584 U.S. 453, 486 (2018) (noting that "Congress can regulate sports gambling directly, but if it elects not to do so, *each State is free to act on its own.*") (emphasis added); *see also id.* at 467–68 (referring to "old laws banning sports gambling," and noting that as of 1992, "all forms of sports gambling were illegal in the great majority of States").

Connecticut regulates gambling via a "tightly controlled, exclusive sports wagering market" created in 2021 by the Connecticut General Assembly.[15] 2021 Conn. Acts, No. 21-

---

[11] *Id.* at 41:4–13.

[12] *Id.* at 68:15–20.

[13] *Id.* at 16:16–17; 101:19–24.

[14] ECF No. 1 ¶ 20.

[15] Defs. Opp'n, ECF No. 46 at 5.

23; Conn. Gen. Stat. § 12-850 *et seq.* The Gaming Division is the DCP's largest division, made up of "64 employees . . . that include[] investigators, sworn law enforcement officers, [and] six attorneys."[16] Eight of these employees are specifically dedicated to sports-related enforcement.[17]

Under Connecticut law, an "online gaming operator" includes entities that operate an "electronic wagering platform" to offer "Internet games" (which are defined to include "online sports wagering"). Conn. Gen. Stat. §§ 12-850(27), 12-850(13). Such online gaming operators must obtain a license from the DCP by contracting directly with one of the state's three master wagering licensees to offer its services.[18]

"Sports wagering," per Connecticut law, is defined as "[r]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform; and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event; or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a

---

[16] ECF No. 82 at 113:2–7.

[17] *Id.* at 115:22.

[18] Conn. Gen. Stat. § 12-857(a). Connecticut law defines a "master wagering licensee" as "(A) the Mashantucket Pequot Tribe, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; (B) the Mohegan Tribe of Indians of Connecticut, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; or (C) the Connecticut Lottery Corporation, if licensed pursuant to section 4 of this act to operate retail sports wagering, online sports wagering, fantasy contests and keno and to sell tickets for lottery draw games through the Internet, an online service or a mobile application[.]" 2021 Conn. Acts, No. 21-23 § 1(16); *see also* Conn. Gen. Stat. § 12-850(21).

combination of sporting events." Conn. Gen. Stat. § 12-850(34). Offering gaming in Connecticut in a manner that violates the state's gaming laws can constitute a class A or class B misdemeanor, exposing any violators to civil and criminal penalties. Conn. Gen. Stat. §§ 53-278b, 53-278d.

**5. The Department of Consumer Protection's Cease-and-Desist Letter**

In 2025, Kalshi's sports-event contracts drew the attention of the DCP. On December 2, 2025, the DCP sent Kalshi an email containing a cease-and-desist letter, stating that Kalshi was "conducting unlicensed online gambling, more specifically sports wagering" by offering its contracts in Connecticut in violation of state law.[19] The letter directed Kalshi to "immediately cease and desist advertising and offering its Contracts to Connecticut residents."[20]

The cease-and-desist letter elaborated that Kalshi's contracts "constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events."[21] It went on to say that "[e]ven if Kalshi possessed an online gaming operator's license, Kalshi's contracts still violate numerous other Connecticut laws and public policies" that bar individuals under 21 from placing wagers and prohibit wagers involving Connecticut intercollegiate sports teams.[22] The letter further contended that Kalshi's contracts are "void" under state law prohibiting wagering

---

[19] Porter Decl. Ex. 1 (C&D Letter), ECF No. 30-3 at 2.

[20] *Id.*

[21] *Id.* (citing Conn. Gen. Stat. § 12-850(34)).

[22] *Id.* at 3 (citing Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30)).

contracts and that Kalshi's "promotion of unlicensed and illegal gambling services is also an unfair trade practice" in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA") because they are "deceptive" and "unfair" as Kalshi "is able to gain a competitive advantage over appropriately licensed entities" by "operating outside of the regulatory environment."[23] The letter warned Kalshi that "[f]ailure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d."[24]

Though Plaintiff initially asserted that the cease-and-desist letter "did not limit itself to Kalshi's sports-event contracts, but rather suggested that *all* of Kalshi's event contracts are unlawful,"[25] Defendants limited their briefing to Kalshi's sports-event contracts and later clarified at oral argument that the scope of the letter only extended to sports gaming contracts.[26]

On December 8, 2025, per the parties' joint stipulation, the Court ordered Defendants "to refrain from taking enforcement action against Kalshi" for conduct mentioned in the cease-and-desist letter pending disposition of the Motion.[27]

---

[23] *Id.*

[24] *Id.* at 3.

[25] Pl. Mem., ECF No. 30-1 at 16.

[26] ECF No. 82 at 76:2–3.

[27] ECF No. 35.

### B. Procedural History

Kalshi initiated this action on December 3, 2025.[28] On December 5, 2025, Kalshi filed the Motion.[29] Defendants responded on January 9, 2026,[30] and Kalshi replied on January 30, 2026.[31] A number of Indian tribes and gaming associations also filed an amicus brief in this case.[32] The Court held oral argument on the Motion on February 11, 2026.[33]

### C. Nationwide Litigation

Numerous courts have considered similar motions by Kalshi, seeking to enjoin state gaming commissions from enforcing state law against it.[34] Federal courts have found both in Kalshi's favor, granting its preliminary injunction motions, and against it, denying such motions. *Compare KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, No. 26-CV-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (granting preliminary

---

[28] ECF No. 1.

