# 26-2239

## In the United States Court of Appeals for the Second Circuit

KALSHIEX LLC,
*Plaintiff-Appellant*

v.

BRYAN T. CAFFERELLI, ET AL.,
*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**DEFENDANTS-APPELLEES' MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR INJUNCTION PENDING APPEAL**

WILLIAM TONG
ATTORNEY GENERAL

Joseph Gasser
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
Ph: 860-808-5400
Fax: 860-808-5593
Email: joseph.gasser@ct.gov

August 24, 2026

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

STATEMENT OF THE CASE .......... 3

A. Connecticut Prohibits Unlicensed Gambling. .......... 3

B. The CEA Regulates Futures Contracts, Not Sports Wagers. .......... 4

C. Kalshi Offers Sports Wagers Disguised as Derivatives. .......... 6

D. Procedural History .......... 7

LEGAL STANDARD .......... 8

ARGUMENT .......... 9

A. Kalshi Fails to Make a Strong Showing on the Merits. .......... 9

1. Kalshi's sports wagers are not "swaps" under the CEA. .......... 10

2. Even if Kalshi's sports event contracts are swaps, the CEA does not preempt established State gambling laws. .......... 15

B. Kalshi Fails to Establish it will Suffer Irreparable Harm Absent an Injunction. .......... 21

C. The Equities and Public Policy Overwhelmingly Favor Defendants. .......... 24

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

### Cases

*Abbott v. Perez*, 585 U.S. 579, 602 (2018) .......... 24

*Agudath Israel of Am. v. Cuomo*, 980 F.3d 222 (2d Cir. 2020) .......... 9

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) .......... 16

*American Agriculture Movement v. Board of Trade*, 977 F.2d 1147 (7th Cir. 1992) .......... 20

*Arizona v. United States*, 567 U.S. 387 (2012) .......... 19

*Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423 (2d Cir. 2024) .......... 19

*Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 817 F.3d 433 (2d Cir. 2016) .......... 11, 12

*Bond v. United States*, 572 U.S. 844 (2014) .......... 13

*Ciampittiello v. Campitello*, 134 Conn. 51 (1947) .......... 3

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) .......... 14

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) .......... 17

*KalshiEX LLC v. Schuler*, No. 26-3196, 2026 U.S. App. LEXIS 12260, at *1 (6th Cir. Apr. 24, 2026) .......... 7, 9, 14

*KalshiEX, LLC v. Flaherty*, 174 F.4th 220 (3d Cir. 2026) .......... 12

*Kansas v. Garcia*, 589 U.S. 191 (2020) .......... 17

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) .......... 19

*Maryland v. King*, 567 U.S. 1301 (2012) .......... 24

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .................................. 16, 17

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353 (1982)....

*Murphy v. NCAA*, 584 U.S. 453 (2018) ................................................ 14

*N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79 (2d Cir. 2017) 15

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97 (2d Cir. 2010) ............................................................................................... 15

*Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93 (2012) ............................ 10

*Rodriguez by Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1998)......... 21

*SEC v. McCarthy*, 322 F.3d 650 (9th Cir. 2003) .................................... 11

*Spieser v. Randall*, 357 U.S. 513 (1958) ................................................ 18

*State v. Harbourne*, 70 Conn. 484 (1898) ................................................. 3

*Tom Doherty Assocs. v. Saban Entm't Inc.*, 60 F.3d 27 (2d Cir. 1995)... 22

*U.S. v. Phillips*, 155 F.4th 102 (2d Cir. 2025) ...................................... 4, 5

*Walden v. Kosinski*, 153 F.4th 118 (2d Cir. 2025) ............................... 8, 9

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001) .......................... 13

*Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274 (2018) .................. 10

## Federal Statutes


7 U.S.C. § 16(e)(2) .......... 17
7 U.S.C. § 16(h) .......... 17
7 U.S.C. § 1a(47)(A)(ii) .......... 5, 10
7 U.S.C. § 2(a) .......... 15
7 U.S.C. § 2(a)(1)(A) .......... 17
7 U.S.C. § 7a-2(c)(1)-(5) .......... 6
7 U.S.C. § 7a-2(c)(5)(C)(i) .......... 6
7 U.S.C. § 7a-2(c)(5)(C)(i)(I) .......... 18
18 U.S.C. § 1084(a) .......... 14
25 U.S.C. § 2710(d)(1)(C) .......... 14
28 U.S.C. § 3702(1) .......... 14
Pub. L. No. 93-463, 88 Stat. 1389 .......... 5


## State Statutes


C.G.S. § 12-850 *et seq* .......... 4
C.G.S. § 52-553 .......... 4
C.G.S. § 53-278a(2) .......... 4
C.G.S. § 53-278b .......... 3
C.G.S. § 53-278g(a) .......... 4


## Federal Regulations


17 C.F.R. § 38.151(b) .......... 19
17 C.F.R. § 40.11(a)(1) .......... 6

## PRELIMINARY STATEMENT

Plaintiff-appellee KalshiEX LLC ("Kalshi") offers a multi-billion-dollar "prediction market," where users trade "event contracts" based on their beliefs about whether things will happen. Since January 2025, Kalshi has used its platform to offer sports wagers in violation of Connecticut law. After Connecticut regulators sent Kalshi a cease-and-desist letter, Kalshi sued Defendant-appellee State officials ("Defendants")[1] in the U.S. District Court for the District of Connecticut on December 3, 2025, claiming federal preemption and seeking a preliminary injunction.

On August 10, 2026, the District Court denied Kalshi's motion, prompting this appeal. [ECF 94][2] ("Op."). The court held that Kalshi failed to establish any of the elements for a preliminary injunction, specifically finding that Kalshi is unlikely to succeed on its theory that only the Commodity Futures Trading Commission (CFTC) can regulate

---

[1] Defendants are Bryan T. Cafferelli, Commissioner of the Connecticut Department of Consumer Protection; Kristofer Gilman, Director of Gaming for the Department of Consumer Protection; William Tong, Attorney General of Connecticut, in their official capacities; and Connecticut Department of Consumer Protection.

[2] "ECF" citations are to the District Court docket; "Dkt." citations are to this Court's docket.

its sports wagers. On August 15, 2026, the District Court denied Kalshi's motion for an injunction pending appeal. [ECF 99.] On August 17, Kalshi filed the instant motion for injunction pending appeal ("Motion"). This Court denied emergency relief and referred the matter to a three-Judge panel [Dkt. 28.1], as it did with Kalshi's similar motion in *KalshiEX LLC v. Williams*, No. 26-1835.

The Court should deny Kalshi's Motion because Kalshi cannot meet the standard for a preliminary injunction, let alone the higher standard for an injunction in the first instance on appeal. Kalshi has not shown, let alone made a "strong showing," that it is likely to prevail on the merits, both because its sports wagers are not "swaps" under the Commodity Exchange Act and because even if they are, there is no indication that Congress intended federal commodity trading law to put them beyond the reach of state gambling regulators.

Kalshi fails to demonstrate that it will suffer irreparable harm if denied an injunction pending appeal. It tells a sky-is-falling story about lost revenue, reputational harm, and the specter of CFTC regulatory action, yet by its own account, its prediction market business is a

juggernaut despite a growing number of injunctions against it nationwide.

Finally, the equities and public policy weigh massively against Kalshi. Kalshi's purported interest in offering sports wagers unabated cannot compare to Defendants' established interests in enforcing duly enacted state gambling and consumer protection law to prevent illegal, unregulated wagering, and curb underage and problem gambling in Connecticut.

## STATEMENT OF THE CASE

### A. Connecticut Prohibits Unlicensed Gambling.

Connecticut regulates gambling pursuant to its inherent police powers and has done so for 250 years. State law evidences an "ancient and deep-rooted public policy" against unlawful wagering predating Connecticut's entry into the Union. *See Ciampittiello v. Campitello*, 134 Conn. 51, 56 (1947) (noting 1778 statute prohibiting wagering on horse races). "Since the establishment of our government[,] wagering has been held to be, if not absolutely immoral, yet so injurious in its results as to require suppression by penal legislation." *State v. Harbourne*, 70 Conn. 484, 490 (1898). Today, that legislation includes Connecticut General Statutes (C.G.S.) § 53-278b, which criminalizes "gambling" and

"professional gambling," and C.G.S. § 52-553, which voids unlawful wagering contracts.

In 2021, the Connecticut General Assembly created a narrow exception to these gambling prohibitions, establishing a tightly controlled, exclusive sports wagering market under the authority of Defendant Department of Consumer Protection (DCP). 2021 Conn. Acts, No. 21-23; C.G.S. § 12-850 *et seq*. Only wagering "authorized by" or "conducted pursuant to" this regulatory scheme is exempted from the prohibitions against gambling. *Id.* §§ 52-553; 53-278g(a); 53-278a(2). Kalshi is not licensed to offer sports wagers in Connecticut.

### B. The CEA Regulates Futures Contracts, Not Sports Wagers.

The basis of Kalshi's suit is its contention that its sports wagers, or "sports event contracts," are out of state regulators' reach because they are really futures contracts regulated under the Commodity Exchange Act (CEA). They are no such thing.

"The CEA was enacted during the Great Depression in response to concerns about manipulation, speculation, and other abuses that could arise from trading derivatives…." *U.S. v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (cleaned up). It aimed to help prevent fraud and guard against

dangerous speculation in futures on agricultural commodities like grain. *See generally Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 360-63 (1982) (tracing CEA's development). In 1974, the Commodity Futures Trading Commission Act created the CFTC and expanded the CEA's authority to include futures trading in virtually all commodities, including non-agricultural financial contracts. Pub. L. No. 93-463, 88 Stat. 1389. While the CEA's scope changed, its purpose—protecting against manipulation and rampant speculation in commodities markets—did not.

In 2010, with the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") Congress directly regulated swaps for the first time. The previous lack of regulation over swaps, particularly credit default swaps, has been described as a "Wild West" that contributed to the 2008 financial crisis. *Phillips*, 155 F.4th at 113. Dodd-Frank created a new definition for swaps in the CEA and generally entrusted their regulation to the CFTC. Swaps include certain event contracts—those, as relevant here, that involve the "occurrence, nonoccurrence, or the extent of the occurrence of an event" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

The CEA authorizes the CFTC to review the issuance of new swaps, allowing Designated Contract Markets (DCMs) like Kalshi either to petition for CFTC approval, or to offer them after self-certifying that they comply with the CEA. 7 U.S.C. § 7a-2(c)(1)-(5). The CFTC has not pre-approved any sports event contracts for trading on DCMs.

Dodd-Frank also created a special rule governing the issuance of event contracts ("Special Rule"). 7 U.S.C. § 7a-2(c)(5)(C)(i). It permits the CFTC to prohibit event contracts involving, *inter alia*, "activity that is unlawful under any Federal or State law," and "gaming." *Id.* Based on that authority, since 2011, the CFTC has outright prohibited "list[ing] for trading or accept[ing] for clearing" such contracts. 17 C.F.R. § 40.11(a)(1), (2).[3]

## C. Kalshi Offers Sports Wagers Disguised as Derivatives.

Kalshi self-certifies that its event contracts are swaps. The sports wagers at issue here are anything but.

---

[3] Defendants note that on June 12, 2026, 15 years after the promulgation of § 40.11, the CFTC issued a Notice of Proposed Rulemaking indicating that it now does not believe the Special Rule "authorize[s] the Commission to impose a *per se* prohibition on the listing of such event contracts independent of a public interest determination." Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35806, 35813 (June 12, 2026).

Since January 2025, Kalshi has used its prediction market to offer contracts relating to the outcomes of, and miscellaneous happenings during, sporting events. As the District Court explained:

> These sports-event contracts allow users to place positions on[,] for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship. But they may also ask: "Will Michigan win by more than 7.5 points? Or will Michigan and UConn score more than a combined 144.5 points? Or will a specific player score more than 10 points? Or pretty much anything else that might happen during a sporting event."

[ECF 94 at 6] (cleaned up) (quoting *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 U.S. App. LEXIS 12260, at *6 (6th Cir. Apr. 24, 2026)). In other words, Kalshi's "sports event contracts" are substantively indistinguishable from wagers made every day at licensed sportsbooks.

On December 2, 2025, DCP sent Kalshi a cease-and-desist letter, advising that its unlicensed offer of sports wagers violated Connecticut law. This suit followed.

**D. Procedural History**

Kalshi filed this suit on December 3, 2025 [ECF 1] and a preliminary injunction motion on December 5 [ECF 30]. The District Court denied that motion on August 10, 2025. [ECF 94.]

The District Court concluded that Kalshi failed to show it was likely to succeed on the merits because its sports event contracts are not "swaps" under the CEA, Op. § II.A.1., but even if they are, the CEA does not preempt states' longstanding police powers over illegal gambling so as to prevent their regulation, *id.* § II.A.2. It further concluded that Kalshi's claims to irreparable harm were either monetary in nature, and therefore not irreparable, or were speculative, and that the purported harm is largely self-inflicted. *Id.* § II.B. Finally, the District Court held that Defendants' interests in enforcing duly enacted state law "heavily outweigh the interests articulated by Kalshi." *Id.* § II.C.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Walden v. Kosinski*, 153 F.4th 118, 134 (2d Cir. 2025) (cleaned up). "[A]n injunction issued in the first instance by an appellate court....demands a significantly higher justification than a request for a stay because, unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts." *Agudath Israel of*

*Am. v. Cuomo*, 980 F.3d 222, 226 (2d Cir. 2020). Even to obtain a stay pending appeal, "more is required [than a preliminary injunction in the District Court], including a strong showing that the movant is likely to succeed on the merits." *Id.* (cleaned up).

Where an appellant "seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," it "must demonstrate a clear or substantial likelihood of success on the merits," that it is "likely to suffer irreparable harm" without an injunction, that the "balance of the equities tips in [its] favor," and that an "injunction serves the public interest," *Walden*, 153 F.4th at 134.

## ARGUMENT

Kalshi has not shown that it is entitled to the extraordinary and drastic relief of an injunction against Defendants pending appeal.

### A. Kalshi Fails to Make a Strong Showing on the Merits.

Kalshi's merits arguments are largely recycled from those made below and rejected by the District Court, as well as those rejected by the Sixth Circuit Court of Appeals, *KalshiEx, LLC v. Schuler*, No. 26-3196, 2026 U.S. App. LEXIS 12260, at *1 (6th Cir. Apr. 24, 2026), and District Courts across the country. Its preemption theory requires two things to

be true: (1) its sports wagers are "swaps" under the CEA, and (2) by adding swaps to the CEA in Dodd-Frank, Congress intended to completely preempt state laws as applied to Kalshi's sports wagers. Neither of these conditions is true.

**1. Kalshi's sports wagers are not "swaps" under the CEA.**

Kalshi's suit rises and falls with its claim that a wager on, *e.g.*, the winner of a sporting event, the number of points scored in a game, or an individual athlete's statistical achievements is a "swap" under the Dodd-Frank amendments to the CEA. But Kalshi offers no persuasive explanation of how that can be true.

A "swap" includes "any agreement, contract, or transaction…that provides for any purchase, sale, payment, or delivery…that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The Court must, as the District Court did, interpret the undefined terms "occurrence," "event," and "potential…consequence" "consistent with their ordinary meaning at the time Congress enacted the statute," *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up), doing so in context, not in

a "vacuum," *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). It must "attempt to give effect to the plain meaning of each word," *Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016), respecting Congress's intention that different words convey different meanings, *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003).

<u>"Occurrence of an event."</u> Kalshi urges the Court to ignore the usual interpretive rules and conclude, notwithstanding Congress's use of the separate terms "occurrence" and "event," that "occurrence" means "[v]irtually any event," Mot. 26,[4] including anything that happens in connection with a sporting event. As the District Court recognized, muddling these statutory terms would sweep in "every outcome" imaginable, Op. 16, and "depart from the ordinary meaning of the term" "event," *id.* at 17. The court's conclusion that a sporting "event" is the "sporting event itself," not the outcome of that event, respects the plain language of the definition and does not create an unreasonable or unworkable outcome.[5]

---

[4] Page numbers refer to the ECF system's automatic numbering.
[5] In claiming that the court's interpretation is "impossible to apply" because it held that "no sports events carry even potential economic

Defendants note that the *Flaherty* decision, on which Kalshi relies, does not appear even to consider the CEA's requirement of the "occurrence" of an "event." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227-28 (3d Cir. 2026), gravely undermining its persuasive value.

"Potential financial, economic, or commercial consequence."

Kalshi similarly fails to show that its sports wagers are "associated with a potential financial, economic, or commercial consequence." It rejects the District Court's requirement of an "embedded" or "inherent" potential consequence, Op. 20, but its alternative makes a mockery of statutory interpretation principles. To Kalshi, "*any prospect* of financial consequences" is sufficient. Mot. 27 (emphasis added). But virtually any event in the universe has *some* prospect of a financial consequence. The Court cannot assume, as the District Court did not, that Congress intended a "limitless" interpretation that would ignore the "consequence" requirement. *Assocs. Against Outlier Fraud*, 817 F.3d at 437.

The absurd implications of Kalshi's interpretation confirm its implausibility. Kalshi's "limitless" definition requires finding that

---

consequences," Mot. 27, Kalshi attacks a straw man. The court's holding went as far as "contracts that depend on a sporting event outcome or an in-game occurrence," no further. Op. 17 n.38.

Congress intended Dodd-Frank to turn contracts based on "virtually any event" with "any prospect" of a financial ripple effect into swaps that, on Kalshi's theory, may *only* be regulated by the CFTC. That premise, of course, sweeps in wagers offered by licensed sportsbooks, as well as wagers on poker, casino games, and online games. *See* Op. 19-20. Kalshi brushes off this conclusion by claiming that what matters is whether the transaction occurs on a DCM, Mot. 28-29, so that its wagers are swaps but these others are not. But its argument is self-defeating: the backbone of Dodd-Frank's swaps regulation is that retail swaps *must* be traded on DCMs, 7 U.S.C. § 2(e), to avoid another "Wild West."

If Kalshi's definition is taken seriously, then Dodd-Frank's "swap" definition completely federalized gambling regulation, replacing the states with the CFTC as regulator without anyone noticing for 15 years, including the CFTC. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes"); *see also Bond v. United States*, 572 U.S. 844, 858 (2014) (requiring Congress be "reasonably explicit" when displacing well-settled state authority); *see also* Former CFTC Chairman Gary Gensler's Brief as Amicus Curiae in Support of Defendants-Appellees at 10, No. 55, *KalshiEx, LLC v. Schuler*,

No. 26-3196 (6th Cir.) ("Gensler Br.") (Exhibit A) (noting Kalshi's position that Dodd-Frank "made the CFTC a nationwide sports betting regulator," and responding "The answer—from someone who was there—is that Congress did nothing of the sort.")

Kalshi's interpretation also creates unnecessary and bizarre conflicts between the CEA and multiple federal laws that restricted or outlawed gambling when Congress defined swaps. The Wire Act of 1961 criminalized interstate sports wagering altogether. 18 U.S.C. § 1084(a). The Professional and Amateur Sports Protection Act, 28 U.S.C. § 3702(1), generally prohibited states from permitting sports wagering until *Murphy v. NCAA*, 584 U.S. 453 (2018) overturned it. The Indian Gaming Regulatory Act privileges gaming permitted by compacts between states and Indian tribes. 25 U.S.C. § 2710(d)(1)(C). Dodd-Frank mentioned *none* of these laws, yet Kalshi's position requires finding that its swap definition, which elevates sports wagers to futures contracts, impliedly repealed all of them. The Court must resist this outcome at all costs. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

Thus, Kalshi offers no reason to disturb the Court's well-reasoned decision that its sports wagers are not "swaps," meaning there is no basis for preemption.

**2. Even if Kalshi's sports event contracts are swaps, the CEA does not preempt established state gambling laws.**

Kalshi urges this Court to hold that the "exclusive jurisdiction" provision in 7 U.S.C. § 2(a) completely deprives state gambling regulators of their authority over sports wagers offered on DCMs. Kalshi offers no basis to conclude that Congress intended this,[6] and in fact the legislative history confirms the opposite.

"The key to the preemption inquiry is the intent of Congress." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010). Kalshi faces a "heavy burden" to demonstrate preemption. *N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 86 (2d Cir. 2017). "In all pre-emption cases, and particularly those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were

[6] Nor does Kalshi demonstrate that so-called "sports event contracts" even existed when Dodd-Frank added swaps to the CEA.

not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (cleaned up).

Kalshi urges an all-or-nothing preemption analysis, asking whether the CEA "preempts state regulation of instruments traded on DCMs, Mot. 20, or even simply "whether the CEA preempts the application of state law." *Id.* at 21. The CEA clearly *can* preempt state law. But, as the District Court observed, that "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008); Op. 24. As Kalshi's preemption position would work a wholesale change of the federal-state balance in an area of well-settled state authority, the District Court was right to carefully analyze whether Congress intended specifically to preempt the historically state-dominated field of sports wagering regulation.

<u>Field Preemption.</u> Only in "rare cases" has "Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208

(2020) (cleaned up). It is plain from both the text of the CEA and the context that this is not such a case.

*First*, the text surrounding the "exclusive jurisdiction" provision does not support the sweeping preemption Kalshi claims. The CEA specifically *exempts* from preemption "the jurisdiction conferred on courts of…any State." 7 U.S.C. § 2(a)(1)(A). This clause is not subject to the "[e]xcept as hereinabove provided" proviso Kalshi notes, Mot. 30. The same section also preserves, to some extent, "the jurisdiction… conferred on…other regulatory authorities under the laws of…any State." Even if these provisions do not clearly articulate the exact extent to which state law is preserved, their existence means that Congress was not "clear and manifest," *Medtronic, Inc.*, 518 U.S. at 485, about its intent to preempt state law across the entire field. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (savings clauses "negate[] the inference that Congress 'left no room' for state causes of action").

Other provisions further undermine Kalshi's field preemption argument. Congress was careful to clearly articulate the CEA's preemptive scope as to, *e.g.*, insurance, 7 U.S.C. § 16(h), and bucket shops, *id.* § 16(e)(2), meaning it knew how to draw a bright line around

preempted state regulation when it wanted to. Kalshi offers no reason why, in contrast, Congress would upend the well-settled field of state-by-state regulatory landscape over gambling without clearly saying so. Indeed, Congress expressly *preserved* state law in the Special Rule. 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). Kalshi does not explain who, if not the States, is to say what is "unlawful activity under state…law." *See Spieser v. Randall*, 357 U.S. 513, 522 n.7 (1958) ("the construction of state laws is the exclusive responsibility of the state courts").

*Second*, the legislative history from Dodd-Frank (unlike the older and more general legislative history Kalshi cites, Mot. 13, 20-21) confirms the lack of intent to specifically preempt state wagering law. Dodd-Frank's drafters took pains to "prevent gambling through futures markets," and "protect the public interest from gaming contracts." 156 Cong. Rec. S. 5902, 5906 (statement of Sen. Lincoln); *see also* Gensler Br. 3 (explaining that "[n]o one working on Dodd-Frank…was attempting to put a curve ball by…Senate Majority Leader [Harry Reid of Nevada] to…preempt the Nevada Gaming Commission, a Commission Majority Leader Reid had chaired").

Conflict Preemption. Kalshi likewise fails to establish conflict preemption, which occurs only where "compliance with both federal and state regulations is a physical impossibility" or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (cleaned up). "Federal law does not preempt state law under conflict preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 436 (2d Cir. 2024) (cleaned up).

*First*, as the District Court held, Kalshi is wrong as a matter of law that the "impartiality" rule at 17 C.F.R. § 38.151(b) prevents compliance with State law. Op. 29-30. Notwithstanding CFTC's sudden and curious reversal of position here,[7] Mot. 24, it has been clear since 2010 that the purpose of this rule is to prevent "using discriminatory access requirements [based on net worth] as a competitive tool against certain

[7] As the District Court noted, no deference is owed to CFTC's guidance or litigation positions. [ECF 99 at 5.] The Court "must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024).

participants." Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80,572, 80,579 & n.51 (Dec. 22, 2010). Kalshi offers no authority for its assertion that ceasing offering sports wagers in one or more states requires violating the "impartiality" rule or any other federal provision. It also offers no evidence for its claim that it is impossible for it to obtain a license to offer sports wagers in Connecticut, Mot. 24. *See* Op. 30 ("It is unclear why Kalshi could not seek out a license pursuant to Connecticut law…").

*Second*, Kalshi's claim that applying state law conflicts with the CEA's "wholecloth" regulatory approach, Mot. 24-25, takes for granted that Congress intended to vest in the CFTC a federal regulatory function over sports wagering at all. As discussed above, it did not. For the same reason, Kalshi's (and the Third Circuit's) citation to *American Agriculture Movement v. Board of Trade*, 977 F.2d 1147 (7th Cir. 1992) is of limited persuasive value. The Seventh Circuit was not called upon to decide the subject matter over which CEA preemption extends; at issue were soybean contracts that were undisputedly within CEA's remit, and the court resolved, as relevant here, only the question of whether state

law causes of action arising out of those contracts were preserved. *Id.* at 1150.

Thus, Kalshi likewise fails to demonstrate that even if its sports wagers could qualify as "swaps," Congress intended to completely preempt their regulation under State gambling law.

**B. Kalshi Fails to Establish it will Suffer Irreparable Harm Absent an Injunction.**

Despite being the "single most important prerequisite for the issuance of a preliminary injunction," *Rodriguez by Rodriguez v. DeBuono*, 175 F.3d 227, at 233-34 (2d Cir. 1998), the irreparable harm prong receives a mere four paragraphs in Kalshi's brief. Mot. 32-34. The District Court, weighing all Kalshi's factual submissions, concluded that Kalshi's claims of "massive civil or even criminal liability" or "enormous and unrecoverable economic and reputational harm," Mot. 32-33, are speculative, exaggerated, or self-inflicted. Kalshi offers no reason to depart from the District Court's conclusions.

*First*, as to harm from civil or criminal penalties, the court already noted that Defendants "lack[] independent authority to initiate criminal prosecutions, and any potential criminal enforcement remains speculative," and that "any civil penalties imposed on Kalshi may be

challenged and vacated should Kalshi ultimately prevail on the merits." Op. 33-34. Kalshi's Motion simply ignores these points.

*Second*, Kalshi's claims of lost revenue or goodwill are speculative at best. Even after the Sixth Circuit denied Kalshi's motion for injunction pending appeal, Kalshi publicly boasted a staggering $22 billion valuation, claiming its "institutional trading volume has increased 800%" and that "Kalshi has emerged as the clear leader in the category, with over 90% of U.S. prediction market activity, as well as the majority of global volume."[8] These are not the claims of a company whose prediction contract offerings are meaningfully threatened by the lack of an injunction in Connecticut pending appeal, let alone one whose "very viability" is at stake. *Tom Doherty Assocs. v. Saban Entm't Inc.*, 60 F.3d 27, 38 (2d Cir. 1995).

Even if Kalshi suffers certain lost revenue as a result of ceasing offering unlicensed sports wagers in Connecticut, that harm would be self-inflicted. As the court noted, "Kalshi [has] continued offering sports-event contracts despite repeated regulatory warnings and adverse

[8] Kalshi News, Kalshi Raises $1 Billion at a $22 Billion Valuation as Institutional Adoption Accelerates (May 7, 2026), https://perma.cc/59Q7-2X36.

judicial decisions rejecting similar preemption arguments." Op. 34. Kalshi ignores this finding, too.

*Third*, Kalshi's claim to fear irreparable harm from CFTC action borders on the fanciful. Kalshi cites to a CFTC order that, in Kalshi's words, purports to "direct[] Kalshi to disobey a potential state-court TRO in New York." Mot. 34. As the District Court observed, such an order would be of no effect because "the CFTC lacks the authority to dictate an order that conflicts with" its decision and that of the Southern District of New York in the *Williams* matter, both of which predated the order. [ECF 99 at 5.] Even if the CFTC order were lawful, it does not threaten any regulatory harm to Kalshi if it complies with state law. As of this filing, Kalshi has already been ordered to implement geofencing measures to prevent users in at least Nevada, Michigan, and Washington from accessing certain event contracts (Exhibits B-D), yet fails to mention any repercussions from the CFTC as a result of complying with those orders.

Instead, it is Defendants, charged with enforcing duly enacted state law, who will be irreparably harmed if an injunction enters. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."

*Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"). The harm is particularly apparent here, where, as explained below, the laws at issue exist to protect Connecticut residents from the harms of illegal, unregulated wagering.

### C. The Equities and Public Policy Overwhelmingly Favor Defendants.

Finally, Kalshi cannot demonstrate that the balance of the equities and public policy warrant hampering Connecticut's enforcement of state law as to its sports wagers pending appeal. As the District Court noted, and Kalshi does not seriously dispute, Defendants have "interests in regulating gaming in Connecticut and ensuring that the DCP has the ability to effectuate statutes enacted to protect the public." [ECF 94 at 36.] As Defendants explained in detail below [ECF 46 at 35-37], Connecticut law protects the public as a whole, and specifically minors and those affected by problem gambling, through its carefully crafted sports wagering scheme. The State also loses significant revenue—including revenue to support youth and anti-problem gambling efforts—every day that Kalshi continues to siphon revenues away from

Connecticut's regulated gaming marketplace. *Id*. at 37. Kalshi does not, and cannot, explain how its interest in offering its sports wagers for commercial gain in Connecticut unhindered can override these critical public interests.

## CONCLUSION

The Court should deny Kalshi's Motion for extraordinary and drastic injunctive relief because it fails to carry its burden to establish a clear and substantial likelihood of success on the merits, that it will suffer irreparable harm absent an injunction, and that the public interest and balance of the equities favor an injunction.

Respectfully submitted,

COUNSEL FOR
DEFENDANTS-APPELLEES

WILLIAM TONG
ATTORNEY GENERAL

By: */s/ Joseph Gasser*
Joseph Gasser
Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
P: 860-808-5247
joseph.gasser@ct.gov

## CERTIFICATE OF COMPLIANCE

This filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,044 words, excluding the parts of the motion exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).

This filing also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been drafted in a proportionally-spaced typeface using Microsoft Word in Century Schoolbook font, 14-point type face.

Date: August 24, 2026

*/s/ Joseph Gasser*
Joseph Gasser

## CERTIFICATE OF SERVICE

I certify that on August 24, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Second Circuit by using the ACMS.

Date: August 24, 2026

*/s/ Joseph Gasser*
Joseph Gasser

# EXHIBITS

| **Exhibit** | **Title** |
|---|---|
| Exhibit A | Former CFTC Chairman Gary Gensler's Brief, *KalshiEX, LLC v. Schuler*, No. 26-3196 (6th Cir). |
| Exhibit B | Order Granting Plaintiff's Motion for Preliminary Injunction (Nevada First Judicial District Court) |
| Exhibit C | Order Granting Temporary Restraining Order (Michigan Circuit Court for the 30th Judicial District) |
| Exhibit D | Order Granting Plaintiff State of Washington's Amended Motion for Preliminary Injunction (Washington Superior Court) |

# EXHIBIT A

**Case No. 26-3196**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

KALSHIEX LLC,

*Plaintiffs-Appellant,*

v.

MATTHEW T. SCHULER, *et al.*,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Southern District of Ohio

---

**FORMER CFTC CHAIRMAN GARY GENSLER'S BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES**

---

Aitan S. Goelman
Alyssa Howard
Ross Slaughter
ZUCKERMAN SPAEDER LLP
2100 M Street NW, Suite 400
Washington, DC 20037
202-778-1800
agoelman@zuckerman.com
ahoward@zuckerman.com
rslaughter@zuckerman.com

Victor Suthammanont
Kostelanetz LLP
7 World Trade Center, 34th FL
New York, NY 10007
212-808-8100
vsuthammanont@kostelanetz.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTERESTS OF *AMICUS CURIAE* ..... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 3

ARGUMENT ..... 8

I. Structure, History, and Purpose Demonstrate Congress Did Not Regulate Sports Betting When It Amended the CEA in 2010. ..... 8

A. Federal Commodity Derivatives Regulation Prior to Dodd-Frank ..... 8

B. Dodd-Frank Was Aimed at the Causes of the Financial Crisis, Not Sports Betting. ..... 13

II. Sports Bets Are Not Swaps ..... 16

III. No One in Congress Called for Preempting State Gaming Laws, Nor Did Dodd-Frank Do So ..... 21

IV. The Special Rule Does Not Imply That Sports Bets Fall Within the Swaps Definition ..... 24

V. CFTC Lacks Experience and Appropriations to Regulate Sports Betting ..... 27

VI. Preemption Elephants Are Not Hidden in Definitional Mouseholes. ..... 28

CONCLUSION ..... 29

# TABLE OF AUTHORITIES

## CASES

*Alabama Ass'n. of Realtors v. Dep't. of Health & Hum. Servs.*, 594 U.S. 758 (2021) .....28

*Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236 (1905) .....9

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) .....27

*CFTC v. Banc de Binary*, No. 13-CV-00992 (D. Nev. Feb. 26, 2016).....18

*Ebu v. U.S. Citizenship & Immigr. Servs.*, 134 F.4th 895 (6th Cir. 2025)..... 7, 8, 16

*F.D.A. v. Brown & Williamson*, 529 U.S. 120 (2000) .....28

*Inv. Co. Inst. v. CFTC*, 720 F.3d 370 (D.C. Cir. 2013) .....8

*KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024) .....18

*King v. Burwell*, 576 U.S. 473 (2015) .....28

*Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026) .....28

*MCI v. A.T.&T.*, 512 U.S. 218 (1994) .....28

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) .....17

*Murphy v. N.C.A.A.*,
584 U.S. 453 (2018) ........ *passim*

*U.S. v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ........ 13, 14, 15

*Whitman v. Am. Trucking Ass'ns.*,
531 U.S. 457 (2001) ........ 7, 28

**STATUTES**

15 U.S.C. §78bb(a) ........ 22

28 U.S.C. § 3702(1) ........ 23

7 U.S.C. § 16(e) ........ 5, 11, 22

7 U.S.C. § 16(h) ........ 22

7 U.S.C. § 1a(18) ........ 5

7 U.S.C. § 1a(47) ........ 14, 15, 17, 18

7 U.S.C. § 1a(49) ........ 18

7 U.S.C. § 2(a)(1) ........ 28

7 U.S.C. § 5 ........ 4, 16

7 U.S.C. § 6(a) ........ 15

7 U.S.C. § 7a-2(c)(5)(C) ........ 24

7 U.S.C. § 27f(b) ........ 27

Commodity Futures Modernization Act of 2000,
Pub. L. No. 106-554, App. E, 114 Stat. 2763A-365 ........ *passim*

Commodity Futures Trading Commission Act of 1974,
Pub. L. No. 93-463, 88 Stat. 1389 ........ 9, 10

Futures Trading Practices Act of 1992,
Pub. L. No. 102-546, 106 Stat. 3590 ........ 10

Gramm-Leach-Bliley Act of 1999,
Pub. L. No. 106-102, 113 Stat. 1338 .......... 1, 2, 11, 14, 16

Interstate Wire Act of 1961,
Pub. L. No. 87-216, 75 Stat. 491 .......... 6

Professional and Amateur
Sports Protection Act of 1992,
Pub. L. No. 102-559, 106 Stat. 4227 .......... *passim*

Sarbanes-Oxley Act of 2002,
Pub. L. No. 107-204, 116 Stat. 745 .......... 1

**REGULATIONS**

17 C.F.R. § 40.11 .......... 6, 26

Exemption for Certain Swap Agreements,
58 Fed. Reg. 5587 (Jan. 22, 1993) .......... 10

Concept Release on the Appropriate
Regulatory Treatment of Event Contracts,
73 Fed. Reg. 25669 (May 7, 2008) .......... 12, 13, 19, 25

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap
Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
76 Fed. Reg. 29818 (May 23, 2011) .......... 20

Provisions Common to Registered Entities,
76 Fed. Reg. 44776 (July 27, 2011) .......... 26

Provisions Common to Registered Entities,
76 Fed. Reg. at 44785 (July 27, 2011) .......... 27

Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major
Swap Participant," "Major Security-Based Swap Participant" and" Eligible
Contract Participant,"
77 Fed. Reg. 30596 (May 23, 2012) .......... 20

Further Definition of “Swap,” “Security-Based Swap,” and “Security-Based Swap
Agreement”; Mixed Swaps; Security-Based Swap Agreement Recordkeeping
77 Fed. Reg. 48208 (August 13, 2012) .......... 20

De Minimis Exception to the Swap Dealer Definition,
83 Fed. Reg. 56666 (Nov. 13, 2018) ....................21

Policy Statement Concerning Swap Transactions,
54 Fed. Reg. 30694 (July 21, 1989) ....................10

**OTHER AUTHORITIES**

Board of Governors of the Federal Reserve System, *et al.*, *Joint Report on Retail Swaps* (Dec. 2001), https://perma.cc/MLA3-KJ39 ....................12

Carl Hulse, *Pentagon Prepares a Futures Market on Terror Attacks*, New York Times (July 29, 2003), https://www.nytimes.com/2003/07/29/us/threats-responses-plans-criticisms-pentagon-prepares-futures-market-terror.html ....................12

CFTC, *Comments for Proposed Rule 76 FR 29818*, https://comments.cftc.gov/publiccomments/CommentList.aspx?id=1032&ctl00_ctl00_cphContentMain_MainContent_gvCommentListChangePage=15 ....................20

CME Chapter 13, https://www.cmegroup.com/rulebook/CME/I/13.pdf ....................16

CME Group, Comment for Proposed Rule 75 Fed. Reg. 67282 at 6, (Jan. 3, 2011), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=26867&SearchText= ....................26

Department of the Treasury, *A New Foundation: Rebuilding Financial Supervision and Regulation* 46-48 (June 17, 2009), https://perma.cc/LVS6-6RCK ....................14

*Derivative*, Black's Law Dictionary (12th ed. 2024) ....................8

Financial Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (Jan. 2011), https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf ....................15

Fred R Bleakley, *Rate Swaps Draw Concern*, N.Y. Times (Feb. 7, 1985), https://www.nytimes.com/1985/02/07/business/rate-swaps-draw-concern.html ....................10

*Harry Reid,* Biographical Directory of the U.S. Congress, https://bioguide.congress.gov/search/bio/r000146 ....................3

Jewson and Brix, *Weather Derivative Valuation* (2005), https://perma.cc/KR7H-2UVB ....................11

John Bresnahan & Carrie Budoff Brown, *Lincoln Wall Street bill tacks left*, Politico, (Apr. 13, 2010), https://www.politico.com/story/2010/04/lincoln-wall-street-bill-tacks-left-035752 ....................25

Milla Jovanovic, *US Sports Betting in 2025 Reaches Record Highs, Driven by New York and Illinois*, SportsHandle (Feb 26, 2026), https://perma.cc/6JW7-D6X8....................7

Remarks of Chairman Gensler Before IMF Conference (March 20, 2013) https://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-137................9

156 Cong. Rec. S5906-07 (dailey ed. July 15, 2010)....................25

156 Cong. Rec. S2816 (daily ed. April 29, 2010)....................29

Testimony of CFTC Chairman Gary Gensler Before the House Financial Services Committee (July 22, 2009), https://www.cftc.gov/PressRoom/SpeechesTestimony/gensler-7 ....................14

Testimony of Chairman J. Christopher Giancarlo Before the Senate Committee on Appropriations Subcommittee on Financial Services and General Government (May 8, 2019), https://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo71 ....................27

Treasury Under Secretary Gary Gensler Testimony Before the House Committee on Banking and Financial Services (May 6, 1999), https://perma.cc/V5PS-V4LW.2

## INTERESTS OF AMICUS CURIAE

Gary Gensler served as Commodity Futures Trading Commission ('CFTC') Chairman from 2009 to 2014, as Securities and Exchange Commission ('SEC') Chair from 2021 to 2025, as Under Secretary and Assistant Secretary of the Treasury between 1997 and 2001, and as Senior Adviser to Senator Paul Sarbanes. Prior to his public service, *Amicus* gained extensive experience in finance and derivatives at Goldman Sachs for 18 years. *Amicus* is currently Professor of the Practice of Global Economics and Management and Professor of the Practice of Finance at the Massachusetts Institute of Technology Sloan School of Management and co-hosts the *Power and Consequences* podcast.[1]

During his government service, *Amicus* worked with Congress and negotiated on behalf of the Administration twice amending the Commodity Exchange Act ('CEA'), through the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ('Dodd-Frank') and the Commodity Futures Modernization Act of 2000 ('CFMA'). As Chairman, he led the CFTC's implementation of Dodd-Frank, including adoption of 67 rules, orders, and guidance. In other roles, he was directly involved in (a) completion of multiple SEC security-based swaps rules, (b) drafting of the Sarbanes-Oxley Act of 2002, and (c) drafting of the Gramm-Leach-Bliley Act

[1] Other than *Amicus* and his counsel, no party authored this brief in whole or in part or contributed money to the preparation or submission of this brief. The parties have consented to filing this brief.

('GLBA') swaps provisions. He also coordinated Treasury's response to the 1998 collapse of hedge fund Long-Term Capital Management (with its $1.3 trillion notional derivatives exposures).[2]

As a Goldman Sachs partner, *Amicus* oversaw fixed income, currency and derivatives trading in Japan and later led worldwide Controller and Treasury functions, including accounting, funding, and risk management for the firm's derivatives desks. He also advised the National Football League in 1990 on the sale of their broadcast rights.

*Amicus* submits this brief to share historical context for Dodd-Frank and CFMA in light of his direct involvement in their passage and the CFTC's regulatory implementation of Dodd-Frank. *Amicus*'s interest is to accurately describe the historical record of colleagues in the Executive Branch and Congress who worked on Dodd-Frank in the wake of the 2008 financial crisis, in particular the late Senate Majority Leader Harry Reid of Nevada.

[2] *See* Treasury Under Secretary Gary Gensler Testimony Before the House Committee on Banking and Financial Services (May 6, 1999), https://perma.cc/V5PS-V4LW.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case boils down to the question of what, if anything, Congress did in Dodd-Frank with regard to sports betting. Kalshi contends that, by encompassing some event contracts within the statutory definition of swap, Congress purposefully made the CFTC a nationwide sports betting regulator and denied states their traditional police power to regulate gaming, including sports betting. The answer—from someone who was there—is that Congress did nothing of the sort.

To put the argument in the plainest real-world terms: Senate Majority Leader Harry Reid of Nevada would never have consented to or passively accepted legislation displacing an activity so critical to his state's economy and politics by permitting sports betting only under CFTC auspices. No one working on Dodd-Frank—in the Executive Branch or Legislative Branch—was attempting to put a curve ball by the Senate Majority Leader to legalize a national sports-betting regime or preempt the Nevada Gaming Commission, a Commission Majority Leader Reid had chaired (1977–1981).[3] He would not have allowed it. Nor did Congress do so.

*First*, the structure, history, and purpose of federal commodity derivatives markets and laws have nothing to do with sports betting. Since the advent of derivatives markets in the United States in the 1850s, the purpose of such markets

[3] *See* Harry Reid, Biographical Directory of the U.S. Congress, https://bioguide.congress.gov/search/bio/r000146.

has been to enable farmers, ranchers, and merchants—and later traders in metals, energy, financial, and other commercial interests—to hedge price risk against market fluctuations. As Congress states in the CEA, "[t]he transactions subject to [this Act] are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks[,]" and "it is the purpose of [the Act] to serve [those] public interests." 7 U.S.C. § 5. These findings and purpose are core to understanding the scope and limits of Congress's design for federal regulation of derivatives markets.

In the 1980s, a new form of over-the-counter ('OTC') derivatives, swaps, developed for institutions to engage in customized bilateral hedging transactions. In 2000, after years of debates and uncertainties as to the legal status of swaps, Congress passed the CFMA so that swaps (and a limited category of event contracts) would not be subject to regulation as futures.

In the wake of the then-unregulated OTC derivatives market's contribution to the 2008 financial crisis, Congress and the Obama administration focused on reversing much of the CFMA and establishing a regulatory regime for swaps (including certain event contracts that CFMA incorporated in the definition of swap) in Dodd-Frank. In so doing, it prohibited non 'eligible contract participants' ('ECPs')[4] from entering into off-exchange swaps under 7 U.S.C. § 2(e)—meaning,

---

[4] An ECP is a financial, commercial or governmental entity or an individual that has

in effect, that "retail" participants may not enter into swaps except on CFTC-licensed exchanges.

*Second*, Congress did not include sports betting contracts within the statutory Dodd-Frank definition of swap. Such contracts do not fit the CEA's purpose or the statutory language defining swap, which focus on hedging economic risk. Sports bets are very rarely, if ever, about hedging. Moreover, if Kalshi were correct that sports bets were swaps, then *all* off-exchange retail sports bets since October 2012—in every state—have been illegal because under 7 U.S.C. § 2(e), non-ECP swaps *must* be traded on exchanges. There was no mention of sports betting during *Amicus's* fifty-four times testifying before Congress as CFTC Chairman, nor did anyone involved in drafting Dodd-Frank speak of making the CFTC a national sports-betting regulator. Further, none of the public comments on the joint CFTC/SEC rules further defining swaps and swaps dealers refer to sports betting contracts.

*Third*, nobody involved in Dodd-Frank's passage called for preempting states or their gaming commissions' authorities over sports betting. Congress could have, but did not, amend the CFMA's limited provision preempting state gaming laws (*see* 7 U.S.C. § 16(e)(2)) to cover event contracts or sports betting. Further, preempting state sports betting authorities would have nullified statutory schemes

---

over $10 million invested assets ($5 million if hedging). 7 U.S.C. § 1a(18).

(the Professional and Amateur Sports Protection Act ('PASPA') and the Interstate Wire Act of 1961) which in 2010 generally prohibited sports betting except for Nevada casinos and a few state lotteries. Yet none of the sophisticated parties involved in *Murphy v. NCAA*, 584 U.S. 453 (2018), claimed Congress had already gutted PASPA eight years earlier.

In a system where only Congress can preempt state authority, Kalshi's and the CFTC's position—that a private actor's self-certification or an Executive Branch agency's mere assertion of jurisdiction can preempt states' traditional police power—stands in stark contrast. Further, it is incorrect to argue that preemption would be limited to sports betting on federal exchanges and would not displace state-regulated sports betting.

*Fourth*, Dodd-Frank's "Special Rule," by text and design, does not define sports bets as swaps. The Special Rule's purpose was to give the CFTC authority to prohibit "agreements, contracts, or transactions" that involve "gaming," unlawful activity, terrorism, war, or assassination from being listed on regulated markets, which the CFTC did unanimously in 2011 through notice-and-comment rulemaking. 17 C.F.R. § 40.11(a). Thus, there is no conflict between federal and state laws preventing sports betting on DCMs. In light of PASPA, it would have made little sense for Congress to stealthily preempt state regulation of sports betting and shift

all regulatory authority to the CFTC to allow sports betting while providing the agency authority to ban gaming contracts.

*Fifth*, the CFTC did not ask Congress for staffing or appropriations to regulate millions of sports betting transactions either when Dodd-Frank passed or after *Murphy*, and it lacks the experience to do so.

*Sixth*, Congress does not make fundamental changes in the balance of state and federal power in isolated snippets of text. As the Court has said, Congress does not "hide elephants in mouseholes." *Ebu v. U.S. Citizenship & Immigr. Servs.*, 134 F.4th 895, 901 (6th Cir. 2025) (quoting *Whitman v. Am. Trucking Ass'ns.*, 531 U.S. 457, 468 (2001)). Preempting state authority over sports betting—an over $165 billion per year industry—has major implications for states' power to protect their residents.[5] It's not the kind of thing Congress hides in a subpart of a definition—a mousehole too small for the Supreme Court to notice in *Murphy*. If Dodd-Frank had preempted the states on sports betting, it would have been one of the biggest stories about Dodd-Frank at the time. But nobody ever mentioned it.

---

[5] *See* Milla Jovanovic, *US Sports Betting in 2025 Reaches Record Highs, Driven by New York and Illinois*, SportsHandle (Feb 26, 2026), https://perma.cc/6JW7-D6X8.

# ARGUMENT

## I. Structure, History, and Purpose Demonstrate Congress Did Not Regulate Sports Betting When It Amended the CEA in 2010.

To best understand the heart of this case, one must review the structure, history, and purpose of the CEA (a highly technical regulatory statute) and the changes Congress made in response to the 2008 financial crisis. *See Ebu*, 134 F.4th at 898.

### A. Federal Commodity Derivatives Regulation Prior to Dodd-Frank

#### 1. *Congress passed CEA and created CFTC to foster hedging and price discovery functions of derivatives.*

U.S. derivative markets developed in the 1850s as a way for farmers, when planting their fields, to get price certainty for their potential crops. Farmers and producers also benefited from prices established in a central market, rather than relying on competition for their crops among local merchants.

A "derivative" is a financial contract that derives its value from a "secondary source such as an underlying bond, currency, or commodity" or an underlying price or index. *Derivative*, Black's Law Dictionary (12th ed. 2024); *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013). Well-functioning derivatives markets are essential for end-users seeking to hedge future price risk and focus on what they do best—efficiently producing goods and services for the economy.

Hedging requires counterparties, often speculators hoping to profit from market risks that others want to hedge. As Justice Holmes explained, "[s]peculation

of this kind by competent men is the self-adjustment of society to the probable. Its value in well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 247 (1905).

Fostering hedging and price discovery functions has been at the heart of federal derivatives regulation for more than a century. In 1922, Congress passed the Grain Futures Act, finding that commodity futures were "affected with a national public interest," because they were used as "a basis for determining prices" and for "hedging . . . against possible loss through fluctuations in price." Pub. L. 22-331, § 3, 42 Stat. 998. Congress required futures in specified agricultural grains to be traded on exchanges "designated" by the Secretary of Agriculture. *Id.* § 4.

The purpose of facilitating commodity hedging carried over to the Commodity Exchange Act of 1936, which strengthened anti-fraud and anti-manipulation provisions and expanded the list of commodities to include certain non-grain commodities such as cotton, rice, mill feeds, butter, eggs, and Irish potatoes. Pub. L. 74-675, §§ 3, 5, 49 Stat. 1491.

In 1974, Congress amended the CEA to establish the CFTC and foster broader futures derivatives markets so commercial interests could hedge price risk in the metals, energy, and financial markets.[6] *See* Commodity Futures Trading

---

[6] Remarks of Chairman Gensler Before IMF Conference (March 20, 2013)

Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389. Importantly, it provided that contract markets were required to seek approval from the CFTC before listing new futures contracts. *See id.* § 207 (amending then Section 5 of the CEA). As amended, the CEA provided that all futures contracts were required to be traded on a designated contract market and gave CFTC exclusive jurisdiction over such contracts, except for specified federal and state authorities.

2. *Congress responds to the emergence of swaps with CFMA.*

In the early 1980s, a new form of derivatives contracts emerged as a way for institutions to engage in customized bilateral hedging transactions: swaps.[7]

To address questions about the legal status of swaps under the CEA, Congress passed the Futures Trading Practices Act of 1992, which granted the CFTC authority to exempt "any agreement, contract, or transaction" from the CEA's requirements. Pub. L. No. 102-546, § 502, 106 Stat. 3590. The CFTC shortly thereafter used that authority to exempt certain customized off-exchange swaps bilaterally negotiated between institutional investors. 58 Fed. Reg. 5587 (Jan. 22, 1993). As the OTC

---

https://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-137.

[7] *See Policy Statement Concerning Swap Transactions*, 54 Fed. Reg. 30694, 30695 (July 21, 1989) (describing swaps as "an agreement between two parties to exchange a series of cash flows"); Fred R Bleakley, *Rate Swaps Draw Concern*, N.Y. Times (Feb. 7, 1985), https://www.nytimes.com/1985/02/07/business/rate-swaps-draw-concern.html.

derivatives markets grew, though, debate continued (including through a 1998 CFTC concept release) as to if and how they should be regulated.[8]

In 2000, to provide legal certainty about the status of swaps, Congress passed the CFMA, which excluded swap transactions in excluded commodities between ECPs from CFTC regulation. *See* Pub. L. No. 106–554-Appendix E, §§ 103 & 105(b), 114 Stat. 2763A-365. The CFMA also added a new definition of "swap agreement" to the GLBA. *Id.* § 301 (adding GLBA § 206A). As a matter of legislative convenience, that amendment defined "swap agreement" to include, among other things, certain event contracts "associated with a potential financial, economic, or commercial consequence." *Id*. Congress included this language against a backdrop of the then-emerging market for OTC weather derivatives used to hedge weather-related commercial risks, including hurricanes.[9]

At the same time, Congress preempted the application of state laws that "regulate gaming or the operation of bucket shops" for an enumerated list of transactions, including swaps in excluded commodities entered into by ECPs. *Id.* § 117 (codified at 7 U.S.C. § 16(e)(2) (amended again in Dodd-Frank)). Congress did not exclude from CFTC jurisdiction nor preempt state laws with respect to 'retail'

---

[8] *See* Rose and Lane, *Lessons Learned? Brooksley Born & the OTC Derivatives Market*, Harvard Business School (2010), https://perma.cc/6RPT-9NGH.

[9] *See* Jewson and Brix, *Weather Derivative Valuation* (2005), https://perma.cc/KR7H-2UVB.

swap transactions. Instead, it directed the Federal Reserve, the Treasury, the CFTC, and the SEC to study "issues involving the offering of swap agreements to persons other than" ECPs, *id.* § 105(c), resulting in a 2001 Joint Report on Retail Swaps ('2001 Joint Report').[10] Nobody in the 2001 Joint Report suggested swaps be used for sports betting.

3. *The CFTC explored whether certain event contracts could function as options or futures while noting many event contracts were ill-suited for hedging or price discovery.*

In the aftermath of the September 11, 2001, attacks, in 2003, the Defense Department's Defense Advanced Research Projects Agency ('DARPA') proposed a Policy Analysis Market that would trade event contracts based on possible political developments in the Middle East. The opposition to markets involving assassination, terrorism and war was swift from Senators and members of President George W. Bush's administration.[11]

Subsequently, in 2008, the CFTC issued a "Concept Release on the Appropriate Regulatory Treatment of Event Contracts" ('2008 Concept Release') to address whether "financial agreements that may primarily function as information

[10] Board of Governors of the Federal Reserve System, *et al.*, *Joint Report on Retail Swaps* (Dec. 2001), https://perma.cc/MLA3-KJ39.

[11] *See* Carl Hulse, *Pentagon Prepares a Futures Market on Terror Attacks*, New York Times (July 29, 2003), https://www.nytimes.com/2003/07/29/us/threats-responses-plans-criticisms-pentagon-prepares-futures-market-terror.html.

aggregation vehicles" were within CFTC's jurisdiction. 73 Fed. Reg. 25669, 25670 (May 7, 2008). The word "swap" is nowhere to be found.

The CFTC recognized that most event contracts are not suited to the purposes of hedging and price discovery central to the CEA. The CFTC stated that event contracts "generally take the form of financial agreements linked to eventualities or measures that neither derive from, nor correlate with, market prices or broad economic or commercial measures." *Id.*

### B. Dodd-Frank Was Aimed at the Causes of the Financial Crisis, Not Sports Betting.

Trading in unregulated swaps boomed in the early 2000s, contributing to the 2008 financial crisis. *See United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025).

In the aftermath, Congress and the Executive Branch got to work on reforms that culminated in Dodd-Frank. A key administration focus was on reversing many of the CFMA's provisions and establishing a regulatory regime for swaps. In May 2009, Treasury Secretary Timothy Geithner sent and publicly released a letter to Senate Majority Leader Harry Reid with the Executive Branch's recommendations "to enable the government to regulate the OTC derivatives markets[,]" *e.g.*, swaps, to achieve four objectives, including promoting efficiency and transparency of the swaps markets, lowering systemic risk, preventing manipulation and fraud, and

ensuring that swaps "are not marketed inappropriately to unsophisticated parties."[12] *Amicus*, testifying to Congress many times, focused on the need for swaps markets reform, including central clearing, exchange trading and pre-trade transparency for standardized swaps as well as registration of swap dealers, post-trade transparency, and business-conduct rules for customized off-exchange swaps entered into by ECPs. Off-exchange non-ECP swaps were to be prohibited.[13]

In response, Congress passed comprehensive reforms in Title VII of Dodd-Frank. *Phillips*, 155 F.4th at 113. In defining "swap," the third prong of the CEA's resulting six-prong definition listed 22 types of agreements, contracts, or transactions commonly known as swaps—from interest rate swaps to commodity swaps. 7 U.S.C. § 1a(47)(A)(iii). Once again, as a matter of legislative convenience, the statutory swap definition included (from the original 2000 GLBA provisions, *supra* Section I.A.2) agreements not typically considered "swaps," i.e., (1) price-related options (put, call, cap, floor, collar, or similar option), *id.* § 1a(47)(A)(i), and (2) a limited category of event contracts "associated with potential financial,

---

[12] *See* Letter from Timothy Geithner, Secretary of the U.S. Treasury to Senator Harry Reid (May 13, 2009), https://perma.cc/QUG5-HTD4. *See also* Department of the Treasury, *A New Foundation: Rebuilding Financial Supervision and Regulation* 46-48 (June 17, 2009), https://perma.cc/LVS6-6RCK.

[13] Testimony of CFTC Chairman Gary Gensler Before the House Financial Services Committee (July 22, 2009), https://www.cftc.gov/PressRoom/SpeechesTestimony/gensler-7.

economic, or commercial consequences." *Id.* § 1a(47)(A)(ii). The best way to read subparagraphs (i) and (ii) is that, for consistent treatment, Congress added to the transactions regulated as "swaps" those options and event contracts that function similarly to the traditional swaps listed in subparagraph (iii) by facilitating hedging of commercial risk.

Moreover, Dodd-Frank notably did not define swaps as a subset of futures, which would have required *all* swaps to trade on Designated Contract Markets ('DCM'.) *See* 7 U.S.C. § 6(a). Rather, while allowing ECPs to trade customized swaps OTC, Congress extended the off-exchange futures prohibition to swaps traded by non-ECPs. *Id.* § 2(e). Further, Dodd-Frank regulated swaps dealers, mandated central clearing of certain swaps, and imposed reporting requirements on participants in the swaps market. *See Phillips*, 155 F.4th at 113.

Sports betting was not part of the 2008 financial crisis or the response to it.[14] Nowhere in the Executive Branch's list of priorities, in *Amicus*'s 54 appearances before Congress, in any statement of a member of Congress, or in the text of Dodd-Frank was there any indication Congress sought to revise sports betting regulation.

---

[14] *See* Financial Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (Jan. 2011), https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

## II. Sports Bets Are Not Swaps.

Kalshi treats the swap definition as if it includes sports betting, or at least sports bets listed on a DCM.[15] That reading, though, is inconsistent with the purpose of the CEA, the statutory context of the swap definition, and the regulatory understanding of the relationship between sports bets, events contracts, and swaps.

As discussed, the purpose of the CEA is to improve commodities markets by facilitating hedging and price discovery. "[T]ransactions subject to" the CEA "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Extending the definition of swap to include sports betting does not serve those purposes. Nor, at the time of Dodd-Frank, were sports bets "entered into regularly in interstate and international commerce." *Id.*

When Congress used language for the CEA swap definition originally adopted in GLBA in 2000 , it had no reason to think that the definition of "swap" in GLBA included sports betting. *See supra* Sections I.A.2 and I.B. That GLBA definition as carried forward to the CEA reflects the purposes of hedging and price discovery common to the CEA's regulatory scheme.

[15] Kalshi is mistaken that CFTC's exclusive jurisdiction extends to "any instrument" listed on a DCM. (Opening Br. for Appellant at 31, 45). DCMs can and do list contracts other than futures, options and swaps. *See, e.g.,* CME Chapter 13, https://www.cmegroup.com/rulebook/CME/I/13.pdf.

Nevertheless, Kalshi now contends that § 1a(47)(A)(ii) includes sports bets. Each prong of § 1a(47)(A), though, must be considered in relation to the other subparagraphs as well as the history and purpose of derivatives legislation—hedging economic risks, principally related to price. Kalshi's alternative reading of subparagraph (ii) makes the list of swaps in subparagraph (iii) superfluous, because the event-contract category would be so broad that it would include the entire list. *See* Br. of Appellees ("Ohio Br.") at 31-32.

The CFTC (*Amicus* Br. of CFTC at 13) now posits hedging theories for some sports bets that are at best only tenuously connected to reliable hedges of commercial risks. That connection, however, is crucial, as Congress included only those event contracts that hedge risks in a manner similar to a swap and are sufficiently "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Read otherwise, there would be no limiting principle on the statutory language. Congress did not consider bets on outcomes of sporting events, how many points a player would score in a quarter, or sportsbook-style parlays to be swaps. These contracts do not have hedgers meeting speculators to lay off risk. *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357–58 (1982). Indeed, Kalshi itself said as much to the D.C. Circuit, conceding that "at least in

general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest."[16]

Moreover, sports bets, even if labeled "binary options" by some, don't meet § 1a(47)(A)(i)'s definition "put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value" because they are not for a holder to purchase or sell a commodity nor based on a price.[17]

Further, nothing in the statutory definition of swap (or the "further definition" rules, *see infra*) limits the scope to agreements between two customers rather than between a customer and the "house."[18] In fact, Congress specifically provided that the "house," i.e., a party making markets in swaps—like a casino does if sports bets were to be considered swaps—be regulated as a swap dealer. *See* 7 U.S.C. § 1a(49)(A) (defining "swap dealer" as any person who, among other things, "makes a market in swaps" or "regularly enters into swaps with counterparties as an ordinary course of business for its own accounts"). Nor does the CEA swap definition depend

---

[16] Brief of Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

[17] The CFTC has asserted jurisdiction over true binary options, contracts that bundle opposing option positions that allow a purchaser to choose between opposing outcomes. True binary options, unlike Kalshi's sports betting contracts, involve a right to buy or sell an asset, or are based on a price. *See* Consent Order, *CFTC v. Banc de Binary*, No. 13-CV-00992 (D. Nev. Feb. 26, 2016).

[18] The CFTC does not join Kalshi in arguing that sports betting against a house is not a swap.

on the venue in which it is entered into—on-exchange or off-exchange. It is the terms of the instrument, not the type of counterparties that enter into it or the venue in which it is entered, that determines whether it is a swap.

More jarring, as noted, 7 U.S.C. § 2(e) makes it "unlawful" for any person (other than ECPs) to enter into swaps other than on a DCM. If *Amicus*, Ohio, and 38 other states are wrong, and Congress swept sports betting into the swap definition, then *all* off-exchange retail sports bets since October 2012 have been illegal. That is every sports wager placed in a casino, on an online sports book, or between two friends at a bar. This would include sports wagers ostensibly permitted by PASPA. *See Murphy*, 584 U.S. at 462. Moreover, somehow, everybody—every Nevada casino and sportsbook, the Supreme Court in *Murphy*—missed this for at least a decade. Stating the proposition demonstrates its unlikelihood.

The regulatory history also precludes the broad reading. In the 2001 joint report to Congress on retail swaps, the Federal Reserve, Treasury, CFTC, and SEC—based in part on market participant interviews—didn't mention sports betting as a potential use of swaps.[19] When the CFTC in 2008 examined event contracts, it considered whether they might be structured as options or futures with no mention of swaps. 73 Fed. Reg. at 25671.

---

[19] *See infra* n. 10.

In 2012, when the CFTC and SEC issued two mandated joint rules further defining swaps and swap dealers, none of the comments suggested that swaps could be used for sports betting. *See* 77 Fed. Reg. 30596 (May 23, 2012). In further defining swap, the Commissions excluded, among other things, certain consumer and commercial agreements, insurance contracts, and forward contracts. *See* 77 Fed. Reg. 48208 (Aug. 13, 2012).

Yet, of all of the comments received during the joint rulemaking process, seeking to exclude certain types of transactions from the swap definition, none contain the word "sport," "sports," or "gamble."[20] And event contracts were only mentioned once in the rule—in a footnote related to credit default swaps. *Id.* at 48273 n. 756. Surely, if a sports wager were considered a swap at the time, someone would have sought clarification in the further definition—especially as such wagers would, by operation of Dodd-Frank, have been required to be placed only on DCMs or limited to ECPs. *See* 7 U.S.C. § 2(e).

Further, though sports betting handle grew to over $165 billion in 2025, the CFTC has not required any sports betting company making markets in "sports bets"

[20] *See* CFTC, *Comments for Proposed Rule 76 FR 29818*, https://comments.cftc.gov/publiccomments/CommentList.aspx?id=1032&ctl00_ctl00_cphContentMain_MainContent_gvCommentListChangePage=15. The word "gaming" appears only twice—both times in reference to "gaming" the system, not gambling or betting.

to register as swap dealers.[21] Not FanDuel, DraftKings, principal trading firms making markets on prediction markets, nor any major casino—though their activity may exceed the trigger for registration ($8 billion aggregate gross notional amount of swap dealing over a rolling 12-month period). *See* 83 Fed. Reg. 56666 (Nov. 13, 2018).

While it is not a question, as a matter of law, whether the definition of swap includes some event contracts, that category is much narrower than Kalshi or the CFTC acknowledge, and Congress in 2000 or 2010 did not include sports betting.

## III. No One in Congress Called for Preempting State Gaming Laws, Nor Did Dodd-Frank do so.

Kalshi argues that when Congress brought swaps under the oversight of the CFTC in response to the 2008 financial crisis, it impliedly preempted all state laws regulating sports betting. As stated above in section I B, though, sports betting was not part of the 2008 financial crisis, the response to it, or the Executive Branch's list of priorities. Nor were there any calls from Congress to preempt the traditional state police powers over gaming to establish nationwide sports betting under CFTC auspices. To the contrary, as discussed below in Section IV, Congress gave the CFTC authority to ban DCMs from listing event contracts involving "gaming."

[21] *See* Jovanovic, *supra* n. 5.

If they wanted to do so, Congress and the Executive Branch knew how to preempt state gaming and bucket shop laws. Just ten years earlier in the CFMA, Congress had done so in the case of an enumerated list of certain financial agreements, contracts, or transactions excluded by select CFMA provisions or exempted by the Commission under section 6(c) authority. *See* CMFA § 117 (codified as amended at 7 U.S.C. § 16(e)(2)). This provision was specifically included in the CFMA to ensure states didn't regulate specific financial instruments which were being excluded from CFTC jurisdiction. In passing Dodd-Frank, Congress did not add to this enumerated preemption list any reference to contracts involving sports or gaming.

Other aspects of Dodd-Frank and its implementation reinforce the conclusion that Dodd-Frank did not make the CFTC the nation's sports betting regulator. Congress did not address the overlap between state and federal law—as it had in the CFMA for insurance. *See* 7 U.S.C. § 16(h). Further, though Dodd-Frank expressly amends the Securities Exchange Act of 1934 to preempt state regulation of security-based swaps, other than for hybrid instruments, it did nothing comparable about swaps in the CEA. *See* Dodd-Frank § 767 (amending 15 U.S.C. §78bb(a)); 7 U.S.C. § 27f(b).

The absence of any such provisions or discussion is especially telling. The CFTC's current position on preemptions also leads to an unconstitutional result that

private parties—just by listing a contract—can preempt state law. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

Further, if Congress preempted state sports betting regulations through Dodd-Frank, it would have represented a sea-change in federal policy. At the time, PASPA, made it unlawful for states to "'authorize . . . betting, gambling, or wagering . . . based . . . on' competitive sporting events." *Murphy*, 584 U.S. at 461 (quoting 28 U.S.C. § 3702(1)). Notably, PASPA did not apply to the few instances of sports betting that were permitted by states at the time of its enactment, including sports betting in Nevada casinos. *Id.* at 462. If, as argued by Kalshi, Congress had given the CFTC exclusive jurisdiction and preempted the states' jurisdiction to regulate sports betting, it would have (a) repudiated a decades-old federal policy against sports betting, (b) implicitly repealed PASPA, and (c) preempted the state laws prohibiting sports betting Congress had relied upon to carry out that policy. *See* Ohio Br. 55-56.

Indeed, seven years after Dodd-Frank, when the Supreme Court took up New Jersey's challenge to PASPA's constitutionality, no one argued to the Court that Congress had already repudiated PASPA and turned nationwide sports betting over to the CFTC.

## IV. The Special Rule Does Not Imply That Sports Bets Fall Within The Swaps Definition.

Dodd-Frank's "Special Rule" by design does not place "agreements, contracts, or transactions" that involve "gaming" within the statutory definition of swap. To the contrary, the purpose of the Special Rule was to give the CFTC authority to determine that certain event contracts are contrary to the public interest and to prohibit CFTC-regulated exchanges from listing or trading such contracts. The Special Rule permits the CFTC to "determine that . . . agreements, contracts, or transactions are contrary to the public interest if [they] involve—(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity." 7 U.S.C. § 7a-2(c)(5)(C)(i). The operative sentence did not define "agreements, contracts, or transactions" involving this list of activities as "swaps."

The text of the Special Rule makes clear that it applies to all "agreements, contracts, or transactions . . . in excluded commodities," not merely "swaps" in excluded commodities. *Id.* No determination that an event contract is a swap is implicit in an application of the Special Rule. The CFTC may forbid *any* event contract, swap or not, if it involves one of the statutory categories.

The Special Rule provision originated in an amendment proposed by Senate Majority Leader Reid, Senator Chris Dodd and Senator Blanche Lincoln on April

29, 2010.[22] The senators proposed the Special Rule as they were seeking the 60 votes needed for cloture and to accommodate members for whom such prohibitions were important.[23] *Amicus*, as CFTC Chairman at the time, provided technical assistance in drafting the Special Rule and specifically recalls discussions with Senate Majority Leader Reid's office regarding the inclusion of "gaming" within the list of activities under the rule.

The list of prohibited activities was included because a number of senators wanted to ban certain agreements, contracts, or transactions, particularly those considered by DARPA, that would have provided markets on terrorist attacks, assassinations, and coups, as well as certain types of event contracts as addressed in the 2008 Concept Release, including those that are "the functional equivalent of gambling" and those "based on assassinations or terrorist activities." 73 Fed. Reg. at 25673. Further, Congress curtailed the impact of the CFMA's contract self-certification provision by giving the CFTC broad public-interest authority to prohibit certain agreements, contracts, and transactions in excluded commodities from being listed.

---

[22] 156 Cong. Rec. S2816, S2889 (daily ed. April 29, 2010) (proposing SA 3739 to S. 3217).

[23] *See* John Bresnahan & Carrie Budoff Brown, *Lincoln Wall Street bill tacks left*, Politico, (Apr. 13, 2010), https://www.politico.com/story/2010/04/lincoln-wall-street-bill-tacks-left-035752.

The only known reference to sports betting in the Dodd-Frank legislative history makes it clear that key members of Congress expected the CFTC to forbid all sports betting on exchanges it regulated. Senator Lincoln explained, in a colloquy with Senator Dianne Feinstein, 156 Cong. Rec. S5906-07 (July 15, 2010):

> Chairman Dodd and I maintained this provision . . . to assure that the Commission has the power to prevent the creation of futures and swaps markets that would allow citizens to profit from devastating events and also prevent gambling through futures markets. . . .
>
> The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

While *Amicus* was Chairman, the bipartisan CFTC used the power Congress granted it and unanimously finalized Rule 40.11 in July 2011, prohibiting listing contracts involving gaming, along with the other activities enumerated in the Special Rule. 76 Fed. Reg. 44776, 44799. The only public comment that discussed gaming merely requested the CFTC further define gaming so as to "avoid confusion" about the line between permissible speculation and "gaming-type activities."[24]

---

[24] *See* Comment for Proposed Rule 75 Fed. Reg. 67282 at 6 (Jan. 3, 2011), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=26867&SearchText=.

Importantly, Rule 40.11(a) prohibits listing "any" contract involving gaming. The purpose of CFTC review of an event contract under Rule 40.11(c) is simply to determine whether a particular contract involves a prohibited category, i.e., whether it involves gaming, war, terrorism, assassination, or unlawful activity. *See* 76 Fed. Reg. at 44785. No contract-specific "public interest" determination is required because the CFTC already concluded in 2011 that all event contracts within these categories are not in the public interest. Thus, if a contract involves gaming, that is the end of the matter.

## V. CFTC Lacks Experience and Appropriations to Regulate Sports Betting.

Congress did not displace historical state police powers over sports betting through Dodd-Frank and give it to a small federal regulatory agency with no expertise in gaming regulation. The CFTC, and *Amicus* as Chairman, did not think at the time it had become—nor did it seek appropriations to be—the nation's sports-betting regulator.[25] Nor did CFTC Chairman Giancarlo ask for such resources after the Supreme Court struck down PASPA's federal prohibition on sports betting in 2018.[26] It is telling that neither Congress nor the Executive Branch took needed steps

---

[25] *See*, *e.g.*, *Financial Services and General Government Appropriations for Fiscal Year 2012*: Hearing on S. 1573 Before the Subcomm. of the Senate Appropriations Comm., 112th Cong. 45 at 54-60 (2011), https://perma.cc/3CNJ-2NCX.

[26] *See*, *e.g.*, Testimony of Chairman J. Christopher Giancarlo Before the Senate Committee on Appropriations Subcommittee on Financial Services and General Government (May 8, 2019), https://www.cftc.gov/PressRoom/

or appropriated funds as if the CFTC was to address the unique problems of being the national sports betting regulator.

## VI. Preemption Elephants Are Not Hidden in Definitional Mouseholes.

The Supreme Court has long disapproved of taking obscure statutory language out of context and reading it as delegating massive executive power—what Justice Scalia referred to as hiding elephants in mouseholes. *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. at 468 (2001); *see also MCI v. AT&T*, 512 U.S. 218, 229 (1994) (rejecting a theoretically possible interpretation of the word "modify" because it would upend the overall statutory scheme); *FDA v. Brown & Williamson*, 529 U.S. 120, 160 (2000); *King v. Burwell*, 576 U.S. 473, 485-86 (2015); *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 638-39 (2026) (plurality op.). This canon of interpretation clearly applies to the CFTC's attempt to upend state gaming regulation based on a portion of a statutory definition that nobody—either at the time Dodd-Frank was enacted or eight years later when the Supreme Court ruled in *Murphy v. NCAA*—claimed that Congress had shifted sports betting regulatory authority to the CFTC.

Such an interpretation is precluded when it would have a major impact on the constitutional balance in our federal system. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (declining to find statutory

SpeechesTestimony/opagiancarlo71.

authority for executive action that "intrude[d] into an area that is the particular domain of state law: the landlord-tenant relationship"). Because 7 U.S.C. § 2(e) requires retail swaps to be listed on DCMs, if Kalshi were right that 7 U.S.C. § 2(a)(1)(A) put sports betting under CFTC's exclusive jurisdiction, there wouldn't be any off-exchange sports betting for states to regulate. The impact on state policies—that regulate and derive revenue from gaming, as well as those that ban it or (like Ohio) that limit it to residents older than 21—would be immense.

Yet Kalshi contends that a Senate led by Majority Leader Reid passed legislation intruding into an area that was of particular importance to Nevada and other states' laws.

The absence of evidence in statutory text or context that Congress intended to preempt state gaming laws, override the federal policy of PASPA, and mandate that the CFTC undertake a regulatory function for which it's ill-equipped preclude reading Dodd-Frank as preempting Ohio's laws.

## CONCLUSION

For the reasons stated above, the District Court's order should be affirmed.

Dated: June 11, 2026

Respectfully submitted,

*<u>/s/ Alyssa Howard</u>*
Aitan D. Goelman
Alyssa Howard
Ross M. Slaughter
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, DC 20037
Tel: 202-778-1800
Fax: 202.822.8106
agoelman@zuckerman.com
ahoward@zuckerman.com
rslaughter@zuckerman.com

Victor Suthammanont
Kostelanetz LLP
7 World Trade Center, 34th FL
New York, NY 10007
212-808-8100
vsuthammanont@kostelanetz.com

*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies, in accordance with Rule 32(g)(1) of the Federal Rules of Appellate Procedure, that this amicus brief complies with the type-volume requirements and contains 6,478 words. *See* Fed. R. App. P. 29(a)(5).

The undersigned further certifies that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s Alyssa Howard*
Alyssa Howard

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing has been served on all parties via their counsel of record through the Court's ECF system this 11th day of June 2026.

*/s Alyssa Howard*
Alyssa Howard

# EXHIBIT B

REC'D & FILED
2026 APR 28 PM 4:21
WILLIAM SCOTT HOEN
CLERK
BY [signature]
DEPUTY

**IN THE FIRST JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

**IN AND FOR CARSON CITY**

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD,<br><br>Plaintiff,<br><br>vs.<br><br>KALSHIEX, LLC,<br><br>Defendant. | Case No. 26 OC 00050 1B<br><br>Dept. No. I |

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This matter having come before the Court for a hearing on April 3, 2026 on Plaintiff, STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD's ("BOARD") Complaint for Permanent Injunction and Declaratory Relief and its Renewed Motion for Preliminary Injunction filed by the BOARD on March 12, 2026. Jessica E. Whelan, Chief Deputy Solicitor General—Litigation, Nevada Office of the Attorney General, appeared on behalf of the BOARD and Grant R. Mainland of Millbank LLP appeared on behalf of Defendant KALSHIEX, LLC ("KALSHI").

On March 20, 2026, this Court granted the BOARD's Renewed Ex Parte Application for Temporary Restraining Order and issued a Temporary Restraining Order prohibiting KALSHI from offering or facilitating the offering of sports-, election-, and entertainment-related event contracts in Nevada for a period of 14 days from the date of the order. The Court subsequently extended the Temporary Restraining Order for an additional period of 14 days at the April 3 hearing.

The Court, having reviewed the pleadings and papers on file and having considered the oral arguments of counsel, hereby **FINDS** and **CONCLUDES** as follows:

The BOARD seeks to preliminarily restrain and enjoin KALSHI and any of its agents, employees, officers, or affiliates from operating a derivatives exchange and prediction market that offers event-based contracts relating to sports, elections, and entertainment events to people within Nevada without obtaining all required Nevada gaming licenses, and from allowing its market to accept wagers from persons under the age of 21.

Under Nevada law, a preliminary injunction is authorized when it "appear[s] by the complaint that the plaintiff is entitled to the relief demanded"; the relief involves "restraining the commission or continuance of the act complained of" (NRS 33.010(1)); and when "the commission or continuance of some act . . . would produce great or irreparable injury to the plaintiff." NRS 33.010(2); *Posner v. U.S. Bank N.A.*, 140 Nev. Adv. Op. 22, 545 P.3d 1150, 1152 (Nev. 2024) (holding injunctive relief is "'proper where the moving party can demonstrate that it has a reasonable likelihood of success on the merits and that, absent [such relief], it will suffer irreparable harm for which compensatory damages would not suffice.'" (quoting *Excellence Cmty. Mgmt., LLC v. Gilmore*, 131 Nev. 347, 351, 351 P.3d 720, 722 (2015)).

In addition, the balance of hardships and public interest may be considered in determining whether injunctive relief is warranted and, if so, the scope and nature of that relief. *University & Cmty. College Sys. of Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712, 721, 100 P.3d 179, 187 (2004).

**I. The BOARD is reasonably likely to prevail on the merits of the underlying case**

As a threshold matter, the BOARD has demonstrated that it has a "reasonable likelihood of success on the merits."

**First**, the Complaint (Compl., pp. 2–3) and Renewed Motion for Preliminary Injunction (Mot., pp. 1–2) establish that gaming in Nevada is expansively and strictly regulated. The BOARD, in conjunction with the Nevada Gaming Commission, has virtually comprehensive statutory authority over gaming in Nevada. *See generally* Nev. Rev. Stat. ch. 463. The strict regulation of gaming promotes the public interest in several respects, including the prevention of underage gambling, preservation of the integrity of the events which are the subject of gaming wagers, and exclusion of unsuitable individuals from gaming activities. NRS 463.166, .350, *Nev. Gam'g Comm. Reg.* 22.1205(2). Gaming in Nevada may only be conducted by an entity licensed under the authority of the Nevada Gaming Control Act. NRS 463.160.

**Second,** "gaming" as used in Nevada law includes a "percentage game," and a "wager" in a "sports pool." NRS 493.0152, .0193, .01962. "Percentage games are . . . games where patrons wager against each other and the house takes a percentage of each wager as a 'rake-off.'" *Hughes Props. v. State*, 100 Nev. 295, 297, 680 P.2d 970, 971 (1984). A "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." NRS 463.01962. And a "sports pool" is "the business of accepting wagers on sporting events or other events by any system or method of wagering." NRS 463.0193.

**Third,** the record at this early stage in the proceedings indicates KALSHI is not licensed under the Nevada Gaming Control Act. KALSHI does not dispute this finding.

**Fourth,** the record at this early stage in the proceedings indicates KALSHI offers "event-based contracts," including college basketball games, college and professional football games and elections. KALSHI does not dispute this finding.

Under Nevada law, this conduct constitutes the operation of a "sports pool" as it involves the acceptance of "wagers" concerning "sporting events or other events" "for which the outcome is uncertain." Further, the record indicates KALSHI takes a commission on contracts purchased through its system, meaning it is operating a "percentage game" as defined in Nevada law.

**Finally,** the Court has considered KALSHI's contentions that it operates a CFTC-registered exchange that lists event contracts for trading; that Nevada gaming laws are preempted with respect to the event contracts offered on a federally regulated exchange; and that the CEA grants the CFTC exclusive jurisdiction to regulate "transactions involving swaps traded or executed on a [federally designated] contract market." 7 U.S.C. §2(a)(1)(A).

At the moment, the balance of convincing legal authority weighs against federal preemption in this context. *See KalshiEx, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 U.S. Dist. LEXIS 234246 at *11–38 (D. Nev. Nov. 24, 2025) [hereinafter referred to as "*KalshiEx*"]; *see also North American Derivatives Ex., Inc. v. Nev. Gaming Control Bd.*, No. 2:25-cv-00978-APG-BNW, 2025 U.S. Dist. LEXIS 466366 (D. Nev. Oct. 14, 2025) (holding contracts based on outcome of sporting events are not "swaps" under the Commodity Exchange Act and are not subject to exclusive jurisdiction of CFTC); *KalshiEx, LLC v. Martin*, No. 25-cv-1283-ABA, 793 F. Supp. 3d 667, 2025 U.S. Dist. LEXIS 147815

(D. Md. Aug. 1, 2025) (holding state law not preempted by Commodity Exchange Act as applied to sports-related event contracts); *Massachusetts v. KalshiEX, LLC*, No. 2584CV02525, 2026 WL 188019 (Super. Ct. Suffolk Cnty., Mass. Jan. 20, 2026) (same). *But see KalshiEx, LLC v. Flaherty*, No. 25-1922, (3d Cir. Apr. 6, 2026) (holding, in a divided panel decision, state law preempted by Commodity Exchange Act as applied to sports-related event contracts); *KalshiEX LLC v. Orgel*, No. 26-cv-00034, 2025 U.S. Dist. LEXIS 33927 (M.D. Tenn. Feb. 19, 2026) (state law likely conflict preempted by the Commodity Exchange Act as applied to sports-related event contracts).

The reasoning in *KalshiEx* and *North American Derivatives* is persuasive. Therefore, this Court concludes that based on the current state of the law, the Commodities Exchange Act, more specifically 7 U.S.C. §2(a)(l)(A), fairly interpreted, does not vest exclusive jurisdiction over KALSHI's event contracts with the CFTC. As such, Nevada law is not preempted, and the BOARD has authority to prosecute the enforcement action presented by the Complaint and the Renewed Motion for Preliminary Injunction.

**II. The BOARD's injuries are irreparable and non-compensable**

KALSHI's wrongful acts cause immediate and irreparable harm to Nevada's "comprehensive regulatory structure" and "strict licensing standards." Such harm is not sufficiently remediable by compensatory damages. The BOARD has a statutory duty to protect the public and advance Nevada's interest in administering a reputable gaming industry with integrity. In furtherance of that duty, the BOARD is obliged to consistently and equitably monitor and enforce regulatory and statutory compliance among all industry participants and protect the health, safety, morals, good order, and general welfare of gaming consumers. An unlicensed participant beyond the BOARD's control, such as KALSHI, obstructs the BOARD's ability to fulfill its statutory functions. For example, the BOARD lacks authority to ensure that wagers are not being accepted by KALSHI from owners, coaches, players or officials who are in a position to influence the outcome of a sporting event. The BOARD also has no means to ensure that individuals under the age of 21 are not allowed to purchase KALSHI's contracts and no ability to enforce any sanction against KALSHI if it determined this to be the case. Additionally, the BOARD has no way to know if unsuitable individuals are involved with KALSHI's activities in Nevada, much less prevent such involvement. By their nature, these injuries cannot be mitigated, much less restored, by compensatory damages after the injury is incurred.

These potential consequences must be characterized as irreparable under Nevada law. As such, they support issuance of a preliminary injunction.

**III. The balance of hardships and public interest weigh in favor of issuing the preliminary injunction**

Largely for the reasons that have already been explained above, the balance of hardships and public interest in maintaining meaningful control over Nevada's gaming industry for the purpose of ensuring its integrity strongly supports issuance of a preliminary injunction. In addition to the harms already discussed, KALSHI's failure to comply with Nevada gaming law gives it a massive and unfair competitive advantage over its competitors, which greatly distorts the playing field and disrupts the gaming industry. All licensed gaming operators must pay taxes, with the revenue financing numerous indispensable state functions. KALSHI threatens that revenue, by evading taxes and diverting business from licensed sports books that pay taxes. The BOARD's and the State's injuries exacerbate with each day that KALSHI operates in Nevada outside the authority of the BOARD. A day means more consumers. More consumers mean more transactions. More transactions means more potential harm to the BOARD and the State. As such, every day matters in this case in a literal sense.

On the other side of the balance, KALSHI does not face irreparable harm from being required to comply with state law as all other sportsbooks do. Any monetary harms KALSHI asserts relating to its compliance are self-inflicted and therefore not irreparable. They are the product of KALSHI's proceeding at its own risk on an untested preemption theory and then dramatically expanding its operations even after a federal district court had rejected this theory. Any such harms in any event pale in comparison to the severe, irreparable harm that KALSHI's unlicensed operations cause to the BOARD and to the State.

**IV. No security is required**

A party who is the beneficiary of a preliminary injunction is typically required to post security for damages resulting from wrongful issuance of the preliminary injunction. NRCP 65(c). However, the BOARD, as an agency of the State of Nevada, is exempted from that typical requirement. *Id.* Therefore, no security will be required.

Therefore, good cause appearing,

**IT IS HEREBY ORDERED** that Plaintiff's Renewed Motion for Preliminary Injunction filed on March 12, 2026 is **GRANTED**. KALSHI is prohibited from offering or facilitating the offering of the following to Nevada residents:

- Sports-related event contracts (i.e., those listed in Kalshi's "Sports" tab on its platform, and sports-related contracts in other portions of its platform), including event contracts involving the outcome of sporting events or any element of any sporting event (i.e., props) or any combination of elements or outcomes of sporting events (i.e., parlays);
- Election-related event contracts (i.e., those listed in Kalshi's "Elections" tab on its platform); and
- Entertainment-related event contracts (i.e., those listed in Kalshi's "Culture" tab on its platform).

KALSHI will have until May 4, 2026 to make technological enhancements necessary to comply with the terms of this order. Until that date, KALSHI will prevent users identified as Nevada residents from entering the sports-, election-, and entertainment-related contracts identified above. If KALSHI determines that compliance by May 4, 2026 is not possible, it may request an extension. Any request for an extension shall include an explanation, supported by sworn declaration, of the degree to which geolocation or geofencing measures have been implemented, the progress which has been made in regard to any implementation that has not yet been completed, the remaining tasks to be completed, and an estimate of the extent to which the geolocation or geofencing measures have been implemented.

**IT IS SO ORDERED.**

Dated this 28th day of April, 2026

JASON D. WOODBURY
DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

Pursuant to NRCP 5(b), I certify that I am an employee of the First Judicial District Court, and that on April 29, 2026, I deposited for mailing, postage paid, at Carson City, Nevada, a true and correct copy of the foregoing Order addressed as follows:

Aaron D. Ford, Attorney General
Jessica E. Whelan,
Chief Deputy Solicitor General
Sabrena K. Clinton,
Senior Deputy Attorney General
John S. Michela,
Senior Deputy Attorney General
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

John K. Gallagher
GUILD, GALLAGHER & FULLER LTD.
100 West Liberty Street, Suite 800
Reno, NV 89501

Dennis L. Kennedy, Esq.
Paul C. Williams, Esq.
BAILEY KENNEDY
8984 Spanish Ridge Avenue
Las Vegas, NV 89148-1302

[signature]
Julie Harkleroad
Judicial Assistant, Dept. 1

# EXHIBIT C

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 30th JUDICIAL CIRCUIT
INGHAM COUNTY

DANA NESSEL, Attorney General of the State of Michigan on behalf of the People of the State of Michigan and the Michigan Gaming Control Board,

*Plaintiff,*

v.

KALSHIEX LLC,
a Delaware corporation based in New York,

*DEFENDANT.*

Case No. 26-1087-CZ

HON. ROSEMARIE E. AQUILINA

**[PROPOSED] ORDER GRANTING TEMPORARY RESTRAINING ORDER**

At a session of said Court held in Lansing, Michigan
on June 29, 2026.

PRESENT: Honorable JUDGE ROSEMARIE E. AQUILINA
Circuit Court Judge

This matter having come to be heard by the Court on Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Subsequent Preliminary Injunction, pursuant to MCR 3.310(B)(1), and after having reviewed the motion, brief in support, affidavit, and docket,

Michigan and its most vulnerable citizens are suffering and will continue to suffer immediate and irreparable harm absent relief from being exploited by Kalshi's

sports betting operation masquerading as an investment opportunity. *First*, Michigan's legalized gaming industry requires those who wish to place wagers to be 21 years of age or older. Kalshi, however, allows people to place wagers beginning at age 18. If Kalshi is allowed to continue to offer sports wagers, the potential irreparable harm on Michigan's youth would be profound. *Second*, Kalshi takes advantage of serious mental health issues without providing the protections that Michigan's regulatory structure was designed to do. *Third*, Kalshi eludes the comprehensive patron protection mechanisms found in Michigan's regulatory framework. *Fourth*, Kalshi's failure to comply with Michigan gaming law gives it a massive and unfair advantage over the entities that comply with Michigan's regulatory structure, which greatly disrupts the industry. *Fifth*, Kalshi is undercutting Michigan's funding for schools, compulsive gambling prevention, economic development, and first responders. *Sixth*, the City of Detroit uses its gaming taxes to fund public needs, including law enforcement, public safety, economic development, youth programs, and infrastructure. *Finally*, Kalshi's conduct negatively impacts Tribes by depriving them of the revenue they need to operate their governments and serve their citizens, while also ignoring their sovereignty.

**IT IS ORDERED** that Defendant KalshiEX, LLC ("Kalshi"), and its officers, agents, employees, attorneys, successor and assigns, and all other persons and entities who receive actual notice of the Order Granting a Temporary Restraining Order, whether acting individually or in active concert or participation with Defendant, directly or indirectly, through any corporation, trust or other device

(including, without limitation, through any entities affiliated with or created by an owner of the Defendant), are hereby enjoying from engaging in any activity in connection with sports wagering in the State of Michigan, including the following conduct:

1. Offering, listing, matching, executing, clearing, settling, or otherwise facilitating any contract, instrument, or product that constitutes internet sports betting as defined by MCL 432.403(s), to any person located in Michigan or through any platform or channel accessible in Michigan;
2. Accepting deposits, stakes, considerations, or fees in connection with any such internet sports betting contracts from any person located in Michigan;
3. Advertising, promoting, marketing, or soliciting participation in any internet sports betting contract to persons located in Michigan or using a Michigan address, including via websites, mobile apps, email, push notifications, social media, influencers, affiliates, or paid placements;
4. Permitting account creation, verification; funding, or maintenance by any person for the purpose of accessing, viewing, trading, or settling internet sports betting; and
5. Designing, launching, or operating products that are functionally similar to internet sports betting, including but not limited to single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange betting, in-game betting, proposition bets, and straight bets for any persons located in Michigan.

In order to comply with this order, Defendant shall utilize a third-party geolocation services provider licensed by the State of Michigan Gaming Control Board capable of ensuring compliance with the geofencing specifications of the Michigan Gaming Control Board Technical Bulletin No. 2024-03. Defendant may propose a third-party geolocation services provider that is licensed by a gaming regulator of another state, and the Court may determine whether such third-party is capable of ensuring compliance with the geofencing specifications of the Michigan Gaming Control Board Technical Bulletin No. 2024-03.

Given that Defendant's failure to adequately geolocate may limit Plaintiff's ability to identify ill-gotten gains for the purpose of disgorgement, Defendant shall pay a fine of $120,000 per day[1] for each day that it does not comply with the geolocation requirements of this order.

This order shall remain in effect for 14 days, until July 13, 2026.

IT IS SO ORDERED

JUN 29 2026

JUDGE ROSEMARIE E. AQUILINA P37670
Circuit Court Judge

[1] This amount is based on a conservative estimate taking Defendant's $600 million/day trading volume, divided by 50 to approximate Michigan's share of the transactions, and taking 1% to estimate Kalshi's fees on those transactions.

# EXHIBIT D

FILED
2026 JUL 20 09:00 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-10264-3 SEA

**STATE OF WASHINGTON**
**KING COUNTY SUPERIOR COURT**

STATE OF WASHINGTON,

Plaintiff,

v.

KALSHIEX, LLC,

Defendant.

NO. 26-2-10264-3 SEA

ORDER GRANTING PLAINTIFF STATE OF WASHINGTON'S AMENDED MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER, was before the Court on Plaintiff State of Washington's Amended Motion for Preliminary Injunction against Defendant KalshiEX, LLC (Kalshi). The Court reviewed the following materials directly related to the matter at issue:

1. The State of Washington's Amended Motion for Preliminary Injunction;
2. The Declaration of Ben Brysacz and attached exhibits;
3. The Declaration of Eric Peters and attached exhibits;
4. Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction;
5. The Declaration of Matthew J. Laroche and attached exhibits;
6. The State of Washington's Reply in Support of the Amended Motion for Preliminary Injunction;
7. The Declaration of Ben Bryacz in Support of the Reply with supportive exhibits; and
8. A Notice of Supplemental Authority from the Defendant submitted after oral argument held on July 10, 2026.

The Court familiar with the records and files herein, and being otherwise fully advised after well-presented oral argument, hereby enters the following Findings of Fact, Conclusions of Law, and Order.

## I. FINDINGS OF FACT

1. Plaintiff is the State of Washington (State), by and through the Consumer Protection Division of the Washington State Attorney General's Office.

2. Defendant Kalshi operates an online platform where users can place bets on the outcome of various events, categorized under multiple different topics including Elections, Politics, Sports, Culture, Crypto, Commodities, Climate, Economics, Mentions, Finance, and Tech & Science. Kalshi makes its betting platform available nationwide, and it specifically targets Washington consumers in its advertising and marketing.

3. Kalshi is a Delaware limited liability company with its principal place of business located at 594 Broadway, Suite 407, New York, NY 10012. Kalshi is a wholly owned subsidiary of Kalshi, Inc. Kalshi is not licensed by the Washington State Gambling Commission to conduct online gambling. Kalshi is not registered to conduct business in Washington.

4. The State's Attorney General is authorized to commence this action pursuant to RCW 19.86.080, RCW 19.86.140, and RCW 43.10.030 to address practices that violate Washington's Consumer Protection Act (CPA), Gambling Act, and the Recovery of Money Lost at Gambling Act (RMLGA), and to vindicate the rights of the public. RCW 9.46.010, .0213, .0269, .038, .0368, .903.

5. This Court has personal jurisdiction over Kalshi. Kalshi has purposefully availed itself of the privileges and benefits of conducting business in King County and elsewhere in the State of Washington by engaging in the conduct set forth in the

Complaint, including but not limited to offering online gambling activities—which Kalshi refers to as a "prediction market"—in King County.

6. This Court has subject matter jurisdiction over this action pursuant to RCW 19.86.080 and RCW 19.86.140.

7. Venue is proper in King County pursuant to RCW 4.12.020 and RCW 4.12.025, and Court Rule 82 because the causes of action arose, in part, in King County and Kalshi transacted business in King County.

8. Washington has tightly regulated gambling since its founding in 1889. Washington's Legislature has consistently recognized a public policy interest in protecting the health, welfare, and safety of Washington residents by restricting gambling activity. In 2006, the Legislature effectively banned all online gambling in Washington. In 2020, the Legislature authorized a limited exception for sports wagering that takes place on tribal lands pursuant to a tribal gaming compact.

9. Kalshi operates an online betting platform that it advertises as a "prediction market" and that allows consumers to bet on thousands of topics ranging from sports, political elections, entertainment, popular culture, and whether public figures will utter specific words or phrases ("mentions"). Kalshi's website and mobile application (app), which is available to both Android and iOS users, are available in Washington.

10. On Kalshi, consumers place bets on the outcome of various issues by purchasing a "yes" or "no" bet. If the consumer wagers correctly, they receive a payout. If the consumer wagers incorrectly, they forfeit the money they wagered. Kalshi earns a transaction fee on each bet placed. Each bet risks money, relies in part on chance, and promises a payout to winners.

11. Kalshi's offerings also include so-called "mention markets" that allow users to bet on whether public figures will say certain words during public appearances.

12. Kalshi knowingly accepts and receives money from Washington consumers through its online betting platform. By facilitating wagers and collecting fees, Kalshi profits from its betting platform.

13. Kashi's website and app provide information about wagers, real-time odds, and match users for wagers. Kalshi transmits gambling information on the internet and maintains the equipment to do so.

14. Kalshi's advertisements that it offers "legal betting" in Washington state are likely to mislead a reasonable consumer that such gambling activities are legal under state law.

15. Kalshi continues to offer illegal gambling, sports wagering, and bookmaking, and continues to advertise to Washington consumers.

16. On December 9, 2025, the Washington Gambling Commission issued a notice that "[o]ffering events-based contracts or participating in these markets is not authorized in Washington State."

17. Kalshi has not ceased offering events-based contracts in Washington. At the same time, Kalshi has also opposed state regulation and oversight in other states, and is subject to a preliminary injunction in Nevada.

18. As the Washington Legislature has found, "some individuals in this state are negatively impacted by problem gambling and gambling disorder." RCW 9.46.071. Similarly, the Washington Supreme Court has observed that "[g]ambling addicts and underage gamblers have greater accessibility to on-line gambling—able to gamble from their homes immediately and on demand, at any time, on any day, unhindered by in-person regulatory measures." *Rousso v. State*, 170 Wn.2d 70, 82, 239 P.3d 1084 (2010).

19. Gambling addiction is a recognized public health problem. According to the 2021 Washington State Adult Problem Gambling Prevalence Study, among

Washington adults who gambled, 3.5% would likely be diagnosed with gambling disorder (1.5% of all adults), and 17% were at an increased risk for problem gambling (7.5% of all adults). The Washington State Adult Problem Gambling Prevalence Study further found that the prevalence of moderate-to-severe problem gambling was substantially higher among “online gamblers” (10.3%) compared to all gamblers (3.5%). Additionally, “online gamblers” were almost four times as likely to experience problem gambling compared to gamblers who only gambled at brick-and-mortar venues such as Washington’s tribal casinos where sports gambling is legal in Washington (10.3% as compared to 2.6%). *See* Washington State Health Care Authority, 2021 Washington State Adult Problem Gambling Prevalence Study Results: Report to the Legislature (June 30, 2022), at iv-vii, www.evergreencpg.org/wp-content/uploads/2022/12/wa-state-adult-problem-gambling-prevalence-study-final-2021.pdf.

20. Gambling disorders also negatively affect spouses, partners, children, and others besides the person experiencing the disorder. Studies show for example that gambling disorders are associated with higher rates of domestic and intimate partner violence. *See* Nerilee Hing et al., An integrative review of research on gambling and domestic and family violence: Fresh perspectives to guide future research, 13 Frontiers Psych., Oct. 2022, https://doi.org/10.3389/fpsyg.2022.987379.

21. Some researchers have noted that prediction markets share “structural and functional similarities” with online gambling, and “pose harms beyond traditional gambling” because they “operate under limited regulation while carrying social and commercial legitimacy.” Nizan Geslevich Packin and Sharon Rabinovitz, Prediction markets as a public health threat, 392 Nature 6795, Apr. 2026, ttps://www.science.org/doi/10.1126/science.aee3932.

## II. CONCLUSIONS OF LAW

1. Kalshi transacts business in King County by offering, operating, conducting, marketing, promoting, and/or distributing unlicensed and illegal gambling activities, including, without limitation, illegal gambling games, bookmaking, and professional gambling with respect to betting on sports, elections, politics, entertainment, culture, and mentions markets (collectively, Illegal Gambling Activities).

2. The Supremacy Clause sets out a "fundamental principle of the Constitution" that "Congress has the power to preempt state law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000); U.S. Const. art. VI, cl. 2. Express preemption "exists when Congress expresses a clear intent to pre-empt state law in the language of the statute." Bibbo v. Dean Witter Reynolds, Inc., 151 F.3d 559, 562 (6th Cir. 1998); see City of Seattle v. Burlington N. R.R. Co., 105 Wn. App. 832, 835-836, 22 P.3d 260 (2001). F

3. The Commodity Exchange Act (CEA) does not preempt Washington State gambling law. While 7 U.S.C. § 2(a)(1)(A) grants the Commodities Futures Trading Commission (CFTC) "exclusive jurisdiction" over certain transactions on designated contract markets (DCMs). This grant or exclusive jurisdiction was not added to exclude state regulation, but to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies" and "consolidate federal regulation of commodity futures trading in" one agency. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386-87 (1982); see also *KalshiEx, LLC v. Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026).

4. 7 U.S.C. § 2(a)(1)(A) does not contain express preemption language. Kalshi's cited authorities are not to the contrary. *Mississippi v. Louisiana*, 506 U.S. 73 (1992), concerned the statutory grant of exclusive jurisdiction over controversies between states to the Supreme Court; *Hughes v. Talen Energy Mktg., LLC*, 578 U.S.

150 (2016), concerned the Federal Power Act and held that the Federal Energy Regulatory Commission had exclusive jurisdiction over the sale of electric energy at wholesale in interstate commerce; and *Bache Halsey Stuart Shields, Inc. v. Erdos*, 35 Wn. App. 225, 232 (1983), concerned "the CEA's preemption of federal and state security laws"—consistent with *Curran* (emphasis added).

5. The "exclusive jurisdiction" provision within 7 U.S.C. § 2(a)(1)(A) contains savings clauses for state "regulatory authorities" and state court jurisdiction. These clauses provide at relevant parts as follows:

> *Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State…*
>
> *Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.*

The language referenced above indicates that Congress did not intend to supersede or limit States in regulating gambling or in superseding or limiting the jurisdiction of any court of any State in addressing such regulation.

6. As to field preemption, while the CEA preempts the field of regulating on DCMs, it does not preempt the State of Washington's enforcement of gambling law under RCW 9.46.

7. Conflict preemption occurs (1) when it is impossible to comply with both federal and state regulation, or (2) where the state law stands as an obstacle to the purposes and objectives of Congress. *Inlandboatmen's Union of the Pacific v. Dept. of Transportation*, 119 Wn.2d 697, 707 (1992).

8. Regulation of gambling and regulation of futures markets are different fields of regulation. Allowing for continued State regulation of activities that fit within the

legal framework of gambling in the State of Washington under RCW 9.46 does not subvert the purpose of the CEA to uniformly regulate actual futures trading. Regulation sought by the State of Washington is solely as to enforcement of gambling laws under RCW 9.46 and as to application of Washington's Consumer Protection Act (CPA), RCW 19.86, and the Recovery of Money Lost at Gambling Act (RMLGA), RCW 4.24. Complying with Washington law would not prevent Kalshi from complying with applicable Federal law.

9. Federal law requires DCMs like Kalshi to provide "impartial access" to its markets per 17 C.F.R. § 38.151(b). 17 C.F.R. § 38.151(b) provides in relevant part as follows:

> **§ 38.151 Access requirements.**
>
> (a) ***Jurisdiction.*** Prior to granting any member or market participant access to its markets, a designated contract market must require that the member or market participant consent to its jurisdiction.
>
> (b) ***Impartial access by members, persons with trading privileges and independent software vendors.*** A designated contract market must provide its members, persons with trading privileges, and independent software vendors with impartial access to its markets and services, including:
>
> (1) Access criteria that are impartial, transparent, and applied in a non-discriminatory manner; and
>
> (2) Comparable fee structures for members, persons with trading privileges and independent software vendors receiving equal access to, or services from, the designated contract market.

The operative language of this regulation means providing its members, persons with trading privileges, and independent software vendors with impartial access to its markets and services. An anticipated inability to match Washington traders with other traders nationwide is not discrimination in providing access on the part of Kalshi.

Moreover, 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), the Special Rule for review and approval of event contracts and swaps contracts within the CEA suggests that certain contracts may be listed in some state markets but not others. This is evident in the language below referencing activity that is "unlawful under any Federal or State law."

7 U.S.C. § 7a-2(c)(5)(C)(i)(I) provides as follows:

a. **C) Special rule for review and approval of event contracts and swaps contracts**

b. **(i) Event contracts**

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) [2] of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve-

(I) activity that is unlawful under any Federal or State law;
(II) terrorism;
(III) assassination;
(IV) war;
(V) gaming; or
(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

While one may argue that the "Special Rule" supports the contention that Federal preemption occurs because it allows the CFTC to determine that certain agreements, contracts or transactions, including those involving gaming, are contrary to the public interest, this provision of authority is not enough to expressly direct Federal preemption. The language referencing "activity that is unlawful under State law" demonstrates that State's retain the authority to determine what is unlawful under applicable State law. The CFTC may then determine whether such unlawful activity may be contrary to the public interest. Regardless of a contrary to public interest determination, certain types of contracts and transactions may be allowed in some states and not in others.[1]

[1] This determination is further supported by the language of 17 C.F.R. § 40.11(a)(1) which also references activities determined to be unlawful under any State or Federal law. 17 C.F.R. § 40.11(a)(1) at relevant part is set forth below:

Required compliance with the law of the State of Washington as to gambling is not unlawful denial of access.

10. The impartial access rule does not require Kalshi to violate state law. Rather the rule requires DCMs to use "access criteria that are impartial, transparent, and . . . non-discriminatory" and "comparable fee structures" for members. 7 C.F.R. § 38.151(b)(1) (2) is a non-discrimination provision.

11. Kalshi's conduct in the State of Washington does not constitute participation in "bona fide business transactions valid under the law of contracts for the purchase or sale at a future date of securities or commodities" such that Kalshi is excluded from compliance with the Washington State Gambling Act under Chapter 9.46 of the Revised Code of Washington.

12. Kalshi's provision, marketing, and advertising of illegal gambling activities constitute unfair and/or deceptive acts or practices in trade or commerce under RCW 19.86.020.

13. Kalshi is engaged in trade or commerce within the meaning of RCW 19.86.020 because it offers illegal gambling activities to Washington consumers and solicits bets from Washington consumers on its platform. For example, Kalshi

---

**§ 40.11 Review of event contracts based upon certain excluded commodities.**

(a) *Prohibition.* A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

specifically solicited online gambling bets from Washington consumers by advertising that they could "bet on the NFL even though [they] live in Washington."

14. Kalshi's conduct affects the public interest within the meaning of RCW 19.86.020 because Kalshi solicits its services to and solicits bets from all Washington consumers over the age of eighteen.

15. Illegal gambling and the recovery of money lost at gambling is a matter of public concern. RCW 9.46.010; *Rousso v. State*, 170 Wn.2d 70, 82, 239 P.3d 1084 (2010); *see also O'Neil v. Crampton*, 18 Wn.2d 579, 583-84, 140 P.2d 308 (1943) (holding basis for RMLGA is not only protection of the individual but "also a protection to the public, which is even more important").

16. The State has shown a likelihood of success on the merits of its claims that Kalshi's conduct constitutes (1) unfair and/or deceptive acts or practices, (2) in trade or commerce, (3) affecting the public interest, in violation of the CPA. *State v. Kaiser*, 161 Wn. App. 705, 719, 254 P.3d 850 (2011).

17. The State has shown a likelihood of success on the merits of its claims that Kalshi's conduct violates the RMLGA, RCW 4.24.070.

18. The State has shown a likelihood that Kalshi's conduct violates multiple provisions of the Washington Gambling Act, including that Kalshi:

a. Operates, develops, manages, finances, and/or profits from Illegal Gambling Activities in Washington, and continues to engage in these activities, including, among other things, unlicensed online sports wagering.

b. Engaged and continues to engage in professional gambling, including by engaging in bookmaking, in violation of Washington law. RCW 9.46.220-.222; RCW 9.46.0269(d).

c. Engaged and continues to engage in online gambling activity in violation of Washington law. RCW 9.46.240.

d. Offered and continues to offer gambling on its platform in violation of Washington's gambling laws and/or regulations.

19. Based on the declarations and exhibits presented, the State has demonstrated a well-grounded fear of immediate invasion of consumers' legal rights. *See Rabon v. City of Seattle*, 135 Wn.2d 278, 284, 957 P.2d 621 (1998). Kalshi has willfully ignored a Washington State Gambling Commission notice stating that offering event-based contracts is not authorized in Washington state.

20. The State has also shown a likelihood of actual and substantial injury to Washington consumers from illegal gambling activities should an injunction not issue.

21. The Court took referenced significant compliance costs and lost profits for Kalshi into consideration in reaching its decision. The public interests at stake and potential harm to consumers in the continued operation of Kalshi's online gambling activities in the State of Washington outweigh harm to Kalshi.

22. Pursuant to CR 65(c) and RCW 4.92.080, no security or other bond shall be required of the State prior to the issuance of the preliminary injunction.

## III. ORDER

It is therefore ORDERED that the State of Washington's Motion for Preliminary Injunction is GRANTED.

IT IS FURTHER ORDERED that:

(1) Defendant shall preserve all records reasonably related to Washington consumers and any event contracts or other contacts, instruments, or products on Defendant's platform accessible in Washington, including logs, communications, geolocation/location determinations, and marketing/targeting data, until further order of the Court.

(2) As to other terms, the Court intends to enter an ORDER as part of the granting of the Preliminary Injunction laying out other specific terms of the Preliminary Injunction by **August 5, 2026**. The Court would have included complete order directives today in line with those requested by the State, however, counsel for Kalshi requested an opportunity to confer with counsel for the State as to the language and scope of the Order derived from the Court's decision. The Court will allow the parties to confer with the hope that Kalshi, through experience with other States, may provide insight into effective ways to protect Washingtonians as the State seeks to do. The parties are to submit agreed terms to the extent possible, and/or proposed terms with briefing believed necessary to support respective positions by **noon on August 3, 2026**. The Court intends to consider submissions without oral argument.

DATED this ____ day of ______ 2026.

______________________________
JUDGE JOHN F. MCHALE
KING COUNTY SUPERIOR COURT

**King County Superior Court**
**Judicial Electronic Signature Page**

Case Number: 26-2-10264-3 SEA
Case Title: STATE OF WASHINGTON VS KALSHIEX LLC

Document Title: Order

Date Signed: 07/17/2026

Judge: John McHale

Key/ID Number: *393878041*

Page Count: This document contains 13 page(s) plus this signature page.