# 26-2239

IN THE

# United States Court of Appeals
# for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

BRYAN T. CAFFERELLI, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Connecticut
No. 3:25-cv-2016 (Oliver, J.)

## REPLY IN SUPPORT OF KALSHIEX LLC'S MOTION FOR AN INJUNCTION PENDING APPEAL

GRANT R. MAINLAND
ANDREW L. PORTER
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

August 28, 2026

*Counsel for Plaintiff-Appellant KalshiEX LLC*

# TABLE OF CONTENTS


INTRODUCTION .......... 1

ARGUMENT .......... 2

I. KALSHI IS LIKELY TO PREVAIL ON APPEAL .......... 2

A. Kalshi's Contracts Are Subject to the CFTC's Exclusive Jurisdiction .......... 2

B. Defendants' Preemption Arguments Fail .......... 7

II. THE EQUITIES STRONGLY FAVOR RELIEF .......... 11

CONCLUSION .......... 14

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:** Page(s)

*Am. Agric. Movement v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ........ 1

*CFTC v. Erskine*,
512 F.3d 309 (6th Cir. 2008) ........ 5, 6

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) ........ 10

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) ........ 10

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) ........ 7

*KalshiEX LLC v. Assad*,
No. 25-7516 (9th Cir. Aug. 28, 2026) ........ 7, 8

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ........ 3, 4, 5, 8, 12

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ........ 1, 7

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 11

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ........ 8

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ........ 11, 12

*N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*,
635 F.3d 66 (2d Cir. 2011) ........ 7

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) ........ 13

## TABLE OF AUTHORITIES—Continued

Page(s)

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ....................12

*Rice v. Santa Fe Elevator*,
331 U.S. 218 (1947) ....................7

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
60 F.3d 27 (2d Cir. 1995) ....................12, 13

*United States v. Minnesota*,
--- F. Supp. 3d ----, No. 26-cv-2661, 2026 WL 2150211
(D. Minn. July 27, 2026) ....................3, 8

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ....................6

**STATUTES:**

5 U.S.C. § 551(13) ....................2, 3

7 U.S.C. §§

1a(47)(A)(ii) ....................3

1a(47)(A)(iv) ....................3

2(a)(1)(A) ....................1, 2, 5, 8

2(e) ....................6

7a-2(c)(5)(C)(i) ....................4, 9, 10

12a(5) ....................11

12a(7) ....................11

12a(9) ....................11

## TABLE OF AUTHORITIES—Continued

Page(s)

16(e)(1)(B)(i) .......... 9

16(e)(2) .......... 9

16(h) .......... 9

15 U.S.C. § 8302(d)(1) .......... 5, 6

**REGULATIONS:**

17 C.F.R. § 38.151(b) .......... 10, 11

Concept Release,
73 Fed. Reg. 25,669 (May 7, 2008) .......... 11

Further Definition of "Swap,"
77 Fed. Reg. 48,208 (Aug. 13, 2012) .......... 5, 6

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (June 12, 2026) .......... 3

**LEGISLATIVE MATERIALS:**

156 Cong. Rec. S5906 (daily ed. July 15, 2010) .......... 10

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) .......... 8

H.R. Rep. No. 97-565, pt. 1 (1982) .......... 9

H.R. Rep. No. 106-711, pt. 2 (2000) .......... 9

**OTHER AUTHORITY:**

*Occurrence*, Webster's New World Dictionary of American English
(3d Coll. ed. 1988) .......... 4

## INTRODUCTION

This case cries out for relief pending appeal. Defendants cannot reconcile their theory of concurrent state jurisdiction with the CEA's grant of "exclusive jurisdiction" to the CFTC. 7 U.S.C. § 2(a)(1)(A). Defendants do not dispute that the decision below contradicts the CFTC's position. Defendants cannot distinguish this Court's precedent holding that the CEA "preempts the application of state law" to derivatives transactions. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.). And Defendants cannot overcome the impossibility of offering 50 state-by-state markets while running a nationwide exchange.

Defendants ask this Court to ignore statutory text in favor of extratextual policy arguments and fail to grapple with the radical consequences of their position: If states can apply their gambling laws to DCMs, then 50 states can impose "varying and potentially contradictory legal standards" that will result in "total chaos" and prevent DCMs from "operat[ing] efficiently" or even "at all." *Am. Agric. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (citation modified).

Defendants' recent conduct refutes their assertion that Kalshi suffers no irreparable harm. On August 26, Defendants sought an *ex parte* temporary injunction in Connecticut state court to prohibit Kalshi from

offering sports-event contracts in Connecticut. Defendants identify no reason to subject Kalshi to irreparable harm—liability, unrecoverable costs, reputational harms, and the threat of enforcement by the CFTC—while this appeal proceeds. The Court should grant an injunction pending appeal.

## ARGUMENT

### I. KALSHI IS LIKELY TO PREVAIL ON APPEAL.

#### A. Kalshi's Contracts Are Subject to the CFTC's Exclusive Jurisdiction.

Section 2(a) unambiguously preempts state law by granting the CFTC "exclusive jurisdiction … with respect to accounts, agreements …, and transactions involving swaps" that are "traded or executed" on DCMs. 7 U.S.C. § 2(a)(1)(A). It has been settled for 50 years that this language preempts states from regulating on-DCM trading. Defendants argue otherwise principally by arguing that Kalshi's contracts are not swaps. That argument fails.

1. Defendants ignore that the CFTC's exclusive jurisdiction extends not just to swaps, but to all "agreements" "traded or executed" on DCMs. Kalshi's sports-event contracts are unquestionably "agreements" traded on a DCM, so they fall within CFTC jurisdiction. That does not leave states without recourse if DCMs list improper contracts. States may sue under the Administrative Procedure Act if they believe the CFTC is not enforcing the

CEA against DCMs, including by challenging the CFTC's forthcoming rule. *See* 5 U.S.C. § 551(13). But they may not prosecute Kalshi for offering contracts its exclusive federal regulator has allowed.

2. Regardless, Kalshi's contracts are swaps. The CEA defines "swap" as any contract providing for payment "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence" or any contract "that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(ii)-(iv). This broad definition "reflects congressional intent to … cover many transactions and agreements." *United States v. Minnesota*, 2026 WL 2150211, at *12 (D. Minn. July 27, 2026). "It is not difficult to see how" contracts on, for example, "which NBA team would sign LeBron James" or "which team would win the World Cup" fit this definition. *Id.* at *14. As the CFTC has explained, "sporting events" "generate billions of dollars in economic activity and materially affect both regional and national markets." Prediction Markets, 91 Fed. Reg. 35,806, 35,807-08 (June 12, 2026) (citation omitted). "Kalshi's sports-event contracts fit comfortably" within the definition. *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026) (quoting *id.* at 233 (Roth, J., dissenting)). Defendants' contrary arguments fail.

*First*, Defendants have no answer to the Special Rule. There, Congress listed "swaps" "involv[ing]" "gaming" as one type of "event contract[ ]" falling within CFTC jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule is irrefutable textual proof that Congress did not exclude contracts involving "gaming" from CFTC jurisdiction or subject them to concurrent state-by-state jurisdiction. Instead, Congress authorized the CFTC to prohibit these contracts *only if* it determines they are "contrary to the public interest." *Id.* Defendants have no response.

*Second*, Defendants claim (at 11) the term "event" excludes "outcome[s]." *See* Op.16. But Defendants cite no authority for that proposition, which contravenes dictionary definitions confirming that "event[s]" include "outcome[s]." Mot. 16-17. Defendants note (at 11-12) the definition refers to "the 'occurrence' of an 'event' " and that "occurrence" and "event" must have different meanings. But no one disputes that they have different meanings—"occurrence" means "the act or fact of occurring," *Occurrence*, Webster's New World Dictionary of American English (3d Coll. ed. 1988), whereas an "event" is what occurs. And while Defendants mistakenly assert (at 12) that *Flaherty* did not consider that requirement, the Third Circuit concluded that Kalshi's contracts "depend on *event outcomes*

associated with economic consequences" and therefore "comfortably" qualify as swaps. 172 F.4th at 227-228 (emphasis added) (citation modified).

*Third*, Defendants make the staggering claim (at 12) that sports events are not "associated with a potential financial, economic, or commercial consequence." That assertion is self-evidently incorrect, and Defendants make no effort to dispute Kalshi's or the CFTC's evidence that sports events generate "billions" in economic consequences. *See* Mot. 13. Nor do Defendants defend the district court's suggestion that consequences from "broadcast rights, and advertising costs" are sufficiently direct but consequences for "sponsors" and "broadcasters" are not. Op.22.

Defendants claim (at 12) that an extratextual limitation is needed to prevent the "swap" definition from being "limitless." But the definition is not limitless; it excludes events not "associated" with any prospect of financial consequences, subject to ordinary causation principles. That limit precludes any artificial categorical rule that all sports events lack potential financial consequences.

*Fourth*, Defendants err in claiming (at 13) that if Kalshi's sports-event contracts are swaps, run-of-the-mill sports bets must also be swaps. To be a swap or other derivative, an instrument must be capable of being "traded" on an exchange. 7 U.S.C. § 2(a)(1)(A). Pursuant to an express delegation

from Congress, *see* 15 U.S.C. § 8302(d)(1), the CFTC and SEC have clarified that swaps are "*traded* on organized markets and over the counter," Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,217 (Aug. 13, 2012) (emphasis added); *see CFTC v. Erskine*, 512 F.3d 309, 323-324 (6th Cir. 2008) (derivatives are "standardized," "fungible," and "traded on an exchange"). That swaps are tradeable explains why Congress placed them under exclusive CFTC jurisdiction in Dodd-Frank. The financial crisis showed that when swaps are traded, their financial risks can migrate to other markets. *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). Congress thus mandated that swaps be traded on-DCM, subject to extensive and exclusive federal oversight.

Kalshi's sports-event contracts are customer-to-customer transactions with prices set by market forces and are structured like other derivative instruments, so they are tradeable instruments subject to the CEA. But bets offered by sportsbooks are company-to-customer transactions with prices set by bookmakers that cannot be traded, in which financial risk stays between the parties. For that reason, Section 2(e) supports Kalshi. The CFTC can force unregulated swaps onto DCMs. But Section 2(e) simply does not apply to sports bets.

### B. Defendants' Preemption Arguments Fail.

Defendants claim that even if Kalshi's contracts are swaps, the CFTC's exclusive jurisdiction does not preempt state law. That is obviously incorrect.

**Express Preemption:** Defendants fail to address Kalshi's argument that the CEA expressly preempts state law. Mot. 10-14. The Supreme Court and this Court have easily concluded that statutes granting "exclusive" "jurisdiction" to federal agencies preempt state law. *Rice v. Santa Fe Elevator,* 331 U.S. 218, 233-234 (1947) (citation omitted); *N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*, 635 F.3d 66, 72 (2d Cir. 2011). These jurisdictional grants preempt states from intruding on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). Defendants make no effort to explain how the CFTC's "exclusive jurisdiction" could give them *concurrent* jurisdiction over Kalshi. Nor do they cite, let alone distinguish, this Court's binding precedent that "[section] 2(a)(1) of the CEA preempts the application of state law." *Leist*, 638 F.2d at 322. The Ninth Circuit agrees that "the CEA expressly preempts state law regulating swaps 'traded or executed on' a DCM." *KalshiEX LLC v. Assad*, No. 25-7516, slip op. at 20 (9th Cir. Aug. 28, 2026) (citation omitted).

**Field Preemption:** If the CEA's text left any doubt, its "comprehensive regulatory structure" confirms states may not regulate on-DCM trading. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). Indeed, Congress announced that the CEA "preempt[s] the field," leaving no "need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.). Defendants have no response.

Defendants cite CEA provisions permitting state regulation. But each authorizes state regulation of *off-DCM* trading, *outside* the field Congress preempted. Thus, while Defendants tout Section 2(a)'s savings clauses, neither clause "reserve[s] to the states the power to regulate transactions involving swaps that take place on DCMs." *Minnesota*, 2026 WL 2150211, at *11. The first savings clause specifies that state law is *not* "supersede[d]" "[e]xcept as" "provided" by the CFTC's exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A). It thus confirms state law *is* superseded where the CFTC's exclusive jurisdiction applies. *See Assad*, slip op. at 21 ("§ 2(a)(1)(A)'s saving clause shows that Congress meant it to be a preemptive provision."). The second savings clause preserves state *court* authority, which "does not contravene the grant of CFTC's exclusive jurisdiction." *Minnesota*, 2026 WL 2150211, at *11 (quoting *Flaherty*, 172 F.4th at 231).

Defendants also cite Section 16's preemption provisions. Again, these provisions support Kalshi. Section 16(e)(1)(B)(i) provides that the CEA shall *not* "supersede or preempt" state regulation of transactions *not* "conducted on" a DCM. The only coherent inference of specifying no preemption as to off-DCM transactions is that Congress *did* preempt on-DCM transactions. Indeed, when Congress added this provision in 1982, it noted that the CEA already "bestowed on the CFTC exclusi[ve] jurisdiction" to regulate on-DCM trading, "thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44 (1982). The second provision, Section 16(e)(2), preempts state regulation of certain *off-DCM* transactions, known as "exempted" transactions. When Congress added this provision in 2000, it again recognized "the current" CEA already "supersedes and preempts" state laws with respect to *on-DCM* transactions. H.R. Rep. No. 106-711, pt. 2, at 71 (2000). The third provision, Section 16(h), added to the CEA in 2010, forbids states from regulating swaps as "insurance," whether they occur on- or off-DCM. None of those provisions calls into doubt that Congress preempted state regulation of on-DCM trading.

Defendants next cite (at 18) the Special Rule, asserting that "Kalshi does not explain who, if not the States" can prohibit event contracts as unlawful under State law. But Congress named the regulator who can

exercise that authority—"the Commission." 7 U.S.C. § 7a-2(c)(5)(C)(i). And while Defendants cite (at 18) the Special Rule's legislative history, it further supports Kalshi by underscoring Congress's intent to "restore *CFTC's* authority to prevent trading that is contrary to the public interest," 156 Cong. Rec. S5906 (daily ed. July 15, 2010) (emphasis added)—*not* to subject event contracts to concurrent state jurisdiction.

Defendants assert (at 18) that Congress did not intend "to specifically preempt state wagering law." Of course, Congress did not preempt states from applying their gambling laws to off-DCM transactions. But Congress *did* preempt state regulation of on-DCM trading, including by state gambling laws. Indeed, before Congress's grant of exclusive federal jurisdiction, many states regulated futures trading as "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933); *see Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888) (futures trading is "gambling" and a "crime"). If Defendants were correct, they could criminalize all derivatives trading tomorrow—an utterly implausible result that Defendants themselves do not defend.

**Conflict Preemption:** Defendants identify no conceivable way Kalshi could comply with 50 different states' laws while adhering to its federal obligation to provide a nationwide marketplace. They assert (at 19-20) that CFTC regulations prohibit only discrimination "based on net worth."

But the regulations mandate "impartial access" across-the-board, 17 C.F.R. § 38.151(b), and the CFTC has confirmed compliance with state laws is "impossible," *see* Mot. 15. Defendants further claim (at 20) that Kalshi can obtain a Connecticut gaming license. But they ignore that all three of Connecticut's wagering licenses have been issued. Mot. 15.

Defendants dismiss (at 19) the CFTC's "reversal of position." But the CFTC has *always* maintained "the CEA supersedes and preempts … state and local gaming and bucket shop laws" as to on-DCM transactions. Concept Release, 73 Fed. Reg. 25,669, 25,673 (May 7, 2008). Defendants cite (at 19 n.7) *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), but the CEA *expressly* delegates authority to the CFTC to effectuate it. 7 U.S.C. §§ 12a(5), (7), (9). A state law or court order requiring Kalshi to violate CFTC directives therefore conflicts with federal law, as the CFTC's emergency order recently confirmed. Mot. 25.

## II. The Equities Strongly Favor Relief.

**Irreparable Harm:** Defendants cannot seriously dispute Kalshi faces irreparable harm. Since filing their opposition, Defendants sought an *ex parte* temporary injunction in state court prohibiting Kalshi from offering sports-event contracts in Connecticut. *State v. KalshiEX LLC*, No. HHD-CV26-6230345-S (Conn. Super. Ct. filed Aug. 26, 2026). If Defendants

obtain that relief, Kalshi will face the "Hobson's choice" between disobeying state law, potentially upon penalty of contempt, and "suffer[ing] the injury of obeying the law" while the appeal is pending. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

Kalshi's irreparable harm is even clearer given recent developments in New York. New York sought to prohibit *all* Kalshi's event contracts, to shut Kalshi down *nationwide*, and to subject Kalshi to a minimum *$36 billion* in damages. *See* Ex. B to Mot. at 2-3. In response, the CFTC declared a "market emergency" and directed Kalshi not to comply with any state-court order. *Id.* Kalshi is caught in the middle.

Defendants respond (at 21-22) that civil penalties imposed on Kalshi may be challenged and vacated. But Kalshi's irreparable harm stems from the loss of business from tens of thousands of Connecticut users—business Kalshi undisputedly *cannot* recoup as damages. When "funds 'cannot be recouped,' " monetary harms are irreparable. *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (per curiam) (citation omitted). Cutting off Connecticut users would also cause Kalshi "reputational harm, including loss of" "goodwill." *Flaherty*, 172 F.4th at 231. Defendants minimize (at 22) this reputational harm and any revenue loss because Kalshi has not shown its "very viability" is at stake. But that standard only applies where "money

damages" are available to the party seeking preliminary relief. *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995). Here they are not.

**Balance of Equities:** The irreparable harms Kalshi will suffer absent relief easily outweigh any harms to Defendants or the public. Defendants identify no case holding that the equities favor enforcement of a preempted law. This Court has held the opposite. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). While Defendants invoke (at 24) their interest in protecting the public, they have not identified a single Connecticut user allegedly harmed by Kalshi. Kalshi imposes myriad consumer-protection measures, Mot. 25-26 & n.6, and Defendants do not explain why these measures are inadequate. And though Defendants cite revenue loss from Kalshi's customers, they (unlike Kalshi) may seek to recover any claimed monetary harms if they prevail on appeal.

## CONCLUSION

The Court should grant an injunction pending appeal.

Date: August 28, 2026

Respectfully submitted,

/s/ Neal Kumar Katyal

GRANT R. MAINLAND
ANDREW L. PORTER
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellant KalshiEX LLC*

## CERTIFICATE OF COMPLIANCE

This reply complies with the type-volume limitation of Federal Rules of Appellate Procedure 27(d)(2)(C) because it contains 2,583 words, excluding the parts of the reply exempted by Federal Rule of Appellate Procedure 27(a)(2)(B) and 32(f).

This reply also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia font 14-point typeface.

Date: August 28, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that, on August 28, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Second Circuit by using the ACMS.

Date: August 28, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal