# 26-2239

IN THE

## United States Court of Appeals for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

BRYAN T. CAFFERELLI, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Connecticut
No. 3:25-cv-2016
Hon. Vernon D. Oliver

**OPENING BRIEF FOR KALSHIEX LLC**

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

September 30, 2026

*Counsel for Plaintiff-Appellant KalshiEX LLC*

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiff-Appellant KalshiEX LLC discloses Kalshi Inc. as its parent company. No publicly held corporation owns 10% or more of KalshiEX LLC's stock.

# TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 7

STATEMENT OF ISSUES FOR REVIEW .......... 7

STATEMENT OF THE CASE .......... 7

I. LEGAL BACKGROUND .......... 7

A. Statutory Scheme .......... 7

B. Statutory History .......... 10

C. Regulatory Framework .......... 19

II. FACTUAL AND PROCEDURAL BACKGROUND .......... 23

SUMMARY OF ARGUMENT .......... 31

STANDARD OF REVIEW .......... 35

ARGUMENT .......... 35

I. THE CEA EXPRESSLY PREEMPTS STATE REGULATION OF INSTRUMENTS TRADED ON DCMS .......... 36

A. The CEA's Exclusive-Jurisdiction Provision Expressly Preempts State Regulation .......... 36

B. Kalshi's Event Contracts Fall Within The Scope Of The CEA's Express-Preemption Provision .......... 41

II. THE CEA IMPLIEDLY PREEMPTS STATE REGULATION OF TRADING ON DCMS .......... 52

A. Connecticut's Gaming Laws Are Field-Preempted As Applied To Kalshi's Exchange-Traded Instruments .......... 52

## TABLE OF CONTENTS—Continued

Page

B. Connecticut's Gaming Laws Are Conflict-Preempted As Applied To Kalshi ..... 54

III. THE ARGUMENTS TO THE CONTRARY ARE WRONG ..... 57

A. The District Court Erred In Holding That The CEA Does Not Preempt State Law ..... 57

B. The Other Arguments Against Preemption Likewise Fail ..... 63

IV. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR KALSHI ..... 68

CONCLUSION ..... 71

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) .................................................. 3, 37, 54, 55

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................. 53, 54, 56

*Burrage v. United States*,
571 U.S. 204 (2014) .................................................. 58

*California v. FERC*,
495 U.S. 490 (1990) .................................................. 56

*Chevron USA Inc. v. Plaquemines Par.*,
608 U.S. 1 (2026) .................................................. 48

*CME v. SEC*,
883 F.2d 537 (7th Cir. 1989) .................................................. 37

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) .................................................. 10

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .................................................. 35, 54

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) .................................................. 2, 10, 11, 62

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) .................................................. 37

*In re Olson*,
No. 21-05, 2021 WL 1336434
(CFTC Apr. 6, 2021) .................................................. 67

*Inv. Co. Inst. v. CFTC*,
891 F. Supp. 2d 162 (D.D.C. 2012) .................................................. 17, 18, 53

**TABLE OF AUTHORITIES—Continued**

Page(s)

*KalshiEX LLC v. Assad*,
--- F.4th ----, No. 25-7516, 2026 WL 2543846
(9th Cir. Aug. 28, 2026) .................. 2, 25, 36, 37, 38, 61, 63, 64, 65, 66, 67

*KalshiEX LLC v. Cafferelli*,
--- F. Supp. 3d ----, No. 3:25-cv-2016, 2026 WL 2294589
(D. Conn. Aug. 10, 2026) .......................................................................... 7

*KalshiEX LLC v. CFTC*,
No. 23-3257, 2024 WL 4164694
(D.D.C. Sep. 12, 2024) ............................................................................ 23

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .............................. 2, 3, 36, 37, 50, 54, 55, 69

*KalshiEX LLC v. Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026) ................................................ 27, 28

*KalshiEX LLC v. Schuler*,
--- F.4th ----, No. 26-3196, 2026 WL 2884087
(6th Cir. Sep. 25, 2026) .................................. 4, 34, 58, 63, 64, 65, 66, 67

*Lanier v. Bats Exch., Inc.*,
838 F.3d 139 (2d Cir. 2016) ..................................................................... 55

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ........................................ 2, 12, 36, 57, 59, 65

*Lockhart v. United States*,
577 U.S. 347 (2016) ............................................................................ 42, 43

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................................. 41

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .............................................. 7, 12, 52, 53, 62, 65, 67

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) .......... 36

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .......... 68

*Murphy v. NCAA*,
584 U.S. 453 (2018) .......... 62, 70

*N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*,
635 F.3d 66 (2d Cir. 2011) .......... 38

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) .......... 70

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012) .......... 54

*New Jersey v. Bessent*,
149 F.4th 127 (2d Cir. 2025) .......... 41

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 69

*Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*,
990 F.3d 217 (2d Cir. 2021) .......... 35

*Piccolo v. CFTC*,
388 F.3d 387 (2d Cir. 2004) .......... 55, 56, 65

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) .......... 59

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) .......... 37

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) .......... 69, 70

## TABLE OF AUTHORITIES—Continued

Page(s)

*Rice v. Bd. of Trade of Chi.*,
331 U.S. 247 (1947) .......... 11

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 37

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) .......... 41

*Slaney v. Int'l Amateur Athletic Fed'n*,
244 F.3d 580 (7th Cir. 2001) .......... 38

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*,
108 F.4th 144 (3d Cir. 2024) .......... 38

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980) .......... 37

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .......... 16, 53

*Yousefzadeh v. J&J Consumer Inc.*,
184 F.4th 130 (2d Cir. 2026) .......... 41, 59, 60

**CONSTITUTION:**

U.S. Const. art. VI, cl. 2 .......... 35

**STATUTES:**

5 U.S.C. § 551(13) .......... 44

7 U.S.C. §§

1a(6) .......... 8

1a(9) .......... 8, 53

# TABLE OF AUTHORITIES—Continued

Page(s)

1a(19) ... 53

1a(19)(iv) ... 15

1a(37) ... 8

1a(40) ... 15, 16

1a(47) ... 53

1a(47)(A) ... 8, 45

1a(47)(A)(ii) ... 1, 4, 17, 45, 46, 47, 48, 58

1a(47)(A)(iv) ... 17, 45, 47, 63

1a(47)(B) ... 19

1a(51)(A)(ii) ... 8, 9

2(a)(1)(A) ... 1, 2, 3, 8, 9, 11, 16, 17, 29, 31, 36, 37, 38, 40, 41, 42, 49, 60, 61, 62, 64

2(e) ... 16, 17, 18, 49, 53, 67

2(h)(8) ... 49

5(a) ... 8, 24, 49, 51, 66, 67

6a ... 9, 51

6b ... 9

6c ... 9

7(d) ... 9

7(d)(1)(A) ... 20

## TABLE OF AUTHORITIES—Continued

Page(s)

7(d)(2) .......... 20

7(d)(2)(A)(i) .......... 19

7(d)(3) .......... 19, 20, 52

7(d)(4) .......... 19, 20

7(d)(5) .......... 19

7(d)(9) .......... 19

7(d)(11) .......... 19, 20

7(d)(18) .......... 19

7(d)(21)(B) .......... 19

7a-1 .......... 9, 19, 20

7a-2(c)(1) .......... 20, 43

7a-2(c)(2) .......... 43

7a-2(c)(5)(B) .......... 21

7a-2(c)(5)(C)(i) .......... 5, 18, 19, 32, 33, 40, 44, 53, 56, 60, 63

7a-2(c)(5)(C)(ii) .......... 18, 19, 65, 66

8(b) .......... 9

9 .......... 9

9(10)(C) .......... 9

12a(5) .......... 19

12a(9) .......... 31, 57

## TABLE OF AUTHORITIES—Continued

Page(s)

13 ..... 9

13a-2(1) ..... 9, 10, 39, 43

13-1 ..... 19

16(e)(1)(B)(i) ..... 13, 39, 43

16(e)(2) ..... 9, 15, 40, 61

16(h) ..... 61

15 U.S.C. § 8302(d)(1) ..... 17, 50

15 U.S.C. § 8321(b) ..... 17

28 U.S.C. § 1292(a)(1) ..... 7

28 U.S.C. § 1331 ..... 7

31 U.S.C. § 5362(1)(E)(ii) ..... 16, 63

31 U.S.C. § 5362(10)(A) ..... 16

Commodity Exchange Act,
Pub. L. No. 74-675, 49 Stat. 1491 (1936) ..... 11, 38, 39

Commodity Futures Modernization Act,
Pub. L. No. 106-554, 114 Stat. 2763A–365 (2000) ..... 14, 15, 16

Conn. Gen. Stat. §§

12-574(g) ..... 67

12-852 ..... 62

12-853 ..... 62

12-857(a) ..... 27

## TABLE OF AUTHORITIES—Continued

Page(s)

12-863(b)(A)(i) .......... 54

12-864(c) .......... 51

53-278a(2) .......... 27

53-278b .......... 27

Grain Futures Act,
Pub. L. No. 67-331, 42 Stat. 998 (1922) .......... 10

**REGULATIONS:**

17 C.F.R. §§

38.4(b) .......... 20

38.151(b) .......... 20, 33, 54, 68, 69

38.251(a) .......... 52

pt. 38 .......... 20

40.2 .......... 20

40.2(a) .......... 20

40.3 .......... 20

40.3(b) .......... 21

40.11(c)(2) .......... 21

Concept Release on the Appropriate Regulatory Treatment of Event Contracts,
73 Fed. Reg. 25,669 (May 7, 2008) .......... 13, 21, 40

Conn. Agencies Regs. § 12-865-4 .......... 62

**TABLE OF AUTHORITIES—Continued**

Page(s)

Contract Market Designation,
40 Fed. Reg. 25,849 (June 19, 1975) .......... 20

Event Contracts,
89 Fed. Reg. 48,968 (June 10, 2024) .......... 22, 40, 41

Event Contracts; Withdrawal of Proposed Regulatory Action,
91 Fed. Reg. 5,386 (Feb. 6, 2026) .......... 22

Further Definition of "Swap,"
77 Fed. Reg. 48,208 (Aug. 13, 2012) .......... 50

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (June 12, 2026) .......... 22, 23, 46, 48, 52, 56, 66

Provisions Common to Registered Entities,
76 Fed. Reg. 44,776 (July 27, 2011) .......... 21, 22, 65

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30464 (1974) .......... 39

156 Cong. Rec. S5923 (daily ed. July 15, 2010) .......... 17

*Hearings Before the H. Comm. on Agric.*, 93d Cong. (1974) .......... 11, 12

*Hearings Before the S. Comm. on Agric. & Forestry*,
93d Cong. (1974) .......... 12, 64

H.R. Rep. No. 93-975 (1974) .......... 11, 12

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) .......... 12, 32, 52, 60

H.R. Rep. No. 97-565, pt. 1 (1982) .......... 13, 39, 40

H.R. Rep. No. 106-711, pt. 2 (2000) .......... 15, 16, 40, 61

S. Rep. No. 93-1131 (1974) .......... 12, 39

## TABLE OF AUTHORITIES—Continued

Page(s)

**OTHER AUTHORITIES:**

*2027 NFL Champion*, Kalshi, https://kalshi.com/markets/kxsb/super-bowl/kxsb-27 (last visited Sep. 30, 2026) .......... 26

Alex Klavens et al., *How DraftKings Uses A.I. to Target the Gamblers Likeliest to Lose*, N.Y. Times (Sep. 19, 2026), https://perma.cc/G9CM-VDNS .......... 67

Andrea M. Corcoran, CFTC No-Action Letter, CFTCLTR No. 93-66, Com. Fut. L. Rep. (CCH) ¶ 25,785, https://perma.cc/J636-DV9X .......... 14

Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5 .......... 5, 47

Andy Wilson et al., Comment Letter on Prediction Markets; Public Interest Determinations (July 27, 2026), https://perma.cc/BD2K-MQUP .......... 44

Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679 .......... 5, 47

*Associate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) .......... 45

Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM .......... 5, 47

Cait Huble, *Report: State Sports Betting Regulations Fall Short of Providing Adequate Consumer Protections*, Nat'l Council on Problem Gambling (Sep. 19, 2024), https://perma.cc/AEP5-JZY5 .......... 70

Christopher J. Kirkpatrick, *Order Directing Kalshi to Continue Exercising DCM Functions*, CFTC (Aug. 11, 2026), https://perma.cc/C6NW-4KFM .......... 31, 57, 69

## TABLE OF AUTHORITIES—Continued

Page(s)


Christopher J. Kirkpatrick, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents*, CFTC (July 14, 2026), https://perma.cc/GV5X-M9PQ ....57

*CME Group partners with FutureSports to introduce world's first futures on sports indexes*, CME Grp. (July 29, 2026), https://perma.cc/XJ7L-HKKA .... 48

Dylan Duke, *How much of an economic boom is the 2026 FIFA World Cup for the U.S. hosting cities?*, NPR (June 15, 2026), https://perma.cc/F64B-G5F4.... 46

*Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language (2001) .... 57, 58

*Exclusive*, American Heritage Dictionary (5th ed. 2022).... 36

John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825 (1982) .... 10, 62

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1 (1977)....10

Kevin T. Van Wart, Preemption and the Commodity Exchange Act, 58 Chi.-Kent L. Rev. 657 (1982) .... 12, 13, 39

Krystal Hur, *Cantor Lets Hedge Funds Place Big Bets on Kalshi's Prediction Markets*, Wall St. J. (Aug. 19, 2026), https://perma.cc/CY69-CYTZ.... 47

*Mandatory KYC and Surveillance*, Kalshi, https://kalshi.com/market-integrity/kyc-surveillance (last visited Sep. 30, 2026)....71

Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/L4YX-7MGD .... 46

## TABLE OF AUTHORITIES—Continued

Page(s)

*Potential*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003)......... 58

*Responsible Trading*, Kalshi, https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited Sep. 30, 2026) ........................................................ 71

*Round of 16 exits fuel World Cup quarterfinal ticket price drops*, Sports Bus. J. (July 10, 2026), https://perma.cc/E32Q-5N4K.............. 46

*Weather Options Overview*, CME Grp. (Nov. 15, 2016), https://perma.cc/7NV9-Q4NP ................................................................14

*Which party will win the U.S. Senate?*, Kalshi, https://kalshi.com/markets/controls/senate-winner/controls-2026 (last visited Sep. 30, 2026)............................................................ 25

# INTRODUCTION

For over half a century, it has been clear that the federal government—rather than the states—exclusively regulates trading on derivatives exchanges. The plain text of the Commodity Exchange Act ("CEA") says as much. The CEA grants a federal agency, the Commodity Futures Trading Commission ("CFTC"), "exclusive jurisdiction" over all "agreements …, and transactions involving swaps or … future[s] …, traded or executed" on federally designated contract markets ("DCMs"). 7 U.S.C. § 2(a)(1)(A). That means that, no matter how much Connecticut or any other state may believe derivatives trading looks like gambling, the state cannot regulate it as such without violating the CFTC's exclusive jurisdiction—not to mention the precedent of this and other Courts.

That principle decides this case. Plaintiff KalshiEX LLC ("Kalshi") sought preliminary relief because Connecticut threatened to criminally prosecute it for offering sports-event contracts on Kalshi's federally regulated derivatives exchange. Those exchange-traded contracts are both "agreements" and "swaps," which the CEA defines as "contract[s]" where payment depends on the "occurrence" of an "event … associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). Thus, Connecticut is no more entitled to enforce its gambling

laws against Kalshi's sports-event contracts than it is permitted to criminally prosecute the Chicago Mercantile Exchange ("CME") for offering weather or agriculture swaps.

A swap is a swap, whether it involves weather, wheat, sports, or anything else. States cannot regulate any of these derivatives without encroaching on the CFTC's exclusive jurisdiction. Indeed, Congress added the CEA's exclusive-jurisdiction provision partly to end states' efforts to prohibit futures trading as "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

The district court, however, disregarded the CEA's text and history by holding that the exclusive-jurisdiction provision does not preempt state regulation of derivatives trading. JA23. This Court has already held the opposite, recognizing that Section 2(a)(1)(A) "preempts the application of state law" to "trading" on federal exchanges. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.). The Third and the Ninth Circuits recently agreed. *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026); *KalshiEX LLC v. Assad*, --- F.4th ----, No. 25-7516, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026).

Those precedents are correct. A state's concurrent jurisdiction over derivatives trading is self-evidently incompatible with the federal

government's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). Until DCMs began offering sports-event contracts in 2024, no one really argued otherwise. After all, like stock markets, derivatives exchanges rely on the free, fair, and fast exchange of contracts nationwide. Exchanges "could not operate efficiently, and perhaps not at all" under 50 different state laws. *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992).

There is no textual basis for carving event contracts involving sports out of the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). The district court manufactured one by holding that sports-event contracts are not swaps. But the CFTC's exclusive jurisdiction extends to all "agreements" traded on a DCM, not just "swaps." That means that, if Connecticut believes sports-event contracts do not qualify as swaps or otherwise violate restrictions governing what may be traded on DCMs, the state must challenge the CFTC's decision to allow them under the Administrative Procedure Act. Connecticut cannot simply begin enforcing its laws against the DCM itself.

Regardless, as the Third Circuit has held, Kalshi's sports-event contracts "fit comfortably within the [CEA's] definition" of swap, *Flaherty*, 172 F.4th at 227 (quoting *id.* at 233 (Roth, J., dissenting)). They are

"contract[s]" that provide for payment depending on the "occurrence" of a particular sports "event"—such as a Spain World Cup win or Patriots loss—that has "potential financial ... consequence[s]" for everyone from advertisers, to sponsors, to merchandise manufacturers. 7 U.S.C. § 1a(47)(A)(ii).

The district court held otherwise only through textual gymnastics and logical leaps. It concluded that "events" exclude "outcomes," positing that whether a boxing match will go three rounds is an "event," while the match's result is an "outcome[ ]." JA16-17. But this distinction is ephemeral; as the Sixth Circuit recently held, dictionaries define "event[s]" to include "outcome[s]" and sports fans frequently refer to wins and losses as major "event[s]." *KalshiEX LLC v. Schuler*, --- F.4th ----, No. 26-3196, 2026 WL 2884087, at *9 (6th Cir. Sep. 25, 2026).

The district court also concluded that sports are not "inherently" connected to financial consequences. JA20 (citation omitted). But the text requires only that an event be "associated with" a "potential" financial consequence. 7 U.S.C. § 1a(47)(A)(ii). Kalshi's event contracts easily qualify because they involve sporting events with financial consequences for sponsors, advertisers, and countless other businesses whose financial well-being is tied to sports. Indeed, entities hedge their sports-related financial

risks on Kalshi all the time. An insurance company, for example, "expects to hedge about $30 million annually through" Kalshi to help teams and sponsors "manage the financial risks of performance incentives in athletes' and coaches' contracts."[1] Small businesses have also used Kalshi "to hedge" promotions tied to whether particular teams win and by how much.[2]

If there were any doubt as to whether the CEA preempts Connecticut's efforts to ban sports-event contracts, it would be resolved by the "Special [R]ule," which specifically governs "[e]vent contracts" including "swaps." 7 U.S.C. § 7a-2(c)(5)(C)(i). Far from barring them from derivatives exchanges or permitting states to do so, the Rule provides that the *CFTC* "may" decide that "[e]vent contracts" involving "gaming" are "contrary to the public interest." *Id.* If the CFTC makes that determination, gaming-related contracts cannot be traded on DCMs. Otherwise, they must be treated like any other swap.

---

[1] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

[2] Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM; Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679.

More fundamentally, the district court's decision rests on the misconception that sports-event contracts mirror sportsbook offerings. That ignores vital distinctions between state-regulated sportsbooks—which set the odds and win when bettors lose—and federally regulated DCMs that offer sports-event contracts—where market participants set the price for the trades, and DCMs do not gain from users' losses. The former, including its modern incarnations, remains fully subject to state regulation. But Congress placed the latter squarely within the CFTC's exclusive oversight.

The district court's disregard of that express congressional decision has led to stunning state overreach throwing the conflict between state and federal law into dramatic relief. The state recently filed a state-court emergency lawsuit seeking to ban Kalshi from offering or marketing its sports-event contracts in Connecticut. The CFTC, for its part, has confirmed that its regulations require Kalshi to offer its contracts on a nationwide basis—not state-by-state—and has ordered Kalshi *not* to follow state-court orders that conflict with Kalshi's federal obligations. Unless this Court grants relief, Kalshi will face serious irreparable harm no matter how it proceeds.

Congress granted the CFTC exclusive jurisdiction precisely to avoid situations like this one. The district court relied on its own erroneous

intuitions about legislative intent to erase Congress's 50-year-old grant of exclusive authority to the CFTC, destroying the nationwide uniformity necessary for derivatives markets to function. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because the action arises under the Supremacy Clause. Judge Vernon D. Oliver denied a preliminary injunction in an opinion and order dated August 10, 2026. *KalshiEX LLC v. Cafferelli*, --- F. Supp. 3d ----, No. 3:25-cv-2016, 2026 WL 2294589 (D. Conn. Aug. 10, 2026). Kalshi timely appealed the same day. JA39-40. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES FOR REVIEW

1. Whether the CEA preempts state regulation of event contracts traded on DCMs.

2. Whether the balance of harms and equities favor a preliminary injunction.

## STATEMENT OF THE CASE

### I. LEGAL BACKGROUND

#### A. Statutory Scheme

1. The CEA establishes a "comprehensive regulatory structure to oversee" derivatives trading on DCMs. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted).

Derivatives trading—that is, exchanging financial instruments whose prices depend on underlying commodities—serves the "national public interest" by establishing "a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). To vindicate that national interest, the CEA grants a federal agency, the CFTC, "exclusive jurisdiction" to regulate derivatives traded on DCMs. *Id.* § 2(a)(1)(A).

The CEA defines "commodit[ies]" to include both tangibles, such as wheat or sports merchandise, as well as "all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." *Id.* § 1a(9). The covered derivatives are defined with equal breadth. For example, the CEA's six-part definition of "swap" encompasses not just interest-rate and weather swaps but also any contract providing for payment "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence," and any "transaction that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A).

The CEA also includes numerous provisions regarding DCMs—the federally designated exchanges (or "contract markets") on which derivatives trade. DCMs are "trading facilit[ies]," *id.* §§ 1a(6), (37), which operate through a "pre-determined non-discretionary" algorithm that automatically

matches bids and offers, *id.* § 1a(51)(A)(ii). The CEA's detailed instructions mandate how exchanges can obtain federal designation as DCMs, how they should operate upon designation, and what instruments can be traded on them. *See id.* § 7(d).

In addition, the CEA contains numerous provisions designed to protect the integrity of on-DCM trading, including prohibitions on fraud, manipulation, and disruptive trading, as well as position-size limits on certain transactions. *Id.* §§ 6a, 6b, 6c, 9. Still other provisions require that all positions be collateralized through federally regulated clearinghouses. *Id.* § 7a-1. Yet others list enforcement tools the CFTC may use to ensure DCMs and their participants comply with the statutory and regulatory scheme, including civil penalties, licensing revocation, and referral for criminal enforcement. *Id.* §§ 8(b), 9(10)(C), 13.

2. Federal preemption is the cornerstone of the CEA. Section 2(a)(1)(A) grants the CFTC exclusive jurisdiction over "accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed on a [designated] contract market" or other federally regulated "board of trade." Section 16(e)(2) extends the preemption of state "gaming" or "bucket shop[ ]" laws to a narrow class of instruments traded *off*-DCM. And Section 13a-2(1), entitled "Jurisdiction of

States," gives the States a role in enforcing the CEA but only against entities "other than" DCMs.

### B. Statutory History

1. Derivatives trading has not always been federally regulated. Historically, because futures traders often exchanged contracts to speculate on the future price of goods without physical delivery, many states decried them as "gambling in grain." *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888); *see also* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977) (documenting states' treatment of futures trading as unlawful gambling). States thus enacted "anti-gaming" and "anti-bucket shop" laws to make it "as difficult as humanly possible to trade futures." John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825, 826 (1982) (quotation marks omitted); *see* Addendum B (enumerating early state statutes banning futures trading as gambling).

2. Congress first recognized the national interest in derivatives trading in the 1920s. The Grain Futures Act of 1922 sought to centralize futures trading on federally approved "contract market[s]." Pub. L. No. 67-331, 42 Stat. 998, 1000-02. But the Supreme Court in *Dickson* held that the statute

did not preempt state prohibitions against "gambling in grain futures." 288 U.S. at 198.

In 1936, two years after the Securities Exchange Act's comprehensive federal overhaul of stock trading, Congress enacted the CEA to provide similar treatment for derivatives. The CEA expanded the Grain Futures Act framework to cover a broader range of commodities and added anti-fraud protections. Pub. L. No. 74-675, 49 Stat. 1491, 1491-99. But Congress again stopped short of preemption, instead preserving "any State law applicable" to certain "transaction[s]" regulated by the Act. *Id.* at 1494. That proviso prevented "supersedure and preserv[ed] state control." *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947).

Over the following decades, that decision produced a patchwork of regulations, leading exchanges to request a uniform "federal policy" not "subject to the vagaries" of "different jurisdictions." *Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1974) ("House Hearings").

3. Congress responded with the Commodity Futures Trading Commission Act of 1974, which was designed to "[b]ring[ ] all futures trading under federal regulation." H.R. Rep. No. 93-975, at 54 (1974). This statute created the CFTC and made federal authority supreme through Section 2(a)(1)(A)'s exclusive-jurisdiction provision. Congress thus sought to avoid

"any possible conflicts over jurisdiction." House Hearings at 128. After all, "different State laws would just lead to total chaos" absent "preemption." *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) ("Senate Hearings") (statement of Sen. Clark). Congress also sought "to protect all futures traders from price manipulation," including "the speculator," who plays a "crucial role in an effective and orderly futures market." *Curran*, 456 U.S. at 390 (citing H.R. Rep. No. 93-975, at 138).

Further, when the House tried to dilute Section 2(a)'s preemptive force by inserting a state-law savings clause, the Senate promptly revised the clause so it applied "except as hereinabove provided" in the exclusive-jurisdiction provision. S. Rep. No. 93-1131, at 31 (1974). The proviso ensured "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." *Id.* at 6. The Senate also "struck" the provision in the 1936 Act that had preserved "any State law applicable" to derivatives transactions. H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.) (quotation marks omitted). As the Conference Report explained, these amendments sought to "preempt the field insofar as futures regulation is concerned." *Id.*

This Court was quick to recognize that the CEA as amended "preempts the application of state law" to trading on federal exchanges. *Leist*, 638 F.2d at 322. The CFTC also understood that these amendments superseded state

laws, including laws barring futures as "illegal gambling contracts." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982) (citation omitted).

4. In 1982, Congress recognized that the 1974 amendments had "bestowed on the CFTC exclusi[ve] jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44 (1982). But Congress concluded "States should be extensively involved in … policing transactions outside those preserved exclusively" for the CFTC. *Id.* Congress therefore added a CEA provision clarifying that "[n]othing in this chapter shall supersede or preempt" "the application of any … State" law to "transaction[s] "not conducted on or subject to the rules" of a DCM. 7 U.S.C. § 16(e)(1)(B)(i). Congress thus reaffirmed the grant of "exclusive CFTC jurisdiction over exchange-traded futures" while permitting states to police off-DCM transactions. H.R. Rep. No. 97-565, pt. 1, at 45.

5. In the 1990s, sophisticated traders recognized the hedging and price discovery benefit of a new kind of derivatives—event contracts. *See* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,669, 25,671-72 (May 7, 2008). These contracts allow a person to hedge risks by purchasing contracts that pay out depending on whether

particular events occur. For example, a farmer concerned about the possibility of drought can hedge her risk by purchasing event contracts that will pay out if there is no rain, and a beach resort might buy the other side of those contracts to hedge its own risk of a rainy season. Or a speculator can take either side. Because the price traders are willing to pay accords with their view of the likelihood of rain, the market price will reflect the market's perception of the odds of rain.

In 1992, CFTC-regulated exchanges started listing these contracts on events from corporate mergers to temperature shifts. *Id.* at 25,671. The following year, the CFTC permitted a prediction market operated by the University of Iowa to list event contracts based on U.S. and Canadian elections.[3] The CME certified its first weather event contract in 1999.[4]

In 2000, Congress responded to this growing trend in the Commodity Futures Modernization Act ("CFMA"), Pub. L. No. 106-554, 114 Stat. 2763A–365, which amended the CEA to expressly recognize that an "occurrence" or "contingency" could be a commodity. Specifically, Congress created a new category of "excluded commodit[ies]"—so named not because they were

---

[3] Andrea M. Corcoran, CFTC No-Action Letter, CFTCLTR No. 93-66, Com. Fut. L. Rep. (CCH) ¶ 25,785, https://perma.cc/J636-DV9X.

[4] *Weather Options Overview*, CME Grp. (Nov. 15, 2016), https://perma.cc/7NV9-Q4NP.

barred, but because they were excluded from the CEA's requirement that derivatives must be traded on-DCM. *Id.* at 2763A–377. Congress then included financially consequential "occurrence[s]" in this new category of commodities. 7 U.S.C. § 1a(19)(iv).

CFMA allowed sophisticated market participants known as "eligible contract participants" to enter transactions in excluded commodities (including event contracts) "over-the-counter"—*i.e.*, off-exchange. 114 Stat. at 2763A–366, 2763A–379. And, to prevent state regulation of these off-DCM transactions, Congress listed excluded commodities in a new preemption provision now codified at Section 16(e)(2), which mandates that the CEA "shall supersede and preempt" any state law "that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability)" to transactions that are "excluded" or "exempted" from the CEA (and DCM trading). The Committee Report explained that the then-"current" CEA already "supersede[d] and preempt[ed]" state laws as to "transactions conducted on" "registered entit[ies]" like DCMs. H.R. Rep. No. 106-711, pt. 2, at 71 (2000). The new preemption provision clarified that the CEA likewise "supersedes and preempts State gaming and bucket shop laws" as to excluded off-DCM

transactions. *Id.*; *see also* 7 U.S.C. § 1a(40) (defining "registered entity" to include DCMs).

The 2000 amendments also addressed derivative instruments known as "swaps." As with excluded commodities, Congress in 2000 exempted most swaps from the CEA's on-DCM trading requirement. 114 Stat. at 2763A–379. Congress also barred the CFTC and SEC from regulating most swaps, including over-the-counter swaps markets. *See id.* at 2763A–452.

6. In 2006, Congress addressed the application of gambling laws to interstate transactions over the internet in the Unlawful Internet Gambling Enforcement Act ("UIGEA"). That statute generally prohibits "bet[s] or wager[s]" if they are illegal in the state where they are initiated or received. 31 U.S.C. § 5362(10)(A). But UIGEA's prohibitions do not apply to "any transaction conducted on" a DCM under the CEA, in keeping with the CFTC's exclusive jurisdiction over DCM trading. *Id.* § 5362(1)(E)(ii).

7. Congress returned to the CEA in the Dodd-Frank Act of 2010. Following the financial crisis, Congress sought to bring unregulated trading under federal control. *See United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). Congress therefore eliminated or amended provisions that had generally allowed derivatives involving excluded commodities and swaps to

be traded off-DCM, and it placed swaps within the CFTC's "exclusive jurisdiction." 7 U.S.C. §§ 2(a)(1)(A), 2(e).

Congress also adopted "a broad and expansive" six-part "definition of the term 'swap'" to capture not just the credit default swaps that had fueled the financial crisis, but other products that market participants might adopt to "evade these important new legal requirements." 156 Cong. Rec. S5923 (daily ed. July 15, 2010) (statement of Sen. Lincoln). As relevant here, Congress defined swaps to include event contracts—that is, contracts providing for payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Congress also defined swap to include any contract "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). And it authorized the CFTC to "further define" "swap" by regulation, 15 U.S.C. § 8302(d)(1), including to cover instruments "structured to evade" the Dodd-Frank Act's new protections, *id.* § 8321(b).

Congress thus sought to keep pace with market innovation by capturing instruments structured like those that caused the crisis—that is, instruments that allow financial risk to be traded and re-traded, thereby "permitt[ing] enormous exposure to risk to grow out of the sight of regulators

and other traders." *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 173-174 (D.D.C. 2012) (citation omitted). And through a new provision, Section 2(e), it mandated that all retail swap trading must occur on a DCM or under its rules, thereby ensuring that such trading would be subject to federal oversight and the CEA's robust market protections.

Dodd-Frank also specifically addressed event contracts in a provision known as the Special Rule. 7 U.S.C. § 7a-2(c)(5)(C)(i). This provision describes "[e]vent contracts" as "agreements, contracts, transactions, or swaps in excluded commodities that are based upon [an] occurrence, extent of an occurrence, or contingency." *Id.* And it authorizes the CFTC to review and prohibit six categories of event contracts if it concludes they are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(ii). The Special Rule provides that the CFTC "may"—but need not—"determine" that event contracts are contrary to the public interest if they "involve":

> (I) activity that is unlawful under any Federal or State law;
> (II) terrorism;
> (III) assassination;
> (IV) war;
> (V) gaming; or
> (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(5)(C)(i). If an event contract is "determined by the [CFTC] to be contrary to the public interest," it may not be listed on a DCM. *Id.* § 7a-2(c)(5)(C)(ii).

Thus, while the CEA bans certain contracts outright, *see, e.g.*, *id.* § 13-1, and carves other agreements out of the "swap" definition, *id.* § 1a(47)(B), Congress did not ban or carve out event contracts involving "gaming." Instead, Congress gave the CFTC discretion to decide when such contracts are contrary to the public interest. *Id.* § 7a-2(c)(5)(C)(ii).

### C. Regulatory Framework

1. The CEA not only grants the CFTC exclusive jurisdiction but also contains numerous provisions addressing how the CFTC should exercise that authority. Thus, the statute instructs the CFTC "to make and promulgate … regulations … reasonably necessary to effectuate" 23 core principles that exchanges must satisfy to obtain and keep their federal designation as DCMs. 7 U.S.C. § 12a(5). These principles provide, for example, that DCMs must impose and comply with "access requirements," *id.* § 7(d)(2)(A)(i), and position limitations to ensure efficient pricing and prevent market manipulation, *id.* §§ 7(d)(5), (9). They must also keep five years' worth of trading records, *id.* § 7(d)(18); maintain capital reserves sufficient to cover "operating costs" for one year, *id.* § 7(d)(21)(B); list only contracts not

"readily susceptible to manipulation," *id.* § 7(d)(3); monitor for "manipulation," *id.* § 7(d)(4); and use a CFTC-regulated clearinghouse to ensure sufficient liquidity, *id.* §§ 7(d)(11), 7a-1.

Pursuant to its statutory mandate, the CFTC has adopted comprehensive regulations elaborating on each of these core principles. *See* 17 C.F.R. pt. 38. For example, pursuant to the second core principle, the CFTC has required that DCMs guarantee "impartial access" to their exchanges to vindicate Congress's interest in efficient and accurate pricing. *Id.* § 38.151(b); *see* 7 U.S.C. § 7(d)(2). The CEA provides that DCMs must "comply with" this and all other CFTC requirements. 7 U.S.C. § 7(d)(1)(A).

The CEA also charges the CFTC with overseeing the listing of contracts on DCMs. *See id.* § 7a-2(c). Until 2000, the CEA required DCMs to obtain CFTC preapproval before listing contracts. *See* Contract Market Designation, 40 Fed. Reg. 25,849, 25,850 (June 19, 1975). But this process proved onerous and inefficient, so in 2000, Congress allowed DCMs to list contracts by self-certifying their compliance with applicable requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §§ 38.4(b), 40.2(a). Today, DCMs seeking to list new contracts must submit detailed certifications to the CFTC to demonstrate CEA compliance. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §§ 40.2, 40.3.

The CFTC may review these certifications to determine whether contracts violate applicable law. 7 U.S.C. § 7a-2(c)(5)(B); *see* 17 C.F.R. § 40.3(b).

2. Over the past two decades, the CFTC has repeatedly used its regulatory authority to address event contracts. In 2008, the CFTC solicited public comment on how to regulate those contracts. 73 Fed. Reg. at 25,669-70. Recognizing that event contracts may be based on "varied" eventualities, such as election results "or the outcome of particular entertainment events," the agency viewed them as akin to "either options or futures contracts." *Id.* The CFTC explained that the CEA "supersedes and preempts other laws, including state and local gaming … laws" as to on-DCM transactions. *Id.* at 25,673. It therefore sought comments on "the implications of possibly preempting state gaming laws with respect to event contracts" by permitting them to be traded on-DCM. *Id.* That rulemaking was never finalized, however, because Dodd-Frank expressly included event contracts within the swap definition and confirmed the CFTC's exclusive regulatory jurisdiction over them in the Special Rule.

In 2011, the CFTC implemented the Special Rule by provisionally barring contracts involving the enumerated categories while authorizing the CFTC to "issue an order approving or disapproving" such contracts on a case-by-case basis. 17 C.F.R. § 40.11(c)(2). As the CFTC explained in

promulgating Rule 40.11, DCMs "may always" self-certify contracts subject to review "on a case-by-case basis." Provisions Common to Registered Entities, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011).

In 2024, the CFTC reiterated that its "exclusive jurisdiction" over event contracts "preempt[s] the application of state law," Event Contracts, 89 Fed. Reg. 48,968, 48,977 n.84 (June 10, 2024), and it proposed a regulation that would have deemed all sports-event contracts "contrary to the public interest," *id.* at 48,975, 48,978. But the proposal was never finalized, and the CFTC formally withdrew it in February 2026. Event Contracts; Withdrawal of Proposed Regulatory Action, 91 Fed. Reg. 5,386 (Feb. 6, 2026).

In June 2026, the CFTC promulgated a Notice of Proposed Rulemaking ("NPRM") announcing a comprehensive framework for regulating event contracts under the Special Rule. *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026). The NPRM confirms that the CEA "expressly preempts state laws" with respect to event contracts on DCMs. *Id.* at 35,808. It recognizes event contracts are "swaps" that serve "price discovery" functions and permit market participants to hedge exposure to events "for which no traditional financial instrument otherwise exists," including "sporting events" generating

"billions of dollars in economic activity." *Id.* at 35,807-08 (citation modified).

The NPRM also proposes revising Rule 40.11 by: (1) defining "gaming" to include event contracts involving sporting events, (2) making clear that these event contracts are *not* (and never have been) categorically prohibited but instead are subject to case-by-case review, (3) providing a framework for the CFTC's public-interest review, and (4) explaining that many (but not all) event contracts involving sporting events "can be operated consistent with the public interest." *Id.* at 35,818, 35,836, 35,853. The NPRM's comment period closed on July 27, 2026. *Id.* at 35,806. The CFTC informed the Ninth Circuit that it "expects that its revised version of 17 C.F.R. § 40.11 will become final within the next two months." Fed. Pls.' Resp. to Defs.-Appellants' Mot. for Summ. Disposition at 2, *CFTC v. Johnson*, No. 26-4281 (9th Cir. Sep. 24, 2026), Dkt. No. 29.1 ("CFTC *Johnson* Response").

## II. Factual And Procedural Background

1. In 2020, the CFTC designated Kalshi as a DCM. *See KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Kalshi offers many kinds of event contracts related to climate, technology, popular culture, economics, and agricultural commodities. *See id.* Each contract has a yes (the event will occur) and a no (it will not) position,

allowing customers to trade on financially significant events. Users can hedge risks associated with these events, and contract prices fluctuate in real time based on bids and asks, which reflect traders' perceptions of how likely the event is to occur, giving these contracts extraordinary predictive value.

That is why Kalshi is known as a "prediction market"—its contracts provide market-driven predictions about future events, crowdsourced by users incentivized to predict accurately. The public benefits of these contracts therefore extend well beyond those who trade. Indeed, most people who interact with Kalshi do not trade, but rather consult Kalshi's publicly available forecasts. Kalshi's event contracts therefore serve the CEA's "national public interest[s]"—"providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

The illustration below, for example, shows the Kalshi contract regarding which party will control the U.S. Senate after the 2026 midterm election:



[5]

In January 2025, Kalshi began offering contracts on sports events. *Assad*, 2026 WL 2543846, at *4. These contracts are structured like Kalshi's other event contracts, and they, too, allow users to hedge risks and provide crowdsourced predictions.

---

5 *Which party will win the U.S. Senate?*, Kalshi, https://kalshi.com/markets/controls/senate-winner/controls-2026 (last visited Sep. 30, 2026).

The illustrative contract below shows the Kalshi contract regarding which team will win the Super Bowl in 2027:



[6]

While the underliers of these event contracts are sports events, they are structured exactly like all other event contracts, and that structure differs from the mechanics of state-regulated sports betting. Sportsbooks are bookmakers; they are counterparties to bets placed by customers, and they

[6] *2027 NFL Champion*, Kalshi, https://kalshi.com/markets/kxsb/super-bowl/kxsb-27 (last visited Sep. 30, 2026).

set the odds. Bookmakers also win when bettors lose, giving them an incentive to stack the odds in their own favor. Kalshi, by contrast, is an exchange. It acts as an intermediary and does not favor one side of the trade. The market—not Kalshi—sets the prices.

2. In December 2025, the Connecticut Department of Consumer Protection ("DCP") sent Kalshi a cease-and-desist letter asserting that Connecticut gambling law prohibits Kalshi's sports-event contracts. JA77-78. Connecticut law requires online gambling operators to obtain a license prior to offering sports wagering and imposes criminal penalties for failing to comply. Conn. Gen. Stat. §§ 12-857(a), 53-278b. Even though the criminal law defining "gambling" expressly excludes "legal business transactions which are valid under the law of contracts," *id.* § 53-278a(2), DCP warned Kalshi that continuing to offer sports-event contracts may result in "civil … and/or criminal penalties." JA78. Kalshi filed this suit, arguing that the CEA preempts Connecticut's enforcement action.

3. While Kalshi's motion was pending, the CFTC confirmed its exclusive jurisdiction over Kalshi's sports-event contracts. The CFTC filed preemption suits against multiple states, including Connecticut, to prevent them from enforcing preempted state laws against DCMs. *See, e.g.*, *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn. filed Apr. 2, 2026);

*KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954, 967-968 (D. Ariz. 2026) (granting CFTC's motion for preliminary injunction against Arizona); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y. filed Apr. 24, 2026). The CFTC has explained that "[s]tates cannot invade the CFTC's exclusive jurisdiction … by re-characterizing swaps trading on DCMs as illegal gambling." CFTC Amicus Br. 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Br."). And it has observed that state regulation of Kalshi's contracts "fundamental[ly] threat[ens] … Congress's statutory design" and would impose "a seismic shift in the longstanding status quo." *Id.*

4. Nonetheless, the district court denied Kalshi a preliminary injunction. It reasoned that it has the authority to decide what counts as a "swap." JA14. The court then held that Kalshi's sports-event contracts are not "swaps" because they do not involve "events." JA16-17. In the court's view, whether a game happens is an "event," but a game's "outcome or discrete in-game occurrences" are not. JA17. And the court further held that a sports event is not "associated" with "potential financial, economic, or commercial consequence[s]" unless "by its very nature, [the event] has embedded" potential financial consequences. JA20 (citation modified).

Putting these two things together, the court held that a swap could involve "the occurrence of a sports game itself, which has, embedded within it, potential financial consequences arising from ticket sales, broadcast rights, and advertising costs." JA22. But a swap may not involve the "results of sporting contests," which have only "incidental financial implications for teams, players, sponsors, broadcasters, and others." JA22.

The court further held that even if Kalshi's contracts are swaps, the CEA does not preempt Connecticut's gambling laws. JA23-32. The court first held that Section 2(a)(1)(A) does not preempt state gambling law because both its savings clause and the Special Rule reference state law, suggesting Congress meant to "leave room" for state regulation. JA26-27 (citation omitted). As to conflict preemption, the court reasoned that there was no conflict because the CEA's impartial-access requirement does not "require DCMs to offer contracts nationwide," and Connecticut's gambling laws are "harmonious with" federal objectives. JA29, 32 (citations omitted).

The court further concluded that Kalshi had not shown irreparable harm and that the equities favored Connecticut. JA35-37. Underlying all the court's holdings was its view that Kalshi's contracts are "sports wagers" properly subject to state regulation. JA37.

Kalshi moved for an injunction pending appeal in the district court, which that court denied. Dkt. No. 99. The court then granted the parties' joint motion to stay the action pending resolution of this appeal. Dkt. No. 102. CFTC's separate lawsuit against Connecticut remains pending before the same judge. *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn.).

Kalshi also moved for an injunction pending appeal in this Court, Dkt. No. 23, which was referred to a three-Judge panel to be heard in tandem with Appellant's motion for an injunction pending appeal in *KalshiEX LLC v. Williams*, No. 26-1835 (2d Cir. filed July 8, 2026), in which a New York district court denied Kalshi a preliminary injunction against similar enforcement efforts initiated by New York state officials. Dkt. No. 27.

Both motions for an injunction pending appeal remain pending. In the meantime, the New York Attorney General has responded to the district court order denying a preliminary injunction in *Williams* by filing a lawsuit seeking to prohibit *all* of Kalshi's event contracts (not just contracts involving sports), to shut Kalshi down nationwide (not just in New York), and to subject Kalshi to a minimum *$36 billion* in damages. *See* Ex. 2 to Notice of Removal, *New York ex rel. James v. KalshiEX LLC*, No. 1:26-cv-6550 (S.D.N.Y. July 31, 2026), Dkt. No. 1-2. The CFTC responded by issuing an emergency order directing "Kalshi to continue to operate its exchange in

accordance with its normal practices" even if New York obtains relief against Kalshi.[7]

## SUMMARY OF ARGUMENT

**I.** The CEA expressly preempts state regulation of trading on DCMs like Kalshi.

**A.** Section 2(a)(1)(A) expressly preempts state law. By granting the CFTC "exclusive jurisdiction" to regulate on-DCM trading, Congress prohibited states from exercising any concurrent jurisdiction over that trading. This Court already recognized as much in *Leist*. And text, history, and Supreme Court precedent are all in accord.

**B.** Kalshi's event contracts fall comfortably within the scope of the CEA's express preemption clause. Section 2(a)(1)(A) covers not just "swaps," but *all* "agreements … traded or executed on a" DCM. Accordingly, if a state believes that the CFTC has erroneously classified certain agreements as swaps or otherwise misapplied the CEA's restrictions to exchange-traded agreements, it must vindicate those concerns through an APA challenge. It cannot simply enforce state laws against DCMs.

[7] Christopher J. Kirkpatrick, *Order Directing Kalshi to Continue Exercising DCM Functions* 1, CFTC (Aug. 11, 2026), https://perma.cc/C6NW-4KFM ("NY CFTC Order"); *see* 7 U.S.C. § 12a(9) (CFTC's emergency authority).

Regardless, Kalshi's event contracts are "swaps." Their structure as tradeable instruments mirrors the structure of other swaps, differing only in that the underlier is a sports event rather than some other event or commodity. The CEA provides no textual or inferential basis to single out contracts involving sports events and exclude them categorically from the swap definition, especially given that sports events obviously carry financial consequences and the CEA expressly references "swaps" involving "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). That does not mean the swap definition is limitless. Among other things, retail swaps must be tradeable and they must be capable of being entered into between parties in different states—requirements that exclude many state-regulated consumer contracts involving speculation, including both insurance contracts and sportsbook betting.

**II.** The CEA also impliedly preempts state regulation of trading on DCMs.

**A.** Congress's avowed purpose in establishing a uniform set of rules for trading on DCMs was to "preempt the field." H.R. Rep. No. 93-1383, at 35. The comprehensive regulatory framework Congress created to oversee futures trading leaves no room for parallel state regulation.

**B.** Connecticut gambling laws are also conflict-preempted as applied to Kalshi. Connecticut seeks to bar Kalshi's contracts in Connecticut, contrary to a CFTC regulation requiring Kalshi to offer "impartial access" to its contracts nationwide. 17 C.F.R. § 38.151(b). Moreover, allowing 50 states to regulate trading on DCMs would thwart Congress's objective of uniform federal regulation of DCMs.

**III.** The arguments to the contrary uniformly fail.

**A.** The district court erred in concluding that the CEA does not preempt state gambling laws as applied to trading on DCMs. The court understood the CEA's grant of *exclusive* jurisdiction over *all* agreements traded on DCMs to mean *concurrent* jurisdiction. And the court rejected conflict preemption on the ground that DCMs can operate fractured state-by-state markets, even though the CFTC has confirmed that compliance with both state and federal law is "impossib[le]." CFTC Br. 26-27.

The district court also erred in concluding that Kalshi's contracts are not swaps. That conclusion cannot be reconciled with the CEA's text and overlooks the Special Rule's reference to "[e]vent contracts" involving "gaming" as one type of "swap[ ]." 7 U.S.C. § 7a-2(c)(5)(C)(i). The district court's results-driven conclusion that an event cannot be an "outcome[ ]" and that swaps must be based on events with "embedded" or "inherent[ ]"

financial consequences, JA17-20 (citation modified), cannot be reconciled with the CEA's plain text or the existence of other event-based swaps, like weather swaps.

**B.** The additional arguments relied on by the Ninth and Sixth Circuits are equally misguided. The Sixth Circuit interpreted the CFTC's "exclusive jurisdiction" over all "agreements" traded on DCMs as concurrent jurisdiction permitting a state to regulate any DCM-traded contract so long as its regulations are not too "direct." *Schuler*, 2026 WL 2884087, at *21. And the Ninth Circuit concluded that the CFTC's Rule 40.11 categorically prohibits listing all sports-event contracts on DCMs—even though the CFTC has always applied Rule 40.11 on a contract-by-contract basis, and even though Rule 40.11 is about to be replaced by the CFTC's new rule addressing sports-event contracts.

Moreover, both the Sixth and Ninth Circuit decisions relied on the erroneous premise that sports-event contracts offered by DCMs are no different than sports bets offered by casinos and bookies. But sports-event contracts are traded on nationwide exchanges that set their prices subject to a neutral algorithm, so they serve the CEA's hedging and price-discovery purposes. By contrast, sports bets are contracts with a casino or bookie, who

sets the price and the odds and wins when its customers lose, making state-regulated intrastate sports betting unsuitable for hedging or price discovery.

**IV.** Kalshi will suffer numerous irreparable harms absent an injunction, including irreparable monetary harm and the jeopardization of its status as a DCM, to say nothing of the harms to its users. By contrast, a state suffers no harm from being denied the ability to enforce preempted laws.

## STANDARD OF REVIEW

To secure a preliminary injunction, a plaintiff must show "[1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in its favor, and [4] that an injunction is in the public interest." *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 225 (2d Cir. 2021) (citation modified). This Court reviews "the denial of a preliminary injunction for abuse of discretion." *Id.*

## ARGUMENT

Under the Supremacy Clause, Congress "has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see* U.S. Const. art. VI, cl. 2. Congress exercised that power in the CEA: It expressly preempted state regulation of derivatives trading on federally

designated exchanges by granting the CFTC exclusive jurisdiction over that trading. And even if Congress hadn't included that express-preemption clause, field and conflict preemption would still apply because the CEA establishes a comprehensive regulatory framework for derivatives trading on DCMs, and that uniform scheme necessarily conflicts with 50 different states' gambling laws.

## I. THE CEA EXPRESSLY PREEMPTS STATE REGULATION OF INSTRUMENTS TRADED ON DCMS.

### A. The CEA's Exclusive-Jurisdiction Provision Expressly Preempts State Regulation.

1. Section 2(a)(1)(A) expressly preempts state law. It grants the CFTC "exclusive jurisdiction … with respect to accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future delivery …, traded or executed on a contract market designated" by the CFTC. The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992); *see also Exclusive*, American Heritage Dictionary (5th ed. 2022) ("[n]ot divided or shared with others"; "sole"; "incompatible"). The CEA's grant of jurisdiction to the CFTC thus "excludes all others." *Assad*, 2026 WL 2543846, at *7.

This Court has therefore held that Section 2(a)(1) "preempts the application of state law." *Leist*, 638 F.2d at 322. The Third and Ninth

Circuits recently agreed, holding that Section 2(a)(1)(A) "expressly preempts state law regulating swaps 'traded or executed on' a DCM." *Assad*, 2026 WL 2543846, at *7; *see Flaherty*, 172 F.4th at 228 (similar). Numerous earlier decisions from other circuits are in accord. *See Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (CEA preempted state-law "commercial gambling" claim); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to occupy the entire field of commodities futures regulation."); *CME v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive"); *Am. Agric.*, 977 F.2d at 1157 (state-law claims "are preempted by the CEA" as applied to contract markets).

The Supreme Court's precedent confirms that these decisions are correct. In *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947), for example, the Court held that a grant of "exclusive" "jurisdiction" to the Secretary of Agriculture means that "the matters regulated by the Federal Act cannot be regulated by the States." *Id.* at 233-234 (citation modified). More recently, the Supreme Court held a grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).

In other contexts, too, this Court and others have held that when "jurisdiction is exclusive," it "preempts other law." *N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*, 635 F.3d 66, 72 (2d Cir. 2011) (interpreting Interstate Commerce Commission Termination Act); *see Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024) (statutory "conferral of exclusive jurisdiction" "withdraws any concurrent" state authority)*; Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001) (statutory grant of "exclusive jurisdiction" to committee preempted state law).

2. Other features of Section 2(a)(1)(A)'s text confirm express preemption. Its savings clause provides that it does not "supersede" the jurisdiction of "other regulatory authorities" under state laws "*[e]xcept as hereinabove provided*" by the grant of "exclusive jurisdiction" (emphasis added). As the Ninth Circuit put it, if Section 2(a)(1)(A)'s exclusive-jurisdiction provision "was not intended to have preemptive effect, the '[e]xcept as hereinabove provided' clause would be superfluous." *Assad*, 2026 WL 2543846, at *7.

3. Statutory history further confirms that the express-preemption provision means what it says. Before 1974, the CEA contained a provision ensuring that it did not "impair any State law" applicable to certain CEA-

covered "transaction[s]." 49 Stat. at 1494. Senate drafters "deleted" this clause when they added the "exclusive jurisdiction" provision "to assure that Federal preemption is complete," 120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis), and they added the "except as hereinabove provided" language when the House added a new state-law savings clause to Section 2(a), S. Rep. No. 93-1131, at 31. These changes "wholly and unequivocally eliminated" the bases the Supreme Court had previously relied on "to hold that the CEA did not preempt state regulation." Van Wart, *supra*, at 692-693.

The later statutory history is to the same effect. In 1978, for example, Congress gave the states some authority to enforce the CEA through litigation, but only against a party "*other than a [designated] contract market*." 7 U.S.C. § 13a-2(1) (emphasis added). Congress included this limitation because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC." Van Wart, *supra*, at 708.

Similarly, in 1982, Congress amended the CEA to clarify that it does *not* "supersede or preempt" state law as to transactions "*not* conducted on" a DCM. 7 U.S.C. § 16(e)(1)(B)(i) (emphasis added). That amendment would be pointless if the CEA did not already preempt the application of state law to transactions conducted *on* DCMs. And Congress confirmed as much at

the time, recognizing that the 1974 amendments already "bestowed on the CFTC exclusi[ve] jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44.

The 2000 amendments are equally on-point. When Congress amended the CEA to include "occurrence[s]" among a new category of "excluded commodities" that could be traded outside the auspices of a DCM, it also extended Section 2(a)(1)(A)'s preemption to this limited category of off-DCM transactions. 7 U.S.C. § 16(e)(2); *see supra* pp. 13-16. In enacting this amendment, Congress reiterated that the CEA "supersede[s] and preempt[s]" state law as applied to on-DCM transactions. H.R. Rep. No. 106-711, pt. 2, at 71.

Thus, when Congress brought "swaps" (including "[e]vent contracts," 7 U.S.C. § 7a-2(c)(5)(C)(i)) within the CFTC's "exclusive jurisdiction" through the Dodd-Frank amendments in 2010, it did so with full knowledge that the CFTC's exclusive jurisdiction preempts state law.

4. Kalshi's federal regulator agrees—and always has. In 2008, the CFTC recognized that "the CEA supersedes and preempts other laws, *including state and local gaming and bucket shop laws*, with respect to transactions executed on" a DCM, including "event contracts." 73 Fed. Reg. at 25,673 (emphasis added). Its proposed 2024 rule confirms that the

CFTC's "exclusive jurisdiction … preempt[s] the application of state law." 89 Fed. Reg. at 48,977 n.84. And it told the D.C. Circuit—when litigating a case *against* Kalshi—that "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant Br. 27, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024), 2024 WL 4512583; *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388, 394, 402 (2024) (courts may account for an agency's "body of experience and informed judgment" in interpreting a statute (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))); *New Jersey v. Bessent*, 149 F.4th 127, 145 (2d Cir. 2025) (recognizing, *post-Loper Bright*, that an agency's expertise may give its interpretation "particular power to persuade" (citation omitted)).

### B. Kalshi's Event Contracts Fall Within The Scope Of The CEA's Express-Preemption Provision.

After concluding that a statute contains an express-preemption clause, this Court considers "the *substance and scope*" of the clause to determine whether it preempts the state regulation at issue. *Yousefzadeh v. J&J Consumer Inc.*, 184 F.4th 130, 145 (2d Cir. 2026) (citation omitted). Here, Section 2(a)(1)(A) preempts state law "with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put',

'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a [designated] contract market."

This broad language grants the CFTC exclusive authority over *all* "agreements … traded" on DCMs, including "swaps" in particular. It therefore readily preempts Connecticut's effort to regulate sports-event contracts traded on Kalshi's DCM.

1. To begin, Section 2(a)(1)(A)'s sweeping language covers every contract "traded or executed on a" DCM. That much is clear from Congress's inclusion of "agreements" in its list of instruments over which the CFTC has "exclusive jurisdiction." The umbrella term "agreement" covers all contracts, and Congress followed it with a parenthetical enumerating a wide, non-exhaustive range of agreements that are expressly "includ[ed]"—demonstrating Congress's desire to cover the waterfront.

Moreover, while the final term in Section 2(a)(1)(A)'s list—"transactions"—is modified by the phrase "involving swaps or contracts of sale …," the rule of the last antecedent dictates that this limiting phrase does not apply to "agreements" or the other enumerated terms separated from the modifying phrase by a comma. *See Lockhart v. United States*, 577 U.S. 347,

351 (2016) ("a limiting clause … should ordinarily be read as modifying only the noun or phrase that it immediately follows" (citation omitted)).

Other provisions of the CEA confirm that Congress intended to cover all agreements "traded or executed on a" DCM, not merely some subset. Section 16(e)(1)(B)(i), for example, preserves state authority over any transaction "that is *not* conducted on" a DCM (emphasis added), confirming that the CEA preempts all trading that *is* conducted on one. And Section 13a-2(1) provides that states may enforce the CEA against entities "other than" DCMs, confirming Congress's desire to give the CFTC exclusive authority to regulate DCMs free of state interference.

That does not mean that a DCM is free to list any contract it wants on its exchange. Before listing a contract, a DCM must certify that it "complies with" the CEA's numerous statutory requirements and the CFTC's "regulations." 7 U.S.C. § 7a-2(c)(1). The CFTC may review and remove contracts if it finds that they violate these statutory and regulatory requirements, *id.* § 7a-2(c)(2), and it may take various enforcement actions against a DCM that repeatedly lists improper contracts.

Thus, if Connecticut believes that Kalshi has inappropriately certified its sports-event contracts because they do not qualify as swaps, the state may take that complaint to the CFTC. Indeed, Connecticut and other states have

already done just that by submitting comments on the agency's recent NPRM regarding sports-event contracts.[8] And if the state is dissatisfied with that final regulation (or any other final agency action or inaction by the CFTC, *see* 5 U.S.C. § 551(13)), it can challenge it under the APA.

Connecticut may not, however, disregard the CFTC's "exclusive jurisdiction" over all "agreements … traded" on a DCM by attempting to enforce its state gambling laws directly against exchange-traded instruments.

2. In any event, Kalshi's sports-event contracts *are* "swaps." The CEA's Special Rule expressly recognizes as much. That provision describes "[e]vent contracts" as "agreements" and "swaps" that may be "list[ed] … by a designated contract market." 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule then gives the CFTC the authority to prevent DCMs from listing certain kinds of event contracts, including those involving "*gaming*," *if* the CFTC finds the contracts "contrary to the public interest." *Id.* (emphasis added). That disposes of any argument that sports-event contracts do not qualify as swaps

[8] Andy Wilson et al., Comment Letter on Prediction Markets; Public Interest Determinations (July 27, 2026), https://perma.cc/BD2K-MQUP (comment letter signed by, *inter alia*, Defendant-Appellee Connecticut Attorney General William Tong).

or otherwise fall outside the scope of the CFTC's exclusive jurisdiction over contracts listed on a DCM.

The CEA's "swap" definition confirms the point. *Id.* § 1a(47)(A). Congress defined "swap" in a broad six-part definition that includes contracts "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). It also includes any contract "that is, or *in the future* becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv) (emphasis added). Kalshi's event contracts easily fall within this definition.

Event contracts—including sports-event contracts—provide for a payment that is "dependent on the occurrence" of an "event." *Id.* § 1a(47)(A)(ii). Kalshi's event contracts are structured to pay out if a specified event (like the Federal Reserve increasing interest rates or Spain winning the World Cup) occurs. Kalshi's contracts are also predicated on events "associated with a potential financial, economic, or commercial consequence." *Id.* To "associate" with means "to join or connect together," or "to bring together or into relationship in any of various intangible ways." *Associate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). All

Kalshi's event contracts are therefore predicated on events connected to potential financial consequences.

That is no less true for Kalshi's sports-event contracts. As the CFTC put it, sports teams "generate economic activity and materially affect both regional and national markets" with "billions" of dollars at stake. 91 Fed. Reg. at 35,807-08, 35,830 (citation modified). Examples abound. The 2026 World Cup produced an estimated "$17 billion boost in U.S. GDP."[9] Wins and losses, too, have financial consequences. World Cup ticket prices spiked and fell depending on which teams advanced.[10] Each 2026 New York Knicks "home playoff game was worth roughly $91 million" to New York City businesses, with the full postseason generating "as much as $832 million."[11] Sports events have financial consequences for sponsors that pay performance bonuses, advertisers with a financial stake in who performs well, television networks that benefit from high viewership, local businesses that profit from team wins—the list goes on. These *actual* and *substantial*

---

[9] Dylan Duke, *How much of an economic boom is the 2026 FIFA World Cup for the U.S. hosting cities?*, NPR (June 15, 2026), https://perma.cc/F64B-G5F4.

[10] *Round of 16 exits fuel World Cup quarterfinal ticket price drops*, Sports Bus. J. (July 10, 2026), https://perma.cc/E32Q-5N4K.

[11] Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/L4YX-7MGD.

economic consequences easily qualify as "potential" consequences. 7 U.S.C. § 1a(47)(A)(ii).

Because sports events have economic consequences (and contrary to the district court's characterization, JA23), the record of hedging on Kalshi grows all the time. An insurance company "expects to hedge about $30 million annually" to mitigate the "financial risks of performance incentives in athletes' and coaches' contracts."[12] Businesses use Kalshi "to hedge" costly promotions tied to team victories.[13] And hedge funds find that "prediction markets allow us to be much more creative with the types of hedging."[14]

Further, because event contracts are so much a part of modern derivatives trading, they qualify as "swaps" for the additional reason that they are now "commonly known to the trade as a swap," a definition that Congress included in the CEA specifically to capture innovation in the markets. 7 U.S.C. § 1a(47)(A)(iv). At this point, sports-event contracts are so commonplace that they are offered not just by young companies like

---

[12] Sorkin et al., *supra*.

[13] Shimkus & Newsham, *supra*; Spiegel, *supra*.

[14] Krystal Hur, *Cantor Lets Hedge Funds Place Big Bets on Kalshi's Prediction Markets*, Wall St. J. (Aug. 19, 2026), https://perma.cc/CY69-CYTZ.

Kalshi but also by incumbents like CME.[15] And the CFTC's forthcoming regulation governing sports-event contracts, which repeatedly recognizes them as swaps under the CEA's "plain language," provides yet further confirmation that they fit easily within the statute. 91 Fed. Reg. at 35,808.

3. None of this is to say that *every* contract involving speculation qualifies as a swap. To the contrary, the CEA imposes at least four distinct limits and empowers the CFTC to establish more. While Kalshi's event contracts satisfy them all, many other speculative contracts, including sports bets, do not.

*First*, because a swap must involve events that are "associated with" potential financial consequences, a DCM cannot list contracts involving events with financial consequences that are too attenuated, remote, or speculative to establish the requisite association. 7 U.S.C. § 1a(47)(A)(ii); *cf. Chevron USA Inc. v. Plaquemines Par.*, 608 U.S. 1, 11 (2026). That means that not every sports event will qualify. For example, Kalshi does not offer trades on sports events that are commonly the subject of sportsbook bets—from the winner of a coin flip to the color of the President's tie when he throws the opening pitch to so-called "micro bets" within games.

---

[15] *CME Group partners with FutureSports to introduce world's first futures on sports indexes*, CME Grp. (July 29, 2026), https://perma.cc/XJ7L-HKKA.

These causation principles, however, do not suggest sports events categorically lack economic consequences. Drawing the line between contracts that are and are not sufficiently connected to potential economic consequences is necessary across contexts. There can be no real dispute, for example, that an event contract regarding a Broadway play's audience numbers could readily fit within the swap definition because of the obvious financial consequences of attendance. That does not mean it would be appropriate to list a similar contract involving attendance at a free high-school play. Still, it would not be reasonable to hold that *all* theater-event contracts are impermissible merely because the high-school drama contract might be.

*Second*, swaps must be tradeable. That much is clear from their inclusion in the Commodity *Exchange* Act, a statute dedicated to establishing markets for *exchanging* derivatives. *See* 7 U.S.C. § 5(a). And Section 2(a)(1)(A) expressly governs instruments "*traded* or executed" on a DCM—that is, a derivatives *exchange* (emphasis added). Still more, Section 2(e) provides that retail participants can only enter into swaps "on, or subject to the rules of, a board of *trade* designated as a contract market." Section 2(h)(8) mandates that all cleared swaps be *traded* on DCMs or swap execution facilities. These provisions all assume swaps are tradeable.

Unsurprisingly, the CFTC and SEC expressly articulated this tradability requirement in a 2012 regulation the agencies promulgated under their statutory authority to "further define" the term swap. 15 U.S.C. § 8302(d)(1); *see Flaherty*, 172 F.4th at 228. That regulation distinguishes swaps from other "consumer or commercial arrangements" principally by asking whether an instrument's "payment provisions" are "severable" and whether the instrument is "*traded on an organized market or over-the-counter*." Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,247-48 (Aug. 13, 2012) (emphasis added). Event contracts, including sports-event contracts, satisfy this requirement because they are structured like every other derivative contract—they can be traded and re-traded.

But many other contracts that similarly pay out depending on the occurrence of an event flunk this tradability requirement. A flood insurance contract, for example, will pay out upon the occurrence of a weather event (a flood), but it does not qualify as a swap because it is structured as a promise to pay a specific entity for a specific loss. A homeowner cannot sell or trade his insurance policy to someone with no connection to his house.

The same is true of sports bets. They take the form of non-fungible contracts between an individual and a casino or sportsbook that retains tight control over the contract's terms—including the price and odds. Indeed,

sports bets are specifically designed so they cannot be traded, both because casinos want to know who their customers are to avoid the most skilled gamblers and because state laws usually bar the exchange of these bets. *See*, *e.g.*, Conn. Gen. Stat. § 12-864(c) (prohibiting placing or accepting a sports wager on another's behalf).

Event contracts, by contrast, are specifically designed to be traded. That is how their price is determined, and that is how they fulfill their price-discovery function. And because price discovery works best when traders are diverse and knowledgeable, exchanges (unlike casinos) have no need to screen out skilled users; these users are what make markets thrive.

*Third*, and relatedly, swaps must be capable of being traded in interstate commerce, like all other instruments covered by the CEA. The CEA covers transactions "entered into regularly in interstate and international commerce." 7 U.S.C. § 5(a). Many other provisions likewise contemplate that derivatives will be traded in interstate commerce. *See, e.g.*, *id.* § 6a (requiring the CFTC to set position limits to prevent "[e]xcessive speculation" that would "burden … interstate commerce."). Thus, transactions that can only be entered into by individuals within a single state—like state-regulated gambling transactions—are not CEA swaps.

*Fourth*, the CEA and its implementing regulations prohibit DCMs from listing any contract readily susceptible to "manipulation." *See id.* § 7(d)(3); 17 C.F.R. § 38.251(a). A swap would flunk this test if it took the form of an event contract that depends on a manipulable occurrence, such as the outcome of an amateur ping-pong match. *Cf.* 91 Fed. Reg. at 35,866-67 (explaining the importance of preventing listing of sports-event contracts readily susceptible to manipulation).

Nor is this list exhaustive. Like all exchange-traded derivatives, swaps must comply with all 23 CEA core principles, and the CFTC may promulgate additional limits under the Special Rule, its express authorization to further define swaps, and its authority to implement the core principles.

## II. THE CEA IMPLIEDLY PREEMPTS STATE REGULATION OF TRADING ON DCMS.

### A. Connecticut's Gaming Laws Are Field-Preempted As Applied To Kalshi's Exchange-Traded Instruments.

The grant of "exclusive jurisdiction" to the CFTC expressly preempts the field of on-DCM trading by withdrawing concurrent state jurisdiction over *all* agreements traded on DCMs. *Supra* p. 12; *see* H.R. Rep. No. 93-1383, at 35-36 (explaining Congress sought to "*preempt the field*" of "futures regulation" and "d[id] not contemplate … a need for any supplementary regulation by the States" (emphasis added)). The CEA's field-preemptive

text is confirmed by Congress's adoption of "a comprehensive regulatory structure to oversee ... futures trading." *Curran*, 456 U.S. at 356 (citation omitted).

The CEA comprehensively regulates DCMs, covering everything from recordkeeping to capital requirements to market monitoring to how trades are matched and executed. *See supra* pp. 19-21. It also contains an elaborate set of provisions defining what types of derivatives may be traded on-DCM and what qualifies as a commodity. *See* 7 U.S.C. §§ 1a(9), (19), (47).

In the 2010 Dodd-Frank amendments, Congress intentionally expanded this framework to comprehensively address swaps, too. The financial crisis showed that when instruments are traded without federal oversight, their financial risks can migrate to other markets and "permit[ ] enormous exposure" to grow unmonitored. *Inv. Co. Inst.*, 891 F. Supp. 2d at 173-174 (citation omitted); *see Phillips*, 155 F.4th at 113. Congress thus added the broad "swap" definition, 7 U.S.C. § 1a(47), mandated that all retail swaps be traded on or subject to the rules of a DCM, *id.* § 2(e), and added the Special Rule expressly addressing "[e]vent contracts," *id.* § 7a-2(c)(5)(C)(i).

This detailed framework ensures uniform nationwide markets and pricing for derivatives contracts—including event contracts. The regime

leaves "no room for the States to supplement it." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation omitted).

### B. Connecticut's Gaming Laws Are Conflict-Preempted As Applied To Kalshi.

In multiple respects, complying with Connecticut law would be "impossible" for Kalshi or pose an "obstacle" to the CEA's purposes. *Crosby*, 530 U.S. at 372-373 (citation modified).

1. This is a quintessential case of impossibility preemption—where federal law "forbids what the state law requires." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012). Connecticut, for example, requires any entity offering sports wagering to "[v]erify" that a sports bettor "is physically present in the state when placing a wager." Conn. Gen. Stat. § 12-863(b)(A)(i). But federal law requires DCMs to provide "impartial access to [their] markets and services." 17 C.F.R. § 38.151(b). A DCM cannot treat all users equally if forced to discriminate based on geography. Rather, as the CFTC has made clear, compliance with state geographic limitations is "impossib[le]" for DCMs. CFTC Br. 26-27.

2. Applying Connecticut's gaming laws to Kalshi also subverts Congress's aim of bringing futures markets "under a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156. As the Third Circuit recently held, Congress intended "to do away with the patchwork of state regulations and

bring futures trading on DCMs under the exclusive jurisdiction of the CFTC." *Flaherty*, 172 F.4th at 230. Letting states enforce gambling laws against Kalshi hinders the CEA's objectives by reinstating "exactly the patchwork that Congress replaced wholecloth" with the CFTC. *Id.* The Seventh Circuit has likewise held that "[w]hen application of state law would directly affect trading on or the operation of a [DCM], it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Am. Agric.*, 977 F.2d at 1156-57 (citation omitted).

This Court has already held as much in the context of nationwide stock exchanges. In *Lanier v. Bats Exchange, Inc.*, 838 F.3d 139 (2d Cir. 2016), the Court held that interpreting a contract to "breach … state law where the SEC would not find a similar breach of the substantively identical regulations 'stands as an obstacle'" to "the uniformity that Congress intended to create for the national market system." *Id.* at 154-155. Indeed, the Court observed that even *uniform* state-law interpretations "would defeat Congress's intent that the SEC, with its expertise in the operation of the securities markets, make the rules regulating those markets." *Id.* at 155.

The same is true with respect to nationwide derivatives exchanges overseen by the CFTC. Congress intended for the CFTC, with its

"particular[ ]" "competence and expertise" in DCM operations, *Piccolo v. CFTC*, 388 F.3d 387, 391 (2d Cir. 2004) (per curiam), to make the rules governing those markets. Permitting concurrent state regulation necessarily creates a conflict.

3. Allowing Defendants to prosecute Kalshi would also conflict with Congress's chosen "method of enforcement." *Arizona*, 567 U.S. at 406. Congress addressed event contracts involving "gaming" in the Special Rule by giving the CFTC—and only the CFTC—authority to prohibit such contracts if they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC has proposed a regulation concluding many sports-event contracts "can be operated consistent with the public interest" and setting forth detailed criteria to guide its public-interest review. 91 Fed. Reg. at 35,836-37. Accordingly, letting states ban sports-event contracts "would disturb and conflict with the balance embodied" in a discretionary judgment Congress delegated to a federal agency. *California v. FERC*, 495 U.S. 490, 506 (1990).

4. The case for conflict preemption has gotten even stronger while this case has been pending. When Kalshi sought to unwind trades involving Michigan residents to comply with a state-court order, the CFTC ordered Kalshi "to fulfill the trades in question in accordance with its normal

practices."[16] And after New York sought a TRO to force Kalshi to cease offering all event contracts nationwide, the CFTC issued an emergency order directing "Kalshi to continue to operate its exchange in accordance with its normal practices" even if New York obtains relief.[17] These developments underscore that a genuine conflict exists.

## III. THE ARGUMENTS TO THE CONTRARY ARE WRONG.

### A. The District Court Erred In Holding That The CEA Does Not Preempt State Law.

The district court got all this exactly backwards. It began by finding that Kalshi's sports-event contracts are not swaps, then determined that even if they were, the CEA does not preempt the application of state gambling laws. These conclusions are wrong, not least because this Court already recognized that the CEA "preempts the application of state law," *Leist*, 638 F.2d at 322—a holding the district court did not cite, let alone distinguish.

1. The court first held that Kalshi's sports-event contracts are not swaps because they involve "outcomes or discrete in-game occurrences," rather than "events." JA16-17. But dictionaries and ordinary users of English

---

[16] Christopher J. Kirkpatrick, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents* 1, CFTC (July 14, 2026), https://perma.cc/GV5X-M9PQ.

[17] NY CFTC Order at 1; *see* 7 U.S.C. § 12a(9).

treat the words "event," "occurrence," and "outcome" as interchangeable—including in describing sports wins and losses. *See, e.g.*, *Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language (2001) ("the outcome, issue, or result of anything" or as "anything that happens"); *Burrage v. United States*, 571 U.S. 204, 212 (2014) ("[I]t is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter."). It is, for example, perfectly natural to talk about Spain winning the World Cup as a major "event" with monumental financial consequences. Nothing in the swap definition requires "event" to be "defined to exclude outcomes." *Schuler*, 2026 WL 2884087, at *9.

The court next concluded that sports outcomes categorically lack commercial consequences by requiring that an event, "by its very nature, ha[ve] embedded within it" or be "inherently joined" with a potential financial consequence. JA20 (citation modified). But those words appear nowhere in the statute, which instead requires that an event be "associated" with "potential" financial consequences, 7 U.S.C. § 1a(47)(A)(ii)—*i.e.*, those that merely "exist[ ] in possibility," *Potential*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003).

Moreover, the district court's interpretation is impossible to apply. The court acknowledged that a sports-event contract regarding whether a

game will occur *is* a swap because sports games have "embedded" "potential financial consequences arising from ticket sales, broadcast rights, and advertising costs." JA22. But it then reasoned that a team's win or loss has no more than "incidental financial implications for teams, players, sponsors, broadcasters, and others." JA22. It is unclear how that could be true, and under that logic Kalshi could list a contract regarding whether the World Series goes to game seven but not a contract regarding whether one team will win a majority of the first six games. That cannot be right.

2. The district court's alternative holding—that the CEA does not preempt the application of state law to DCM-traded swaps—is equally flawed because this Court already held that the CEA preempts such state regulation. *Leist*, 638 F.2d at 322. The district court's failure to acknowledge *Leist* is only the beginning of the problems with its preemption rationale.

For one thing, the district court began its preemption analysis by applying "a presumption against preemption." JA24 (citation omitted). But courts "do not invoke any presumption against pre-emption" where, as here, a statute "contains an express pre-emption clause." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation modified). In such cases, courts "should not invoke the presumption against preemption," because the

clause's "plain wording" "necessarily contains the best evidence of Congress' preemptive intent." *Yousefzadeh*, 184 F.4th at 145 (citation modified).

The district court then held that the CEA does not preempt state regulation of swap trading because Section 2(a)(1)(A)'s savings clause reflects Congress's intent to preserve a role for the states. JA25-26. But the court failed to recognize the savings clause's critical proviso, which makes clear that it applies "*[e]xcept as hereinabove provided*" by Section 2(a)(1)(A)'s grant of "exclusive jurisdiction" (emphasis added). Congress thus "clarif[ied]" that "where applicable," the CFTC's jurisdiction "supersedes State as well as Federal agencies." H.R. Rep. No. 93-1383, at 35. Rather than undermine preemption, the savings clause reinforces that the CFTC's exclusive jurisdiction "supersede[s]" state regulation of on-DCM transactions. 7 U.S.C. § 2(a)(1)(A).

The district court also contorted the Special Rule, reading it to "demonstrate[ ]" that some state law can "operate in tandem with the CEA." JA26 (citation modified). In fact, it establishes that the *CFTC*—not 50 states—has the authority to prohibit as "contrary to the public interest" event contracts that "involve" "gaming" or unlawful "activity" under federal or state law. 7 U.S.C. § 7a-2(c)(5)(C)(i).

The court also wrongly concluded that "Congress' intended scope of preemption" is limited to Section 16's express-preemption clauses. JA27 (citation omitted). These provisions merely extend Section 2(a)(1)(A)'s preemption of *on*-DCM trading to discrete *off*-DCM transactions: Section 16(e)(2) preempts state gaming laws as to agreements "excluded" or "exempted" from the CEA's on-DCM trading requirement, while Section 16(h) prevents states from regulating swaps as insurance—even if they are traded off-DCM. In enacting these provisions, Congress recognized that "the current" CEA already "supersedes and preempts" state laws as to on-DCM transactions. H.R. Rep. No. 106-711, pt. 2, at 71. Thus, as the Ninth Circuit recently observed, Section 16(e)(2)'s "more explicit language" does not call into question Section 2(a)(1)(A)'s preemptive effect. *Assad*, 2026 WL 2543846, at *7.

3. The district court's reasons for rejecting conflict preemption likewise fail. The court maintained that there is no conflict because Kalshi can seek a Connecticut license and establish a category of Connecticut market participants. JA30. But the CFTC has made clear that compliance with state laws like Connecticut's is an "impossibility" because a DCM "cannot fulfill its federal mandate" if it imposes geographical state-by-state restrictions. CFTC Br. 26-27. The court's contrary reasoning would require

DCMs to offer up to 50 different markets for the same contracts—a "seismic shift." *Id.* at 2. And all three "master wagering licenses" allowed under Connecticut law have been issued. *See* Conn. Agencies Regs. § 12-865-4; Conn. Gen. Stat. §§ 12-852, 12-853. Accordingly, if Connecticut law applies, Kalshi cannot operate in the State at all.

4. Finally, the district court concluded that the CEA was not intended to displace "traditional" state authority over gambling. JA26-27. That is exactly wrong. The Supreme Court has held that "Congress can regulate sports gambling directly," such that "each State is free to" do so only "if [Congress] elects not to." *Murphy v. NCAA,* 584 U.S. 453, 486 (2018). And Congress enacted Section 2(a)(1)(A) with the express intent of preempting state gambling laws. For as long as derivatives trading has existed in this country, states have sought to regulate it as gambling. Prior to the CEA, states enacted "anti-gaming" and "anti-bucket shop" laws to make it "as difficult as humanly possible to trade futures." Stassen, *supra*, at 826 (quotation marks omitted). The Supreme Court itself resolved multiple cases involving state efforts to ban futures trading as "gambling in grain." *Dickson*, 288 U.S. at 198. And Congress in 1974 recognized that "healthy futures market[s]" require some degree of speculation. *Curran*, 456 U.S. at 390. Thus, in granting the CFTC exclusive jurisdiction to regulate on-DCM

trading, Congress no doubt knew it was preempting state laws seeking to ban derivatives trading as gambling.

Even in the internet era, Congress has reaffirmed the CFTC's exclusive jurisdiction over on-DCM trading despite state gambling statutes. Thus, in UIGEA, Congress excluded "any transaction conducted on or subject to the rules of" a DCM from the definition of "bet or wager." 31 U.S.C. § 5362(1)(E)(ii). And in Dodd-Frank, Congress both charged the CFTC with regulating "[e]vent contracts" that "involve … gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), and defined "swap" broadly enough to include not just event contracts with potential financial significance but all instruments that become known as swaps "in the future," *id.* § 1a(47)(A)(iv), ensuring the CFTC's exclusive jurisdiction would evolve along with the markets it oversees.

### B. The Other Arguments Against Preemption Likewise Fail.

While the Third Circuit has resoundingly rejected state regulation of Kalshi's event contracts, the Sixth and Ninth Circuits recently held otherwise. *Assad*, 2026 WL 2543846, at *7-12; *Schuler*, 2026 WL 2884087, at *18, *28. For the most part, their holdings echo the district court's erroneous conclusions, and their additional rationales are just as flawed.

1. The Sixth Circuit, for example, held that Section 2(a)(1)(A)'s exclusive-jurisdiction provision "displaces direct enforcement and regulatory authority" over DCMs but not "ancillary regulations that only incidentally burden DCMs." *Schuler*, 2026 WL 2884087, at *21. That reads the CFTC's *exclusive* jurisdiction as *concurrent*. Nor did the panel explain how a state's authority to license or outright ban contracts on DCMs is "ancillary." The panel's interpretation would radically upend the law by letting states regulate on-DCM trading for the first time since the CFTC's creation 50 years ago.

2. The Sixth Circuit also held that Section 2(a)(1)(A)'s grant of exclusive jurisdiction extends solely to transactions involving "swaps" (or futures contracts), rather than to all "agreements ... traded on a" DCM. *Schuler,* 2026 WL 2884087, at *16; *see also Assad*, 2026 WL 2543846, at *8. But that holding grants the states a roving license to police any contract traded on an exchange to decide whether, in each state's view, it qualifies as a swap or future—all with the looming threat of criminal prosecution if state regulators anywhere conclude that any such contract is not a swap or a future after all. The result will be the "total chaos" that Congress has long sought to avoid. Senate Hearings at 685.

The Sixth Circuit also reasoned that some of Kalshi's contracts are not "used to hedge risk and derive pricing information." *Schuler*, 2026 WL 2884087, at *13. But even if *some* traders exchange *some* swaps for speculative purposes, their participation nevertheless serves the CEA's interests: Hedging "is facilitated by" "speculators willing to assume the market risk that" hedgers seek to avoid. *Curran*, 456 U.S. at 358. Moreover, as this Court has long recognized, "there is no bright-line difference between hedgers and speculators." *Leist*, 638 F.2d at 288. Given the difficulty of untangling those functions, Congress placed derivatives under a unified federal framework. And to the extent the states argue that some of Kalshi's contracts do not belong on DCMs, it is the CFTC, with its relevant "competence and expertise," *Piccolo*, 388 F.3d at 391, that is best-positioned to decide.

3. Meanwhile, the Ninth Circuit relied heavily on its interpretation of a soon-to-be-replaced CFTC regulation, Rule 40.11, as categorically prohibiting sports-event contracts. *See Assad*, 2026 WL 2543846, at *12; *see also id.* at *19 (Lee, J., concurring) (noting Rule 40.11 "controls the outcome of this appeal"). But Rule 40.11 has always been interpreted to impose case-by-case review, not a blanket prohibition. *See* 76 Fed. Reg. at 44,785-86. That renders the regulation consistent with the CEA, which

allows the CFTC to prohibit contracts only upon determining that they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(ii).

The CFTC recently confirmed it "has consistently applied § 40.11" to provide for discretionary review, "rather than a self-executing per se prohibition" that would violate the CEA. 91 Fed. Reg. at 35,815. And the current rule will soon be replaced by the CFTC's new regulation permitting many sports-event contracts, further undercutting the Ninth Circuit's reasoning.[18]

4. Finally, both the Sixth and Ninth Circuits concluded that Kalshi's contracts cannot qualify as swaps because Congress did not want the CFTC to regulate instruments with "hallmarks of sports betting." *Assad*, 2026 WL 2543846, at *9; *see Schuler*, 2026 WL 2884087, at *22. That is flat wrong. Sports-event contracts materially differ from sports bets in important respects that explain why Congress included one in the CEA and left the other to state regulation.

Most notably, sports-event contracts are traded on exchanges, so their prices are set by participants' bids and asks. These contracts thus serve the CEA's "national public interest[s]," 7 U.S.C. § 5(a), in hedging and price

[18] The CFTC "expects that its revised version of 17 C.F.R. § 40.11 will become final within the next two months." CFTC *Johnson* Response at 2.

discovery. They also present unique "hazards" associated with tradeable instruments—including insider trading, liquidity problems, and other market defects—that the CEA is designed to address. *Curran*, 456 U.S. at 360.

Because sports bets are not exchange-traded instruments, they do not present the same benefits or risks. They cannot be used for price discovery because bookies set their prices, typically excluding skilled customers to favor themselves.[19] And without a market, they cannot be used for hedging, either, which "depends on the availability of" other market participants "willing to assume or to share the hedger's risk" to profit. *Curran*, 456 U.S. at 390. Mitigating risks associated with sports bets requires laws ensuring the bookie's moral and financial integrity—precisely the focus of state gambling laws. *See, e.g.*, Conn. Gen. Stat. § 12-574(g).[20]

---

[19] *See* Alex Klavens et al., *How DraftKings Uses A.I. to Target the Gamblers Likeliest to Lose*, N.Y. Times (Sep. 19, 2026), https://perma.cc/G9CM-VDNS.

[20] These structural differences explain why the Sixth and Ninth Circuits were wrong that anyone placing an off-DCM sports bet would violate the CEA. *Schuler*, 2026 WL 2884087, at *14-15; *Assad*, 2026 WL 2543846, at *11. Section 2(e) is directed at unlawful underground swap exchanges, not sports bets. *In re Olson*, No. 21-05, 2021 WL 1336434, at *1 (CFTC Apr. 6, 2021) (enforcing Section 2(e) against an off-exchange trading platform).

## IV. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR KALSHI.

The equities sharply favor an injunction because Kalshi will suffer irreparable harms by being subjected to unlawful state regulation that conflicts with the mandates of its exclusive federal regulator, while Connecticut will not be harmed by its inability to apply preempted state laws.

1. Kalshi will suffer irreparable harm absent relief. JA88-95. Unless the Court issues an injunction, Kalshi will face a "Hobson's choice" of "continually violat[ing]" state law and exposing itself to "huge liability," or "suffer[ing] the injury of obeying the law" during this appeal. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

If Kalshi exercises its right under the CEA to continue offering event contracts during this appeal, Kalshi will face severe harm under state law. Connecticut's state-court action seeks to enjoin Kalshi from "offering any sports wagering service" in Connecticut and recover "disgorgement of all revenues" from Kalshi's sports-event contracts. *See* Ex. 1 to Notice of Removal at 22, *Connecticut v. KalshiEX LLC*, No. 3:26-cv-1382 (D. Conn. Aug. 26, 2026), Dkt. No. 1-1.

If Kalshi instead attempts to comply with Connecticut's demands, Kalshi will face countervailing irreparable harms. Compliance with Connecticut law would require Kalshi to terminate trading in Connecticut—

thereby preventing Kalshi from "fulfill[ing] its federal mandate to provide impartial national access" to its exchange. CFTC Br. 26-27 (citing 17 C.F.R. § 38.151(b)). The CFTC's recent emergency order directing Kalshi to disobey a potential state-court TRO in New York highlights the irreconcilable conflict posed by these state demands. *See* NY CFTC Order. Absent preliminary relief, Defendants could put Kalshi to an untenable choice between compliance with state law and a direct order from Kalshi's federal regulator to do the opposite.

Shuttering Kalshi's operations in Connecticut would also harm Kalshi's users. Kalshi has tens of thousands of users in Connecticut, many with open investments. JA88-93. And Defendants have immunity from liability for damages, so Kalshi could not recoup that lost business even if it ultimately prevails. *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (per curiam) ("loss of money" irreparable if "funds 'cannot be recouped'" (citation omitted)). Additionally, because Kalshi's exchange operates nationwide, abruptly terminating trades in Connecticut would affect counterparties even in states like New Jersey where courts have rejected state efforts to ban Kalshi's contracts. Thus, compliance with Defendants' demands would subject Kalshi to "economic and reputational harm, including loss of business and goodwill." *Flaherty*, 172 F.4th at 231; *see*

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (reputational harms and lost business constitute irreparable harm).

2. Conversely, a state suffers no harm from an injunction preventing it from enforcing preempted laws. "The Government does not have an interest" in enforcing "unconstitutional law[s]," so an injunction "is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation modified).

The district court invoked Connecticut's interest in "regulating gaming." JA36. But Connecticut has no interest in regulating nationwide exchanges. And recognizing as much does not infringe on Connecticut's authority to regulate the casino and sportsbook gambling that have fallen within its regulatory domain since 2018. *Murphy,* 584 U.S. at 486.

The district court also invoked consumer protections afforded by state gambling laws. JA36. But many states fall short of ensuring robust protections.[21] On the other hand, Kalshi is subject to rigorous market protections under federal law, employs Know-Your-Customer procedures, and lets users self-exclude from trading, take breaks, and set personal

[21] Cait Huble, *Report: State Sports Betting Regulations Fall Short of Providing Adequate Consumer Protections*, Nat'l Council on Problem Gambling (Sep. 19, 2024), https://perma.cc/AEP5-JZY5.

funding caps.[22] The question is not whether Kalshi should be regulated, but rather by whom. Congress's clear answer is the CFTC.

## CONCLUSION

This Court should reverse the denial of preliminary relief.

Dated: September 30, 2026

Respectfully submitted,

/s/ *Neal Kumar Katyal*

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiff-Appellant KalshiEX LLC*

[22] *Mandatory KYC and Surveillance*, Kalshi, https://kalshi.com/market-integrity/kyc-surveillance (last visited Sep. 30, 2026); *Responsible Trading*, Kalshi, https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited Sep. 30, 2026).

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32.1(a)(4)(A) because it contains 13,974 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared using Microsoft Office Word for Office 365 in 14-point Georgia font.

September 30, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Plaintiff-Appellant KalshiEX LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using ACMS on September 30, 2026.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by ACMS.

September 30, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Plaintiff-Appellant*
*KalshiEX LLC*

# ADDENDUM A:

## Pertinent Statutes and Regulations

# TABLE OF CONTENTS

Provisions from the Commodity Exchange Act (as codified at 7 and 15 U.S.C.):

7 U.S.C. § 1a(9) ........ A1

7 U.S.C. § 1a(19) ........ A1

7 U.S.C. § 1a(27) ........ A2

7 U.S.C. § 1a(36) ........ A2

7 U.S.C. § 1a(47) ........ A2

7 U.S.C. § 2(a)(1)(A) ........ A7

7 U.S.C. § 2(e) ........ A7

7 U.S.C. § 7a-2(c)(5)(C) ........ A8

7 U.S.C. § 13a-2 ........ A9

7 U.S.C. § 16(e) ........ A11

15 U.S.C. § 8302(d)(1) ........ A12

Provisions from the Commodity Futures Modernization Act of 2000 (Pub L. No. 106-554, Appendix E, 114 Stat. 2763A-365)

Section 103 - 114 Stat. at 2763A-377-378 ........ A12

Provisions from Title 17 of the Code of Federal Regulations:

17 C.F.R. § 38.4 ........ A13

17 C.F.R. § 38.5 ........ A14

17 C.F.R. § 40.2 ........ A15

17 C.F.R. § 40.3 ........ A17

17 C.F.R. § 40.11 ........ A20

## Provisions from the Commodity Exchange Act (as codified at 7 and 15 U.S.C.):

### 7 U.S.C. § 1a(9)

The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

### 7 U.S.C. § 1a(19)

The term "excluded commodity" means—

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

> (I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or
>
> (II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

> (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and
>
> (II) associated with a financial, commercial, or economic consequence.

### 7 U.S.C. § 1a(27)

The term "future delivery" does not include any sale of any cash commodity for deferred shipment or delivery.

### 7 U.S.C. § 1a(36)

The term "option" means an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty".

### 7 U.S.C. § 1a(47)

(A) In general

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;
>
> (ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;
>
> (iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—
>
> > (I) an interest rate swap;

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;

(X) an equity index swap;

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap;

(XXI) an emissions swap; and

(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

(B) Exclusions

The term “swap” does not include—

(i) any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 23 of this title, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(ii) any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled;

(iii) any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(iv) any put, call, straddle, option, or privilege relating to a foreign currency entered into on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a));

(v) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(vi) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a contingent basis that is subject to the Securities Act of 1933 (15 U.S.C. 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), unless the agreement, contract, or transaction predicates the purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction;

(vii) any note, bond, or evidence of indebtedness that is a security, as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1));

(viii) any agreement, contract, or transaction that is—

(I) based on a security; and

(II) entered into directly or through an underwriter (as defined in section 2(a)(11) of the Securities Act of 1933 (15 U.S.C. 77b(a)(11)) by the issuer of such security for the purposes of raising capital, unless the agreement, contract, or transaction is entered into to manage a risk associated with capital raising;

(ix) any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States; and

(x) any security-based swap, other than a security-based swap as described in subparagraph (D).

(C) Rule of construction regarding master agreements

(i) In general

Except as provided in clause (ii), the term "swap" includes a master agreement that provides for an agreement, contract, or transaction that is a swap under subparagraph (A), together with each supplement to any master agreement, without regard to whether the master agreement contains an agreement, contract, or transaction that is not a swap pursuant to subparagraph (A).

(ii) Exception

For purposes of clause (i), the master agreement shall be considered to be a swap only with respect to each agreement, contract, or transaction covered by the master agreement that is a swap pursuant to subparagraph (A).

(D) Mixed swap

The term "security-based swap" includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) and also is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).

(E) Treatment of foreign exchange swaps and forwards

(i) In general

Foreign exchange swaps and foreign exchange forwards shall be considered swaps under this paragraph unless the Secretary makes a written determination under section 1b of this title that either foreign exchange swaps or foreign exchange forwards or both—

(I) should be not be regulated as swaps under this chapter; and

(II) are not structured to evade the Dodd-Frank Wall Street Reform and Consumer Protection Act in violation of any rule promulgated by the Commission pursuant to section 721(c) of that Act.

(ii) Congressional notice; effectiveness

The Secretary shall submit any written determination under clause (i) to the appropriate committees of Congress, including the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives. Any such written determination by the Secretary shall not be effective until it is submitted to the appropriate committees of Congress.

(iii) Reporting

Notwithstanding a written determination by the Secretary under clause (i), all foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the Commission pursuant to section 6r of this title within such time period as the Commission may by rule or regulation prescribe.

(iv) Business standards

Notwithstanding a written determination by the Secretary pursuant to clause (i), any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 6s(h) of this title.

(v) Secretary

For purposes of this subparagraph, the term “Secretary” means the Secretary of the Treasury.

(F) Exception for certain foreign exchange swaps and forwards

(i) Registered entities

Any foreign exchange swap and any foreign exchange forward that is listed and traded on or subject to the rules of a designated contract market or a swap execution facility, or that is cleared by a derivatives clearing organization, shall not be exempt from any provision of this chapter or amendments made by the Wall Street Transparency and Accountability Act of 2010 prohibiting fraud or manipulation.

(ii) Retail transactions

Nothing in subparagraph (E) shall affect, or be construed to affect, the applicability of this chapter or the jurisdiction of the Commission with respect to agreements, contracts, or transactions in foreign currency pursuant to section 2(c)(2) of this title.

**7 U.S.C. § 2(a)(1)(A)**

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

**7 U.S.C. § 2(e)**

It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

**7 U.S.C. § 7a-2(c)(5)(C)**

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii) Swaps contracts

(I) In general

In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

(II) Requirements

Any such criteria, conditions, or rules shall consider—

(aa) the financial integrity of the derivatives clearing organization; and

(bb) any other factors which the Commission determines may be appropriate.

(iv) Deadline

The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

**7 U.S.C. § 13a-2**

(1) Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this chapter, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

(2) The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia, shall have jurisdiction of all suits in equity and actions at law brought under this section to enforce any liability or duty created by this chapter or any rule, regulation, or order of the Commission thereunder, or to obtain damages or other relief with respect thereto. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that the defendant take such action as is necessary to remove the danger of violation of this chapter or of any such rule, regulation, or order. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

(3) Immediately upon instituting any such suit or action, the State shall serve written notice thereof upon the Commission and provide the

Commission with a copy of its complaint, and the Commission shall have the right to (A) intervene in the suit or action and, upon doing so, shall be heard on all matters arising therein, and (B) file petitions for appeal.

(4) Any suit or action brought under this section in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

(5) For purposes of bringing any suit or action under this section, nothing in this chapter shall prevent the attorney general, the administrator of the State securities laws, or other duly authorized State officials from exercising the powers conferred on them by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(6) For purposes of this section, "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

(7) Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State.

(8)

> (A) Nothing in this chapter shall prohibit an authorized State official from proceeding in a State court against any person registered under this chapter (other than a floor broker, floor trader, or registered futures association) for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.
>
> (B) The State shall give the Commission prior written notice of its intent to proceed before instituting a proceeding in State court as described in this subsection and shall furnish the Commission with a copy of its complaint immediately upon instituting any such proceeding. The Commission shall have the right to (i) intervene in the proceeding and, upon doing so, shall be heard on all matters arising therein, and (ii) file a petition for appeal. The Commission or the defendant may remove such proceeding to the district court of the United States for the proper district by following the procedure for

removal otherwise provided by law, except that the petition for removal shall be filed within sixty days after service of the summons and complaint upon the defendant. The Commission shall have the right to appear as amicus curiae in any such proceeding.

**7 U.S.C. § 16(e)**

(1) Nothing in this chapter shall supersede or preempt—

(A) criminal prosecution under any Federal criminal statute;

(B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

(i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

(A) an electronic trading facility excluded under section 2(e) of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

**15 U.S.C. § 8302(d)(1)**

Notwithstanding any other provision of this title and subsections (b) and (c), the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of Governors, shall further define the terms "swap", "security-based swap", "swap dealer", "security-based swap dealer", "major swap participant", "major security-based swap participant", "eligible contract participant", and "security-based swap agreement" in section 1a(47)(A)(v) of the Commodity Exchange Act (7 U.S.C. 1a(47)(A)(v)) and section 78c(a)(78) of this title.

**Provisions from the Commodity Futures Modernization Act of 2000 (Pub L. No. 106-554, Appendix E, 114 Stat. 2763A-365)**

**Section 103 – 114 Stat. at 2763A-377-378**

Section 2 of the Commodity Exchange Act (7 U.S.C. 2, 2a, 3, 4, 4a) is further amended by adding at the end the following:

"(d) EXCLUDED DERIVATIVE TRANSACTIONS.—

"(1) IN GENERAL—Nothing in this Act (other than section 5b or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in an excluded commodity if—

"(A) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants at the time at which the persons enter into the agreement, contract, or transaction; and

"(B) the agreement, contract, or transaction is not executed or traded on a trading facility.

"(2) ELECTRONIC TRADING FACILITY EXCLUSION.—Nothing in this Act (other than section 5a (to the extent provided in section 5a(g)), 5b, 5d, or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in an excluded commodity if—

"(A) the agreement, contract, or transaction is entered into on a principal-to-principal basis between parties trading for their own accounts or as described in section 1a(12)(B)(ii);

"(B) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants described in subparagraph (A), (B)(ii), or (C) of section 1a(12)) at the time at which the persons enter into the agreement, contract, or transaction; and

"(C) the agreement, contract, or transaction is executed or traded on an electronic trading facility.".

**<u>Provisions from Title 17 of the Code of Federal Regulations:</u>**

**17 C.F.R. § 38.4**

(a) Request for Commission approval of rules and products.

(1) An applicant for designation, or a designated contract market, may request that the Commission approve under section 5c(c) of the Act, any or all of its rules and contract terms and conditions, and subsequent amendments thereto, prior to their implementation or, notwithstanding the provisions of section 5c(c)(4) of the Act, at any time thereafter, under the procedures of § 40.3 or § 40.5 of this chapter, as applicable. A designated contract market may label a future, swap or options product in its rules as "Listed for trading pursuant to Commission approval," if the future, swap or options product and its terms or conditions have been approved by the Commission, and it may label as "Approved by the Commission" only those rules that have been so approved.

(2) Notwithstanding the timeline under §§ 40.3(c) and 40.5(c) of this chapter, the operating rules, and terms and conditions of futures, swaps and option products that have been submitted for Commission approval at the same time as an application for contract market designation or an application under § 38.3(b) of this part to reinstate the designation of a dormant designated contract market, as defined in § 40.1 of this chapter, or while one of the foregoing is pending, will be deemed approved by the Commission no earlier than when the facility is deemed to be designated or reinstated.

(b) Self-certification of rules and products. Rules of a designated contract market and subsequent amendments thereto, including both operational rules and the terms or conditions of futures, swaps and option products listed for trading on the facility, not voluntarily submitted for prior Commission approval pursuant to paragraph (a) of this section, must be submitted to the Commission with a certification that the rule, rule amendment or futures, swap or options product complies with the Act or rules thereunder pursuant to the procedures of § 40.6 of this chapter, as applicable. Provided, however, any rule or rule amendment that would, for a delivery month having open interest, materially change a term or condition of a swap or a contract for future delivery in an agricultural commodity enumerated in section 1a(9) of the Act, or of an option on such

contract or commodity, must be submitted to the Commission prior to its implementation for review and approval under § 40-4 of this chapter.

(c) An applicant for designation, or a designated contract market, may request that the Commission consider under the provisions of section 15(b) of the Act any of the contract market's rules or policies, including both operational rules and the terms or conditions of products listed for trading.

**17 C.F.R. § 38.5**

(a) Requests for information. Upon request by the Commission, a designated contract market must file with the Commission information related to its business as a designated contract market, including information relating to data entry and trade details, in the form and manner and within the time specified by the Commission in its request.

(b) Demonstration of compliance. Upon request by the Commission, a designated contract market must file with the Commission a written demonstration, containing supporting data, information and documents, in the form and manner and within the time specified by the Commission, that the designated contract market is in compliance with one or more core principles as specified in the request, or that is requested by the Commission to show that the designated contract market satisfies its obligations under the Act.

(c) Equity interest transfers—

> (1) Equity interest transfer notification. A designated contract market shall file with the Commission a notification of each transaction that the designated contract market enters into involving the transfer of ten percent or more of the equity interest in the designated contract market.
>
> (2) Timing of Notification. The equity transfer notice described in paragraph (1) shall be filed electronically with the Secretary of the Commission at its Washington, DC headquarters at submissions@cftc.gov and the Division of Market Oversight at DMOSubmissions@cftc.gov, at the earliest possible time but in no event later than the open of business ten business days following the date upon which the designated contract market enters into a firm obligation to transfer the equity interest.
>
> (3) Rule filing. Notwithstanding the foregoing, any aspect of an equity interest transfer described in paragraph (c)(1) of this section that necessitates the filing of a rule as defined in part 40 of this

chapter shall comply with the requirements of 5c(c) of the Act and part 40 of this chapter, and all other applicable Commission regulations.

(d) Delegation of authority. The Commission hereby delegates, until it orders otherwise, the authority set forth in paragraph (b) of this section to the Director of the Division of Market Oversight or such other employee or employees as the Director may designate from time to time. The Director may submit to the Commission for its consideration any matter that has been delegated in this paragraph. Nothing in this paragraph prohibits the Commission, at its election, from exercising the authority delegated in this paragraph.

**17 C.F.R. § 40.2**

(a) Submission requirements. A designated contract market or a swap execution facility must comply with the submission requirements of this section prior to listing a product for trading that has not been approved under § 40.3. A submission shall comply with the following conditions:

(1) The designated contract market or the swap execution facility has filed its submission electronically in a format and manner specified by the Commission;

(2) The Commission has received the submission by the open of business on the business day preceding the product's listing; and

(3) The submission includes:

(i) The information required by appendix D to this part;

(ii) A copy of the rules that set forth the contract's terms and conditions;

(iii) The intended listing date;

(iv) A certification by the designated contract market or the swap execution facility that the product to be listed complies with the Act and Commission regulations thereunder;

(v) A concise explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder. This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with applicable

law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(vi) A certification that the registered entity posted a notice of a pending product certification with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(vii) A request for confidential treatment, if appropriate, as permitted under § 40.8.

(b) Additional information. If requested by Commission staff, a registered entity shall provide any additional evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the requirements of the Act or the Commission's regulations or policies thereunder.

(c) Stay. The Commission may stay the listing of a contract pursuant to paragraph (a) of this section during the pendency of Commission proceedings for filing a false certification or during the pendency of a petition to alter or amend the contract terms and conditions pursuant to Section 8a(7) of the Act. The decision to stay the listing of a contract in such circumstances shall not be delegable to any employee of the Commission.

(d) Class certification of swaps.

(1) A designated contract market or swap execution facility may list or facilitate trading in any swap or number of swaps based upon an "excluded commodity," as defined in section 1a(19)(i) of the Act, not including any security, security index, and currency other than the United States Dollar and a "major foreign currency," as defined in § 15.03(a) of this chapter, or an "excluded commodity," as defined in section 1a(19)(ii)-(iv) of the Act, provided the designated contract market or swap execution facility certifies, under paragraphs (a)(1) and (2) and (a)(3)(i), (iv), and (vi) of this section, the following:

(i) Each particular swap within the certified class of swaps is based upon an excluded commodity specified in paragraph (d)(1) of this section;

(ii) Each particular swap within the certified class of swaps is based upon an excluded commodity with an identical pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations;

(iii) The pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in each particular swap within the certified class of swaps is identical to a pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in a product previously submitted to the Commission and certified or approved pursuant to this section or § 40.3; and

(iv) Each particular swap within the certified class of swaps is based upon an excluded commodity involving an identical currency or identical currencies.

(2) The Commission may in its discretion require a registered entity to withdraw its certification under paragraph (d)(1) of this section and to submit each individual swap or certain individual swaps within the submission for Commission review pursuant to this section or § 40.3.

**17 C.F.R. § 40.3**

(a) Request for approval. Pursuant to section 5c(c) of the Act, a designated contract market, a swap execution facility, or a derivatives clearing organization may request that the Commission approve a new product prior to listing the product for trading or accepting the product for clearing, or if a product was initially submitted under § 40.2 or § 39.5 of this chapter, subsequent to listing the product for trading or accepting the product for clearing. A submission requesting approval shall:

(1) Be filed electronically in a format and manner specified by the Commission;

(2) Include the information required by appendix D to this part;

(3) Include a copy of the rules that set forth the contract's terms and conditions;

(4) Include an explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder. This explanation and analysis shall either be

accompanied by the documentation relied upon to establish the basis for compliance with the applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(5) Describe any agreements or contracts entered into with other parties that enable the registered entity to carry out its responsibilities;

(6) Include the certifications required in § 41.22 for product approval of a commodity that is a security future or a security futures product as defined in Sections 1a(44) or 1a(45) of the Act, respectively;

(7) Include, if appropriate, a request for confidential treatment as permitted under § 40.8;

(8) Include the filing fee required under appendix A to this part;

(9) Certify that the registered entity posted a notice of its request for Commission approval of the new product and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(10) Include, if requested by Commission staff, additional evidence, information or data demonstrating that the contract meets, initially or on a continuing basis, the requirements of the Act, or other requirement for designation or registration under the Act, or the Commission's regulations or policies thereunder. The registered entity shall submit the requested information by the time specified by Commission staff, or at the conclusion of any extended period agreed to by Commission staff after timely receipt of a written request from the registered entity.

(b) Standard for review and approval. The Commission shall approve a new product unless the terms and conditions of the product violate the Act or the Commission's regulations.

(c) Commission review.

(1) All products submitted for Commission approval pursuant to, and in compliance with the submission requirements of, paragraph (a) of

this section shall be subject to review by the Commission for a period of 45 days after receipt by the Commission.

(2) The Commission may extend the initial 45-day review period for up to an additional 45 days if the product raises novel or complex issues that require additional time to analyze, the submission is incomplete or the requestor does not respond completely to Commission questions in a timely manner, in which case the Commission shall notify the submitting registered entity within the initial 45-day review period and shall briefly describe the nature of the specific issues for which additional time for review shall be required.

(3) At any time during its review of a proposed product under this section, the Commission may extend the review period for any period of time to which the registered entity agrees in writing.

(4) Any amendment or supplementation made by the registered entity to the submission will be treated as the filing of a new submission under this section and be subject to the initial 45-day review period in accordance with paragraph (c)(1) of this section, unless the amendment or supplementation is requested by the Commission or is made for correction of typographical errors, renumbering or other non-substantive revisions.

(5) If the review period described in paragraph (c)(1) of this section would end on a day that is not a business day, such review period shall instead be extended to end on the next business day.

(d) Commission Determination—

(1) Approval. Any product submitted for Commission approval in compliance with paragraph (a) of this section shall be deemed approved by the Commission under section 5c(c) of the Act at the conclusion of the applicable review period under paragraph (c) of this section, unless the Commission issues a notice of non-approval to the registered entity under paragraph (d)(2) of this section within the applicable review period.

(2) Notice of non-approval. Any time during its review under this section, the Commission may notify the registered entity that it will not, or is unable to, approve the new product. This notification will briefly specify the nature of the issues raised and the specific provision of the Act or the Commission's regulations, including the form or content requirements of this section, with which the new

product is inconsistent or appears to be inconsistent with the Act or the Commission's regulations.

(e) Effect of non-approval.

(1) Notification to a registered entity under paragraph (d)(2) of this section of the Commission's determination not to approve a product does not prevent the entity from subsequently submitting a revised version of the product for Commission approval, or from submitting the product as initially proposed, in a supplemented submission; the revised or supplemented submission will be reviewed without prejudice.

(2) Notification to a registered entity under paragraph (d)(2) of this section of the Commission's determination not to approve a product shall be presumptive evidence that the entity may not truthfully certify under § 40.2 that the same, or substantially the same, product complies with the Act and the Commission's regulations thereunder.

**17 C.F.R. § 40.11**

(a) Prohibition. A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved]

(c) 90-day review and approval of certain event contracts. The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day

review. The 90-day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90-day review period. The Commission shall post on the Web site a notification of the intent to carry out a 90-day review.

(2) Final determination. The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.

# ADDENDUM B:

## State Gambling and Bucket-Shop Laws Regulating Futures Before the Commodity Exchange Act's Enactment in 1936

**ALABAMA**

- "If any person, corporation, or other association of persons … shall establish or open an office or other place of business in this state for the purpose of carrying on or engaging in any business of making contracts to sell and deliver any cotton, Indian corn, wheat, rye, oats, tobacco, meal, lard, bacon, salt pork, salt fish, beef cattle, sugar, coffee, stocks, bonds, or choses … when … **it is not intended by the parties thereto that the articles or things so agreed to be sold and delivered shall be actually delivered or the value thereof paid,** but it is intended and understood by then, that money or other thing of value shall be paid to the one party by the other, … he shall be guilty of a misdemeanor." Ala. Code § 3579 (1928).

**ARKANSAS**

- "[T]he buying or selling or otherwise [dealing] in what is known as futures, either in cotton, grain or anything whatsoever, with a view to profit, is hereby declared to be **gambling**." Act of March 30, 1883, 1883 Ark. Acts 29.

**CALIFORNIA**

- Outlawing "'[b]ucketing' or 'bucket shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale of any securities or commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in and **without a bona fide purchase or sale of the same**." Cal. Gen. L., tit. 75, § 2 (1923).

**COLORADO**

- Outlawing bucket-shop transactions "respecting the purchase or sale … of any … commodities, … intending that such contract or other transaction shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities … are dealt in, **and without intending a bona fide purchase or sale of the same**." Colo. L. ch. 57, § 1(a) (1931).
- "All contracts, agreements, trades or transactions of the nature described in Section 1 of this Act [on bucket shops]," including those

"respecting the purchase or sale" of "commodities, not intending the actual bona fide receipt or delivery of any such … commodities, but intending a settlement of such contract or other transaction based upon the difference in such public market quotations of or such prices at which said … commodities are, or are asserted to be, bought or sold," "are hereby declared **gambling** and criminal Acts and absolutely null and void." Colo. L., ch. 57, §§ 1(c), 5 (1931).

**CONNECTICUT**

- Outlawing bucket shops, which are defined as, in relevant part, "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … shall conduct the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any … grain, provisions or other commodity …, wherein both parties thereto, or such proprietor or keeper, shall contemplate or intend that such contracts, agreements, trades or transactions shall be or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Conn. Gen. Stat. §§ 6345-6346 (1930).

**DISTRICT OF COLUMBIA**

- Outlawing "'[b]ucketing' or 'bucket-shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale … of any … commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said … commodities are dealt in and **without a bona fide purchase or sale of the same**." D.C. Code tit. 6, §§ 158-159 (1929).

**FLORIDA**

- "[D]eclaring unlawful all the transactions conducted in and through a bucket shop," which is defined "to be an office, store, or other place wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of

any … cotton, grain, provisions or other commodities … wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be or may be closed, adjusted, or settled according to or on the basis of the market quotations or prices made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in and **without a bona fide transaction on such board of trade or exchange**." Fla. Comp. L. § 7899 (1927).

**GEORGIA**

- Futures contracts are valid when they are "(1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange, or similar institution, and performed or discharged according to the rules thereof, and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of Georgia or any other State." Ga. Code Ann. § 4264(2) (1926 Code, 1930 Supp.).
- Outlawing bucket shops, which are "defined to be and mean any place of business where" persons make "any contract of sale for future delivery of cotton, grain, stocks, or other commodities, **where it is not the bona fide intention of parties that the things mentioned therein are to be delivered**, but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual bona fide execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution**, in accordance with the rules thereof." Ga. Code Ann. §§ 4264(3)-(4) (1926 Code, 1930 Supp.).

**ILLINOIS**

- "Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity … shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered **gambling contracts,** and shall be void." Ill. Rev. Stat. Crim. Code § 130 (1874).

- Outlawing "any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Ill. Rev. Stat. ch. 38, §§ 317-318 (1931).

**INDIANA**

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Act of April 10, 1907 §§ 3837-3838.

**IOWA**

- Outlawing bucket shops, which are defined to include "office[s], store[s], or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, cotton, or other commodity…" "[w]herein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades, or transactions are dealt in by competitive buying and selling, and **without a bona fide transaction on such board of trade or exchange**." Iowa Code §§ 9895, 9899, 9901 (1931).

**KANSAS**

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, cotton or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that the contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Kan. Rev. Stat. Ann., ch. 50, § 122 (1923) (citing Kan. L., ch. 121 § 2 (1909)).
- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Kan. Rev. Stat. Ann., ch. 50, § 123 (1923) (citing Kan. L., ch. 121 § 2 (1909)).

**MAINE**

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s], or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale of any … grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades, or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Me. Rev. Stat., ch. 136, §§ 14-15 (1930).

### MASSACHUSETTS

- Outlawing bucket shops, which are defined to include places where "[t]he making of, or offering to make, any contract respecting the purchase or sale … of any … commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which said … commodities are dealt in, and **without a bona fide purchase or sale of the same**" takes place. Mass. Gen. L., ch. 271, §§ 35-36 (1921).

### MICHIGAN

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale of any … grains, provisions or other commodity … wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Mich. Acts, no. 328 §§ 126-128 (1931).
- The "pretended buying or selling of … petroleum, cotton, grain, provisions or other produce, … without any intention of receiving and paying for the property so bought or of delivering the property so sold" is "hereby declared **gambling** and [a] criminal act[ ]." Mich. Acts, no. 328 § 311 (1931).

### MINNESOTA

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplates or intends that such contracts, agreement, trades or transactions, shall be, or may be, closed, adjusted or settled,

according to, or upon the basis of the public market quotations, of prices made on any board of trade or exchange, upon which the commodities … referred to in said contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Minn. Stat. §§ 10488-10489 (1927).

**MISSISSIPPI**

- As "**[g]ambling [c]ontracts**," "contract[s] for the purchase or sale of a commodity of any kind, to be delivered at a future date, the parties not intending that the commodity is to be actually delivered in kind and the price paid, shall not be enforced by any court; nor shall any contract of the kind commonly called 'futures' be enforced …." Miss. Code Ann., ch. 31, § 2034 (1927) (citing 1882 Miss. Laws 140).

**MISSOURI**

- Outlawing bucket shops, which are defined as "place[s] wherein the person carrying on the bucket shop, then and there, either as principal or agent, pretends to buy or sell, or goes through the form of buying or selling, to or for any other person or persons, … petroleum, cotton, grain, provisions and other commodities, or any one or more of the same, at prices fixed or pretended to be fixed by trades or transactions made or offered to be made in same on boards of exchange or otherwise, but **wherein there is in fact no actual purchase and sale, or sale and purchase of such commodity for or on account of the party or parties thereto**." Mo. Rev. Stat. §§ 4316-4318 (1929) (citing Mo. Rev. Stat. § 3565 (1919)).
- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Mo. Rev. Stat. § 4318 (1929) (citing Mo. Rev. Stat. § 3566 (1919)).

**NEBRASKA**

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, where there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the

party or parties thereto, are hereby declared **gambling** and criminal acts." Neb. Comp. Stat. § 9813 (1922) (citing Neb. Rev. Stat. § 8817 (1913)).

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s], **board-of-trade room[s]**, or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or purchase and sale, of any … grains, provisions, cotton or other commodity … wherein said proprietor or keeper or patron contemplates or intends that the contracts, agreements, trades or transactions shall be or may be, closed, adjusted or settled according to or upon the basis of the market quotations or prices made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board-of-trade**." Neb. Comp. Stat. §§ 28-955, 28-959 (1929).

**NEW HAMPSHIRE**

- Considered a form of "**[g]ambling**," "[n]o person or corporation shall keep, or cause to be kept, an office, store, or other place in which is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions, pork or other produce… without any intention of receiving and paying for the property so bought, or of delivering the property so sold, or in which is conducted or permitted the pretended buying or selling of such property on margins, or when the party buying, or offering to buy, such property, does not intend actually to receive the same if purchased, or deliver it if sold." N.H. Pub. L., ch. 384, § 23 (1925).

**NEW YORK**

- Outlawing bucket shops, which are defined to include places where a person "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale … of any … commodities … intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which such commodities … are dealt in, and **without intending a bona fide purchase or sale of the same**." N.Y. Penal Law § 390 (1909).

**NORTH CAROLINA**

- "The test of the validity of a contract for 'future' which this section requires is the 'intention not to actually deliver' the articles bought or sold for future delivery. No matter how explicit the words in any contract which may require a delivery, if in fact there is no intention to deliver, but the real understanding is that on the stipulated date the losing party shall pay to the other the difference between the market price and the contract price, this is a **gambling contract**." Ed.'s Note, N.C. Code Ann. § 2144 (1931).

**NORTH DAKOTA**

- Bucket shops, considered a "place for **gaming**," are "unlawful" where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile or agricultural products on margins, without any intention of future delivery." N.D. Comp. L. Ann. § 9699 (1913).

**OHIO**

- "[I]t shall be unlawful for any corporation, association, chamber of commerce, **board of trade**, copartnership or person to keep or cause to be kept within this state any bucket shop, office or other place wherein is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Ohio Gen. Code § 6934a-1 (1902).
- It is unlawful for a person to use a building for a " 'bucket shop' or grain **gambling**." Ohio Gen. Code § 6934a-5 (1902).

**OKLAHOMA**

- "[A]ll contracts of sales for future delivery of cotton, grain, stocks or other commodities" that are "(1) made in accordance with the rules of any board of trade, exchange or similar institution where such contracts of sale are executed and (2) actually executed on the floor of such board of trade, exchange or similar institution and performed or discharged according to the rules thereof; and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton, exchange, grain exchange, board of trade, or similar institution organized under the laws of the State of Oklahoma or any other State shall be, and they are hereby declared to be valid

and enforceable in the courts of this State according to their terms." Okla. Comp. Stat. Ann. § 3883 (1921).

- Prohibiting bucket shops, which are "defined to be and mean any place of business wherein are made" "contract[s] of sale for the future delivery of cotton, grain, stocks or other commodities, which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange or similar institutions, upon which contracts of sale for future delivery are executed and dealt in **without any actual bonafide execution and the carrying out or discharge of such contracts upon the floor of such exchange, board of trade, or similar institution in accordance with the rules thereof**." Okla. Comp. Stat. Ann. §§ 3885-3888 (1921).

**OREGON**

- Outlawing when a person, "as broker," "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale … of any … commodities, intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities … are dealt in, and **without intending a bona fide purchase or sale of the same**." Ore. L., ch. 395, § 2 (1931).

**PENNSYLVANIA**

- Outlawing bucket shops, which are defined to include "an office, store, or other place, wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any … grains, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices, made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades, or transactions, are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Dig. Pa. Stat. L. § 2413 (1920) (citing Act of June 1, 1907).

- "All contracts, agreements, trades, or transactions of the nature described in section one of this act [on bucket shops] are hereby declared **gambling**, and criminal acts, and absolutely null and void." Dig. Pa. Stat. L. § 2418 (1920) (citing Act of June 1, 1907).

**RHODE ISLAND**

- Outlawing bucket-shopping, which includes "[t]he making of or offering to make any contract respecting the purchase or sale … of any … commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in, and **without a bona fide purchase or sale of the same**." R.I. Gen. L., ch. 406, § 1 (1923) (citing R.I. Gen. L., ch. 353 (1909)).

**SOUTH CAROLINA**

- "[A]ll contracts of sale for future delivery of cotton, grain, stocks, or other commodities, (1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange or similar institution, and performed or discharged according to the rules thereof, and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of South Carolina, or any other State, shall be and they hereby are declared to be valid and enforceable in the Courts of this State, according to their terms." S.C. Acts, no. 711 § 2 (1928).
- Bucket shops are unlawful; "[a]ny contract of sale for future delivery of cotton, grain, stocks, or other commodities **where it is not the bona *fide* intention of parties that the things mentioned therein are to be delivered** but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual bona *fide* execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution, in accordance with the rules thereof**, shall be null and void and unenforceable in any Court of this State, and no action shall be maintainable thereon at the suit of any party." S.C. Acts, no. 711 §§ 3-4 (1928).

**South Dakota**

- Bucket shops, as a form of "**[g]ambling in [f]utures**," are unlawful where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile, mining or agricultural products or corporation stocks, on margins, without any intention of future delivery, whether such pretended contracts are to be performed within or without the state." S.D. Comp. L. § 3925 (1929).

**Tennessee**

- "[H]ereafter any sale, contract or agreement for the sale of … grain, cotton or other produce, property, commodity, article or thing, for future delivery, where either of the contracting parties, buyer or seller, in dealing simply for the margin, or on the prospective rise or fall in the price of the article or thing sold, and where either of the said contracting parties have had no intention or purpose of making actual delivery or receiving the property or thing in specie, shall be deemed and is hereby declared **gambling**." Act of March 30, 1883, 1883 Tenn. Pub. Acts 331.

**Vermont**

- As a form of "**[g]ambling**," a bucket shop is unlawful where it is used for "the pretended buying or selling of … petroleum, cotton, grain, provisions, pork or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Vt. Gen. L. § 7081 (1917).

**Virginia**

- Outlawing "bucket-shopping," which includes "[t]he making of, or offering to make, any contract respecting the purchase or sale … of any … commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which said … commodities are dealt in, and **without a bona fide purchase or sale of the same**." Va. Code Ann. §§ 4714-4715 (1924).

**Washington**

- Outlawing bucket shops, which are "defined to be shed[s], tent[s], tenement[s], booth[s], building[s], float[s] or vessel[s], or any part

thereof, wherein may be made contracts respecting the purchase or sale … of any commodities … wherein both parties, intend that such contract shall or may be terminated, closed and settled” **(1) “[u]pon the basis of the market prices quoted or made on any board of trade or exchange upon which such commodities … may be dealt in,” (2) “[w]hen the market prices for such commodities … shall reach a certain figure in any such board of trade or exchange,’ or (3) “[o]n the basis of the difference in the market prices at which said commodities … are, or purport to be, bought and sold.”** Wash. Code § 8932 (1919).

**WEST VIRGINIA**

- “If any person shall carry on in this State what is commonly known as a bucket shop, or act as agent for any person, firm or corporation carrying on such business, or engage in transactions for the purchase or sale for others of grain, provisions, … or other property wherein the parties thereto or the broker intend that such transaction shall be settled according to the public market quotations on any board of trade or exchange, or intend that such transaction may be deemed terminated when such public market quotations shall reach a certain figure, or intend that such property shall be resold before or at the time fixed in such transaction for the delivery of such property and that the difference between the contract price and the market price thereof shall be paid or received **without the prior receipt or delivery of such property under the former sale**, he shall be guilty of a felony, and, upon conviction thereof, shall be confined in the penitentiary not less than two nor more than five years.” W. Va. Code, ch. 61, art. 10, § 18 (1930).

**WISCONSIN**

- Outlawing bucket shops, which are “defined to be an office, store or other place wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grains, provisions or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such

contract, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Wis. Stat. §§ 348.175-348.178 (1929).

**WYOMING**

- It is "unlawful for any corporation, association, co-partnership or person to keep or cause to be kept within this state any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any corporation, or petroleum … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold** or wherein is conducted or permitted the pretended buying or selling of such property on margins." Wyo. Rev. Stat. Ann. § 32-924 (1931).