[29] ECF No. 30.

[30] ECF No. 46.

[31] ECF No. 75.

[32] ECF No. 56-1. The Brief was filed by the Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Minnesota Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Native American Finance Officers Association, San Manuel Gaming and Hospitality Authority, and 16 tribes: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Sandia; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuuhaviatam of San Manuel Nation.

[33] ECF No. 81.

[34] The Court is aware of 14 lawsuits that Kalshi has brought against states in their respective federal district courts: Nevada, New Jersey, Maryland, Ohio, New York, Connecticut, Illinois, Tennessee, Utah, Iowa, Arizona, Montana, Minnesota, and Rhode Island.

injunctions) *with KalshiEX LLC v. Schuler* ("*Schuler II*"), No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Cox*, No. 26-CV-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026); *KalshiEX LLC v. Williams*, No. 25-CV-8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026); *KalshiEX LLC v. Johnson*, No. 26-CV-1715, 2026 WL 958171 (D. Ariz. Apr. 8, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) (denying preliminary injunctions).

Many state courts are likewise considering similar actions involving Kalshi.[35] In contrast to the federal courts that have addressed this issue, every state court to have issued a ruling has ruled against Kalshi. *See Massachusetts v. KalshiEX, LLC*, 2584-CV-2525, Order on Plaintiff's Motion for a Preliminary Injunction and Defendant's Motion to Dismiss (Mass. Sup. Ct. Jan. 20, 2026), available here; *Nessel v. KalshiEX LLC*, 26-1087-CZ, Order Granting Temporary Restraining Order (Mi. Circuit Ct. June 29, 2026), available here; *Nevada v. KalshiEX, LLC*, 26-0C-50, Joint Stipulation and Order (Nev. Dist. Ct. July 24, 2026), available here. Massachusetts, Nevada, and Michigan state courts have all ordered Kalshi to implement geofencing in order to bar Kalshi's offerings to users in those respective states. While Massachusetts's order has been stayed pending appeal, Kalshi has pledged to implement geofencing in Nevada by August 12, 2026, and faces the same deadline for doing so in Michigan.

[35] The Court is aware of four civil enforcement actions brought by states against Kalshi that remain pending in their respective state courts. Each of those cases—filed in Nevada, Washington, Massachusetts, and Michigan—was remanded to state court after removal. In addition, a criminal enforcement action is pending against Kalshi in Arizona state court. Numerous other state-filed actions have also been removed by Kalshi, and the question of whether those cases should be remanded is currently being litigated.

## II. DISCUSSION

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "In general, '[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023)). As discussed below, the Court concludes that all factors weigh in favor of Defendants and accordingly **denies** the motion for a preliminary injunction.

### A. Likelihood of Success on the Merits

The Court begins with assessing Plaintiff's likelihood of success on the merits. "In general, to establish a 'likelihood of success on the merits' the movant for injunctive relief 'need only make a showing that the probability of his prevailing is better than fifty percent.'" *Abrams v. Waters*, No. 17-CV-1659 (CSH), 2018 WL 1469057, at *4 (D. Conn. Mar. 26, 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Here, the merits of the case center on whether (1) Kalshi's sports-event contracts constitute "swaps" within the meaning of the CEA, and, if so, (2) whether Connecticut gambling laws are preempted by federal law as applied to Kalshi's sports-event contracts. Kalshi has not demonstrated that it is likely to succeed on the merits on either of these issues, as explained below.

#### 1. Whether Sports-Events Contracts Are Swaps

As noted in Section I.A.1–2, *supra*, to fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A), a contract must be a "swap[ ]. . . traded or executed on" a DCM.

Connecticut argues that the sports-event contracts at issue are not "swaps" within the meaning of the CEA and therefore fall outside the CFTC's exclusive jurisdiction. For the reasons that follow, the Court largely agrees.

First, the Court notes that it has the authority to interpret the CEA, including its definition of a swap. "[T]he CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap." *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1180 (D. Nev. 2025) ("*Crypto*") (comparing *Batterton v. Francis*, 432 U.S. 416, 430–31 (1977) (evaluating a statute that expressly "authorize[d]" the Secretary of Health, Education, and Welfare the power to define a statutory term through statutory language: "unemployment (as determined in accordance with standards prescribed by the Secretary)" (cleaned up)), with 7 U.S.C. § 2(a)(1)(A) (granting the CFTC "exclusive jurisdiction" over "accounts, agreements . . ., and transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC). "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("Congress expects courts to handle technical statutory questions."). Nothing in the CEA takes statutory interpretation away from courts. *See* 7 U.S.C. § 2(a)(1)(A).

Kalshi agrees, but states that "a challenge to the CFTC's determination [of what constitutes a swap] *must* be brought against the CFTC itself."[36] The Court is not persuaded. In support of its argument, Kalshi relies on a wholly inapposite Ninth Circuit case, *Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 (9th Cir. 2015). That case indeed holds, as Kalshi

---

[36] ECF No. 75 at 2 (emphasis added).

states, that a "collateral attack on agency decision would be prohibited 'end-run.'"[37] But unlike in *Big Lagoon*, where California challenged a Bureau of Indian Affairs decision to hold a parcel of land in trust for an Indian tribe, Kalshi has failed to identify what exact CFTC decision Connecticut is seeking to collaterally attack here. Kalshi's reliance on *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156–57 (7th Cir. 1992) is similarly misplaced. That case held that certain state law claims asserted by soybean farmers were preempted by the CEA; it did not address whether a court may determine, in the first instance, whether the contracts at issue fall within the CFTC's exclusive jurisdiction. Nothing in *American Agricultural Movement* precludes a court from resolving that threshold question here.

As noted above, the CEA defines swaps as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define "occurrence" or "event," so the Court may "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). Although dictionaries may illuminate ordinary meaning, *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568–69 (2012), statutory language must be construed in context, not in isolation. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Thus, the Court must "attempt to give effect to the plain meaning of each word," *Assocs. Against Outlier Fraud v. Huron*

---

[37] *Id.*

*Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016), including Congress's decision to use the distinct terms "occurrence" and "event."

The Court finds that the statutory phrase "occurrence, nonoccurrence, or the extent of the occurrence of an event" is concerned with whether an event takes place and to what extent it occurs, not various outcomes of or embedded within that event. The Court finds persuasive the analysis of the District of Nevada in *Crypto*, which reached the same conclusion after examining contemporaneous dictionary definitions of "occurrence" and "event." *See* 815 F. Supp. 3d at 1181–83. That court ultimately interpreted "occurrence" to mean "something [that] happened," and "event" as "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Id.* Crucially, though "some dictionaries suggest 'event' could mean 'outcome,' Webster's and Merriam-Webster's noted this definition of event is an 'archaic' use of the word," not its ordinary meaning. *Id.* at 1182 (quoting Webster's New College Dictionary (2009) (definition of event), Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (definition of event)). Thus, "event" as used in the CEA cannot also encompass "outcome," and, conversely, the statutory phrase cannot be read to make every outcome an "occurrence . . . of an event."

In the context of sporting events, "the ordinary meaning of event . . . would be the sporting event itself, not who wins it." *Crypto*, 815 F. Supp. at 1183. For example, a boxing match would constitute the relevant "event," and it "could either take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence)." *Id.* The term "event" does not encompass the result of the event, meaning who wins the boxing match is not a separate event in and of itself. Indeed, "[a]n ordinary American interpreting the word 'event'

would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself." *Id.*

Kalshi's sports-event contracts fail to satisfy this portion of the statutory definition of a swap because they do not depend on whether an underlying sporting event occurs, fails to occur, or occurs to a particular extent. Instead, Kalshi's sports-event contracts depend on the event's outcomes or discrete in-game occurrences. Treating those outcomes as separate "events" would depart from the ordinary meaning of the term. Thus, Kalshi's sports-event contracts do not fall within § 1a(47)(A)(ii). [38]

Separately, the Court finds that Kalshi's sports-event contracts are also not swaps because they are not "associated with a potential financial, economic, or commercial consequence," as required by 7 U.S.C. § 1a(47)(A)(ii). Kalshi asserts that "[s]ports events have *actual* and *significant* financial consequences," and that they "readily meet the swap definition, which requires only *potential* consequences."[39] It further contends that—when it comes to a limiting principle—"the definition of swap is broad but not limitless"; to qualify as a swap, an event contract must be based on "an event that has a potential consequence for stakeholders."[40]

The Court agrees with the Defendants and the *Hendrick* court that Kalshi's position that sports-event outcomes are associated with financial consequences "knows no limiting

[38] The Court notes that, although neither the statute nor the parties define "sports-event contracts," this holding and the accompanying analysis is limited to contracts that depend on a sporting event outcome or an in-game occurrence—for example, which team wins or advances or whether a player scores a touchdown. The Court does not decide on this limited record whether the same analysis would apply to other types of sports-related event contracts (e.g. whether a game proceeds to overtime or whether a series reaches a seventh game), as the record does not establish that such contracts are offered or are at issue, and the parties have not addressed these types of contracts.

[39] ECF No. 75 at 3.

[40] ECF No. 82 at 36:23; 37:10–12.

principle." *Hendrick*, 817 F. Supp. 3d at 1027. In asserting that an event contract qualifies as a swap if it is based on "an event that has a potential consequence for stakeholders,"[41] Kalshi does little to clarify the scope of the statutory phrase. The proposed limitation simply replaces one undefined concept with another: what qualifies as a "potential consequence," and which "stakeholders" are relevant? Kalshi's formulation provides no meaningful basis for drawing those lines, and its own examples illustrate the difficulty of that proposed limitation.

For example, Kalshi draws a distinction between contracts on the winner of a sporting event, which it contends qualify as swaps, and contracts on the game's exact final score, which it does not offer because, in its view, they are "divorced from . . . an outcome that would have an effect on the team or their sponsors" and thus fall outside the statutory definition of a "swap."[42]But it is not clear to the Court why the identity of the winning team, as opposed to the game's final score, is meaningfully different for purposes of the statutory requirement that the event have a potential financial, economic, or commercial consequence. There are many sporting events in which the winner has little or no practical consequence beyond the contest itself, while the precise score may carry significant financial and commercial implications. For example, the winner of a late-season game between two teams already eliminated from postseason contention may have relatively limited economic significance, whereas a losing team reaching a scoring threshold that secures playoff qualification or advancement under a tournament's rules may have substantial financial consequences for players, coaches, teams,

[41] ECF No. 82 at 37:12.

[42] *Id.* at 101:3–10.

broadcasters, sponsors, and other stakeholders. Kalshi offers no principled basis for concluding that the former satisfies the statutory definition of a swap while the latter necessarily does not.

Or, for instance, Kalshi has represented that it would not list a contract on whether or not a player at a blackjack table wins their hand because "it would be very difficult to argue that that's not gaming" and because that is an example of a "transaction that has implications for the people in the transaction, but no extrinsic implications for people outside of the transaction."[43] But Kalshi has offered "no principled reason" for why a "'combo' on both the Giants and Broncos winning," which is a type of contract Kalshi does offer, is meaningfully different.[44] Whether both the Giants and Broncos happen to win on a given weekend may have no independent financial, economic, or commercial consequence at all, apart from its significance to participants in Kalshi's market and others who have wagered on that particular combination of outcomes. Conversely, a blackjack hand could have significant financial consequences for the casino, the player, or others with contractual or commercial interests tied to the game. If the existence of some downstream economic consequence is sufficient to transform an event into a swap, the statute would encompass virtually any uncertain event with economic ramifications—a construction that is difficult to reconcile with the text Congress enacted.

Nor could Congress have intended to strip states of their ability to regulate sports betting outside of a CEA-regulated DCM. If the Court were to accept that sports-event contracts are, indeed, swaps, and 7 U.S.C. § 2(a)(1)(A) put such contracts under CFTC's

[43] ECF No. 82 at 45:8–23.

[44] ECF No. 46 at 18.

exclusive jurisdiction, but 7 U.S.C. § 2(e) requires swaps to be listed on DCMs, "then state-regulated sportsbooks, casinos, or licensed online gaming providers would be violating federal law by offering them outside of a CEA exchange."[45]

Kalshi's argument that § 2(e) applies only to contracts listed on DCMs does not resolve this issue. That interpretation would create an anomalous regulatory gap, allowing entities to offer swaps outside of CEA-regulated exchanges while avoiding the very oversight and standardization requirements Congress enacted through Dodd-Frank. If companies could offer swaps in this regulatory "Wild West," there would be no principled reason why other types of swaps—including credit default swaps—could not similarly be traded outside the CEA framework. Such a reading would undermine Dodd-Frank's objectives and create a regime in which significant categories of derivatives could evade federal regulation. The better reading is that Congress did not intend to transform all sports-event contracts into federally regulated swaps that must be traded on CEA exchanges.

The Court thus interprets the phrase "associated with a potential financial, economic, or commercial consequences" to mean that the event or contingency, by its very nature, has embedded within it some potential financial, economic, or commercial consequence. This interpretation is consistent with the interpretation of the *Hendrick* court, which held that "the event or contingency is itself inherently joined or connected with a potential financial, economic, or commercial consequence."[46] *Hendrick*, 817 F. Supp. 3d at 1027. In reaching that

---

[45] ECF No. 46 at 19.

[46] In their briefing, Defendants pointed the Court to the *Hendrick* court's definition of a swap and asked the Court to adopt it. ECF No. 46 at 17. At the oral argument on the Motion, however, Defendants suddenly changed course and stated that was no longer their position. ECF No. 82 at 84:21–23. Instead, they urged the Court to require the phrase "associated with" to encompass

conclusion, the *Hendrick* court explained that the relevant consequence must arise from the event or contingency itself, rather than from externalities such as downstream financial effects created by third parties' independent decisions to bet on the event. *Id.*

Although the Court articulates this principle somewhat differently than the *Hendrick* court, it relies on the same considerations that informed *Hendrick*'s interpretation. The *Hendrick* court supported its reading by examining the surrounding statutory text, which primarily concerns financial instruments and economic measures; Dodd-Frank's focus on regulating systemic risks in the financial markets; the CFTC's post-enactment guidance distinguishing swaps from ordinary consumer transactions; and federalism principles recognizing the states' traditional role in regulating gambling. *Id.* at 1027–31. The Court adopts that reasoning and incorporates it here rather than repeating the extensive analysis set forth in *Hendrick*.

It is true, as Kalshi points out, that the text of the CEA does not explicitly require an event to be "inherently joined or connected with" a potential financial consequence.[47] Nor does the statutory text recite "that the event or contingency, by its very nature, has embedded within it" such a consequence, as the Court interprets the statute above. Nevertheless, the Court must give independent meaning to the phrase "associated with" by identifying a meaningful boundary on what it requires. Reading "associated with" to encompass any event that could have some conceivable financial, economic, or commercial consequence would render the

"something that has some logical proximate relationship to the preceding event." *Id.* at 85:5–6. The Court declines to accept this proposed formulation because it was neither briefed nor meaningfully developed at oral argument.

[47] ECF No. 75 at 3–4.

phrase effectively limitless, because virtually any uncertain event could produce some downstream financial effect.

The Court therefore interprets "associated with" to require a connection between the financial, economic, or commercial consequence and the event or contingency itself, rather than consequences arising solely from externalities such as endorsement contracts triggered by a team's success, bonus provisions in player or coaching contracts, side wagers, or other downstream financial arrangements created by independent actors. This interpretation ensures that the statutory phrase "associated with a potential financial, economic, or commercial consequence" captures events that are connected to financial, economic, or commercial consequences by their own nature, while excluding events that acquire such significance only through external market activity.

Applying this framework, the Court concludes that Kalshi's sports-event contracts that are based on outcomes of or discrete moments within sporting events (e.g. who wins, whether there is a fumble, etc.) are not based on events that, by their very nature, have embedded within them potential financial, economic, or commercial consequence (unlike the occurrence of a sports game itself, which has, embedded within it, potential financial consequences arising from ticket sales, broadcast rights, and advertising costs). Rather, these contracts are based on the results of sporting contests—events that may have incidental financial implications for teams, players, sponsors, broadcasters, and others, but that do not themselves become financial, economic, or commercial events merely because third parties may derive economic value from, or assign financial significance to, those results. In other words, the fact that a particular outcome of or within a sporting event may have downstream economic

consequences does not satisfy § 1a(47)(A)(ii), because those consequences arise from externalities surrounding the event rather than from the event itself.

This interpretation is reinforced by the CEA's statement of purpose. The CEA provides that transactions subject to the Act "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Thus, Congress envisioned the Act as facilitating legitimate risk management and price discovery in the nation's commodity markets. It is not apparent to the Court what risk-management or hedging function contracts premised on the outcomes of or within sporting contests actually serve. Kalshi has said so itself, conceding in a previous litigation that "at least in general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Brief of Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

Because Kalshi's sports-event contracts are not swaps under the CEA, they do not fall within the CFTC's exclusive jurisdiction, and the CEA does not preempt state regulation of those contracts.

### 2. Whether Connecticut Gambling Laws Are Preempted

The Court's conclusion that Kalshi's contracts are not swaps is sufficient to resolve the Motion. Nevertheless, even if the contracts were properly characterized as swaps, Kalshi's preemption arguments would still fail for the independent reasons discussed below.

Under the Supremacy Clause, federal law prevails when it conflicts with state law. *See* U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding.”); *Crosby v. Nat’l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (stating that “[a] fundamental principle of the Constitution is that Congress has the power to preempt state law”). “In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.” *N.Y. SMSA Ltd. P’ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (cleaned up).

“The key to the preemption inquiry is the intent of Congress.” *Id.* at 104. “If a federal law contains an express preemption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress’ displacement of state law still remains.” *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). That is, even when a federal statute contains an express preemption clause, the Court must still consider whether Congress’ preemptive intent may be inferred from the scope of the statute such that “Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law.” *Id.* at 76–77 (cleaned up). “[T]he party asserting that federal law preempts state law bears the burden of establishing preemption.” *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

“Traditionally, there has been a presumption against preemption with respect to areas where states have historically exercised their police powers.” *New York SMSA Ltd. P’ship*, 612 F.3d at 104; *see also Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (“There is typically a presumption against preemption in areas of regulation that are traditionally

allocated to states and are of particular local concern.”). “A local government's legislative exercise of ‘historic police powers of the State [ ]’ is not to be superseded by a federal statute unless it was ‘the clear and manifest purpose of Congress’ to do so.” *New York SMSA Ltd. P’ship*, 612 F.3d at 104 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). But this presumption against preemption does not generally apply when a state regulates in an area “where there has been a history of significant federal presence.” *United States v. Locke,* 529 U.S. 89, 108 (2000).

**a. Field Preemption**

Kalshi first asserts that “Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation.”[48] Kalshi asserts that field preemption exists here based on the statutory text of the CEA, the statutory purpose of the CEA, the CEA’s drafting history, and the comprehensive nature of the regulatory scheme created by the CEA. Numerous federal courts have now considered these arguments, and the Court finds persuasive the reasoning of those decisions rejecting Kalshi’s claim that Congress intended the CEA to occupy the field.

Field preemption exists where a federal regulatory scheme is “so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it.” *Fid. Fed. Sav. & Loan Ass’n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (cleaned up). Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption “categories” “are not ‘rigidly distinct,’” and “‘field’ preemption may fall into any of the categories of express,

[48] ECF No. 30-1 at 19.

implied, or conflict preemption”). Congress’s intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm’n*, 461 U.S. 190, 203–13 (1983). Courts can also infer field preemption from a scheme of “federal statutory directives” that “provide a full set of standards . . . designed [to function] as a ‘harmonious whole.’” *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)). “Where Congress occupies an entire field . . . even complementary state regulation is impermissible.” *Id.*

First, Kalshi has not demonstrated that field preemption exists based on “the text and structure of the statute at issue.” *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Here, the CFTC’s “exclusive jurisdiction” with respect to “transactions involving swaps” on a DCM is limited by the CEA’s provision that “nothing contained in th[e] section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State.” 7 U.S.C. § 2(a)(1)(A). “This provision evinces Congress’ intent to leave room for states to regulate certain activities that may have otherwise been covered by the CEA.” *Williams*, 2026 WL 2017466, at *7.

Second, the structure of the CEA as a whole, and particularly Congress’ enactment of the Special Rule, demonstrates Congress’ “intent that some state law and regulation should operate in tandem with the CEA.” *Id.* Specifically, because the Special Rule provides the CFTC with authority to prohibit event contracts that are “contrary to the public interest” because they “involve . . . activity that is unlawful under any Federal or State law” or “gaming,” 7 U.S.C. § 7a-2(c)(5)(C)(i), the Special Rule’s “plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful.” *Martin*, 793 F. Supp. 3d at 680 (emphasis in original). Additionally, given that the power to regulate

gambling is a traditional police power exercised by Connecticut, as did the Southern District of New York, this Court "also declines to interpret the CEA's grant of exclusive jurisdiction as leaving no room for supplementary state legislation." *Williams*, 2026 WL 2017466, at *7 (cleaned up).

Next, "Congress' intended scope of preemption under the CEA is demonstrated in the Act's express prohibition of state regulation in certain contexts." *Id.* While not at issue here, Section 16 of the CEA, for example, displaces state gambling and bucket-shop laws as applied to transactions involving swaps in limited circumstances, including certain electronic trading facilities and agreements excluded or exempted from the CEA. 7 U.S.C. § 16(e)(2). It also provides that swaps may not be regulated as insurance contracts under state law. *Id.* § 16(h). "These provisions provide 'strong evidence' that when enacting § 2 of the CEA with a grant of exclusive jurisdiction to the CFTC, Congress did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps." *Williams*, 2026 WL 2017466, at *7 (quoting *Martin*, 793 F. Supp. 3d at 681). Had Congress intended to occupy the field with respect to the types of contracts at issue here, it could have expressly said so, as it did in other contexts under § 16. The absence of such language, coupled with the CEA's preservation of state authority and its recognition of concurrent state regulation in certain areas, weighs against a finding of field preemption.

Lastly, the Supreme Court has cautioned against interpreting ambiguous or obscure statutory language, divorced from its context, as conferring broad and transformative authority on the Executive Branch—what Justice Scalia famously described as "hiding elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The Court finds it unlikely that, through Dodd-Frank, Congress intended to displace the States' historic

police powers over sports betting and instead vest exclusive regulatory authority over such activity in the CFTC—a relatively small financial regulator with no historical role or particular expertise in regulating sports betting. The briefing does not identify, and the Court is not aware of, any congressional appropriation of funds or allocation of resources to the CFTC for the purpose of regulating sports betting, either at the time Dodd-Frank was enacted or at any point thereafter.

Taken together, the CEA's text, structure, and targeted preemption provisions demonstrate that Congress did not intend the statute to occupy the field of state regulation at issue here. Accordingly, Kalshi is unlikely to succeed on its field-preemption claim.

**b. Conflict Preemption**

Kalshi also asserts that Connecticut's gambling laws are conflict-preempted as applied to Kalshi, "because it would be 'impossible' for Kalshi 'to comply with both state and federal law,' and because Connecticut's laws stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in the CEA."[49] Defendants respond that Kalshi has not demonstrated that Connecticut's gambling laws would conflict with the CEA, or that they pose any obstacles to federal objectives.[50] The Court agrees and holds that Kalshi has failed to show a likelihood of success that conflict preemption applies in this matter.

"Conflict preemption of state law occurs where 'it is impossible for a private party to comply with both state and federal law' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Williams*,

---

[49] ECF No. 30-1 at 25 (quoting *Crosby*, 530 U.S. at 372–73).

[50] ECF No. 46 at 27–29.

2026 WL 2017466, at *7 (quoting *Crosby*, 530 U.S. at 372–73). "Federal law does not preempt state law under conflict preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 436 (2d Cir. 2024) (cleaned up). The "mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (cleaned up).

First, Kalshi has not demonstrated impossibility of compliance with both Connecticut gambling laws and the CEA. Kalshi claims that adhering to Connecticut's gambling laws would be impossible without violating the CFTC's requirement that a DCM provide "impartial access to its markets and services," because Kalshi would be required to limit access to its exchange to persons living only in Connecticut, which would be impossible for a nationwide platform such as Kalshi.[51] The Court does not agree. "The purpose of the impartial access requirement is to prevent DCMs from having certain discriminatory access requirements for their platform; it does not require DCMs to offer contracts nationwide." *Williams*, 2026 WL 2017466, at *8 (citing 17 C.F.R. § 38.151(b) (providing that impartial access includes "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner"); Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ("The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants.").

---

[51] ECF No. 30-1 at 28.

It is unclear why Kalshi could not seek out a license pursuant to Connecticut law and establish a category of Connecticut market participants that does not discriminate within the state. *See* 75 Fed. Reg. at 80579 ("A DCM can satisfy the requirement that membership and participation criteria are impartial, transparent, and non-discriminatory by establishing clear and impartial guidelines and procedures for granting access to its facilities and publishing such guidelines and procedures on its Web site. Such requirements may establish different categories of market participants, but may not discriminate within a particular category."); *Martin*, 793 F. Supp. 3d at 686 ("Kalshi's point is not a basis for holding that conflict preemption exists and that Maryland's laws are preempted simply because *not* obtaining a license limits Kalshi's geographical access . . . . So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland."); *KalshiEX LLC v. Schuler* (*"Schuler I")*, No. 25-CV-1165, 2026 WL 657004, at *9 (S.D. Ohio Mar. 9, 2026) ("Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'"). The fact that Connecticut law imposes an additional regulatory requirement on Kalshi does not, without more, establish a conflict with federal law. Because the two regimes can coexist, Kalshi's attempt to evade Connecticut's requirements fails.

Nor has Kalshi demonstrated that Connecticut's gambling laws frustrate Congress' objectives underpinning the CEA or serve as an obstacle to the CEA's regulatory scheme. Kalshi contends that "once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with

federal law."[52] Penalties imposed by Connecticut's criminal law, Kalshi continues, "substantially interfere with the CFTC's discretion."[53]

The Court, again, disagrees. "The mere fact that state laws . . . overlap to some degree with federal . . . provisions does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211. "Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute [state offenses] is entirely consistent with federal interests." *Id.* at 212. As Defendants point out, the CFTC itself "has *banned* the conduct that the State law seeks to address [when it] expressly outlawed contracts on conduct 'that involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal Law,' 17 C.F.R. § 40.11(a)(1), or activity that is similar thereto, *id.* § 40.11(a)(2)."[54] Kalshi's conduct thus appears unlawful under the scheme that Kalshi claims protects it from regulation by state law.

Additionally, as previously discussed, the CEA's text and structure, as well as the historical context of Connecticut's interest in regulating gambling through its police power, demonstrate that Congress did not intend to preempt all state actions that may relate to DCMs. The "objectives behind federal commodities regulation include standardization, stability, and prevention of unlawful and abusive conduct in the nation's derivatives markets, while Dodd-Frank specifically concerned itself with ensuring the integrity and accountability of the

---

[52] ECF No. 30-1 at 27.

[53] *Id.* at 27.

[54] ECF No. 46 at 29.

marketplace for swaps."[55] Far from determining that a likely conflict exists, the Court holds that "Connecticut gaming law is harmonious with those objectives."[56]

Lastly, "although Kalshi can list any contract that it self-certifies, its self-certification is not tantamount to a declaration that the contract is lawful." *Williams*, 2026 WL 2017466, at *9. It is ultimately the CFTC that holds the authority to conduct a review and determine whether a sports-event contract listed by Kalshi is legal. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Though the CFTC has not subjected any of Kalshi's contracts to such a review, "the agency's inaction is not proof that the sports-event contracts are regulated by or permissible under the CEA—and the Court has concluded they are not." *Schuler I*, 2026 WL 657004, at *9.

Accordingly, the Court holds that Connecticut's gambling laws complement rather than conflict with federal law. Because Kalshi has not demonstrated a likelihood of success on its preemption claim, this factor weighs against granting a preliminary injunction.

**B. Irreparable Harm**

Plaintiff has not demonstrated that in the absence of the injunction it seeks, it is likely to suffer an irreparable harm that cannot be otherwise remedied. In order to satisfy the irreparable harm requirement, a plaintiff must "demonstrate that absent a preliminary injunction [it] will suffer an injury that is . . . actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary

---

[55] *Id.*

[56] *Id.*

circumstances." *Moore v. Consol. Edison Co. of N.Y.,* 409 F.3d 506, 510 (2d Cir. 2005). "Irreparable harm may be found where damages are difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

Kalshi argues that if it chooses not to comply with the DCP's cease-and-desist letter, it will face "the extraordinary harms associated with the threat of civil liability and criminal prosecution."[57] Next, it claims that compliance "would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation," including the loss of business from its more than 24,000 Connecticut users and millions of dollars in open investments, the substantial time and expense of implementing state-specific geolocation capabilities, and unrecoverable economic losses due to Connecticut's Eleventh Amendment immunity.[58] Finally, Kalshi argues that an injunction is necessary to prevent disruption to its users' existing contracts and the broader market, as well as to avoid irreparable harm to Kalshi's reputation, goodwill, and continued status as a CFTC-designated contract market.[59]

Although the prospect of criminal prosecution can, in appropriate circumstances, support a finding of irreparable injury, *see Black v. Cakor Rest., Inc.*, No. 22-CV-1447, 2022 WL 17689840, at *6 (S.D.N.Y. Dec. 15, 2022), Kalshi has not demonstrated that such harm is actual and imminent here. As Defendants note, the DCP lacks independent authority to initiate criminal prosecutions, and any potential criminal enforcement remains speculative.[60] Moreover, any civil penalties imposed on Kalshi may be challenged and vacated should Kalshi

---

[57] ECF No. 30-1 at 29.

[58] *Id.* at 29–30; *see also* ECF No. 82 at 13:15–20.

[59] ECF No. 30-1 at 30–31.

[60] ECF No. 46 at 30.

ultimately prevail on the merits. As in *Hendrick*, the Court concludes that Kalshi's asserted injuries "are largely monetary" and thus do not constitute irreparable harm. *Hendrick*, 817 F. Supp. 3d at 1035.; *see also Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (holding that where "monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm").

Nor has Kalshi shown that its asserted compliance costs constitute irreparable harm. Its claimed injuries—including the expense of implementing state-specific geolocation capabilities and lost business in Connecticut—are the type of "ordinary compliance costs [that] are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)). Defendants also persuasively argue that these asserted harms are, to a significant extent, self-inflicted, as Kalshi continued offering sports-event contracts despite repeated regulatory warnings and adverse judicial decisions rejecting similar preemption arguments.[61] Additionally, Kalshi represented at oral argument that geofencing in one state, such as Connecticut, "effectively means geofencing everywhere."[62] But courts in other states have already directed Kalshi to cease offering its sports-event contracts in those jurisdictions.[63] To the extent Kalshi will comply with these orders by August 12—as it has already indicated it will in Nevada,—it will have already implemented geofencing restrictions in those states. Accordingly, requiring Kalshi to restrict access in Connecticut would appear unlikely to impose the substantial additional costs Kalshi discusses.

---

[61] *Id.* at 31.

[62] ECF No. 82 at 12.

[63] *See* Section I.C, *supra*.

Finally, Kalshi has not offered evidence that the CFTC is likely to revoke its designation as a DCM if it complies with Connecticut law. As Defendants point out, Kalshi's assertion that the CFTC *could* take such action is speculative, particularly given that Kalshi has continued to litigate similar disputes in other states without any indication that the CFTC has sought to alter its designation.[64] Likewise, Kalshi's asserted reputational harms and alleged disruption to users and nationwide markets rest on predictions that are too conjectural to support a finding of irreparable injury. The Court finds that monetary damages here would be an adequate remedy. Accordingly, the Court concludes that the balance of the evidence weighs against a finding of irreparable harm.

**C. Balance of Equities and Public Interest**

The Court considers the balance of the equities between the parties and the public's interest together. *See Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025) ("With respect to the factors of the public interest and the balance of the equities, in a suit against the government, balancing of the equities merges into [the Court's] consideration of the public interest." (cleaned up)).

Kalshi argues that the "public has a first-order interest in ensuring that preempted Connecticut laws are not enforced against federally regulated entities."[65] Conversely, Kalshi says, "Defendants cannot show any harm as a result of being prevented from enforcing a statute until after a determination of its constitutionality."[66] And lastly, Kalshi contends, "[i]mmediate compliance with Connecticut law to avoid criminal penalties will harm Kalshi's users in

[64] *Id.*

[65] ECF No. 30-1 at 31.

[66] *Id.* at 32.

Connecticut and impose intractable technological difficulties on a very short timeframe.[67] Defendants respond that "the public has a significant interest in enforcement of laws and regulations that protect the public, specifically minors, from problem gambling and predatory advertising"; "the public has an interest in the revenue received from licensed sports wagering and the benefits therefrom."[68]

Defendants' interests in regulating gaming in Connecticut and ensuring that the DCP has the ability to effectuate statutes enacted to protect the public heavily outweigh the interests articulated by Kalshi. Particularly, the Court agrees that states have a strong interest in reducing "the social costs associated" with gambling, a "vice activity," *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 182, 185 (1999), and to promote the "welfare, safety, and morals" of their citizens. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003). Further, the public has a strong interest "in deterring predatory marketing targeted at Connecticut's youth . . . due to the clear risks to youths and others from sports betting."[69] Additionally, an injunction prohibiting Connecticut's ability to regulate Kalshi would substantially disrupt Connecticut's carefully crafted, decades-old regulatory scheme and prevent the State from enforcing its duly enacted gaming laws, resulting in significant irreparable harm to the State and the public interest. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) ("When

[67] *Id.*

[68] ECF No. 46 at 35–37.

[69] ECF No. 46 at 35 (citing Antonio Pequeno IV, Sports Gambling, Prediction Markets Could Lead to New Credit Risks for Young Men and Low Earners, Bank Warns, Forbes (Nov. 25, 2025)).

a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers) ("Any time [a state is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Lastly, the Court is not persuaded by Kalshi's argument that its users will suffer harm if it is made to unwind ongoing sports-event contracts. Kalshi has been on notice of the potential for state enforcement against its contracts since it began offering them. It has provided no disclosures or warnings to its users, and has instead continued to advertise itself as the "first app for legal sports betting in all 50 states." *Hendrick*, 817 F. Supp. 3d at 1020. Any resulting harm to Kalshi's approximately 24,000 Connecticut users from unwinding existing contracts does not outweigh the State's and the public's strong interests in enforcing Connecticut's gaming laws.

Accordingly, the balance of the equities and the public's interest weigh in favor of Defendants.

## III. <u>CONCLUSION</u>

"Kalshi characterizes its sports-related event contracts in various ways, but at bottom, they are sports wagers." *Hendrick*, 817 F. Supp. 3d at 1029. Kalshi itself has touted its platform as offering legal sports betting nationwide. But sports wagering has long been subject to state regulation pursuant to the states' police powers because of the significant public interests and risks associated with gambling. The Court declines to conclude either that these sports wagers are properly categorized as swaps and fall under the CFTC's authority, or that Congress clearly displaced Connecticut's traditional authority to regulate sports wagering and vested that

authority in the CFTC, an agency that has not historically regulated sports wagering and has not exercised meaningful oversight over Kalshi's sports event contracts.

For the foregoing reasons, the Motion is **DENIED**. Per the Court's previous order at ECF No. 48, the parties are ordered to file their Rule 26(f) Report on or before **August 24, 2026**. Defendants may respond to the Complaint in this matter on or before **August 31, 2026.**

**SO ORDERED.**

Hartford, Connecticut
August 7, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge