# 26-2239

IN THE

## United States Court of Appeals for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

BRYAN T. CAFFERELLI, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Connecticut
No. 3:25-cv-2016 (Hon. Vernon D. Oliver)

## JOINT APPENDIX

WILLIAM TONG,
ATTORNEY GENERAL
JOSEPH GASSER
*Counsel of Record*
OFFICE OF THE ATTORNEY GENERAL
165 Capitol Ave.
Hartford, CT 06106
Telephone: (860) 808-5247
joseph.gasser@ct.gov

*Counsel for Defendants-Appellees*

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellant*

*Additional counsel listed on inside cover*

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiff-Appellant*

September 30, 2026

# TABLE OF CONTENTS

Page

Order Denying Motion for Preliminary Injunction ("PI"),
Dkt. No. 94 (Aug. 10, 2026)........................................................ JA1

Notice of Interlocutory Appeal,
Dkt. No. 95 (Aug. 10, 2026)........................................................JA39

District Court Docket Sheet
(D. Conn. 3:25-cv-2016) ........................................................... JA41

Complaint,
Dkt. No. 1 (Dec. 3, 2025) ..........................................................JA55

Cease & Desist Letter, Exhibit 1 to Complaint,
Dkt. No. 1-1 (dated Dec. 2, 2025; filed Dec. 5, 2025)..........................JA76

Motion for PI,
Dkt. No. 30 (Dec. 5, 2025)..........................................................JA79

Declaration of Xavier Sottile, Exhibit 5 to Motion for PI,
Dkt. No. 30-5 (Dec. 5, 2025) .....................................................JA82

Transcript of PI Hearing,
Dkt. No. 82 (held Feb. 11, 2026; filed Feb. 18, 2026) .........................JA96

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

KALSHIEX LLC,

Plaintiff,

-against-

BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG, in his official capacity as Attorney General of Connecticut,

Defendants.

---

**MEMORANDUM & ORDER**

25-CV-2016 (VDO)

**VERNON D. OLIVER**, United States District Judge:

Before the Court is Plaintiff KalshiEX LLC's ("Kalshi") Motion for a Preliminary Injunction (the "Motion"). Kalshi seeks an order enjoining Defendants, various Connecticut officials, and the Connecticut Department of Consumer Protection ("DCP"), from enforcing Connecticut's gaming regulatory scheme against Kalshi. Kalshi contends that federal law preempts Connecticut's gaming regulatory regime and related statutes. For the reasons that follow, the Motion is **DENIED**.

## I. <u>BACKGROUND</u>

### A. Factual Background

#### 1. Derivatives, Swaps, and Event Contracts Under the CEA

Derivative contracts, some types of which are at issue in this case, are financial tools that traders use to mitigate risk. "A derivative is a financial instrument or contract whose price is directly depending upon (i.e., derived from) the value of one or more underlying assets–for

example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025) (cleaned up). In a classic example of a derivatives contract, a farmer may enter into an agreement with a buyer to trade a crop, like wheat, at a predetermined price on a specific future date, effectively locking in value and removing the risk of unexpected price drops.[1] A "future" is a type of derivative contract between parties to buy or sell an asset at a predetermined price on a future date that is listed on an organized exchange. *See generally,* Beylin, *supra* n.1.

Congress regulates many derivatives through the Commodity Exchange Act ("CEA"), a federal statute that provides a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). "The CEA was enacted during the Great Depression in response to concerns about manipulation, speculation, and other abuses that could arise from trading derivatives." *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (cleaned up). Originally enacted to regulate futures contracts in agricultural commodities, the CEA has since "expanded well beyond its agricultural-commodity roots." *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026). "In 1974, Congress created the Commodity Futures Trading Commission (CFTC) and gave this agency the authority to

---

[1] To shed some further light on how such a contract would play out, "a farmer could go 'short' through the futures contract (i.e., sell the grain under the contract) to neutralize her risk that grain prices fluctuate. Through selling wheat under the futures contract, the farmer effectively sells at a price fixed at the time of execution with settlement taking place in the future through an exchange of the referenced commodity for cash. If prices for wheat increase, the farmer will (i) lose money under the futures contract because the price of wheat at the time of delivery under the futures contract exceeds what she sold it for, but (ii) experience increased revenues from the harvest. If, on the other hand, prices fall, the farmer will (i) profit under the futures contract, and (b) suffer offsetting losses as she sells her harvest at the lower price." Ilya Beylin, *Event Contracts Are a Step Too Far for Derivatives Regulation*, 4 U. Chi. Bus. L. Rev. 77, 78–79 (2025).

regulate all futures contracts . . ." *Id.* (citing 7 U.S.C. § 2(a)(1)(A); Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1395).

Among other extensive regulatory changes, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act of 2010") "brought much of the swaps market within the CFTC's purview for the first time." *Phillips*, 155 F.4th at 113. As part of the Dodd-Frank Act of 2010, Congress expanded the CEA's reach to include "swap[ ]" contracts, 7 U.S.C. § 2(a)(1)(A), which it defined within the CEA as contracts in which a party's "payment" depends on the "occurrence, nonoccurrence, or [ ] extent of the occurrence of an event" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Swaps generally involve "the exchange of cash flows from financial instruments," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013), allowing parties to trade risky or variable returns for more certain ones and vice versa. "For instance, parties might agree to swap future interest payments at different rates, or future payments in one currency for payments in another."[2] Unlike futures and options, "which contemplate delivery of or performance related to a commodity at some future time, swaps are pure financial instruments based on the difference between two fluctuating values." *Phillips*, 155 F.4th at 112 (cleaned up).

The contracts involved in this case are commonly referred to as event contracts, another category of derivative contracts regulated by the CEA. Although the CEA repeatedly uses the term "event contract," it does not define it; nor do any regulations issued by the CFTC. Courts have used the term to describe financial instruments that identify a future event with several

[2] ECF No. 46 at 7.

possible outcomes, a payment schedule for the outcomes, and an expiration date. *See KalshiEX LLC v. CFTC*, No. 23-CV-3257, 2024 WL 4164694, at *2 (D.D.C. Sep. 12, 2024). Event contracts are typically traded on an exchange, and their value is determined by market forces. This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a unique financial instrument that tracks real-world market perceptions. *Id.* The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *Id.* For example, one might purchase a position on an event contract titled "Will it rain tomorrow?" with a $1 fixed payout.[3] If that person purchased a 70-cent "yes" position "and it rained the next day, [that person] would earn a 30-cent profit when the contract settles" while the person "who didn't predict correctly would lose their [30-cent] investment."[4]

### 2. CFTC Regulation of Swaps and Event Contracts

The CEA "gives the CFTC 'exclusive jurisdiction' 'with respect to,' among other covered contracts, 'transactions involving swaps' 'traded or executed on a contract market' that the agency has designated." *Schuler*, 2026 WL 1295806, at *1 (quoting 7 U.S.C. § 2(a)(1)(A)). An entity that seeks to list and publicly trade its event contracts must apply to the CFTC to be a designated contract market ("DCM"). *See* 7 U.S.C. §§ 2(e), 7(a). Once the CFTC designates an entity as a DCM, the entity must comply with the CEA's "core principle[s]" and the CFTC's regulations. *Id.* § 7(d)(1)(A). Of note, the CFTC has promulgated regulations that

---

[3] Commodity Futures Trading Comm'n, Understanding Prediction Markets and Event Contracts, https://www.cftc.gov/LearnandProtect/PredictionMarkets.

[4] *Id.*

govern the "access requirements" that a DCM must follow. *Id.* § 7(d)(2)(A)(i). These regulations require a DCM to "provide its members . . . with impartial access to its markets and services." 17 C.F.R. § 38.151(b); *see also id.* § 37.202(a). The DCM must both follow "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner" and set "[c]omparable fee structures." *Id.* § 38.151(b); *see also id.* § 37.202(a).

The CEA also contains a "[s]pecial rule for review and approval of event contracts and swap contracts" created by Congress as part of the 2010 amendments to the Dodd-Frank Act (the "Special Rule"). 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule applies to contracts in certain excluded commodities. As relevant here, the CEA defines an excluded commodity to include "an occurrence, extent of an occurrence, or contingency" that is both "beyond the control" of the contracting parties and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).[5]

Under the Special Rule, DCMs may list relevant contracts without prior CFTC approval by self-certifying that those contracts comply with applicable law and regulations. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2) (listing submission requirements). If a DCM lists contracts "in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," the CFTC can then review and prohibit these contracts when they are "contrary to the public interest" because they involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest." 7 U.S.C.

[5] *Cf.* 7 U.S.C. § 1a(47)(A) (defining "swap" as "any agreement, contract, or transaction" "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence").

§ 7a-2(c)(5)(C)(i).[6] Contracts contrary to the public interest "may [not] be listed or made available for clearing or trading on or through a registered entity," such as a DCM. *Id.* § 7a-2(c)(5)(C)(ii).

### 3. Kalshi's Registration as a CFTC-Designated Contract Market

Kalshi is a financial services company that operates a prediction market, which allows users to buy and sell event contracts on its platform.[7] The CFTC certified Kalshi as a DCM in 2020. *KalshiEX*, 2024 WL 4164694, at *4. Kalshi initially offered event contracts about technology, health, crypto, popular culture, politics, and economics. *Schuler*, 2026 WL 1295806, at *2. But in January 2025, Kalshi self-certified several contracts related to sporting events and began to list them on its exchange.[8] These sports-event contracts allow users to place positions on "for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship."[9] But they may also ask:

> Will Michigan win by more than 7.5 points? Or will Michigan and UConn score more than a combined 144.5 points? Or will a specific player score more than 10 points? Or pretty much anything else that might happen during a sporting event.

*Schuler*, 2026 WL 1295806, at *2.

As of February 11, 2026, the date of the hearing on the Motion, Kalshi's value sat at around $11 billion.[10] The vast majority of the contracts listed on Kalshi's site—between 80%

---

[6] Effective as of 2011, the CFTC issued a similar regulation, providing that a "registered entity shall not list for trading" contracts contrary to the public interest—the same types of contracts enumerated above. 17 C.F.R. § 40.11(a)(1).

[7] Compl., ECF No. 1 ¶ 18.

[8] *Id.* ¶ 43.

[9] *Id.*

[10] Oral Arg. Tr., ECF No. 82 at 68:21–69:3.

and 90%—were sports-events contracts;[11] between 80% and 90% of Kalshi's revenue came from its sports-events contracts;[12] and the CFTC had not subjected a single one of these contracts to review under the Special Rule, let alone prohibited any contract after such review.[13]

**4. The Connecticut Regulatory Scheme for Gaming**

The Gaming Division of the DCP "regulates gaming in the state of Connecticut by licensing or permitting all individuals and entities that are involved with legalized gaming, and by monitoring and educating to ensure compliance with [the state's] gaming laws."[14] It does so pursuant to Connecticut's long-held police powers. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a State …."); *Marvin v. Trout*, 199 U.S. 212, 224 (1905) ("The power of the state to enact laws to suppress gambling cannot be doubted …."); *Murphy v. NCAA*, 584 U.S. 453, 486 (2018) (noting that "Congress can regulate sports gambling directly, but if it elects not to do so, *each State is free to act on its own.*") (emphasis added); *see also id.* at 467–68 (referring to "old laws banning sports gambling," and noting that as of 1992, "all forms of sports gambling were illegal in the great majority of States").

Connecticut regulates gambling via a "tightly controlled, exclusive sports wagering market" created in 2021 by the Connecticut General Assembly.[15] 2021 Conn. Acts, No. 21-

---

[11] *Id.* at 41:4–13.

[12] *Id.* at 68:15–20.

[13] *Id.* at 16:16–17; 101:19–24.

[14] ECF No. 1 ¶ 20.

[15] Defs. Opp'n, ECF No. 46 at 5.

23; Conn. Gen. Stat. § 12-850 *et seq.* The Gaming Division is the DCP's largest division, made up of "64 employees . . . that include[] investigators, sworn law enforcement officers, [and] six attorneys."[16] Eight of these employees are specifically dedicated to sports-related enforcement.[17]

Under Connecticut law, an "online gaming operator" includes entities that operate an "electronic wagering platform" to offer "Internet games" (which are defined to include "online sports wagering"). Conn. Gen. Stat. §§ 12-850(27), 12-850(13). Such online gaming operators must obtain a license from the DCP by contracting directly with one of the state's three master wagering licensees to offer its services.[18]

"Sports wagering," per Connecticut law, is defined as "[r]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform; and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event; or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a

[16] ECF No. 82 at 113:2–7.

[17] *Id.* at 115:22.

[18] Conn. Gen. Stat. § 12-857(a). Connecticut law defines a "master wagering licensee" as "(A) the Mashantucket Pequot Tribe, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; (B) the Mohegan Tribe of Indians of Connecticut, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; or (C) the Connecticut Lottery Corporation, if licensed pursuant to section 4 of this act to operate retail sports wagering, online sports wagering, fantasy contests and keno and to sell tickets for lottery draw games through the Internet, an online service or a mobile application[.]" 2021 Conn. Acts, No. 21-23 § 1(16); *see also* Conn. Gen. Stat. § 12-850(21).

combination of sporting events." Conn. Gen. Stat. § 12-850(34). Offering gaming in Connecticut in a manner that violates the state's gaming laws can constitute a class A or class B misdemeanor, exposing any violators to civil and criminal penalties. Conn. Gen. Stat. §§ 53-278b, 53-278d.

**5. The Department of Consumer Protection's Cease-and-Desist Letter**

In 2025, Kalshi's sports-event contracts drew the attention of the DCP. On December 2, 2025, the DCP sent Kalshi an email containing a cease-and-desist letter, stating that Kalshi was "conducting unlicensed online gambling, more specifically sports wagering" by offering its contracts in Connecticut in violation of state law.[19] The letter directed Kalshi to "immediately cease and desist advertising and offering its Contracts to Connecticut residents."[20]

The cease-and-desist letter elaborated that Kalshi's contracts "constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events."[21] It went on to say that "[e]ven if Kalshi possessed an online gaming operator's license, Kalshi's contracts still violate numerous other Connecticut laws and public policies" that bar individuals under 21 from placing wagers and prohibit wagers involving Connecticut intercollegiate sports teams.[22] The letter further contended that Kalshi's contracts are "void" under state law prohibiting wagering

---

[19] Porter Decl. Ex. 1 (C&D Letter), ECF No. 30-3 at 2.

[20] *Id.*

[21] *Id.* (citing Conn. Gen. Stat. § 12-850(34)).

[22] *Id.* at 3 (citing Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30)).

contracts and that Kalshi's "promotion of unlicensed and illegal gambling services is also an unfair trade practice" in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA") because they are "deceptive" and "unfair" as Kalshi "is able to gain a competitive advantage over appropriately licensed entities" by "operating outside of the regulatory environment."[23] The letter warned Kalshi that "[f]ailure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d."[24]

Though Plaintiff initially asserted that the cease-and-desist letter "did not limit itself to Kalshi's sports-event contracts, but rather suggested that *all* of Kalshi's event contracts are unlawful,"[25] Defendants limited their briefing to Kalshi's sports-event contracts and later clarified at oral argument that the scope of the letter only extended to sports gaming contracts.[26]

On December 8, 2025, per the parties' joint stipulation, the Court ordered Defendants "to refrain from taking enforcement action against Kalshi" for conduct mentioned in the cease-and-desist letter pending disposition of the Motion.[27]

---

[23] *Id.*

[24] *Id.* at 3.

[25] Pl. Mem., ECF No. 30-1 at 16.

[26] ECF No. 82 at 76:2–3.

[27] ECF No. 35.

### B. Procedural History

Kalshi initiated this action on December 3, 2025.[28] On December 5, 2025, Kalshi filed the Motion.[29] Defendants responded on January 9, 2026,[30] and Kalshi replied on January 30, 2026.[31] A number of Indian tribes and gaming associations also filed an amicus brief in this case.[32] The Court held oral argument on the Motion on February 11, 2026.[33]

### C. Nationwide Litigation

Numerous courts have considered similar motions by Kalshi, seeking to enjoin state gaming commissions from enforcing state law against it.[34] Federal courts have found both in Kalshi's favor, granting its preliminary injunction motions, and against it, denying such motions. *Compare KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, No. 26-CV-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (granting preliminary

[28] ECF No. 1.

[29] ECF No. 30.

[30] ECF No. 46.

[31] ECF No. 75.

[32] ECF No. 56-1. The Brief was filed by the Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Minnesota Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Native American Finance Officers Association, San Manuel Gaming and Hospitality Authority, and 16 tribes: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Sandia; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuuhaviatam of San Manuel Nation.

[33] ECF No. 81.

[34] The Court is aware of 14 lawsuits that Kalshi has brought against states in their respective federal district courts: Nevada, New Jersey, Maryland, Ohio, New York, Connecticut, Illinois, Tennessee, Utah, Iowa, Arizona, Montana, Minnesota, and Rhode Island.

injunctions) *with KalshiEX LLC v. Schuler* ("*Schuler II*"), No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Cox*, No. 26-CV-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026); *KalshiEX LLC v. Williams*, No. 25-CV-8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026); *KalshiEX LLC v. Johnson*, No. 26-CV-1715, 2026 WL 958171 (D. Ariz. Apr. 8, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) (denying preliminary injunctions).

Many state courts are likewise considering similar actions involving Kalshi.[35] In contrast to the federal courts that have addressed this issue, every state court to have issued a ruling has ruled against Kalshi. *See Massachusetts v. KalshiEX, LLC*, 2584-CV-2525, Order on Plaintiff's Motion for a Preliminary Injunction and Defendant's Motion to Dismiss (Mass. Sup. Ct. Jan. 20, 2026), available here; *Nessel v. KalshiEX LLC*, 26-1087-CZ, Order Granting Temporary Restraining Order (Mi. Circuit Ct. June 29, 2026), available here; *Nevada v. KalshiEX, LLC*, 26-0C-50, Joint Stipulation and Order (Nev. Dist. Ct. July 24, 2026), available here. Massachusetts, Nevada, and Michigan state courts have all ordered Kalshi to implement geofencing in order to bar Kalshi's offerings to users in those respective states. While Massachusetts's order has been stayed pending appeal, Kalshi has pledged to implement geofencing in Nevada by August 12, 2026, and faces the same deadline for doing so in Michigan.

[35] The Court is aware of four civil enforcement actions brought by states against Kalshi that remain pending in their respective state courts. Each of those cases—filed in Nevada, Washington, Massachusetts, and Michigan—was remanded to state court after removal. In addition, a criminal enforcement action is pending against Kalshi in Arizona state court. Numerous other state-filed actions have also been removed by Kalshi, and the question of whether those cases should be remanded is currently being litigated.

## II. DISCUSSION

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "In general, '[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023)). As discussed below, the Court concludes that all factors weigh in favor of Defendants and accordingly **denies** the motion for a preliminary injunction.

### A. Likelihood of Success on the Merits

The Court begins with assessing Plaintiff's likelihood of success on the merits. "In general, to establish a 'likelihood of success on the merits' the movant for injunctive relief 'need only make a showing that the probability of his prevailing is better than fifty percent.'" *Abrams v. Waters*, No. 17-CV-1659 (CSH), 2018 WL 1469057, at *4 (D. Conn. Mar. 26, 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Here, the merits of the case center on whether (1) Kalshi's sports-event contracts constitute "swaps" within the meaning of the CEA, and, if so, (2) whether Connecticut gambling laws are preempted by federal law as applied to Kalshi's sports-event contracts. Kalshi has not demonstrated that it is likely to succeed on the merits on either of these issues, as explained below.

#### 1. Whether Sports-Events Contracts Are Swaps

As noted in Section I.A.1–2, *supra*, to fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A), a contract must be a "swap[ ]. . . traded or executed on" a DCM.

Connecticut argues that the sports-event contracts at issue are not "swaps" within the meaning of the CEA and therefore fall outside the CFTC's exclusive jurisdiction. For the reasons that follow, the Court largely agrees.

First, the Court notes that it has the authority to interpret the CEA, including its definition of a swap. "[T]he CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap." *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1180 (D. Nev. 2025) ("*Crypto*") (comparing *Batterton v. Francis*, 432 U.S. 416, 430–31 (1977) (evaluating a statute that expressly "authorize[d]" the Secretary of Health, Education, and Welfare the power to define a statutory term through statutory language: "unemployment (as determined in accordance with standards prescribed by the Secretary)" (cleaned up)), with 7 U.S.C. § 2(a)(1)(A) (granting the CFTC "exclusive jurisdiction" over "accounts, agreements . . ., and transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC). "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("Congress expects courts to handle technical statutory questions."). Nothing in the CEA takes statutory interpretation away from courts. *See* 7 U.S.C. § 2(a)(1)(A).

Kalshi agrees, but states that "a challenge to the CFTC's determination [of what constitutes a swap] *must* be brought against the CFTC itself."[36] The Court is not persuaded. In support of its argument, Kalshi relies on a wholly inapposite Ninth Circuit case, *Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 (9th Cir. 2015). That case indeed holds, as Kalshi

[36] ECF No. 75 at 2 (emphasis added).

Case: 26-2239, 09/30/2026, DktEntry: 38.1, Page 18 of 214

states, that a "collateral attack on agency decision would be prohibited 'end-run.'"[37] But unlike in *Big Lagoon*, where California challenged a Bureau of Indian Affairs decision to hold a parcel of land in trust for an Indian tribe, Kalshi has failed to identify what exact CFTC decision Connecticut is seeking to collaterally attack here. Kalshi's reliance on *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156–57 (7th Cir. 1992) is similarly misplaced. That case held that certain state law claims asserted by soybean farmers were preempted by the CEA; it did not address whether a court may determine, in the first instance, whether the contracts at issue fall within the CFTC's exclusive jurisdiction. Nothing in *American Agricultural Movement* precludes a court from resolving that threshold question here.

As noted above, the CEA defines swaps as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define "occurrence" or "event," so the Court may "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). Although dictionaries may illuminate ordinary meaning, *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568–69 (2012), statutory language must be construed in context, not in isolation. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Thus, the Court must "attempt to give effect to the plain meaning of each word," *Assocs. Against Outlier Fraud v. Huron*

[37] *Id.*

*Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016), including Congress's decision to use the distinct terms "occurrence" and "event."

The Court finds that the statutory phrase "occurrence, nonoccurrence, or the extent of the occurrence of an event" is concerned with whether an event takes place and to what extent it occurs, not various outcomes of or embedded within that event. The Court finds persuasive the analysis of the District of Nevada in *Crypto*, which reached the same conclusion after examining contemporaneous dictionary definitions of "occurrence" and "event." *See* 815 F. Supp. 3d at 1181–83. That court ultimately interpreted "occurrence" to mean "something [that] happened," and "event" as "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Id.* Crucially, though "some dictionaries suggest 'event' could mean 'outcome,' Webster's and Merriam-Webster's noted this definition of event is an 'archaic' use of the word," not its ordinary meaning. *Id.* at 1182 (quoting Webster's New College Dictionary (2009) (definition of event), Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (definition of event)). Thus, "event" as used in the CEA cannot also encompass "outcome," and, conversely, the statutory phrase cannot be read to make every outcome an "occurrence . . . of an event."

In the context of sporting events, "the ordinary meaning of event . . . would be the sporting event itself, not who wins it." *Crypto*, 815 F. Supp. at 1183. For example, a boxing match would constitute the relevant "event," and it "could either take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence)." *Id.* The term "event" does not encompass the result of the event, meaning who wins the boxing match is not a separate event in and of itself. Indeed, "[a]n ordinary American interpreting the word 'event'

would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself." *Id.*

Kalshi's sports-event contracts fail to satisfy this portion of the statutory definition of a swap because they do not depend on whether an underlying sporting event occurs, fails to occur, or occurs to a particular extent. Instead, Kalshi's sports-event contracts depend on the event's outcomes or discrete in-game occurrences. Treating those outcomes as separate "events" would depart from the ordinary meaning of the term. Thus, Kalshi's sports-event contracts do not fall within § 1a(47)(A)(ii). [38]

Separately, the Court finds that Kalshi's sports-event contracts are also not swaps because they are not "associated with a potential financial, economic, or commercial consequence," as required by 7 U.S.C. § 1a(47)(A)(ii). Kalshi asserts that "[s]ports events have *actual* and *significant* financial consequences," and that they "readily meet the swap definition, which requires only *potential* consequences."[39] It further contends that—when it comes to a limiting principle—"the definition of swap is broad but not limitless"; to qualify as a swap, an event contract must be based on "an event that has a potential consequence for stakeholders."[40]

The Court agrees with the Defendants and the *Hendrick* court that Kalshi's position that sports-event outcomes are associated with financial consequences "knows no limiting

[38] The Court notes that, although neither the statute nor the parties define "sports-event contracts," this holding and the accompanying analysis is limited to contracts that depend on a sporting event outcome or an in-game occurrence—for example, which team wins or advances or whether a player scores a touchdown. The Court does not decide on this limited record whether the same analysis would apply to other types of sports-related event contracts (e.g. whether a game proceeds to overtime or whether a series reaches a seventh game), as the record does not establish that such contracts are offered or are at issue, and the parties have not addressed these types of contracts.

[39] ECF No. 75 at 3.

[40] ECF No. 82 at 36:23; 37:10–12.

principle." *Hendrick*, 817 F. Supp. 3d at 1027. In asserting that an event contract qualifies as a swap if it is based on "an event that has a potential consequence for stakeholders,"[41] Kalshi does little to clarify the scope of the statutory phrase. The proposed limitation simply replaces one undefined concept with another: what qualifies as a "potential consequence," and which "stakeholders" are relevant? Kalshi's formulation provides no meaningful basis for drawing those lines, and its own examples illustrate the difficulty of that proposed limitation.

For example, Kalshi draws a distinction between contracts on the winner of a sporting event, which it contends qualify as swaps, and contracts on the game's exact final score, which it does not offer because, in its view, they are "divorced from . . . an outcome that would have an effect on the team or their sponsors" and thus fall outside the statutory definition of a "swap."[42]But it is not clear to the Court why the identity of the winning team, as opposed to the game's final score, is meaningfully different for purposes of the statutory requirement that the event have a potential financial, economic, or commercial consequence. There are many sporting events in which the winner has little or no practical consequence beyond the contest itself, while the precise score may carry significant financial and commercial implications. For example, the winner of a late-season game between two teams already eliminated from postseason contention may have relatively limited economic significance, whereas a losing team reaching a scoring threshold that secures playoff qualification or advancement under a tournament's rules may have substantial financial consequences for players, coaches, teams,

---

[41] ECF No. 82 at 37:12.

[42] *Id.* at 101:3–10.

broadcasters, sponsors, and other stakeholders. Kalshi offers no principled basis for concluding that the former satisfies the statutory definition of a swap while the latter necessarily does not.

Or, for instance, Kalshi has represented that it would not list a contract on whether or not a player at a blackjack table wins their hand because "it would be very difficult to argue that that's not gaming" and because that is an example of a "transaction that has implications for the people in the transaction, but no extrinsic implications for people outside of the transaction."[43] But Kalshi has offered "no principled reason" for why a "'combo' on both the Giants and Broncos winning," which is a type of contract Kalshi does offer, is meaningfully different.[44] Whether both the Giants and Broncos happen to win on a given weekend may have no independent financial, economic, or commercial consequence at all, apart from its significance to participants in Kalshi's market and others who have wagered on that particular combination of outcomes. Conversely, a blackjack hand could have significant financial consequences for the casino, the player, or others with contractual or commercial interests tied to the game. If the existence of some downstream economic consequence is sufficient to transform an event into a swap, the statute would encompass virtually any uncertain event with economic ramifications—a construction that is difficult to reconcile with the text Congress enacted.

Nor could Congress have intended to strip states of their ability to regulate sports betting outside of a CEA-regulated DCM. If the Court were to accept that sports-event contracts are, indeed, swaps, and 7 U.S.C. § 2(a)(1)(A) put such contracts under CFTC's

---

[43] ECF No. 82 at 45:8–23.

[44] ECF No. 46 at 18.

exclusive jurisdiction, but 7 U.S.C. § 2(e) requires swaps to be listed on DCMs, "then state-regulated sportsbooks, casinos, or licensed online gaming providers would be violating federal law by offering them outside of a CEA exchange."[45]

Kalshi's argument that § 2(e) applies only to contracts listed on DCMs does not resolve this issue. That interpretation would create an anomalous regulatory gap, allowing entities to offer swaps outside of CEA-regulated exchanges while avoiding the very oversight and standardization requirements Congress enacted through Dodd-Frank. If companies could offer swaps in this regulatory "Wild West," there would be no principled reason why other types of swaps—including credit default swaps—could not similarly be traded outside the CEA framework. Such a reading would undermine Dodd-Frank's objectives and create a regime in which significant categories of derivatives could evade federal regulation. The better reading is that Congress did not intend to transform all sports-event contracts into federally regulated swaps that must be traded on CEA exchanges.

The Court thus interprets the phrase "associated with a potential financial, economic, or commercial consequences" to mean that the event or contingency, by its very nature, has embedded within it some potential financial, economic, or commercial consequence. This interpretation is consistent with the interpretation of the *Hendrick* court, which held that "the event or contingency is itself inherently joined or connected with a potential financial, economic, or commercial consequence."[46] *Hendrick*, 817 F. Supp. 3d at 1027. In reaching that

---

[45] ECF No. 46 at 19.

[46] In their briefing, Defendants pointed the Court to the *Hendrick* court's definition of a swap and asked the Court to adopt it. ECF No. 46 at 17. At the oral argument on the Motion, however, Defendants suddenly changed course and stated that was no longer their position. ECF No. 82 at 84:21–23. Instead, they urged the Court to require the phrase "associated with" to encompass

conclusion, the *Hendrick* court explained that the relevant consequence must arise from the event or contingency itself, rather than from externalities such as downstream financial effects created by third parties' independent decisions to bet on the event. *Id*.

Although the Court articulates this principle somewhat differently than the *Hendrick* court, it relies on the same considerations that informed *Hendrick*'s interpretation. The *Hendrick* court supported its reading by examining the surrounding statutory text, which primarily concerns financial instruments and economic measures; Dodd-Frank's focus on regulating systemic risks in the financial markets; the CFTC's post-enactment guidance distinguishing swaps from ordinary consumer transactions; and federalism principles recognizing the states' traditional role in regulating gambling. *Id.* at 1027–31. The Court adopts that reasoning and incorporates it here rather than repeating the extensive analysis set forth in *Hendrick*.

It is true, as Kalshi points out, that the text of the CEA does not explicitly require an event to be "inherently joined or connected with" a potential financial consequence.[47] Nor does the statutory text recite "that the event or contingency, by its very nature, has embedded within it" such a consequence, as the Court interprets the statute above. Nevertheless, the Court must give independent meaning to the phrase "associated with" by identifying a meaningful boundary on what it requires. Reading "associated with" to encompass any event that could have some conceivable financial, economic, or commercial consequence would render the

---

"something that has some logical proximate relationship to the preceding event." *Id*. at 85:5–6. The Court declines to accept this proposed formulation because it was neither briefed nor meaningfully developed at oral argument.

[47] ECF No. 75 at 3–4.

phrase effectively limitless, because virtually any uncertain event could produce some downstream financial effect.

The Court therefore interprets "associated with" to require a connection between the financial, economic, or commercial consequence and the event or contingency itself, rather than consequences arising solely from externalities such as endorsement contracts triggered by a team's success, bonus provisions in player or coaching contracts, side wagers, or other downstream financial arrangements created by independent actors. This interpretation ensures that the statutory phrase "associated with a potential financial, economic, or commercial consequence" captures events that are connected to financial, economic, or commercial consequences by their own nature, while excluding events that acquire such significance only through external market activity.

Applying this framework, the Court concludes that Kalshi's sports-event contracts that are based on outcomes of or discrete moments within sporting events (e.g. who wins, whether there is a fumble, etc.) are not based on events that, by their very nature, have embedded within them potential financial, economic, or commercial consequence (unlike the occurrence of a sports game itself, which has, embedded within it, potential financial consequences arising from ticket sales, broadcast rights, and advertising costs). Rather, these contracts are based on the results of sporting contests—events that may have incidental financial implications for teams, players, sponsors, broadcasters, and others, but that do not themselves become financial, economic, or commercial events merely because third parties may derive economic value from, or assign financial significance to, those results. In other words, the fact that a particular outcome of or within a sporting event may have downstream economic

consequences does not satisfy § 1a(47)(A)(ii), because those consequences arise from externalities surrounding the event rather than from the event itself.

This interpretation is reinforced by the CEA's statement of purpose. The CEA provides that transactions subject to the Act "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Thus, Congress envisioned the Act as facilitating legitimate risk management and price discovery in the nation's commodity markets. It is not apparent to the Court what risk-management or hedging function contracts premised on the outcomes of or within sporting contests actually serve. Kalshi has said so itself, conceding in a previous litigation that "at least in general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Brief of Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

Because Kalshi's sports-event contracts are not swaps under the CEA, they do not fall within the CFTC's exclusive jurisdiction, and the CEA does not preempt state regulation of those contracts.

### 2. Whether Connecticut Gambling Laws Are Preempted

The Court's conclusion that Kalshi's contracts are not swaps is sufficient to resolve the Motion. Nevertheless, even if the contracts were properly characterized as swaps, Kalshi's preemption arguments would still fail for the independent reasons discussed below.

Under the Supremacy Clause, federal law prevails when it conflicts with state law. *See* U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding.”); *Crosby v. Nat’l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (stating that “[a] fundamental principle of the Constitution is that Congress has the power to preempt state law”). “In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.” *N.Y. SMSA Ltd. P’ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (cleaned up).

“The key to the preemption inquiry is the intent of Congress.” *Id.* at 104. “If a federal law contains an express preemption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress’ displacement of state law still remains.” *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). That is, even when a federal statute contains an express preemption clause, the Court must still consider whether Congress’ preemptive intent may be inferred from the scope of the statute such that “Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law.” *Id.* at 76–77 (cleaned up). “[T]he party asserting that federal law preempts state law bears the burden of establishing preemption.” *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

“Traditionally, there has been a presumption against preemption with respect to areas where states have historically exercised their police powers.” *New York SMSA Ltd. P’ship*, 612 F.3d at 104; *see also Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (“There is typically a presumption against preemption in areas of regulation that are traditionally

allocated to states and are of particular local concern."). "A local government's legislative exercise of 'historic police powers of the State [ ]' is not to be superseded by a federal statute unless it was 'the clear and manifest purpose of Congress' to do so." *New York SMSA Ltd. P'ship*, 612 F.3d at 104 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). But this presumption against preemption does not generally apply when a state regulates in an area "where there has been a history of significant federal presence." *United States v. Locke,* 529 U.S. 89, 108 (2000).

**a. Field Preemption**

Kalshi first asserts that "Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation."[48] Kalshi asserts that field preemption exists here based on the statutory text of the CEA, the statutory purpose of the CEA, the CEA's drafting history, and the comprehensive nature of the regulatory scheme created by the CEA. Numerous federal courts have now considered these arguments, and the Court finds persuasive the reasoning of those decisions rejecting Kalshi's claim that Congress intended the CEA to occupy the field.

Field preemption exists where a federal regulatory scheme is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (cleaned up). Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption "categories" "are not 'rigidly distinct,'" and "'field' preemption may fall into any of the categories of express,

[48] ECF No. 30-1 at 19.

implied, or conflict preemption"). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)). "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.*

First, Kalshi has not demonstrated that field preemption exists based on "the text and structure of the statute at issue." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Here, the CFTC's "exclusive jurisdiction" with respect to "transactions involving swaps" on a DCM is limited by the CEA's provision that "nothing contained in th[e] section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A). "This provision evinces Congress' intent to leave room for states to regulate certain activities that may have otherwise been covered by the CEA." *Williams*, 2026 WL 2017466, at *7.

Second, the structure of the CEA as a whole, and particularly Congress' enactment of the Special Rule, demonstrates Congress' "intent that some state law and regulation should operate in tandem with the CEA." *Id.* Specifically, because the Special Rule provides the CFTC with authority to prohibit event contracts that are "contrary to the public interest" because they "involve . . . activity that is unlawful under any Federal or State law" or "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), the Special Rule's "plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." *Martin*, 793 F. Supp. 3d at 680 (emphasis in original). Additionally, given that the power to regulate

gambling is a traditional police power exercised by Connecticut, as did the Southern District of New York, this Court "also declines to interpret the CEA's grant of exclusive jurisdiction as leaving no room for supplementary state legislation." *Williams*, 2026 WL 2017466, at *7 (cleaned up).

Next, "Congress' intended scope of preemption under the CEA is demonstrated in the Act's express prohibition of state regulation in certain contexts." *Id.* While not at issue here, Section 16 of the CEA, for example, displaces state gambling and bucket-shop laws as applied to transactions involving swaps in limited circumstances, including certain electronic trading facilities and agreements excluded or exempted from the CEA. 7 U.S.C. § 16(e)(2). It also provides that swaps may not be regulated as insurance contracts under state law. *Id.* § 16(h). "These provisions provide 'strong evidence' that when enacting § 2 of the CEA with a grant of exclusive jurisdiction to the CFTC, Congress did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps." *Williams*, 2026 WL 2017466, at *7 (quoting *Martin*, 793 F. Supp. 3d at 681). Had Congress intended to occupy the field with respect to the types of contracts at issue here, it could have expressly said so, as it did in other contexts under § 16. The absence of such language, coupled with the CEA's preservation of state authority and its recognition of concurrent state regulation in certain areas, weighs against a finding of field preemption.

Lastly, the Supreme Court has cautioned against interpreting ambiguous or obscure statutory language, divorced from its context, as conferring broad and transformative authority on the Executive Branch—what Justice Scalia famously described as "hiding elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The Court finds it unlikely that, through Dodd-Frank, Congress intended to displace the States' historic

police powers over sports betting and instead vest exclusive regulatory authority over such activity in the CFTC—a relatively small financial regulator with no historical role or particular expertise in regulating sports betting. The briefing does not identify, and the Court is not aware of, any congressional appropriation of funds or allocation of resources to the CFTC for the purpose of regulating sports betting, either at the time Dodd-Frank was enacted or at any point thereafter.

Taken together, the CEA's text, structure, and targeted preemption provisions demonstrate that Congress did not intend the statute to occupy the field of state regulation at issue here. Accordingly, Kalshi is unlikely to succeed on its field-preemption claim.

**b. Conflict Preemption**

Kalshi also asserts that Connecticut's gambling laws are conflict-preempted as applied to Kalshi, "because it would be 'impossible' for Kalshi 'to comply with both state and federal law,' and because Connecticut's laws stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in the CEA."[49] Defendants respond that Kalshi has not demonstrated that Connecticut's gambling laws would conflict with the CEA, or that they pose any obstacles to federal objectives.[50] The Court agrees and holds that Kalshi has failed to show a likelihood of success that conflict preemption applies in this matter.

"Conflict preemption of state law occurs where 'it is impossible for a private party to comply with both state and federal law' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Williams*,

---

[49] ECF No. 30-1 at 25 (quoting *Crosby*, 530 U.S. at 372–73).

[50] ECF No. 46 at 27–29.

2026 WL 2017466, at *7 (quoting *Crosby*, 530 U.S. at 372–73). "Federal law does not preempt state law under conflict preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 436 (2d Cir. 2024) (cleaned up). The "mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (cleaned up).

First, Kalshi has not demonstrated impossibility of compliance with both Connecticut gambling laws and the CEA. Kalshi claims that adhering to Connecticut's gambling laws would be impossible without violating the CFTC's requirement that a DCM provide "impartial access to its markets and services," because Kalshi would be required to limit access to its exchange to persons living only in Connecticut, which would be impossible for a nationwide platform such as Kalshi.[51] The Court does not agree. "The purpose of the impartial access requirement is to prevent DCMs from having certain discriminatory access requirements for their platform; it does not require DCMs to offer contracts nationwide." *Williams*, 2026 WL 2017466, at *8 (citing 17 C.F.R. § 38.151(b) (providing that impartial access includes "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner"); Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ("The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants.").

---

[51] ECF No. 30-1 at 28.

It is unclear why Kalshi could not seek out a license pursuant to Connecticut law and establish a category of Connecticut market participants that does not discriminate within the state. *See* 75 Fed. Reg. at 80579 ("A DCM can satisfy the requirement that membership and participation criteria are impartial, transparent, and non-discriminatory by establishing clear and impartial guidelines and procedures for granting access to its facilities and publishing such guidelines and procedures on its Web site. Such requirements may establish different categories of market participants, but may not discriminate within a particular category."); *Martin*, 793 F. Supp. 3d at 686 ("Kalshi's point is not a basis for holding that conflict preemption exists and that Maryland's laws are preempted simply because *not* obtaining a license limits Kalshi's geographical access . . . . So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland."); *KalshiEX LLC v. Schuler* (*"Schuler I")*, No. 25-CV-1165, 2026 WL 657004, at *9 (S.D. Ohio Mar. 9, 2026) ("Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'"). The fact that Connecticut law imposes an additional regulatory requirement on Kalshi does not, without more, establish a conflict with federal law. Because the two regimes can coexist, Kalshi's attempt to evade Connecticut's requirements fails.

Nor has Kalshi demonstrated that Connecticut's gambling laws frustrate Congress' objectives underpinning the CEA or serve as an obstacle to the CEA's regulatory scheme. Kalshi contends that "once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with

federal law."[52] Penalties imposed by Connecticut's criminal law, Kalshi continues, "substantially interfere with the CFTC's discretion."[53]

The Court, again, disagrees. "The mere fact that state laws . . . overlap to some degree with federal . . . provisions does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211. "Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute [state offenses] is entirely consistent with federal interests." *Id.* at 212. As Defendants point out, the CFTC itself "has *banned* the conduct that the State law seeks to address [when it] expressly outlawed contracts on conduct 'that involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal Law,' 17 C.F.R. § 40.11(a)(1), or activity that is similar thereto, *id.* § 40.11(a)(2)."[54] Kalshi's conduct thus appears unlawful under the scheme that Kalshi claims protects it from regulation by state law.

Additionally, as previously discussed, the CEA's text and structure, as well as the historical context of Connecticut's interest in regulating gambling through its police power, demonstrate that Congress did not intend to preempt all state actions that may relate to DCMs. The "objectives behind federal commodities regulation include standardization, stability, and prevention of unlawful and abusive conduct in the nation's derivatives markets, while Dodd-Frank specifically concerned itself with ensuring the integrity and accountability of the

---

[52] ECF No. 30-1 at 27.

[53] *Id.* at 27.

[54] ECF No. 46 at 29.

marketplace for swaps."[55] Far from determining that a likely conflict exists, the Court holds that "Connecticut gaming law is harmonious with those objectives."[56]

Lastly, "although Kalshi can list any contract that it self-certifies, its self-certification is not tantamount to a declaration that the contract is lawful." *Williams*, 2026 WL 2017466, at *9. It is ultimately the CFTC that holds the authority to conduct a review and determine whether a sports-event contract listed by Kalshi is legal. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Though the CFTC has not subjected any of Kalshi's contracts to such a review, "the agency's inaction is not proof that the sports-event contracts are regulated by or permissible under the CEA—and the Court has concluded they are not." *Schuler I*, 2026 WL 657004, at *9.

Accordingly, the Court holds that Connecticut's gambling laws complement rather than conflict with federal law. Because Kalshi has not demonstrated a likelihood of success on its preemption claim, this factor weighs against granting a preliminary injunction.

**B. Irreparable Harm**

Plaintiff has not demonstrated that in the absence of the injunction it seeks, it is likely to suffer an irreparable harm that cannot be otherwise remedied. In order to satisfy the irreparable harm requirement, a plaintiff must "demonstrate that absent a preliminary injunction [it] will suffer an injury that is . . . actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary

[55] *Id.*

[56] *Id.*

circumstances." *Moore v. Consol. Edison Co. of N.Y.,* 409 F.3d 506, 510 (2d Cir. 2005). "Irreparable harm may be found where damages are difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

Kalshi argues that if it chooses not to comply with the DCP's cease-and-desist letter, it will face "the extraordinary harms associated with the threat of civil liability and criminal prosecution."[57] Next, it claims that compliance "would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation," including the loss of business from its more than 24,000 Connecticut users and millions of dollars in open investments, the substantial time and expense of implementing state-specific geolocation capabilities, and unrecoverable economic losses due to Connecticut's Eleventh Amendment immunity.[58] Finally, Kalshi argues that an injunction is necessary to prevent disruption to its users' existing contracts and the broader market, as well as to avoid irreparable harm to Kalshi's reputation, goodwill, and continued status as a CFTC-designated contract market.[59]

Although the prospect of criminal prosecution can, in appropriate circumstances, support a finding of irreparable injury, *see Black v. Cakor Rest., Inc.*, No. 22-CV-1447, 2022 WL 17689840, at *6 (S.D.N.Y. Dec. 15, 2022), Kalshi has not demonstrated that such harm is actual and imminent here. As Defendants note, the DCP lacks independent authority to initiate criminal prosecutions, and any potential criminal enforcement remains speculative.[60] Moreover, any civil penalties imposed on Kalshi may be challenged and vacated should Kalshi

---

[57] ECF No. 30-1 at 29.

[58] *Id.* at 29–30; *see also* ECF No. 82 at 13:15–20.

[59] ECF No. 30-1 at 30–31.

[60] ECF No. 46 at 30.

ultimately prevail on the merits. As in *Hendrick*, the Court concludes that Kalshi's asserted injuries "are largely monetary" and thus do not constitute irreparable harm. *Hendrick*, 817 F. Supp. 3d at 1035.; *see also Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (holding that where "monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm").

Nor has Kalshi shown that its asserted compliance costs constitute irreparable harm. Its claimed injuries—including the expense of implementing state-specific geolocation capabilities and lost business in Connecticut—are the type of "ordinary compliance costs [that] are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)). Defendants also persuasively argue that these asserted harms are, to a significant extent, self-inflicted, as Kalshi continued offering sports-event contracts despite repeated regulatory warnings and adverse judicial decisions rejecting similar preemption arguments.[61] Additionally, Kalshi represented at oral argument that geofencing in one state, such as Connecticut, "effectively means geofencing everywhere."[62] But courts in other states have already directed Kalshi to cease offering its sports-event contracts in those jurisdictions.[63] To the extent Kalshi will comply with these orders by August 12—as it has already indicated it will in Nevada,—it will have already implemented geofencing restrictions in those states. Accordingly, requiring Kalshi to restrict access in Connecticut would appear unlikely to impose the substantial additional costs Kalshi discusses.

---

[61] *Id.* at 31.

[62] ECF No. 82 at 12.

[63] *See* Section I.C, *supra*.

Finally, Kalshi has not offered evidence that the CFTC is likely to revoke its designation as a DCM if it complies with Connecticut law. As Defendants point out, Kalshi's assertion that the CFTC *could* take such action is speculative, particularly given that Kalshi has continued to litigate similar disputes in other states without any indication that the CFTC has sought to alter its designation.[64] Likewise, Kalshi's asserted reputational harms and alleged disruption to users and nationwide markets rest on predictions that are too conjectural to support a finding of irreparable injury. The Court finds that monetary damages here would be an adequate remedy. Accordingly, the Court concludes that the balance of the evidence weighs against a finding of irreparable harm.

**C. Balance of Equities and Public Interest**

The Court considers the balance of the equities between the parties and the public's interest together. *See Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025) ("With respect to the factors of the public interest and the balance of the equities, in a suit against the government, balancing of the equities merges into [the Court's] consideration of the public interest." (cleaned up)).

Kalshi argues that the "public has a first-order interest in ensuring that preempted Connecticut laws are not enforced against federally regulated entities."[65] Conversely, Kalshi says, "Defendants cannot show any harm as a result of being prevented from enforcing a statute until after a determination of its constitutionality."[66] And lastly, Kalshi contends, "[i]mmediate compliance with Connecticut law to avoid criminal penalties will harm Kalshi's users in

---

[64] *Id.*

[65] ECF No. 30-1 at 31.

[66] *Id.* at 32.

Connecticut and impose intractable technological difficulties on a very short timeframe.[67] Defendants respond that "the public has a significant interest in enforcement of laws and regulations that protect the public, specifically minors, from problem gambling and predatory advertising"; "the public has an interest in the revenue received from licensed sports wagering and the benefits therefrom."[68]

Defendants' interests in regulating gaming in Connecticut and ensuring that the DCP has the ability to effectuate statutes enacted to protect the public heavily outweigh the interests articulated by Kalshi. Particularly, the Court agrees that states have a strong interest in reducing "the social costs associated" with gambling, a "vice activity," *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 182, 185 (1999), and to promote the "welfare, safety, and morals" of their citizens. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003). Further, the public has a strong interest "in deterring predatory marketing targeted at Connecticut's youth . . . due to the clear risks to youths and others from sports betting."[69] Additionally, an injunction prohibiting Connecticut's ability to regulate Kalshi would substantially disrupt Connecticut's carefully crafted, decades-old regulatory scheme and prevent the State from enforcing its duly enacted gaming laws, resulting in significant irreparable harm to the State and the public interest. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) ("When

---

[67] *Id.*

[68] ECF No. 46 at 35–37.

[69] ECF No. 46 at 35 (citing Antonio Pequeno IV, Sports Gambling, Prediction Markets Could Lead to New Credit Risks for Young Men and Low Earners, Bank Warns, Forbes (Nov. 25, 2025)).

a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers) ("Any time [a state is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Lastly, the Court is not persuaded by Kalshi's argument that its users will suffer harm if it is made to unwind ongoing sports-event contracts. Kalshi has been on notice of the potential for state enforcement against its contracts since it began offering them. It has provided no disclosures or warnings to its users, and has instead continued to advertise itself as the "first app for legal sports betting in all 50 states." *Hendrick*, 817 F. Supp. 3d at 1020. Any resulting harm to Kalshi's approximately 24,000 Connecticut users from unwinding existing contracts does not outweigh the State's and the public's strong interests in enforcing Connecticut's gaming laws.

Accordingly, the balance of the equities and the public's interest weigh in favor of Defendants.

## III. CONCLUSION

"Kalshi characterizes its sports-related event contracts in various ways, but at bottom, they are sports wagers." *Hendrick*, 817 F. Supp. 3d at 1029. Kalshi itself has touted its platform as offering legal sports betting nationwide. But sports wagering has long been subject to state regulation pursuant to the states' police powers because of the significant public interests and risks associated with gambling. The Court declines to conclude either that these sports wagers are properly categorized as swaps and fall under the CFTC's authority, or that Congress clearly displaced Connecticut's traditional authority to regulate sports wagering and vested that

authority in the CFTC, an agency that has not historically regulated sports wagering and has not exercised meaningful oversight over Kalshi's sports event contracts.

For the foregoing reasons, the Motion is **DENIED**. Per the Court's previous order at ECF No. 48, the parties are ordered to file their Rule 26(f) Report on or before **August 24, 2026**. Defendants may respond to the Complaint in this matter on or before **August 31, 2026.**

**SO ORDERED.**

Hartford, Connecticut
August 7, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG in his official capacity as Attorney General of Connecticut,<br><br>*Defendants*. | Civil Action No.: 3:25-cv-02016-VDO<br><br>AUGUST 10, 2026 |

**PLAINTIFF'S NOTICE OF APPEAL**

Please take notice that KalshiEX LLC hereby appeals to the United States Court of Appeals for the Second Circuit from the Memorandum Decision and Order Denying Plaintiff's Motion for Preliminary Injunction entered in this action on August 10, 2026, Dkt. No. 94.

Dated: August 10, 2026
Hartford, Connecticut

Respectfully submitted,

_/s/ Vanessa Roberts Avery_
Vanessa Roberts Avery (ct21000)
Snigdha Mamillapalli (ct31142)
**McCarter & English, LLP**
CityPlace I, 185 Asylum Street
Hartford, CT 06103
Telephone: (860) 275-6700
vavery@mccarter.com

Neal Katyal (admitted *pro hac vice*)
Joshua B. Sterling (admitted *pro hac vice*)
William E. Havemann (admitted *pro hac vice*)
**Milbank LLP**
1101 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
nkatyal@milbank.com
JSterling@milbank.com
WHavemann@milbank.com

Grant R. Mainland (admitted *pro hac vice*)
Andrew L. Porter (admitted *pro hac vice*)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
GMainland@milbank.com
APorter@milbank.com

*Attorneys for KalshiEX LLC*

APPEAL,EFILE,STAYED

# U.S. District Court
# District of Connecticut (New Haven)
# CIVIL DOCKET FOR CASE #: 3:25-cv-02016-VDO

KalshiEX LLC v. Cafferelli et al
Assigned to: Judge Vernon D. Oliver
Cause: 7:6(b) Federal Commodity Exchange Regulation

Date Filed: 12/03/2025
Jury Demand: None
Nature of Suit: 850 Securities/Commodities
Jurisdiction: Federal Question

**Plaintiff**

**KalshiEX LLC** represented by

**Andrew Leighton Porter**
Milbank LLP
55 Hudson Yards
New York, NY 10001
212-530-5000
Fax: 212-530-5219
Email: aporter@milbank.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grant R. Mainland**
Milbank LLP
55 Hudson Yards
New York, NY 10001
212-530-5251
Email: gmainland@milbank.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Brooks Sterling**
Milbank LLP
1101 New York Avenue, NW
Washington, DC 20005
202-835-7535
Email: jsterling@milbank.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Neal Kumar Katyal**
Milbank LLP
1101 New York Avenue, NW
Washington, DC 20005
202-835-7505
Email: nkatyal@milbank.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Snigdha Mamillapalli**
McCarter & English, LLP
CityPlace I
185 Asylum St
Hartford, CT 06103
203-631-6249
Email: smamillapalli@mccarter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Vanessa Roberts Avery**
McCarter & English, LLP
CityPlace I
185 Asylum Street
Hartford, CT 06103
860-275-6700
Email: vavery@mccarter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kelly Dodge Garcia**
Milbank LLP
55 Hudson Yards
New York, NY 10001
212-530-5781
Email: kgarcia@milbank.com
*ATTORNEY TO BE NOTICED*

**William E. Havemann**
Milbank LLP
1101 New York Avenue, NW
Washington, DC 20005
202-835-7518
Email: whavemann@milbank.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Bryan T Cafferelli**
*in his official capacity as Commissioner of the Connecticut Department of Consumer Protection*

represented by

**Joseph E. Gasser**
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
860-808-5247
Email: joseph.gasser@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Nunes**
Connecticut Office of the Attorney General
165 Capitol Ave
Ste 4098
Hartford, CT 06106

860-808-5223
Email: michael.nunes@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Kristofer Gilman**<br>*in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection* | represented by | **Joseph E. Gasser**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Michael Nunes**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Connecticut Department of Consumer Protection** | represented by | **Joseph E. Gasser**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Michael Nunes**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **William Tong**<br>*in his official capacity as Attorney General of Connecticut* | represented by | **Joseph E. Gasser**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Michael Nunes**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Tribal Amici** | represented by | **Elizabeth Bower**<br>1899 L Street NW<br>Suite 1200<br>Washington, DC 20036<br>434-996-0802<br>Email: ebower@hobbsstraus.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Jens Wesley Camp**<br>Hobbs, Straus, Dean & Walker, LLP<br>1899 L St, NW<br>Suite 1200 |

Washington, DC 20036
202-822-8282
Email: jcamp@hobbsstraus.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H Webster**
Hobbs, Straus, Dean & Walker LLP
1899 L Street, NW
Ste 1200
Washington, DC 20036
202-822-8282
Fax: 202-296-8834
Email: jwebster@hobbsstraus.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Crowell**
Crowell Law Offices
1487 W Sr 89 A
Suite 8
Sedona, AZ 86336
425-802-5369
Email: scottcrowell@clotag.net
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas J. Murphy**
Cowdery, Murphy & Healy, LLC
280 Trumbull Street
Hartford, CT 06103
860-278-5555
Fax: 860-249-0012
Email: tmurphy@cmandh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/03/2025 | 1 | COMPLAINT against Bryan T Cafferelli, Connecticut Department of Consumer Protection, Kristofer Gilman, William Tong ( Filing fee $405 receipt number ACTDC-8422313.), filed by KALSHIEX LLC. (Attachments: # 1 Exhibit 1, # 2 Civil Cover Sheet)(Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | | Request for Clerk to issue summons as to Bryan T Cafferelli. (Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | | Request for Clerk to issue summons as to Kristofer Gilman. (Avery, Vanessa) (Entered: 12/03/2025) |

| | | |
|---|---|---|
| 12/03/2025 | | Request for Clerk to issue summons as to Connecticut Department of Consumer Protection. (Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | | Request for Clerk to issue summons as to William Tong. (Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | 2 | Disclosure Statement by KALSHIEX LLC. (Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | 3 | NOTICE of Appearance by Vanessa Roberts Avery on behalf of KALSHIEX LLC (Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | 4 | MOTION for Attorney(s) Andrew L. Porter to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422353) by KALSHIEX LLC. (Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | 5 | MOTION for Attorney(s) Grant R. Mainland to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422383) by KALSHIEX LLC. (Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | 6 | MOTION for Attorney(s) Joshua B. Sterling to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422394) by KALSHIEX LLC. (Attachments: # 1 Certificate of Good Standing)(Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | 7 | MOTION for Attorney(s) Neal Kumar Katyal to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422400) by KALSHIEX LLC. (Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | 8 | MOTION for Attorney(s) William E. Havemann to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422410) by KALSHIEX LLC. (Attachments: # 1 Certificate of Good Standing)(Avery, Vanessa) (Entered: 12/03/2025) |
| 12/03/2025 | | CASE ASSIGNMENT: District Judge Vernon D. Oliver assigned to the case. If the District Judge issues an Order of Referral to a Magistrate Judge for any matter other than settlement, the matter will be referred to Magistrate Judge Thomas O. Farrish. (Oliver, T.) (Entered: 12/04/2025) |
| 12/03/2025 | 12 | Order on Pretrial Deadlines: Amended Pleadings due by 2/1/2026, Discovery due by 6/4/2026, Dispositive Motions due by 7/9/2026.<br>Signed by Clerk on 12/3/2025. (Imbriani, S) (Entered: 12/05/2025) |
| 12/03/2025 | 13 | ELECTRONIC FILING ORDER FOR COUNSEL - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER<br>Signed by Judge Vernon D. Oliver on 12/3/2025.(Imbriani, S) (Entered: 12/05/2025) |
| 12/03/2025 | 14 | Standing Protective Order<br>Signed by Judge Vernon D. Oliver on 12/3/2025.(Imbriani, S) (Entered: 12/05/2025) |
| 12/03/2025 | 15 | **Notice to Counsel and Litigants Regarding AI-Assisted Research**: Attorneys and *pro se* litigants alike should exercise great caution in submitting any AI-generated language in filings before the Court. Use of AI without verification of the accuracy of the information it generates like any other shoddy research method from other sources or tools implicates Federal Rule of Civil Procedure 11, the central purpose of which is to deter baseless filings in district court and thus to streamline the administration and procedure of the federal courts. Rule 11 applies fully to actions filed by *pro se* litigants.<br><br>Therefore, all parties are on notice that the Court has a no-tolerance policy for any briefing (AI-assisted or not) that hallucinates legal propositions or otherwise severely misstates the law. Such filings will often result in sanctions absent reasonable excuse. *See generally Willis v. U.S. Bank Nat'l Ass'n et al*, No. 3:25-CV-516-BN, 2025 WL 1408897 |

| | | |
|---|---|---|
| | | (N.D. Tex. May 15, 2025).<br>Signed by Clerk on 12/3/2025.(Imbriani, S) (Entered: 12/05/2025) |
| 12/03/2025 | 16 | Notice of Option to Consent to Magistrate Judge Jurisdiction.<br>(Imbriani, S) (Entered: 12/05/2025) |
| 12/03/2025 | | Set Deadlines: Rule 26 Meeting Report due by 1/17/2026. (Kelsey, N) Modified on 12/11/2025 to correct deadline (Kelsey, N). (Entered: 12/11/2025) |
| 12/04/2025 | 9 | Notice: Pursuant to Federal Rule of Civil Procedure 7.1(b), a disclosure statement required under Rule 7.1(a) must be filed with a party's first appearance, pleading, petition, motion, response, or other request addressed to the Court and must be supplemented if any required information changes during the case.<br>Signed by Clerk on 12/4/25.(Hushin, Z.) (Entered: 12/04/2025) |
| 12/04/2025 | 10 | NOTICE of Appearance by Joseph E. Gasser on behalf of Bryan T Cafferelli, Connecticut Department of Consumer Protection, Kristofer Gilman, William Tong (Gasser, Joseph) (Entered: 12/04/2025) |
| 12/05/2025 | 11 | Joint STIPULATION *and [Proposed] Order* by KalshiEX LLC. (Avery, Vanessa) (Entered: 12/05/2025) |
| 12/05/2025 | 17 | NOTICE TO COUNSEL/SELF-REPRESENTED PARTIES : Counsel or self-represented parties initiating or removing this action are responsible for serving all parties with attached documents and copies of 13 Electronic Filing Order, 15 Notice re: AI-Assisted Research,,,, 8 MOTION for Attorney(s) William E. Havemann to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422410) filed by KalshiEX LLC, 12 Order on Pretrial Deadlines, 1 Complaint, filed by KalshiEX LLC, 9 Notice re: Disclosure Statement, 5 MOTION for Attorney(s) Grant R. Mainland to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422383) filed by KalshiEX LLC, 4 MOTION for Attorney(s) Andrew L. Porter to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422353) filed by KalshiEX LLC, 7 MOTION for Attorney(s) Neal Kumar Katyal to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422400) filed by KalshiEX LLC, 6 MOTION for Attorney(s) Joshua B. Sterling to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422394) filed by KalshiEX LLC, 3 Notice of Appearance filed by KalshiEX LLC, 16 Notice of Option to Consent to Magistrate Judge Jurisdiction, 14 Standing Protective Order, 11 Stipulation filed by KalshiEX LLC, 10 Notice of Appearance filed by Kristofer Gilman, Bryan T Cafferelli, Connecticut Department of Consumer Protection, William Tong, 2 Disclosure Statement filed by KalshiEX LLC<br>Signed by Clerk on 12/5/2025.(Imbriani, S) (Entered: 12/05/2025) |
| 12/05/2025 | 18 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Bryan T Cafferelli* with answer to complaint due within *21* days. Attorney *Vanessa Roberts Avery* *McCarter & English, LLP* *City Place I, 185 Asylum Street* *Hartford, CT 06103*. (Imbriani, S) (Entered: 12/05/2025) |
| 12/05/2025 | 19 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Kristofer Gilman* with answer to complaint due within *21* days. Attorney *Vanessa Roberts Avery* *McCarter & English, LLP* *City Place I, 185 Asylum Street* *Hartford, CT 06103*. (Imbriani, S) (Entered: 12/05/2025) |
| 12/05/2025 | 20 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Connecticut Department of Consumer Protection* with answer to complaint due within *21* days. Attorney *Vanessa Roberts Avery* *McCarter & English, LLP* *City Place I, 185 Asylum Street* *Hartford, CT 06103*. (Imbriani, S) (Entered: 12/05/2025) |

| | | |
|---|---|---|
| 12/05/2025 | 21 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *William Tong* with answer to complaint due within *21* days. Attorney *Vanessa Roberts Avery* *McCarter & English, LLP* *City Place I, 185 Asylum Street* *Hartford, CT 06103*. (Imbriani, S) (Entered: 12/05/2025) |
| 12/05/2025 | 22 | ORDER granting 4 Motion to Appear Pro Hac Vice for Attorney Andrew L. Porter. Certificate of Good Standing due by 2/3/2026. Signed by Clerk on 12/5/2025. (Imbriani, S) (Entered: 12/05/2025) |
| 12/05/2025 | 23 | ORDER granting 5 Motion to Appear Pro Hac Vice for Attorney Grant R. Mainland. Certificate of Good Standing due by 2/3/2026. Signed by Clerk on 12/5/2025. (Imbriani, S) (Entered: 12/05/2025) |
| 12/05/2025 | 24 | ORDER granting 6 Motion to Appear Pro Hac Vice for Attorney Joshua B. Sterling. Signed by Clerk on 12/5/2025. (Imbriani, S) (Entered: 12/05/2025) |
| 12/05/2025 | 25 | ORDER granting 7 Motion to Appear Pro Hac Vice for Attorney Neal Kumar Katyal. Certificate of Good Standing due by 2/3/2026. Signed by Clerk on 12/5/2025. (Imbriani, S) (Entered: 12/05/2025) |
| 12/05/2025 | 26 | ORDER granting 8 Motion to Appear Pro Hac Vice for Attorney William E. Havemann. Signed by Clerk on 12/5/2025. (Imbriani, S) (Entered: 12/05/2025) |
| 12/05/2025 | 27 | CERTIFICATE OF GOOD STANDING re 4 MOTION for Attorney(s) Andrew L. Porter to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422353) by KalshiEX LLC. (Avery, Vanessa) (Entered: 12/05/2025) |
| 12/05/2025 | 28 | CERTIFICATE OF GOOD STANDING re 5 MOTION for Attorney(s) Grant R. Mainland to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422383) by KalshiEX LLC. (Avery, Vanessa) (Entered: 12/05/2025) |
| 12/05/2025 | 29 | CERTIFICATE OF GOOD STANDING re 7 MOTION for Attorney(s) Neal Kumar Katyal to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8422400) by KalshiEX LLC. (Avery, Vanessa) (Entered: 12/05/2025) |
| 12/05/2025 | 30 | MOTION for Preliminary Injunction by KalshiEX LLC.Responses due by 12/26/2025 (Attachments: # 1 Memorandum of Law in Support of Preliminary Injunction, # 2 Declaration of Andrew Porter, # 3 Exhibit 1 to Porter Declaration, # 4 Exhibit 2 to Porter Declaration, # 5 Declaration of Xavier Sottile)(Avery, Vanessa) (Entered: 12/05/2025) |
| 12/08/2025 | 31 | WAIVER OF SERVICE Returned Executed as to Bryan T Cafferelli waiver sent on 12/5/2025, answer due 2/3/2026 filed by KalshiEX LLC. (Avery, Vanessa) (Entered: 12/08/2025) |
| 12/08/2025 | 32 | WAIVER OF SERVICE Returned Executed as to Kristofer Gilman waiver sent on 12/5/2025, answer due 2/3/2026 filed by KalshiEX LLC. (Avery, Vanessa) (Entered: 12/08/2025) |
| 12/08/2025 | 33 | WAIVER OF SERVICE Returned Executed as to Connecticut Department of Consumer Protection waiver sent on 12/5/2025, answer due 2/3/2026 filed by KalshiEX LLC. (Avery, Vanessa) (Entered: 12/08/2025) |
| 12/08/2025 | 34 | WAIVER OF SERVICE Returned Executed as to William Tong waiver sent on 12/5/2025, answer due 2/3/2026 filed by KalshiEX LLC. (Avery, Vanessa) (Entered: 12/08/2025) |
| 12/08/2025 | 35 | ORDER. Per the parties' joint stipulation (ECF No. 11), the Court orders Defendants to refrain from taking enforcement action against Kalshi regarding any conduct described in |

| | | |
|---|---|---|
| | | the Cease and Desist Letter dated December 2, 2025 (ECF No. 1-1), pending the Court's disposition of Plaintiff's motion for a preliminary injunction (the "Motion") (ECF No. 30).<br><br>The Court also enters the following briefing schedule on the Motion: Defendants' response to Plaintiff's Motion shall be filed on or before **January 9, 2026**. Plaintiff's reply in further support of its Motion shall be filed on or before **January 30, 2026.** Oral argument will take place on **February 12, 2026, at 10:00 AM.** A separate scheduling order shall issue.<br><br>Signed by Judge Vernon D. Oliver on 12/8/2025. (Dikler, J) (Entered: 12/08/2025) |
| 12/08/2025 | | Set Deadlines as to 30 MOTION for Preliminary Injunction. Responses due by 1/9/2026. Motion for Preliminary Injunction Hearing set for 2/12/2026 at 10:00 AM in Courtroom Three, 450 Main St., Hartford, CT before Judge Vernon D. Oliver.<br>Signed by Judge Vernon D. Oliver on 12/08/2025.(Kelsey, N) (Entered: 12/11/2025) |
| 12/10/2025 | 36 | NOTICE of Appearance by Neal Kumar Katyal on behalf of KalshiEX LLC (Katyal, Neal) (Entered: 12/10/2025) |
| 12/10/2025 | 37 | NOTICE of Appearance by Grant R. Mainland on behalf of KalshiEX LLC (Mainland, Grant) (Entered: 12/10/2025) |
| 12/10/2025 | 38 | NOTICE of Appearance by William Havemann on behalf of KalshiEX LLC (Havemann, William) (Entered: 12/10/2025) |
| 12/10/2025 | 39 | NOTICE of Appearance by Joshua Brooks Sterling on behalf of KalshiEX LLC (Sterling, Joshua) (Entered: 12/10/2025) |
| 12/10/2025 | 40 | NOTICE of Appearance by Andrew Leighton Porter on behalf of KalshiEX LLC (Porter, Andrew) (Entered: 12/10/2025) |
| 12/11/2025 | 41 | NOTICE OF E-FILED CALENDAR re: 30 MOTION for Preliminary Injunction. THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Motion for Preliminary Injunction Hearing set for 2/12/2026 at 10:00 AM in Courtroom Three, 450 Main St., Hartford, CT before Judge Vernon D. Oliver. (Kelsey, N) (Entered: 12/11/2025) |
| 12/11/2025 | 42 | NOTICE of Appearance by Michael Nunes on behalf of Bryan T Cafferelli, Connecticut Department of Consumer Protection, Kristofer Gilman, William Tong (Nunes, Michael) (Entered: 12/11/2025) |
| 12/29/2025 | 43 | RESCHEDULED NOTICE OF E-FILED CALENDAR re: 30 MOTION for Preliminary Injunction. THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 02/12/2026*. Motion Hearing now set for 2/11/2026 at 10:00 AM in Courtroom Three, 450 Main St., Hartford, CT before Judge Vernon D. Oliver. (Kelsey, N) (Entered: 12/29/2025) |
| 01/08/2026 | 44 | MOTION for Attorney(s) Kelly D. Garcia to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8458393) by KalshiEX LLC. (Avery, Vanessa) (Entered: 01/08/2026) |
| 01/09/2026 | 45 | ORDER granting 44 Motion to Appear Pro Hac Vice for Attorney Kelly D. Garcia. Signed by Clerk on 01/09/2026. (Denault, S) (Entered: 01/09/2026) |
| 01/09/2026 | 46 | Memorandum in Opposition re 30 MOTION for Preliminary Injunction filed by Bryan T Cafferelli, Connecticut Department of Consumer Protection, Kristofer Gilman, William Tong. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 |

| | | |
|---|---|---|
| | | Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Errata H, # 9 Exhibit I)(Gasser, Joseph) (Entered: 01/09/2026) |
| 01/09/2026 | 47 | Joint MOTION for Extension of Time until 14 days after the Court has ruled on Plaintiff's Motion for Preliminary Injunction and 21 days after the Court's ruling on Plaintiff's PI Motion for the parties to file a Rule 26(f) report and to respond to the Complaint accordingly Set Deadlines/Hearings by KalshiEX LLC. (Avery, Vanessa) (Entered: 01/09/2026) |
| 01/12/2026 | 48 | ORDER **granting** 47 Motion for Extension of Time. The parties may file their 26(f) report 14 days after the Court issues a decision on the pending Motion for a Preliminary Injunction (the "Motion") (ECF No. 30). Defendants may respond to the complaint 21 days after the Court's ruling on the Motion.<br><br>Signed by Judge Vernon D. Oliver on 1/12/2026. (Dikler, J) (Entered: 01/12/2026) |
| 01/16/2026 | 49 | NOTICE of Appearance by Thomas J. Murphy on behalf of Tribal Amici (Murphy, Thomas) (Entered: 01/16/2026) |
| 01/16/2026 | 50 | MOTION for Attorney(s) Joseph H. Webster to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8469905) by Tribal Amici. (Attachments: # 1 Exhibit A)(Murphy, Thomas) (Entered: 01/16/2026) |
| 01/16/2026 | 51 | MOTION for Attorney(s) Elizabeth A. Bower to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8469908) by Tribal Amici. (Attachments: # 1 Exhibit A)(Murphy, Thomas) (Entered: 01/16/2026) |
| 01/16/2026 | 52 | MOTION for Attorney(s) Jens W. Camp to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8469909) by Tribal Amici. (Attachments: # 1 Exhibit A)(Murphy, Thomas) (Entered: 01/16/2026) |
| 01/16/2026 | 53 | MOTION for Attorney(s) Bryan Newland to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8469912) by Tribal Amici. (Attachments: # 1 Exhibit A)(Murphy, Thomas) (Entered: 01/16/2026) |
| 01/16/2026 | 54 | MOTION for Attorney(s) Michael Hoenig to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8469914) by Tribal Amici. (Attachments: # 1 Exhibit A)(Murphy, Thomas) (Entered: 01/16/2026) |
| 01/16/2026 | 55 | MOTION for Attorney(s) Scott Crowell to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8469920) by Tribal Amici. (Attachments: # 1 Exhibit A)(Murphy, Thomas) (Entered: 01/16/2026) |
| 01/16/2026 | 56 | MOTION for Leave to File *Amicus Curiae Brief* by Tribal Amici. (Attachments: # 1 Exhibit 1)(Murphy, Thomas) (Entered: 01/16/2026) |
| 01/20/2026 | 57 | ORDER granting 50 Motion to Appear Pro Hac Vice for Attorney Joseph H. Webster. Signed by Clerk on 1/20/2026. (Denault, S) (Entered: 01/20/2026) |
| 01/20/2026 | 58 | ORDER granting 51 Motion to Appear Pro Hac Vice for Attorney Elizabeth A. Bower. Signed by Clerk on 1/20/2026. (Denault, S) (Entered: 01/20/2026) |
| 01/20/2026 | 59 | ORDER granting 52 Motion to Appear Pro Hac Vice for Attorney Jens W. Camp. Signed by Clerk on 1/20/2026. (Denault, S) (Entered: 01/20/2026) |
| 01/20/2026 | 60 | ORDER granting 54 Motion to Appear Pro Hac Vice for Attorney Michael Hoenig. Signed by Clerk on 1/20/2026. (Denault, S) (Entered: 01/20/2026) |
| 01/20/2026 | 61 | ORDER granting 55 Motion to Appear Pro Hac Vice for Attorney Scott Crowell. Signed by Clerk on 1/20/2026. (Denault, S) (Entered: 01/20/2026) |

| | | |
|---|---|---|
| 01/20/2026 | 62 | ENTERED IN ERROR - ORDER granting 53 Motion to Appear Pro Hac Vice for Attorney Bryan Newland. Certificate of Good Standing due by 3/21/2026. Signed by Clerk on 1/20/2026. (Denault, S) Modified on 1/20/2026 to reflect entered in error (Denault, S). (Entered: 01/20/2026) |
| 01/20/2026 | 63 | ORDER. Any party wishing to oppose 56 Motion for Leave to File Amicus Brief may do so on or before **January 27, 2026.** A reply, if one is to be filed, is due on or before **February 3, 2026.**<br><br>Signed by Judge Vernon D. Oliver on 1/20/2026. (Dikler, J) (Entered: 01/20/2026) |
| 01/20/2026 | 64 | Docket Entry Correction re 62 Order on Motion for Admission Pro Hac Vice, to reflect order entered in error. (Denault, S) (Entered: 01/20/2026) |
| 01/20/2026 | 65 | ORDER **denying** 53 Motion for Admission Pro Hac Vice by attorney Bryan Newland. Admission pro hac vice in this Court requires a "certificate of good standing from the court of the state in which [the attorney seeking pro hac vice admission has their] primary office." Attorney Newland submitted a certificate of good standing from the Supreme Court of the State of Michigan, but listed his primary office as being located in Washington, D.C. See ECF No. 53-1 at 3 and ECF No. 53 at 2. Accordingly, the motion is **denied without prejudice to refiling.**<br>Signed by Judge Vernon D. Oliver on 1/20/2026.(Denault, S) (Entered: 01/20/2026) |
| 01/20/2026 | 66 | Set Deadlines as to 56 MOTION for Leave to File Amicus Curiae Brief. Responses due by 1/27/2026. (Kelsey, N) (Entered: 01/21/2026) |
| 01/23/2026 | 67 | MOTION for Attorney(s) Bryan Newland to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-8476149) by Tribal Amici. (Murphy, Thomas) (Entered: 01/23/2026) |
| 01/23/2026 | 68 | NOTICE of Appearance by Scott Crowell on behalf of Tribal Amici *Rincon Band of Luiseno Indians, Santa Ynez Chumash Indians, Spokane Tribe of Indians* (Crowell, Scott) (Entered: 01/23/2026) |
| 01/26/2026 | 69 | ORDER granting 67 Motion to Appear Pro Hac Vice for Attorney Bryan Newland. Signed by Clerk on 1/26/2026. (Denault, S) (Entered: 01/26/2026) |
| 01/27/2026 | 70 | NOTICE of Appearance by Jens Wesley Camp on behalf of Tribal Amici (Attachments: # 1 Exhibit Exhibit A - List of Tribal Amici)(Camp, Jens) (Entered: 01/27/2026) |
| 01/27/2026 | 71 | NOTICE of Appearance by Kelly Dodge Garcia on behalf of KalshiEX LLC (Garcia, Kelly) (Entered: 01/27/2026) |
| 01/27/2026 | 72 | NOTICE of Appearance by Joseph H Webster on behalf of Tribal Amici (Attachments: # 1 Exhibit Exhibit A List of Tribal Amici)(Webster, Joseph) (Entered: 01/27/2026) |
| 01/29/2026 | 73 | NOTICE of Appearance by Elizabeth Bower on behalf of Tribal Amici (Attachments: # 1 Exhibit Exhibit A)(Bower, Elizabeth) (Entered: 01/29/2026) |
| 01/30/2026 | 74 | ORDER **granting** 56 Motion for Leave to File Amicus Curiae Brief. The proposed amicus brief Tribal Amici submitted with their motion (ECF No. 56-1) shall be deemed submitted.<br><br>Signed by Judge Vernon D. Oliver on 1/30/2026. (Dikler, J) (Entered: 01/30/2026) |
| 01/30/2026 | 75 | REPLY to Response to 30 MOTION for Preliminary Injunction filed by KalshiEX LLC. (Attachments: # 1 Declaration of Andrew Porter, # 2 Exhibit 3 to Porter Decl. - Filed Under Seal, # 3 Exhibit 4 to Porter Decl. - Filed Under Seal, # 4 Exhibit 5 to Porter Decl. - Transcript of Sept. 19, 2024 Oral Argument, KalshiEX LLC v. CFTC, No. 24-5205 |

| | | |
|---|---|---|
| | | (D.C. Cir.), # 5 Exhibit 6 to Porter. Decl. - Remarks of CFTC Chairman Michael S. Selig, Jan. 29, 2026)(Avery, Vanessa) (Entered: 01/30/2026) |
| 01/30/2026 | 76 | MOTION to Seal Exhibits 3 and 4 to the Declaration of Andrew Porter (ECF 75-2 and 75-3) by KalshiEX LLC. (Attachments: # 1 Memorandum in Support of Motion to Seal, # 2 Declaration of Xavier Sottile in Support of Motion to Seal)(Avery, Vanessa) (Entered: 01/30/2026) |
| 01/30/2026 | 77 | Sealed Document: Exhibits 3 and 4 to the Declaration of Andrew Porter by KalshiEX LLC re 75 Reply to Response to Motion, . (Attachments: # 1 Exhibit 3 to Porter Declaration (ECF 75-2), # 2 Exhibit 4 to Porter Declaration (ECF 75-3))(Avery, Vanessa) (Entered: 01/30/2026) |
| 01/31/2026 | 78 | NOTICE of Appearance by Snigdha Mamillapalli on behalf of KalshiEX LLC (Mamillapalli, Snigdha) (Entered: 01/31/2026) |
| 02/02/2026 | 79 | ORDER **granting** 76 Motion to Seal. The Court finds that good cause exists to seal Exhibits 3 and 4 to the Reply to the Motion for Preliminary Injunction, because the documents contain sensitive, confidential, and proprietary information, including trade secrets. Sealing is supported by clear and compelling reasons and is narrowly tailored to serve these reasons. *See* D. Conn. L. Civ. R. 5(e).<br><br>Signed by Judge Vernon D. Oliver on 2/2/2026. (Dikler, J) (Entered: 02/02/2026) |
| 02/03/2026 | 80 | Notice of Additional Authority re 30 MOTION for Preliminary Injunction filed by Bryan T Cafferelli, Connecticut Department of Consumer Protection, Kristofer Gilman, William Tong. (Gasser, Joseph) (Entered: 02/03/2026) |
| 02/11/2026 | 81 | Minute Entry for proceedings held before Judge Vernon D. Oliver: Motion Hearing held on 2/11/2026 re 30 MOTION for Preliminary Injunction filed by KalshiEX LLC. Total Time: 2 hours and 36 minutes (Court Reporter Corinne Thomas.) (Kelsey, N) (Entered: 02/11/2026) |
| 02/18/2026 | 82 | TRANSCRIPT of Proceedings: Type of Hearing: Motion Hearing. Held on 2/11/2026 before Judge Vernon D. Oliver. Court Reporter: Corinne Thomas. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 3/11/2026. Redacted Transcript Deadline set for 3/21/2026. Release of Transcript Restriction set for 5/19/2026. (Thomas, Corinne) (Entered: 02/18/2026) |
| 02/23/2026 | 83 | NOTICE by KalshiEX LLC *of Supplemental Authority* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Avery, Vanessa) (Entered: 02/23/2026) |
| 03/10/2026 | 84 | Notice of Additional Authority re 30 MOTION for Preliminary Injunction filed by Bryan T Cafferelli, Connecticut Department of Consumer Protection, Kristofer Gilman, William Tong. (Gasser, Joseph) (Entered: 03/10/2026) |
| 03/23/2026 | 85 | MOTION / Request for Judicial Notice by KalshiEX LLC.Responses due by 4/13/2026 (Attachments: # 1 Exhibit 1 (March 12, 2026 DMO Advisory), # 2 Exhibit 2 (CFTC-MLB MOU))(Avery, Vanessa) (Entered: 03/23/2026) |

| | | |
|---|---|---|
| 04/06/2026 | 86 | NOTICE by KalshiEX LLC *of Supplemental Authority* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Avery, Vanessa) (Entered: 04/06/2026) |
| 05/07/2026 | 87 | NOTICE by KalshiEX LLC *of Supplemental Authority* (Attachments: # 1 Exhibit 1) (Avery, Vanessa) (Entered: 05/07/2026) |
| 06/16/2026 | 88 | NOTICE by KalshiEX LLC *of Supplemental Authority* (Attachments: # 1 Exhibit 1) (Avery, Vanessa) (Entered: 06/16/2026) |
| 06/26/2026 | 89 | Notice of Additional Authority re 30 MOTION for Preliminary Injunction filed by Bryan T Cafferelli, Connecticut Department of Consumer Protection, Kristofer Gilman, William Tong. (Nunes, Michael) (Entered: 06/26/2026) |
| 07/08/2026 | 90 | Notice of Additional Authority re 30 MOTION for Preliminary Injunction filed by Bryan T Cafferelli, Connecticut Department of Consumer Protection, Kristofer Gilman, William Tong. (Gasser, Joseph) (Entered: 07/08/2026) |
| 07/10/2026 | 91 | MOTION for Leave to File *Response to Defendants' Notice of Supplemental Authority (ECF No. 90)* by KalshiEX LLC. (Attachments: # 1 Exhibit A (Response to Defendants' Notice of Supplemental Authority))(Avery, Vanessa) (Entered: 07/10/2026) |
| 07/13/2026 | 92 | ORDER **denying** 85 Request for Judicial Notice.<br><br>Federal Rule of Evidence 201 allows a court to take notice of a "fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c). "The Second Circuit has, however, recognized that judicial notice may be restricted to facts that are relevant to the dispute at hand." *Fair v. Esserman*, No. 15-CV-681 (SRU), 2015 WL 7451154, at *1 (D. Conn. Nov. 23, 2015) (cleaned up).<br><br>The Court declines to take judicial notice of the two documents identified in Plaintiff's request because Plaintiff has not demonstrated that they are relevant to any issue presently before the Court. Specifically, Plaintiff seeks judicial notice of (1) a March 12, 2026 Advisory issued by the Staff of the Commodity Futures Trading Commission's Division of Market Oversight stating that "the Commission is actively discussing issues of settlement integrity with some relevant sports leagues and their governing bodies," and (2) a March 19, 2026 Memorandum of Understanding between the Commodity Futures Trading Commission and Major League Baseball. Plaintiff does not explain how either document bears on the issues presented in this action, and the Court does not find their relevance to be apparent. Accordingly, the Request for Judicial Notice is **denied.**<br><br>Signed by Judge Vernon D. Oliver on 7/13/2026. (JD2) (Entered: 07/13/2026) |
| 07/13/2026 | 93 | ORDER **denying** 91 Motion for Leave to File Response to Defendants' Notice of Supplemental Authority. Neither a response to the Notice of Supplemental Authority, nor any additional briefing on the issues presented based on the supplemental authority, are necessary at this time.<br><br>Signed by Judge Vernon D. Oliver on 7/13/2026. (JD2) (Entered: 07/13/2026) |
| 08/10/2026 | 94 | ORDER **denying** 30 Motion for Preliminary Injunction, for the reasons in the attached. Per the Court's previous order at ECF No. 48, the parties are ordered to file their Rule 26(f) Report on or before **August 24, 2026**. Defendants may respond to the Complaint in this matter on or before **August 31, 2026**. |

| | | |
|---|---|---|
| | | Signed by Judge Vernon D. Oliver on 8/10/2026. (JD2) (Entered: 08/10/2026) |
| 08/10/2026 | 95 | NOTICE OF INTERLOCUTORY APPEAL as to 94 Order on Motion for Preliminary Injunction, by KalshiEX LLC. Filing fee $ 605, receipt number ACTDC-8710652. (Avery, Vanessa) Modified on 8/26/2026 to edit text (nk). (Entered: 08/10/2026) |
| 08/10/2026 | | Set Deadlines: Rule 26 Meeting Report due by 8/24/2026; Answer deadline updated for Bryan T Cafferelli to 8/31/2026; Connecticut Department of Consumer Protection to 8/31/2026; Kristofer Gilman to 8/31/2026; William Tong to 8/31/2026 (nk) (Entered: 08/11/2026) |
| 08/11/2026 | 96 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 95 Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Dinah Milton Kinney, Clerk. Documents manually filed not included in this transmission: None (si) (Entered: 08/11/2026) |
| 08/13/2026 | 97 | MOTION for Emergency Injunction Pending Appeal re 94 Order on Motion for Preliminary Injunction, by KalshiEX LLC.Responses due by 9/3/2026 (Attachments: # 1 Memorandum in Support)(Avery, Vanessa) (Entered: 08/13/2026) |
| 08/14/2026 | 98 | OBJECTION re 97 MOTION for Emergency Injunction Pending Appeal re 94 Order on Motion for Preliminary Injunction, filed by Bryan T Cafferelli, Connecticut Department of Consumer Protection, Kristofer Gilman, William Tong. (Gasser, Joseph) (Entered: 08/14/2026) |
| 08/15/2026 | 99 | ORDER **denying** 97 Motion for Emergency Injunction Pending Appeal for the reasons stated in the attached memorandum.<br>Signed by Judge Vernon D. Oliver on 8/15/2026. (SF) (Entered: 08/15/2026) |
| 08/19/2026 | 100 | CERTIFIED ORDER of USCA as to 95 Notice of Appeal filed by KalshiEX LLC USCA Case Number 26-2239 (si) (Entered: 08/20/2026) |
| 08/20/2026 | 101 | Joint MOTION to Stay by Bryan T Cafferelli, Connecticut Department of Consumer Protection, Kristofer Gilman, William Tong.Responses due by 9/10/2026 (Gasser, Joseph) (Entered: 08/20/2026) |
| 08/21/2026 | 102 | ORDER **granting** 101 Joint Motion to Stay. In light of the pendency of the Second Circuit appeal of this Courts decision on the Motion for Preliminary Injunction at ECF No. 94, and in the interest of judicial economy, the Court finds that a stay is appropriate. The matter is thus **stayed** until 21 days after the Second Circuits decision in the above appeal. Within 21 days of such a decision, the parties shall file a joint status report on this docket with proposed responsive pleading and discovery deadlines.<br><br>Signed by Judge Vernon D. Oliver on 8/21/2026. (JD2) Modified on 8/25/2026 to edit text (nk). (Entered: 08/21/2026) |
| 08/25/2026 | 103 | Docket Entry Correction re 102 Order: Corrected Order.<br><br>ORDER **granting** 101 Joint Motion to Stay. In light of the pendency of the Second Circuit appeal of this Courts decision on the Motion for Preliminary Injunction at ECF No. 94, and in the interest of judicial economy, the Court finds that a stay is appropriate. The matter is thus **stayed** until 21 days after the Second Circuits decision in the above appeal. Within 21 days of such a decision, the parties shall file a joint status report on this docket with proposed responsive pleading and discovery deadlines.<br><br>Signed by Judge Vernon D. Oliver on 8/21/2026. (JD2) (nk) (Entered: 08/25/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/30/2026 01:12:43 | | | |
| **PACER Login:** | mthm1720 | **Client Code:** | 49130.00017 |
| **Description:** | Docket Report | **Search Criteria:** | 3:25-cv-02016-VDO |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff,*<br><br>vs.<br><br>BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG in his official capacity as Attorney General of Connecticut,<br><br>*Defendants*. | Case No.:<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |

## INTRODUCTION

1. This action challenges the State of Connecticut's intrusion into the federal government's exclusive authority to regulate derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). The Connecticut Department of Consumer Protection seeks to prevent Plaintiff KalshiEX LLC ("Kalshi") from offering event contracts for trading on its federally regulated exchange. It does so by threatening Kalshi with imminent criminal and civil penalties for offering these contracts. Connecticut's attempt to regulate Kalshi intrudes upon the federal regulatory framework that Congress established for regulating derivatives on designated exchanges. The state's efforts to regulate Kalshi are both field-preempted and conflict-preempted. This Court should therefore issue both a

preliminary and a permanent injunction, as well as declaratory relief.

2. Kalshi is a federally designated derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to trade in many types of event contracts, including, as relevant here, sports-event contracts. These contracts are subject to exclusive federal oversight, and—critically—they are *lawful* under federal law.

3. Commodity futures regulation has long been under the exclusive purview of the federal government. In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives. In 1974, Congress established a federal agency called the CFTC to oversee it.

4. The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of derivatives on exchanges overseen by the CFTC, known as "designated contract markets" or "DCMs." The text of the statute gives the CFTC "exclusive jurisdiction" over trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). During the drafting process of the 1974 amendments to the CEA, Congress deleted a provision that would have granted states concurrent jurisdiction over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge). One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 50 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). As the conference report to the 1974 amendments explained, they were designed "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And the statute gives the CFTC comprehensive authority over regulated exchanges,

including the authority to approve or reject certain categories of event contracts as against the public interest.

5. For that reason, courts have easily found state laws preempted in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.). The CFTC itself agrees. It recently informed the U.S. Court of Appeals for the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Appellant Br. *27, *KalshiEx LLC v. CFTC*, 119 F.4th 48 (D.C. Cir. 2024) (emphasis added).

6. Commentators have likewise concluded with no difficulty that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vand. L. Rev. 1, 2 (1976). And commentators have specifically recognized that "the CEA preempts state bucket-shop laws and other anti-gambling legislation." Kevin T. Van Wart, Preemption and the Commodity Exchange Act, 58 Chi.-Kent L. Rev. 657, 721 (1982).

7. Earlier this year, a federal court in the District of New Jersey granted Kalshi's preliminary injunction to prevent similar state overreach. The court enjoined state officials from attempting to prohibit Kalshi's event contracts, explaining that it was "persuaded [] Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi. *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). Moreover, the court recognized that even the "express preemption provisions" of 7 U.S.C. § 16 "do[] not foreclose implied preemption elsewhere within the CEA." *Id.* at *5. *But see KalshiEX LLC v. Martin*, 793 F. Supp.

3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025).

8. The district court in New Jersey also found that Kalshi faced irreparable harm because:

> the prospect of facing civil or criminal enforcement or complying and compromising the integrity of its contracts imperils the reputation Kalshi has cultivated over several years . . . at minimum—Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial.

*Flaherty*, 2025 WL 1218313, at *7 (describing the circumstances as a "Hobson's choice" for Kalshi where "leaving it subject to state enforcement or obligating it to shift its business practices [are] consequences that are not cleanly undone").

9. In ruling for Kalshi, the district court in New Jersey pointed out that Kalshi received a "similar cease-and-desist letter" from another state—like that which was issued by Connecticut here—which underscores the "harms to [Kalshi]'s reputation and goodwill" at stake in this case. *Flaherty*, 2025 WL 1218313, at *7. The court emphasized that even if Kalshi's contracts were "unlawful" under federal law "that would subject Kalshi to the review of the CFTC—not state regulators." *Id.* at *5.

10. The Connecticut Department of Consumer Protection seeks to intrude on the comprehensive federal scheme for regulating designated exchanges by attempting to prohibit Kalshi from offering contracts that federal law permits. Kalshi is a federally-designated and approved derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to invest in many types of event contracts, including, as relevant here, sports-outcome contracts. These contracts are subject to extensive oversight by the CFTC, and—critically—they are *lawful* under federal law. Earlier this year, the CFTC allowed Kalshi's sports-outcome contracts to take effect without review.

11. Even though Kalshi's contracts are subject to the CFTC's exclusive jurisdiction, Defendants are threatening Kalshi with criminal action and civil penalties unless it shuts down these contracts in Connecticut and allows all Connecticut residents to withdraw any funds currently held by Kalshi *immediately*. Defendants thus seek to subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and to interfere with the CFTC's exclusive authority to regulate derivatives trading on the exchanges it oversees.

12. Defendants' actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has expressly and impliedly occupied the field of regulating futures trading on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal law. Kalshi is entitled to declaratory and injunctive relief to prevent Connecticut authorities from enforcing their preempted state laws against Kalshi.

13. Defendants' actions threaten immediate and irreparable harm, not just to Kalshi but to its customers and commercial counterparties. Shutting down its event contracts in Connecticut would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear. Defendants' acts also impair Kalshi's existing contracts with consumers and business partners, subject Kalshi's users to uncertainty and loss, undermine confidence in the integrity of Kalshi's platform, threaten its prospective business relationships, and jeopardize Kalshi's status as a CFTC-approved exchange. For that reason, Kalshi intends to imminently seek an emergency temporary restraining order and preliminary injunction to avoid the immediate and irreparable harm that would result from Defendants' unlawful acts.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal

question presented is whether Connecticut law is preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

15. The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. Under the Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123 (1908), "a plaintiff may sue a state official acting in his official capacity . . . for prospective injunctive relief from violations of federal law" and "vindicate the overriding federal interest in assuring the supremacy of that law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617-618 (2d Cir. 2007) (citations and internal quotations omitted).

16. Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The Individual Defendants perform their duties and thus reside in the State of Connecticut. The Connecticut Department of Consumer Protection is subject to this Court's personal jurisdiction and thus resides in this District. A substantial part of the events giving rise to the claim occurred in this District.

**PARTIES**

17. Plaintiff Kalshi is a financial services company with its principal place of business in New York. Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

18. Defendant Bryan T. Cafferelli is sued in his official capacity as the Commissioner of the Connecticut Department of Consumer Protection.

19. Defendant Kristopher Gilman is sued in his official capacity as the Director of Gaming for the Connecticut Department of Consumer Protection.

20. Defendant Connecticut Department of Consumer Protection is sued as the state agency that regulates gaming in the State of Connecticut by licensing or permitting all individuals and entities that are involved with legalized gambling, and by monitoring and educating to ensure compliance with Connecticut's gaming laws. As the state's gaming regulator, the Department has jurisdiction over all persons involved in legal gaming.

21. Defendant William Tong is sued in his official capacity as Attorney General of Connecticut.

22. Together, defendants Bryan T. Cafferelli, Kristopher Gilman, Connecticut Department of Consumer Protection, and Attorney General William Tong would be responsible for enforcing any demand for Kalshi to comply with Connecticut state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

### A. An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.

23. Derivatives contracts are financial tools used to mitigate risk. Event contracts are a quintessential example of a derivatives contract—they are a type of option. This type of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

Case: 26-2269, 09/30/2026, DktEntry: 38.1, Page 65 of 214

24. Event contracts are traded on an exchange. Traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place."). Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

25. The value of an event contract is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

26. Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

27. Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other financial instrument with the unique capability to capture the risks of an event with potential economic consequences.

28. Sports events can have significant economic consequences for a broad ecosystem of stakeholders. Advertisers, sponsors, television networks, local communities, and state-based sportsbooks all stand to gain or lose substantial sums depending on the outcomes of sports events. Sports-event contracts thus offer these entities opportunities to hedge their exposure. For example, sponsors of a particular team or athlete can use event contracts to hedge against the risk that the team or athlete underperforms. Or sportsbooks, which take on significant financial risk related to sporting events, can use sports-event contracts to reduce their exposure.[1]

29. Event contracts are a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions. Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

---

[1] One sportsbook has recently announced its intention to do just that. *See* Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, IN GAME, https://perma.cc/BT4A-BK8T (last accessed Dec. 3, 2025).

**B. Congress Delegated the Power to Regulate Event Contracts That Are Offered by a Regulated Exchange to the CFTC.**

30. Futures contracts have long been regulated by the federal government. In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

31. In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA. Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves," thus subjecting futures exchanges to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156. One Senator remarked that "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark). As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).

32. The public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent



ME1\59247996.v1

manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. 17 C.F.R. § 38.3(a)(1).

33. Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives traded on the market. Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event" contracts. *See id.* § 1a(47)(A)(ii), (iv), (vi).

34. Once the CEA designates a board of trade as a DCM, the market is subject to an extensive framework for CFTC oversight. Part 38 of Title 17, Chapter 1 of the Code of Federal Regulations comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain their designations as DCMs. 17 C.F.R. pt. 38. Among other things, DCMs must abide by recordkeeping requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. DCMs must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Part 38 also imposes specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more.

Case: 26-2239, 09/30/2026 DktEntry: 28.1, Page 69 of 214

35. The CEA allows DCMs to list contracts on its exchange without pre-approval from the CFTC. To do so, a DCM self-certifies that a given contract complies with the CEA and CFTC regulations by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).

36. Alternatively, exchanges have the option of submitting contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B). Substantially all contracts listed by DCMs for trading are self-certified by the listing DCMs; it is extremely rare for a DCM to seek CFTC approval of individual contracts.

*37.* The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on DCMs. The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for DCMs. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings. If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures, including (1) civil monetary penalties, (2) restitution, (3) disgorgement, (4) suspension, denial, revocation, or restriction of registration and trading privileges, and (5) injunctions or cease-and-desist orders. *See* CFTC Division of Enforcement, Enforcement Manual (May 20, 2020), https://www.cftc.gov/media/1966, at § 3.3. If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution. *Id.*

Case: 26-2239, 09/30/2026, DktEntry: 28.1, (70 of 214)

*38.* The CFTC regulates derivatives that reference physical commodities like "wheat, cotton, rice, corn, oats." 7 U.S.C. § 1a(9) The CFTC also regulates derivatives on "excluded commodit[ies]" which are intangible commodities like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9). Prior to 2010, the CFTC recognized that "event contracts," including contracts on "the outcome of particular entertainment events," "can be designed to exhibit the attributes of either options or futures contracts." *Concept Release*, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008). In 2010, Congress amended the CEA to add "swaps" to the CFTC's exclusive jurisdiction and to define event contracts as a type of swap. *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i).

*39.* Also, in 2010, Congress amended the CEA to add a "Special Rule" governing event contracts. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.*

**C. After an Extensive Regulatory Process, the CFTC Registered Kalshi as a Contract Market That Operates Under Federal Law.**

40. Kalshi is a CFTC-regulated exchange and prediction market where users can trade on the outcome of real-world events. In 2020, the CFTC unanimously designated Kalshi as a contract market, affirming that its platform complied with the CEA. Since then, Kalshi has been

fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

41. Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

42. Kalshi offers many kinds of event contracts related to an array of substantive areas like climate, technology, health, crypto, popular culture, and economics. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

43. Among its menu of event contracts, Kalshi offers sports-event contracts. On January 22, 2025, Kalshi self-certified, pursuant to section 7a-2(c)(1) of the CEA, the first of a number of sports contracts that are now available on its exchange. Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review. Kalshi's sports-related contracts allow users to place positions on, for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship. Shortly after Kalshi self-certified its first sports-event contracts, the CFTC requested that Kalshi submit a demonstration of compliance with the CEA pursuant to 17 C.F.R. § 38.5(b). Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports-event contracts traded on DCMs. The CFTC took no further action and has since allowed thousands of Kalshi's sports-event contracts to be listed, traded, and closed, with no hint that the agency views these

Case: 26-2239, 09/30/2026, DktEntry: 28.1, (72 of 214)

contracts as falling outside of its jurisdiction. Had the CFTC deemed Kalshi's contracts impermissible, it would have had the responsibility to "object[]" to the contracts. 7 U.S.C. § 7a-2(c)(3)(B)(ii). But it did not. Unless and until the CFTC takes action on Kalshi's sports-event contracts—all of which have been self-certified under the CEA—they are authorized under federal law. 7 U.S.C. § 7a-2(c)(5).

**D. The Connecticut Department of Consumer Protection Threatens Kalshi with State Civil and Criminal Penalties with Regard to Its Sports-Event Contracts.**

44. On the afternoon of December 2, 2025, the Connecticut Department of Consumer Protection ("DCP") sent Kalshi an email containing a cease-and-desist letter claiming that it was "conducting unlicensed online gambling, more specifically sports wagering" by offering its contracts in Connecticut in violation of state law. The letter directed Kalshi to "immediately cease and desist advertising and offering its Contracts to Connecticut residents." Exhibit 1 at 1.

45. DCP claimed that Kalshi's contracts "constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events." *Id*. at 1 (citing Conn Gen. Stat. § 12-850(34)).

46. DCP added that "[e]ven if Kalshi possessed an online gaming operator's license, Kalshi's contracts still violate numerous other Connecticut laws and public policies" that bar individuals under 21 from placing wagers and prohibit wagers involving Connecticut intercollegiate sports teams. *Id*. at 2 (citing Conn. Gen. Stat. §§ 12-663(a)(1) and 12-850(30)).

47. DCP further contended that Kalshi's contracts are "void" under state law prohibiting wagering contracts. *Id*. (citing Conn Gen. Stat. § 52-553).

48. DCP also claimed that Kalshi's "promotion of unlicensed and illegal gambling services is also an unfair trade practice" in violation of the Connecticut Unfair Trade Practices Act,

Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA") because they are "deceptive" and "unfair" as Kalshi "is able to gain a competitive advantage over appropriately licensed entities" by "operating outside of the regulatory environment." *Id.*

49. Setting aside Kalshi's sports-event contracts, DCP's cease-and-desist letter suggested that *all* of Kalshi's event contracts are unlawful because Connecticut law "prohibits gambling," defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device," and Kalshi's actions do not "fall within any of the excepted activities to the prohibition on gambling." *Id.* at 1-2 (quoting Conn. Gen. Stat. § 53-278a). DCP's theory is that *all* event contracts amount to unlawful gambling, even though the CEA clearly authorizes event contracts and subjects them to the CFTC's exclusive jurisdiction.

50. DCP ordered Kalshi to "immediately cease and desist advertising, offering, promoting, or otherwise making available Contracts or any other form of unlicensed online gambling to Connecticut residents." *Id.* at 2.

51. Finally, DCP warned that "[f]ailure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d ." *Id.* at 2.

52. Kalshi has no option but to seek judicial relief. DCP's cease-and-desist letter demands that Kalshi ***immediately*** cease operating in Connecticut or face criminal and civil liability. Because its platform lists contracts to be traded continuously, Kalshi has no other practical choice to protect its commercial interests and those of its users except to bring this suit. Absent judicial relief, Kalshi faces the prospect of criminal enforcement and civil penalties in Connecticut as of the date of this filing.

**REQUISITES FOR RELIEF**

53. As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions, including, but not limited to, the enforcement of preempted state law threatened by the cease-and-desist letter, will violate the Supremacy Clause of the U.S. Constitution and subject Kalshi and its customers to irreparable harm.

54. An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein, including direct threats to Kalshi, has already and will continue to result in irreparable injury to Plaintiff, including but not limited to criminal liability, economic hardship, and impairment of existing contractual relationships.

55. Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Plaintiff therefore seeks declaratory and injunctive relief restraining Defendants from enforcing Connecticut law that interferes with the operation and function of Plaintiff's futures market described herein.

**COUNT I**

**(Supremacy Clause—Preemption by Commodity Exchange Act)**

56. Plaintiff incorporates all prior paragraphs by reference.

57. The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

58. The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

59. Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges. 7 U.S.C. § 2(a)(1)(A). Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos." Senate Hearings, at 685 (statement of Sen. Clark). Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges. *See, e.g., Am. Agric. Movement*, 977 F.2d at 1156; *Leist*, 638 F.2d at 322; *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

60. In threatening to enforce Conn. Gen. Stat. §§ 42-110 et seq., 53-278b, 53-278d, and any rules adopted thereunder against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter. Likewise, Defendants' threats to abate Kalshi's website for supposedly constituting an unfair trade practice intrudes on the field that Congress has preempted. Because federal law occupies the entire field of regulating trading on designated contract markets, Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause.

61. In addition, Defendants' threatened actions conflict with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized (and to

subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. In addition, complying with Defendants' demand to immediately cease offering event contracts in Connecticut could conflict with the federal law governing DCMs, and would thus imperil Kalshi's CFTC approval. For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

62. Defendants may not enforce Connecticut's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

**PRAYER FOR RELIEF**

WHERFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1. Enter a judgment declaring that Conn. Gen. Stat. §§ 42-110 et seq., 53-278b, 53-278d, any rules adopted thereunder, and any other Connecticut law that is used in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;
2. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Conn. Gen. Stat. §§ 42-110 et seq., 53-278b, 53-278d, any rules adopted thereunder, or any other Connecticut law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff;

3. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Conn. Gen. Stat. §§ 42-110 et seq., 53-278b, 53-278d, any rules adopted thereunder, or any other Connecticut law that attempts to effectively regulate Plaintiff's designated contract market.
4. Any other relief within this Court's discretion that it deems just and proper.

Dated: December 3, 2025

Respectfully submitted,

/s/ Vanessa Roberts Avery
Vanessa Roberts Avery (ct 21000)
**McCarter & English, LLP**
CityPlace I, 185 Asylum Street
Hartford, CT 06103
Telephone: (860) 275-6700
vavery@mccarter.com

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**Milbank LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
nkatyal@milbank.com
JSterling@milbank.com
WHavemann@milbank.com

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
GMainland@milbank.com
APorter@milbank.com

*Attorneys for KalshiEX LLC*

# EXHIBIT 1

# STATE OF CONNECTICUT

*DEPARTMENT OF CONSUMER PROTECTION*

December 2, 2025

**Via Certified Mail and E-Mail**

KalshiEX LLC
594 Broadway #407
New York, NY 10012

Case No. 2025-77

To Whom it May Concern:

The Department of Consumer Protection ("Department") has become aware that KalshiEX LLC, d/b/a Kalshi ("Kalshi"), is conducting unlicensed online gambling, more specifically sports wagering, in Connecticut through its online sports event contracts ("Contracts"). Kalshi's actions are in violation of Connecticut General Statutes (Conn. Gen. Stat.) §§ 53-278b, 53-278d, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA"). The Department, therefore, orders Kalshi to immediately cease and desist advertising and offering its Contracts to Connecticut residents.

Conn. Gen. Stat. § 53-278b prohibits gambling and professional gambling. Gambling is defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device . . . ." Conn. Gen. Stat. § 53-278a. Professional gambling means "accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling . . . ." Id.

Sports wagering is a form of gambling and is defined as:

> [R]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform, and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event, or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events.

Conn Gen. Stat. § 12-850(34).

Kalshi's platform allows users to purchase Contracts based on their belief that a particular sport outcome will occur, such as a specific team winning a game, division, or championship. The user is paid based on the outcome of the sporting event and not based on the occurrence or nonoccurrence of such event. These Contracts constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events.

Case: 26-2239, 09/30/2026 DktEntry: 38.1 (81 of 214)

# STATE OF CONNECTICUT

*DEPARTMENT OF CONSUMER PROTECTION*

Public Act 21-23 authorized online sports gambling in Connecticut, but only for specific licensed entities. Kalshi does not possess an online gaming operator's license under Conn. Gen. Stat. § 12-857 or any other relevant qualification that would allow Kalshi to provide online gaming to Connecticut residents; nor do Kalshi's actions fall within any of the excepted activities to the prohibition on gambling listed in Conn. Gen. Stat. § 53-278g. Even if Kalshi possessed an online gaming operator's license, Kalshi's Contracts still violate numerous other Connecticut laws and public policies in that Kalshi allows for individuals under 21 years of age to place wagers and allows illegal wagers on Connecticut intercollegiate teams. Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30).

Moreover, Kalshi's Contracts are void under Conn. Gen. Stat. 52-553, which prohibits wagering contracts. More specifically, Section 52-553 states:

> All wagers, and all contracts and securities of which the whole or any part of the consideration is money or other valuable thing won, laid or bet, at any game, horse race, sport or pastime, and all contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void . . . .

Kalshi's Contracts likewise fail to meet any of the exemptions of Conn. Gen. Stat. § 52-553.

Kalshi's promotion of unlicensed and illegal gambling services is also an unfair trade practice, which violates CUTPA. Not only are Kalshi's actions deceptive, they are also unfair in that Kalshi, by operating outside of the regulatory environment, is able to gain a competitive advantage over appropriately licensed entities.

Kalshi is hereby ordered to immediately cease and desist advertising, offering, promoting, or otherwise making available Contracts or any other form of unlicensed online gambling to Connecticut residents. Kalshi must, however, allow all Connecticut residents to withdraw any funds currently held by Kalshi. Failure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d.

Sincerely,

Kristofer Gilman
Director of Gaming

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

KALSHIEX LLC,

*Plaintiff,*

vs.

BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG in his official capacity as Attorney General of Connecticut,

*Defendants.*

Civil Action No.: 3:25-cv-02016-VDO

DECEMBER 5, 2025

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Rule 65(a), Plaintiff KalshiEX LLC, by and through undersigned counsel, hereby moves this Court for a Preliminary Injunction. Accompanying this Motion for a Preliminary Injunction is a Memorandum of Law in Support of the Motion for a Preliminary Injunction, Declaration of Andrew Porter, Declaration of Xavier Sottile, and Proposed Order. Plaintiff moves for:

- Equitable relief enjoining Defendants and their agents from enforcing preempted state laws against Plaintiff during the pendency of this action;
- Any other relief deemed appropriate by this Court.

Dated: December 5, 2025
Hartford, Connecticut

Respectfully submitted,

_/s/ Vanessa Roberts Avery_
Vanessa Roberts Avery (ct21000)
**McCarter & English, LLP**
CityPlace I, 185 Asylum Street
Hartford, CT 06103
Telephone: (860) 275-6700
vavery@mccarter.com

Neal Katyal (admitted *pro hac vice*)
Joshua B. Sterling (admitted *pro hac vice*)
William E. Havemann (admitted *pro hac vice*)
**Milbank LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
nkatyal@milbank.com
JSterling@milbank.com
WHavemann@milbank.com

Grant R. Mainland (admitted *pro hac vice*)
Andrew L. Porter (admitted *pro hac vice*)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
GMainland@milbank.com
APorter@milbank.com

*Attorneys for KalshiEX LLC*

Case: 26-2239, 09/30/2026, DktEntry: 38.1, (84 of 214)

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated below. Parties may access this filing through the Court's CM/ECF System.

By: *<u>/s/ Vanessa Roberts Avery</u>*
Vanessa Roberts Avery (ct21000)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

KALSHIEX LLC,

*Plaintiff*,

vs.

BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG in his official capacity as Attorney General of Connecticut,

*Defendants*.

Case No.: 3:25-cv-02016-VDO

**DECLARATION OF XAVIER SOTTILE**

1. I am the Head of Markets at KalshiEX LLC. In that role, I am responsible for the generation of new markets. I received an undergraduate degree in Economics from Yale University in 2020. Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

2. My duties include devising proposed new contracts and shepherding those proposals from inception to completion. I also facilitate the process by which our markets undergo the regulatory review cycle under the purview of the Commodity Futures Trading Commission ("CFTC"). This involves everything from personally notifying the CFTC of contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the CFTC regulations to maintaining records pursuant to their requirements, certifying that Kalshi's contracts comply with the Act, and communicating with Commission staff over the substance of contract filings.

Case: 26-2239, 09/30/2026, DktEntry: 38.1, Page 86 of 214

3. The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

4. I offer this Declaration to describe the extraordinary harm that Kalshi and its users will incur unless the court immediately prevents the Connecticut Department of Consumer Protection ( "DCP") from enforcing its demand that Kalshi immediately cease and desist from offering sporting event-based contracts in Connecticut. Porter Decl., Ex. 1 at 1. Without an injunction, Kalshi will be forced into an impossible choice. It must either decline to comply with the letter, subjecting itself and its representatives to the risk of criminal and civil liability. *Id.* at 1-2. Or it must attempt to comply with the letter, thereby subjecting itself and its users to a host of harms that could not be repaired even if Kalshi ultimately succeeds in this case. This Declaration reflects my preliminary analysis of Kalshi's harms. Other unanticipated harms are possible, and even likely, given the nature of the DCP's letter and the uncharted territory into which it would lead.

**I. Harms Resulting from Noncompliance**

5. If Kalshi declines to comply with the letter and continues to offer sports event contracts in the state of Connecticut, the company and its representatives risk criminal and civil jeopardy in Connecticut.

6. Connecticut authorities have threatened Kalshi and its representatives with civil and criminal penalties. *Id*. at 1-2. The DCP has expressed that it believes that Kalshi's operations in Connecticut are in violation of several Connecticut statutes. *Id*. The DCP stated that Kalshi's conduct violates Conn. Gen. Stat. §§ 53-278b and 53-278d, which can give rise to potential criminal charges. *Id.*

7. The DCP's December 2, 2025 cease & desist letter stated that "[f]ailure to comply" with the letter "may result in additional action including, but not limited to, civil penalties under [the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq.] and/or criminal penalties." Porter Decl., Ex. 1 at 2.

8. Since Kalshi's designation as a CFTC-regulated contract market in 2020, the company has offered event contracts nationwide. As Head of Markets, I have assiduously complied with federal regulations with regard to all our contracts, including the sports-related contracts that Connecticut authorities have highlighted in their letter. *See id.* at 1-2. We have done our best to run the company according to our understanding of the regulatory framework under which we have been governed for almost five years.

9. Since receiving the cease-and-desist letter, Kalshi's operations—which are lawful under federal law—risk exposing the company and representatives to criminal and civil liability. It is terrifying and stressful to attempt to operate the company while the risk of criminal and civil jeopardy looms. I am deeply concerned that Connecticut will make good on its threat to file criminal and civil charges against Kalshi, its representatives, and possibly even its contractual counterparties. That fear becomes all the more distressing given that Kalshi's only other alternative is compliance with the cease-and-desist letter, which would bring about a whole host of other harms to Kalshi and its users as I describe below.

## II. Harms Resulting from Attempted Compliance

10. Choosing to comply with the cease-and-desist letter would introduce a new set of barriers and challenges that themselves would subject Kalshi and its users to irreparable harm. Technical compliance with the cease-and-desist letter in short order would be exceedingly difficult. But even if Kalshi could implement a technical solution to comply with the letter, halting access to event contracts in Connecticut would cause severe harm to Kalshi's existing user base. Compliance would also risk Kalshi's status as a designated contract market under the CFTC, throwing away years of efforts to earn and maintain its federal designation. All of these harms would be avoided by this Court's entry of immediate injunctive relief.

11. Kalshi's harms from attempting compliance can be categorized as follows: (a) harms imposed by technical barriers to compliance, (b) harms to Kalshi's users from abruptly ceasing operations in Connecticut, (c) risk that complying with Connecticut law would jeopardize

Kalshi's CFTC designation, and (d) economic and reputational harm to Kalshi from ceasing event-based contracts in Connecticut. I describe each of these categories in more detail below.

*a. Harms Resulting from Technical Barriers to Compliance*

12. The cease-and-desist letter requires Kalshi to undertake technological changes that would be either difficult or impossible for Kalshi to implement immediately, under the threat of imminent litigation. Attempting to undertake these extraordinary technological changes would impose substantial and irreparable costs that could not be recouped even if Kalshi ultimately prevails in this case.

13. The DCP's letter requires Kalshi to cease all of its event contracts in Connecticut under threat of imminent enforcement. *Id*. at 1-2. If Kalshi attempted to comply with this demand, it would be required to, first, undertake efforts to geolocate which of its users are in Connecticut, and, second, cease all event contracts for those users. I have engaged in internal discussions with our leadership and technical team to determine the feasibility of compliance at both of these steps. Compliance would be difficult to implement even under a relaxed timeline and could not be done immediately.

i. <u>Step One – Identifying Connecticut Users</u>

14. Because Kalshi is subject to uniform federal regulation rather than state-by-state laws, it currently lacks a mechanism to identify which of its users are located in any particular state at any particular time. Implementing such a mechanism would be incredibly costly and could not be done immediately.

15. Traditional web-based sports pools identify their users' whereabouts through a process called geolocation (or geo-positioning). Geolocation identifies and tracks an internet-connected device's location to provide real-time data as to the geographic position of the device. This technology is more sophisticated than merely identifying the device's IP address. Instead, geolocation uses a combination of location-identifiers like GPS coordinates, cell phone towers, WiFi access points, network connections, and Bluetooth beacons to triangulate location. While

IP addresses can provide city-level location accuracy, geolocation is sensitive enough to track the exact moment that a device crosses state lines.

16. It is my understanding that geolocation is a multi-step and technically complex process even for stationary devices, and that the process is even more challenging when tracking real-time movement of devices.

17. The reason traditional sports pools deploy geolocation is to ensure that the bets and wagers that individuals place in their pools conform to state laws governing gaming and gambling. The precision of geolocation allows sports pools to make refined geographic determinations at the transaction level rather than the user level. Through geolocation, a company can allow and disallow certain transactions that take place in restricted areas rather than bluntly denying gamblers access to their platforms based on their residence irrespective of where they are located at the time of wager.

18. Kalshi is not a sports pool. As a CFTC-regulated contract market, Kalshi has never developed or implemented geolocation on its platform because it is subject to the CFTC's exclusive jurisdiction and is not subject to individual state laws governing gambling. Like the Chicago Mercantile Exchange and the Intercontinental Exchange, Kalshi does not distinguish between users or trades on the basis of geographic location. Instead, Kalshi is subject exclusively to federal law, which does not apply different standards to users of different states.

19. Kalshi keeps Know Your Customer (KYC) data on the traders that place positions on its platform. Kalshi knows the permanent residence and IP address of its users but does not geolocate its users and therefore does not know where a user's device is located at any point in time. Kalshi maintains a database of its traders' KYC data, which is available for CFTC inspection upon request.

20. Kalshi has no evident way to comply immediately with the cease-and-desist letter. If Kalshi sought to use its existing KYC data to identify Connecticut-based users on its platform, this broad-brush approach would risk being deemed both under- and over-inclusive. KYC data would capture all users who claim their permanent residence as Connecticut even if they place

positions when they are located outside of Connecticut. Conversely, the KYC data could fail to capture users whose permanent residence is outside of Connecticut but who travel to the state and place a position while there.

21. If, alternatively, Kalshi sought to implement geolocation services across its platform, this process would be incredibly costly and time-consuming. Kalshi lacks the capacity to implement this service in-house and would therefore need to contract with a cloud- or server-based geolocation platform. I estimate that a partnership with a geolocation service provider would cost Kalshi up to tens of millions of dollars annually. Thus, if it attempted compliance with the DCP's letter, Kalshi would be forced to expend enormous financial resources on geolocating services, even if the court ultimately concludes that Connecticut law does not apply to Kalshi.

22. Based on my prior negotiations with other key partners, moreover, I estimate that negotiating a complex contract with a geolocation service provider alone could take months. Implementing and integrating the geolocation services into our existing platform would take longer still. Thus, attempting to comply with the DCP's letter could not feasibly be done quickly and, even if it could, would subject Kalshi to massive irrevocable costs.

ii. Step Two - Geographical Cessation

23. Only after identifying Kalshi users who are physically present in Connecticut could Kalshi cease offering its event contracts to users in Connecticut. It would be required to do so through a technical process called "geofencing." This process would involve creating a virtual geographic boundary, or geofence, around the state of Connecticut. Again, this process would be technically challenging, time-consuming, and expensive.

24. While geofencing might block *newcomers* from trading on the platform from Connecticut, geographical cessation presents a host of additional difficulties for *existing* Kalshi users. As of today, there are 29,920 accounts on Kalshi that have registered with a Connecticut address; 24,302 of those accounts have passed KYC protocols and become full-fledged Kalshi members. While the precise numbers are not public, these accounts have millions of dollars in

open interest on the Kalshi platform, meaning Connecticut users have millions of dollars' worth of open positions on Kalshi markets that have not yet been settled.

25. The DCP's letter could be understood to require Kalshi to cease its contracts even with respect to these existing positions. But doing so would present intractable technical difficulties.

26. If the DCP's letter is understood to require Kalshi to unilaterally liquidate all trades that originated in Connecticut, compliance would either be impossible or irreparably harmful. To explain why, it is helpful to distinguish Kalshi's exchange from a sports pool or casino. A casino or sports pool operates by taking bets from gamblers on games where the house has a statistical advantage. In other words, gamblers bet against the "house," and when the house loses, it must pay the gambler on demand. Casinos and sports pools therefore maintain a high level of liquidity so that they can pay out those bets.

27. But Kalshi does not operate a casino or sports pool. Instead, it manages a federally-regulated contract market. In contrast to a casino, an exchange facilitates trades between different users on the platform. Traders do not bet against the house, but rather enter into contracts with other traders on an exchange. To ensure compliance with the CFTC regulations, Kalshi operates a CFTC-approved derivatives clearinghouse that holds traders' funds during the pendency of an open contract. But Kalshi does not have access to immediate liquidity like a sports pool or casino that it could use to refund the cost basis of a trader's investment. Attempting to facilitate those exits using Kalshi's own funds would be exceptionally expensive and require technical capabilities that Kalshi does not now have.

28. Kalshi, moreover, would want to give its users reasonable notice to allow them to exit their positions voluntarily if they so choose. But the immediate threat of criminal and civil liability from Connecticut state authorities raises serious questions about whether Kalshi could even engage in that basic diligence.

*b. Irreparable Harms to Kalshi's Users*

29. Ceasing operations in Connecticut would impose irreparable harm on Kalshi's existing user base. Ceasing operations could be understood to require either pausing current trades

pending the outcome of the event that is the subject of the contract, or else liquidating user positions. Either option would impose severe harms on users.

i. Pausing Positions

30. Pausing current positions on Kalshi pending the outcome of the event at issue would deny traders access to their property and threaten their economic expectations.

31. Pausing positions pending the outcome of the event would deny Connecticut users access to their property. Users' capital would be locked on the Kalshi platform and users with significant investments on the platform would be unable to retrieve it. If the event at issue is months or years in the future, users' assets would be locked up for the duration. Given current market conditions and uncertainty, this lack of access funds could result in substantial losses.

32. Pausing positions would also cause a massive disruption to users' investment-backed expectations. Financial traders on Kalshi, like investors in other markets, expect to be able to alter their investments as facts on the ground change. Due to the unique market sensitivity of event contracts and the ease with which exchanges allow traders to place positions, traders capitalize on the opportunity to enter and exit their positions during the pendency of the contract. Traders also deploy well-recognized strategies like stop-loss orders and portfolio-wide loss mitigation strategies. Investors may invest in a contract expecting to sell if the contract price falls below a certain value or expecting to reinvest more if the investment proves especially sound. And while some contracts operate on short timelines, many of the contracts that Kalshi offers are long-term. For example, one of Kalshi's event contracts allows traders to place positions on whether the electric vehicle market share will rise above 30% by 2030. Traders who have placed a position on this contract may be mitigating their risk on other investments by placing a position that effectively balances out the investment portfolio. As the market for electric vehicles changes, so does the price of the event contract. A trader may make an investment at 45 cents on the electric vehicle contract and institute a stop-loss order to sell the contract when the price dips below 30 cents because 30 cents is the breakeven point on the investment.

33. Traders are constantly engaged in the practice of ascertaining risk. As facts on the ground change, so do traders' strategies. Indeed, traders often do not place a position on a contract with the intent of seeing that contract through to its expiration date and risking the full amount of the entry price. Instead, they monitor market fluctuations during the lifetime of the event contract to determine when to cash out. In other words, traders do not necessarily value event contracts based on the ultimate value of the contract at its expiration date. They also value the flexibility that event contracts provide as a financial tool to mitigate risk in real-time.

34. Hitting pause on all Connecticut-based trades would completely upend this investment strategy and destroy traders' expectations. If Kalshi were to pause all trades in Connecticut, traders would no longer be able to take action on their existing contracts in accordance with their investment models. The flexible investment opportunity on which Kalshi users relied when entering into these contracts would be lost. A Kalshi user that entered into a contract on whether President Trump would impose tariffs on pharmaceutical imports to the United States before December 31, 2025, for example, would not be able to exit that contract even if facts on the ground change dramatically in the meantime.[1] Traders would be forced either to leave the state to change positions or suffer whatever losses they may endure as a result of being locked out.

35. Pausing all Connecticut-based trades would not solely affect Connecticut-based users and transactions; it would wreak havoc on the entire Kalshi exchange ecosystem. Again, exchanges do not operate like casinos where gamblers bet against the house. Instead, exchanges facilitate contracts between individual traders on the market. Traders on either side of a contract are often from different states, given that Kalshi does not distinguish between the geographic location of traders. If traders in Connecticut are locked out of their positions, then their trading counterparts in other states will likewise be limited in whether and how often they can enter and exit their positions on the Kalshi exchange. Traders in California, for example, may expect to rely on traders in Connecticut on contracts related to water availability in the American

[1] This is a politics-based event contract that is currently offered through the Kalshi exchange. KalshiEX, *Will Trump impose pharma tariffs this year?*, https://kalshi.com/markets/kxtariffpharma/pharma-tariffs/kxtariffpharma-25.

Southwest. But if the Connecticut-based traders and transactions are all of a sudden restricted on the platform, that will have an equal and opposite effect on the market for traders in other states. Pausing transactions in Connecticut would thus disrupt users' positions on the exchange nationwide, which they placed in reliance on their ability to flexibly enter and exit.

ii. Liquidating Positions

36. Liquidating Connecticut-based positions on Kalshi would similarly subject users to irreparable harm. This would require Kalshi to refund either the current value of users' existing positions or the original cost of their existing positions on their respective open contracts. Unilaterally settling traders' positions based on current market conditions or the original cost of the positions could lead to significant losses for users. A trader, for example, may have entered a long-term event contract at 80 cents, but market conditions may have caused his position to decline in value to 30 cents. Rather than allowing the trader to ride out the market dip, immediate liquidation at the market rate would force the trader to take a 50-cent loss on the contract through no fault of his own. Likewise, a trader who bought a contract during a market dip and is forced to exit at the original contract price would not be able to realize any gains that he earned over his holding period for the contract. And in either event, refunding users based either on the cost of their positions or the position's current value would be prohibitively expensive for Kalshi to execute.

37. By the same token, immediately liquidating Connecticut-based users' positions would disrupt the market for out-of-state users by causing a false signal in the market. Event contract markets respond to market fluctuations. The immediate exit of a large portion of investors on a particular contract would have a distorting effect on the value of the contract, impairing other investors' ability to predict market changes and act accordingly. If, for example, Connecticut traders make up a plurality of the trades on a particular contract, the immediate liquidation of all Connecticut positions would indicate to the market that the contract's value has changed, causing a price change in response. Remaining traders would suffer from the market distortion, resulting in substantial financial losses even for Kalshi's non-Connecticut users. Alternatively, Kalshi

Case: 26-2239, 09/30/2026, DktEntry: 38.1, (95 of 214)

could liquidate the entire market for both Connecticut and non-Connecticut users by settling prices at either the current market price or the original contract price, but this would, again, be prohibitively expensive and likely occasion the end of our federally-regulated company simply to stave off potential criminal or civil liability.

*c. Harms to Kalshi Resulting from the Risk of CFTC Decertification*

38. Compliance with Connecticut state law would jeopardize Kalshi's status as a CFTC-designated contract market. It is difficult to overstate how harmful this would be to Kalshi.

39. As the Head of Markets at Kalshi, I oversee the entire regulatory review process for Kalshi's contract markets. In that role, I am responsible for ensuring that each of Kalshi's contracts complies with the nearly two dozen CFTC Core Principles that govern event contracts traded on CFTC-regulated exchanges. Complying with Connecticut state law could be understood to put Kalshi out of compliance with these Core Principles, imperiling Kalshi's designation as a contract market under the CFTC's purview.

40. CFTC Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process." 17 C.F.R. § 38.250. Immediately liquidating or pausing traders' positions could be understood to lead to the very sort of price distortion and market manipulation that the CFTC regulations guard against. Pausing trades could cause "disruption[ ] of the delivery or cash-settlement process" and immediate liquidation could cause "price distortion."

41. CFTC Core Principle 2 requires that designated contract markets provide their "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b). Pursuant to this regulation, "[a]ccess criteria" must be "impartial, transparent, and applied in a non-discriminatory manner." *Id.* Discrimination based on geographic location would conflict with this requirement, but that is exactly what Kalshi would have to do to comply with Connecticut's cease-and-desist letter. Traders who execute positions in Connecticut would be barred from accessing Kalshi's exchange

and placing positions on Kalshi's contracts, whereas traders in any other state would have unlimited access to the platform.

42. Violation of these Core Principles could subject Kalshi to the panoply of enforcement mechanisms that the CFTC has at its disposal. Those tools range from civil monetary penalties to restitution to criminal liability.

43. Violating these principles could even jeopardize Kalshi's federal-contract-market status with the CFTC. The CFTC is authorized to suspend or revoke Kalshi's designation if Kalshi fails to comply with federal regulations. Kalshi has spent the better part of the last decade working to gain federal registration as a contract market under the CFTC and has scrupulously endeavored to comply with CFTC regulations to maintain that registration. Losing our federal license would be catastrophic for the company, even if Kalshi were to ultimately succeed in this suit against the state authorities in the long-term.

44. CFTC enforcement is not a mere theoretical risk. Several years ago, a CFTC-regulated exchange was charged with offering contracts on a discriminatory basis because it only allowed sportsbooks to trade on its platform. Discriminating on the basis of state residence could likewise subject Kalshi to federal repercussions. It is inconceivable, for example, to imagine a CFTC-designated contract market like the Chicago Mercantile Exchange abruptly closing its exchange to users in a particular state without serious federal repercussions. Yet that is what compliance with the DCP's letter would require Kalshi to do.

45. Compliance with Connecticut law thus places Kalshi in a regulatory Catch-22: Either it complies with Connecticut law and risks CFTC sanctions, or it continues operations in Connecticut and subjects itself to state criminal and civil liability.

*d. Economic and Reputational Harms to Kalshi*

46. Compliance with the cease-and-desist letter would also cause economic and reputational harm to Kalshi. Losses on both fronts would be irreparable even if Kalshi ultimately wins this case.

47. Kalshi has over 24,000 verified users in Connecticut with millions of dollars invested on the exchange. The market uncertainty created by abruptly closing its contracts in Connecticut could lead many users to leave the platform—even users outside of Connecticut. Traders must have confidence in the integrity of the market to invest in it, but market confidence would be deeply shaken by complying with the DCP's order and the prospect that other states may to follow Connecticut's lead. Even if Kalshi were to prevail in this lawsuit, regaining that market confidence would be difficult. Kalshi has expended enormous resources to advertise its platform, onboard traders, and maintain their business. Losing those traders would mean that many of those efforts were for naught. Thus, compliance would impose significant and irrevocable economic harm on the company.

48. The threat of state litigation also endangers Kalshi's established partnerships and relationships. One of Kalshi's banner partners, Robinhood, has already chosen not to list Kalshi's event contracts in some states because of state cease-and-desist letters. This is a massive disruption for Kalshi given Robinhood had agreed to list Kalshi's contracts to its millions of active users, but chose to deviate from that plan in direct response to a cease-and-desist letter similar to the one Connecticut issued here. Other partners that help us comply with CFTC regulations by facilitating our digital investment platform and helping detect improper trading behavior may also seek to limit their exposure given the uncertainty of the application of state law to Kalshi.

49. The effects of Connecticut's cease-and-desist letter are not limited to the state but instead threaten to open a Pandora's box of regulation for the 49 other states that may wish to impose their local laws on Kalshi's exchange. In the absence of a temporary restraining order and preliminary injunction, partners and users alike will be hesitant to engage with Kalshi given this potential for state litigation.

* * *

50. The DCP's cease-and-desist letter imposes irreparable harms that Kalshi cannot avoid no matter how it responds. If Kalshi did not comply with the DCP's demands, the company

faces civil and criminal liability and its representatives face nothing short of imprisonment. But if Kalshi attempted to comply with the DCP's demands, it would incur massive costs, its users would be harmed, its federal registration would be imperiled, and user confidence in the integrity of its market would be shaken. All of these harms are compounded by the real risk that other states will be emboldened by the DCP's demands to follow Connecticut's lead. And there are serious questions about whether Kalshi could implement the technical solutions on an expedited timeline. Kalshi has spent years cultivating its reputation and developing its user base. Compliance with the DCP's demands to ward off Connecticut criminal and civil liability would lead to economic and reputational harm that will be difficult to regain.

51. I certify under penalty of perjury that the foregoing is true and correct.

At New York, New York, this 5th day of December, 2025.

Xavier Sottile

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KalshiEX LLC, | No. 3:25-cv-02016-VDO |
| Plaintiff, | February 11, 2026 |
| v. | 10:19 a.m. |
| BRYAN T. CAFFERELLI, ET AL., | 450 Main Street, Hartford, Connecticut |
| Defendants. | |

MOTION HEARING

B E F O R E:

THE HONORABLE VERNON D. OLIVER, U.S.D.J.

Official Court Reporter:
Corinne T. Thomas, RPR
(203) 809-0848

A P P E A R A N C E S:

For the Plaintiff:

MILBANK LLP
1101 New York Avenue, NW
Washington, DC 20005
(202) 835-7518
Email: whavemann@milbank.com
jsterling@milbank.com
BY: WILLIAM HAVEMANN, ESQ.
JOSHUA BROOKS STERLING, ESQ.

55 Hudson Yards
New York, NY 10001
(212) 530-5781
Email: kgarcia@milbank.com

MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum St.
Hartford, CT 06103
(860) 275-6700
Email: vavery@mccarter.com
smamillapalli@mccarter.com
BY: VANESSA ROBERTS AVERY, ESQ.
SNIGDHA MAMILLAPALLI, ESQ.

For the Defendants:

OFFICE OF THE ATTORNEY GENERAL
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5247
Email: joseph.gasser@ct.gov
michael.nunes@ct.gov
BY: JOSEPH E. GASSER, ESQ.
MICHAEL NUNES, ESQ.

(Call to Order, 10:19 a.m.)

THE COURT: Good morning. We are here for argument relating to the temporary restraining order/preliminary injunction in the matter *KalshiEX LLC v. Bryan T. Cafferelli, et al.* It is at docket number on our civil docket 3:25-cv-02016.

Let's begin please with appearances, starting with counsel for the plaintiff. Good morning.

MR. HAVEMANN: Good morning, Your Honor. Attorney Vanessa Roberts Avery for the plaintiff, KalshiEX LLC. And I'm here joined at counsel table with my cocounsel Will Havemann and Josh Sterling, and along with Rick Heaslip, who is the GC of Kalshi, general counsel for Kalshi. And we are joined on counsel bench by Kelly Garcia and Snigdha Mamillapalli.

THE COURT: Thank you, Attorney Roberts Avery and it's great to see you in a different capacity, but nonetheless great to have you before the Court.

MS. ROBERTS AVERY: Likewise, Your Honor.

THE COURT: Thank you.

And for the state?

MR. GASSER: Good morning, Your Honor. Assistant Attorneys General Joseph Gasser and Michael Nunes for defendants.

THE COURT: Good morning to both of you. And since you're up, Attorney Gasser, who will be making argument or is this going to be broken up?

MR. GASSER: Your Honor, Attorney Nunes drafted the public interest portion of our brief, so we would ask the Court's permission that he respond to the questions on that piece if that's all right with Your Honor.

THE COURT: That's just fine.

And Attorney Roberts Avery, who on behalf of Kalshi will be making which arguments, please.

MS. ROBERTS AVERY: Good morning, Your Honor. William Havemann will be making the arguments on behalf of Kalshi today.

THE COURT: Anything before we get started then from the plaintiff?

MR. HAVEMANN: No, Your Honor.

THE COURT: Attorney Gasser?

MR. GASSER: No, Your Honor.

THE COURT: Attorney Havemann.

MR. HAVEMANN: Good morning, Judge Oliver, and may it please the Court, William Havemann on behalf of Kalshi.

It has been settled for 50 years that the Commodity Exchange Act preempts states from

regulating trading on designated contract markets. It is not an exaggeration to say that every marker of congressional intent beginning with the textual grants to the CFTC of exclusive jurisdiction confirms preemption.

Now, the Court has our papers. I don't want to recapitulate everything that we've written in our papers, but my main goal is to answer whatever questions the Court may have, unless the Court has a different preference. There are three topics, I think, implicated by the defendants' opposition to our motion that I'd like to get into. The first is why Kalshi's contracts are clearly swaps or other derivatives subject to CFTC jurisdiction; the second is why the CEA preempts state regulation in this area; and the third is the public interest in the balance of harms and why they favor preliminary relief.

So on the question of swaps, there are a few textual arguments to make in response to the defendant's points and then there are a few, I think, non-textual arguments that the defendants make that I want to make sure that I have an opportunity to respond to. So to begin, I think the defendants point to various places in their opposition brief, at

page 2, at page 11, and then again at page 25, and they nudge to the idea that CFTC itself has made various statements or issued advisories or rulemakings that suggest that the CFTC does not understand itself to have jurisdiction over Kalshi's instruments. Now, those arguments we think are wrong when they were made and they are absolutely, clearly wrong now based on intervening events. What the CFTC chairman has said since they filed their opposition in this case is, quote, Event contracts are not new, have been within the CFTC's regulatory perimeter for more than two decades and has discussed filing amicus briefs to defend the CFTC's exclusive jurisdiction in this area.

THE COURT: When did the chairman say that, Counsel?

MR. HAVEMANN: The chairman said that -- this is in our reply brief. It was the day before our reply brief was filed.

THE COURT: Where did he say it?

MR. HAVEMANN: He said it at a public event and it is posted to the CFTC's website.

THE COURT: Didn't he make clear he was not speaking as chairman of the CFTC?

MR. HAVEMANN: He did, but then, following

his remarks, the CFTC itself took a number of actions. The CFTC withdrew the advisory that he referred to.

THE COURT: If he made a statement and was clear to preface whatever remarks he said by saying I'm not speaking as chair of CFTC nor am I speaking on behalf of the CFTC, how can you come in and make a representation that these are actions on behalf of or under the authority of the CFTC?

MR. HAVEMANN: Well, because I think they inform the actions that the CFTC subsequently took.

THE COURT: How many people are on this board right now?

MR. HAVEMANN: Right now, only one.

THE COURT: And who is that?

MR. HAVEMANN: That is the chair.

THE COURT: Interim chair?

MR. HAVEMANN: No. He is the confirmed Senate-confirmed chair.

THE COURT: Okay. And for how long has he been confirmed?

MR. HAVEMANN: Late last year, I believe.

THE COURT: Late 2025?

MR. HAVEMANN: Late 2025, that's right.

THE COURT: And we're here in February 2026?

MR. HAVEMANN: That's right.

THE COURT: How does a board made of one person ever achieve quorum and engage in the deliberate acts we expect from a board?

MR. HAVEMANN: I have the same question.

THE COURT: Is it even a board?

MR. HAVEMANN: As I understand it -- sorry, Your Honor. I didn't mean to interrupt.

As I understand it, there is no quorum requirement for the CFTC, and so the chair in a situation like this one, where there are no other confirmed commissioners, the chair has authority to act on behalf of the CFTC. And what I want to emphasize to Your Honor is that is what he has done. So he has -- the CFTC, not the chair, but the CFTC has withdrawn the advisory on which the defendants rely in their opposition brief.

THE COURT: Let's talk about the advisory first and then the withdrawal, which I think happened on February 4th of this year. Does that sound about right?

MR. HAVEMANN: That sounds right, Your Honor.

THE COURT: And today is the 11th. So that advisory was an advisory in letter form, five or so pages, September 30th of last year?

MR. HAVEMANN: That's right.

THE COURT: And it put FCMs and DCMs on notice that engaging in the sports betting market or starting to form sports-event contracts entails a certain risk, and so DCMs and others should be prepared to make contingency plans. Specifically mentioned in that letter is that the DCMs have to be prepared to confront and deal with state regulatory scheme surrounding sports betting, correct?

MR. HAVEMANN: There is a footnote to that effect, yes.

THE COURT: So that's September 30, 2025, and the withdrawal last week has what effect on the actions that you take? Obviously, you didn't know the withdrawal was coming, it came last week, and if you took actions after the September 30, 2025, advisory, you can't suggest that this withdrawal just wipes that away and we erase our memories and we work backwards from the result.

MR. HAVEMANN: Sure, Your Honor. So I think that the advisory caused a lot of confusion in the regulatory community because on one hand, it is -- was an assertion, or at least it strongly suggested that the CFTC had jurisdiction over these instruments because it indicated these are on our exchanges, we

have not yet conducted a public interest review of these instruments, but we could. And so on one hand, the advisory strongly suggests that the CFTC has jurisdiction here, and of course, it has been settled that where the CFTC has jurisdiction, that jurisdiction is exclusive.

THE COURT: Doesn't that advisory, at the very least, go to the irreparable harm prong putting you on notice that you should be prepared to mitigate any potential damages and risks of entering a state's sports market?

MR. HAVEMANN: I think it did put entities on notice of the risks and the litigation itself put entities on notice of the risks.

THE COURT: Not just the litigation, the CFTC saying essentially, we think we have jurisdiction, it may not be complete, there may not be entire preemption, the state may have a role to play, and you should prepare for that before you enter the market.

MR. HAVEMANN: Respectfully, that's not how I read the footnote at issue. The footnote at issue notes this litigation. The footnote at issue indicates that DCMs and FCMs should plan contingencies to deal with the fact that this

litigation is ongoing and Kalshi did, but the fact that Kalshi did, the fact that you prepare for an emergency situation that'd be a disaster for the company, the fact that you prepare for that does not mean that when that disaster occurs, it is not irreparably harmful. So that's the point we would make on that.

THE COURT: What would be the disaster?

MR. HAVEMANN: The disaster would be all of the things, Your Honor, that Congress was seeking to prevent when it granted the CFTC exclusive jurisdiction in 1974. The risk of kicking a designated contract market out of -- not just the state of Connecticut, Your Honor, but there are 50 different states. There are 50 different states that have interests, potential interests in this area. Subjecting Kalshi to 50 different state licensing regimes, forcing it to offer some products in some states, different products in other states in a way that is totally different than the way that DCMs have operated for the past 50 years, they create real regulatory risk with respect to our exclusive federal regulator because it is absolutely far from clear that what the states are demanding that we do would be permissible under CFTC regulations and core

principles with which we are required to abide under federal law.

So that is the catastrophe, and I'm happy to talk about irreparable harm, Your Honor, if Your Honor would like to get there, but being forced out of the state of Connecticut, we lose our customers in Connecticut. We can't get them back. We have to geofence. Geofencing here effectively means geofencing everywhere. We have a declaration that is unrebutted that makes clear this would cost us tens of millions of dollars. We don't think that, under the federal regime that applies to us, we have to, and in fact, we think that under the federal regime that applies to us, we can't.

THE COURT: What's the status of geofencing in Massachusetts?

MR. HAVEMANN: We have an order -- a preliminary injunction order against us in Massachusetts. It takes -- it has not taken effect yet. It takes effect 30 days from the date of the order, which has not lapsed, and we are planning to seek a stay from the appellate court.

THE COURT: What is Kalshi's estimate as to the cost of geofencing in the state of Massachusetts?

MR. HAVEMANN: The evidence in that case and

this case is it would cost Kalshi tens of millions of dollars annually to do it. And with respect to the state of Massachusetts, I do want to make this point clear, the way that geofencing works is you figure out where everyone on your exchange is. That's the only way that you can keep people in Massachusetts out is if you know where everyone is. So it's not geofencing in Massachusetts. I mean, that's what the order would do, but geofencing in Massachusetts really would require the company to develop the capability to geofence everywhere, and that is -- in the declaration that we filed accompanying our preliminary injunction motion, that that would be to the tune of tens of millions of dollars annually, and there is no dispute, I think, in this case that that is money that Kalshi could not recoup, even if it prevailed at the end of the day because of sovereign immunity.

So that is money out the door that we can never get back. No DCM, to our knowledge at least, has ever geofenced. There is a real -- there is a real reputational risk. There's a real regulatory risk that would result from doing this, and especially in a situation where the CFTC -- and again, this is the CFTC, not the chairperson

speaking, the CFTC just filed a letter in the Ninth Circuit in an appeal presenting basically the same issues that we have here saying that it plans to file an amicus brief supporting our position on preemption in that appeal. There's a rulemaking underway. The CFTC is exercising jurisdiction in this area and --

THE COURT: They plan to by telling the Ninth Circuit that they intend to file a brief?

MR. HAVEMANN: They intend to file a brief six days from today.

THE COURT: Is that exercising jurisdiction or getting -- putting the Court perhaps on notice that they're consider -- intending to exercise jurisdiction through an amicus brief?

MR. HAVEMANN: I think, Your Honor, that the statement that they are about to embark on a rulemaking with respect to event contracts to clarify the rules of the road --

THE COURT: Didn't they say that early last year, we're going to engage in rulemaking?

MR. HAVEMANN: No. There's two different rulemakings at issue, Your Honor. There is the rulemaking that was proposed, I think, now two years ago, that was recently withdrawn, and again, that's an action by the commission, not a statement by the

chair. It was recently withdrawn. Then the chair indicated that he has directed the CFTC to initiate a rulemaking to clarify the rules of the road to make clear, you know, how the CFTC plans to exercise its jurisdiction in this area.

So I will grant you, that is a statement by the chair, so take that for what it's worth, but given that there is one commissioner, only the chair of the CFTC right now, it is a strong -- it is strong evidence that the CFTC is planning to exercise jurisdiction in this area. And so really what the State of Connecticut is suggesting is that it wants to initiate a state enforcement proceeding on the theory that it has jurisdiction in this area to regulate these contracts when DCMs exclusive federal regulator has strongly indicated that they understand themselves to have jurisdiction, that they plan to exercise rulemaking authority here to clarify the rules that apply to these sorts of contracts --

THE COURT: Don't they already have jurisdiction and so they shouldn't have to inform a federal appellate court that we're going to begin to exercise jurisdiction not by doing what's already within their rules, not by actually making a rule, but by filing an amicus brief? Why don't they, for

example, exercise jurisdiction by reviewing actual contracts? They have their Rule 40.11 that gives them that authority. Why not do that?

MR. HAVEMANN: I think that -- so you're absolutely right. The premise of Your Honor's question is absolutely right that they already have jurisdiction and they should not have to file an amicus brief and argue to make that clear because we think it's clear based on the statutory text.

THE COURT: No. They didn't say exclusive jurisdiction but jurisdiction. So let me ask, as it relates to 40.11 and CFTC's ability to have a 90-day review of these self-certified Kalshi contracts, are you aware of any contract that -- for which they've actually undertaken the 90-day review.

MR. HAVEMANN: The specific answer to the question is no. I'm not aware of any contract with which they have done that, but they did something different at the outset, and let me try to explain what they did. Under the CFTC rules, there's authority by the CFTC under 38.5, 17 CFR 38.5, to ask a regulated entity for something called the demonstration of compliance with CFTC rules. Kalshi, as these contracts often are done, and that's not just by DCMs like Kalshi, but by many others, you

self-certify. According to, you know, the clear command of Congress, this is permissible. And then the CFTC has an opportunity to say, hey, before you put these contracts, make these contracts available, we want you to provide us more information, demonstrate your compliance with federal law and with our regulations, and Kalshi complied. It submitted lengthy memoranda to the CFTC explaining its view that these were permitted under federal law, these are derivatives subject to the CFTC's exclusive jurisdiction, these are not contrary to public interest, these have various types of utility and they should be permitted.

And in response to that demonstration of compliance, which was in January of last year, the CFTC permitted Kalshi's contracts to go online. And you're right, it hasn't subjected the contracts to 90-day review, but we think that that's pretty good evidence that they don't think that these contracts are contrary to the public interest. The fact that they exercise their jurisdiction by allowing contracts to trade is not a suggestion that they're abdicating anything or anything of the like. It's an indication based on the scheme that Congress created that they are permitting these contracts.

And then again, in the context of the CFTC now coming out and saying we're going to initiate a rulemaking to explain the rules of the road here for regulated parties, again, that's pretty powerful evidence that the CFTC, at least, understands these contracts to fall within its regulatory perimeter.

THE COURT: In advance of this anticipated rule, what is the CFTC's regulatory, investigatory, and enforcement framework as it relates to sporting events contracts, bearing in mind the history of potential corruption, point shaving, influencing? The states have regulatory schemes long-standing and agreements and regulatory functions. As it relates to sporting-event contracts, how is the CFTC set up to regulate and enforce and investigate these things?

MR. HAVEMANN: Sure. So the way that the CEA operates is principally by making DCMs self-regulatory organizations. They have to adopt to rule books to which they have to comply and then they have to abide by 23 core principles that impose a host of obligations on designated contract markets to protect against the risks of -- the specific risks of this sort of instrument, this sort of derivative, and that is preventing market manipulation, preventing cornering of the market, preventing market

disruptions, monitoring activity on the exchange to look for the very type of things that I think Your Honor is pointing to, unusual or suspicious trading activity, trading activity that would suggest insider trading, trading activity of the like. There is each -- Kalshi has a robust system for identifying and looking at that sort of unusual trading activity that flags red flags.

THE COURT: Is the argument that the CFTC's regulatory, investigatory, and enforcement mechanism is requiring the DCMs to do it themselves?

MR. HAVEMANN: It's not just requiring the DCMs to do it themselves because, of course, the CFTC has enforcement staff. The CFTC itself monitors these contracts.

THE COURT: What is their enforcement staff as it relates to sports-event contracts, as opposed to what they normally have done in the futures market?

MR. HAVEMANN: Well, so I want to, I guess, push back a little bit on the premise of that question. There is necessarily a big difference between the types of enforcement that you would see with respect to sports-event contracts and all the trillions of dollars of other derivatives that are

traded on the exchanges that the CFTC oversees. And I think this gets to a point the defendants make in their opposition brief that I want to make sure I have an opportunity to respond to, which is, look, this is just sports betting, this is the same as what our sportsbooks do, it's sports betting by another name, there is no difference. Sportsbooks bet against their customers. When their customers lose, they win. When their customers win, they lose.

Kalshi is not like that. Kalshi is an exchange. It brings together customers willing to buy at a price, willing to sell at a price. It brings them together, and like other exchanges, the way that it makes money is it takes a small transaction fee.

THE COURT: Buy or sell what?

MR. HAVEMANN: Buy or sell an event contract, Your Honor.

THE COURT: Buy or sell an event contract?

MR. HAVEMANN: Yeah. A derivative, which, in our view, is like other derivatives traded every day to the tune of trillions of dollars on these exchanges. And so what the CFTC does is it first imposes extremely specific and detailed requirements on DCMs to abide -- to adopt rules and abide by them.

And then it has, of course, an enforcement staff that oversees these markets, and these markets trade to the tune of trillions of dollars. And so I do think --

THE COURT: When is the last time the CFTC audited Kalshi as it relates to the sports event market?

MR. HAVEMANN: Audited, I'm not sure if I know the answer to that question.

THE COURT: Enforced, investigated, requested compliance, sent somebody in, anything like that.

MR. HAVEMANN: I think the answer that I'm about to get is that -- January, so last month, and I think --

THE COURT: January 2026.

MR. HAVEMANN: Yes. I mean, there's --

THE COURT: What does that look like then?

MR. HAVEMANN: So, Your Honor, I should make sure to get accurate information for you before I --

THE COURT: Please do. Is it more than self-certifying that you're doing certain things?

MR. HAVEMANN: Yes. It is absolutely more than self-certifying. And what I can say to Your Honor is that there is sort of an impression that I think the defendants are making in this case or

trying to convey in this case that CFTC is asleep at the wheel, they don't know what's going on, this is freewheeling, this is unregulated, and I can represent to Your Honor that that is just not accurate, that there is a lot of interaction between Kalshi and its federal regulator. It is routine. The federal regulator is and has been aware of what Kalshi is doing. It has asked for more information. It has asked us various things. It has audited. We have gone through extensive reviews, and the upshot of all of that is in the past year, they have not subjected our contracts to public interest review, they have not suggested that our contracts are not swaps or other derivatives subject to their jurisdiction and the like.

THE COURT: So as to swaps defined in relevant part as any agreement, contract, or transaction that provides for any purchase, sale, payment, or delivery, other than a dividend on an equity security, that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence. Can you address both parts of the state's argument, first, that sports betting is not dependent on the

occurrence or nonoccurrence of the event?

MR. HAVEMANN: Sure. I'll begin with the event question and then I'll go to the financial consequences question. With respect to event, plain text dictionary usage confirms that their understanding is incorrect, and if Your Honor has questions about the plain text or thinks that the plain text is insufficiently clear, there is a lot of other evidence that supports the plain text. But just to begin, I think that their argument is that event is really different from outcome and these might be outcomes but they're not events, and you can sort of distinguish the two. The problem with that argument is that dictionaries now and in effect in 2010 then define event to encompass outcomes. So American Heritage Dictionary, Merriam-Webster, Random House, OED, define event to include outcomes. That's true of dictionaries and then that's true of precedent.

So there's a case from this Court, a different judge in this Court, that makes clear -- it was a question about what does the term event mean in a contract, and the Court said event, looking at common usage, includes outcome. It's true in a Tenth Circuit case. It's true in every case we have found

that addresses the question what does event mean. Event can encompass outcomes. So that's the problem with their plain-text usage.

Then there's context. Two years before Congress added the term swap to the CEA and subjected it to the CFTC's exclusive jurisdiction, the CFTC put out a concept release where it talked about event contracts and sort of what they are and how they work. Here's what the CFTC said in the concept release about event contracts, this is a quote: Event contracts may be based on eventualities, ellipses, such as the outcome of particular entertainment events, and then there's also a reference to sporting events in that concept release. So we think that, of course, informs what Congress would have had in mind when it was adding event contracts to the CEA.

The same is true even of the proposed rule that has since been withdrawn. So the defendants cite the proposed rule as a suggestion that these aren't really swaps, but the proposed rule itself makes clear event contracts are generally understood to be a type of derivative contract, ellipses, based on the outcome of an underlying event. So even the CFTC understands event contracts, not just can be but

sort of quintessentially are contracts that are based on outcomes. And then if the Court has any doubt about that, imagine the difficult interpretive semantic problems that would arise from trying to distinguish between a contract that's really based on an event versus a contract that's based on an outcome. You can say a contract about who will win game six is -- maybe that's an outcome, but will there be a game seven, that's an event, and the list goes on. President Trump's election victory, is that an event or is that an outcome? Mayor Mamdani's election victory, is that the outcome of an election or is that an event? In plain usage, it would be very, very, very difficult and I think turn essentially on semantics --

THE COURT: Let's get to the second part, please, Counsel. Let's get the second part of the state's argument, because I know what the state thinks -- obviously, I've read the brief -- that there is no independent financial, economic, or commercial consequence of a lot of the sports contracts offered by Kalshi.

MR. HAVEMANN: Yes. That is a factual assertion that they make and it is factually incorrect.

THE COURT: How so?

MR. HAVEMANN: Because sports are a huge business in this country and the outcomes of sporting events have massive, not just potential but actual financial, commercial, or economic consequences for a host of stakeholders, for the teams, for advertisers, for sponsors.

THE COURT: Whether it occurs or not, whether the event occurs or not, will there be a Super Bowl, yes, then there will be Super Bowl ads, but whether the first team to score a touchdown or will the Star Spangled Banner be two minutes or two minutes and one second, what is the independent financial, economic, commercial consequence of those types of sports betting contracts offered on Kalshi?

MR. HAVEMANN: Sure. So even with respect to outcomes and the fact the Seahawks won the Super Bowl is a financially consequential outcome. It is an event for the Seattle Seahawks, for the City of Seattle, for the companies that sponsor Seattle and the like. So with respect to outcomes, I mean, the idea that there's no financial consequence with the outcomes of sporting events is -- as just as empirical as a factual matter, we do not think that it is accurate.

And I think maybe an example might help sort of play this out. This is not in our briefing because it was just publicly reported yesterday, but I think it illustrates sort of the problems with the defendants' arguments. There is a company called Game Point Capital and the whole business model of this company is to hedge risk associated with sports outcomes, and until recently, the way that they did this was by trying to get bespoke arrangements with various insurers, like Lloyd's of London. The problem was the rates were bad, it was an inefficient market, they couldn't do it. They have started working with Kalshi, and one, I think, helpful example that is very close to home here is the UConn men's basketball team and women's basketball teams, which won the NCAA tournament a couple of years ago. The men's team won; the women's team made it to the Final Four. And so this has great consequences for the community. It has great consequences for a lot of people. It also costs money, because when UConn wins, they have to pay bonuses to their coaches, they have to pay for travel, they have to pay for hotel rooms, they have to pay for championship rings and the like. And the public reporting on this is that it would have cost UConn about five, five-and-a-half

million dollars to do all this. They had a contract with this company, Game Point Capital, so that they only had to pay a fraction of that amount, and that is classic hedging. I mean, that is hedging with respect to sports-related outcomes and that is just one example of many.

And they are now working with Kalshi because Kalshi provides a more efficient way for them to do this. So that's one example. Of course, there are others. There are consequences for advertisers. There are consequences for sponsors. There are consequences for television networks and the like, and that's not only with respect to sports outcomes, but it's also with respect to individual player performance. There's a lot of money on the line in America today on how well, you know, athletes perform.

THE COURT: So in terms of what Congress intended, as you've been arguing, in terms of exclusive jurisdiction, Kalshi argued and stated the following in its motion for summary judgment, that gaming must involve a game. It distinguished its elections contracts that were at issue there from gaming by stating, quote, Elections, again, unlike games, have extrinsic effects outside the contest

itself and indeed carry economic consequences in the real world. Kalshi also distinguished horse races and boxing matches from elections by stating that those are, quote, Staged purely for entertainment and to facilitate betting. They have no independent significance. Their outcomes carry no economic risks. In the oral argument, Kalshi said, what's a game, it's something that has no inherent economic significance. Contracts that involve games are probably not the type of contracts that we want to be listed on an exchange because they don't have any real economic value to them. The game is the thing that doesn't have intrinsic economic significance. The DC circuit adopted that rationale and Kalshi argued the same thing to the DC circuit in its oral argument before the CFTC dropped that appeal.

How do you explain what you said then and what you're saying now, that there are all these consequences to satisfy the definition of a swap?

MR. HAVEMANN: Sure. So those were statements that were made by Kalshi's counsel in that case. There were also statements --

THE COURT: By Kalshi.

MR. HAVEMANN: Yes, Kalshi's counsel representing Kalshi. So they are representations by

Kalshi, that's right. But there are also statements in the same oral argument, I think that Your Honor was referencing, where one of the judges pushed back on counsel and said, well, wait, how can you say that, because, of course there's major consequence with respect to sports events. And Kalshi's counsel said, yes, that may be right with respect to some.

Now, stepping back, I want to clarify and make sure that I'm clear about the context of those statements and how they present a different question than the question that is at issue here. There was no dispute in that case that Kalshi's contracts were swaps. It was not a case about whether Kalshi's contracts were swaps. It was a case about whether Kalshi's election contracts amounted to gaming under the special rule and the points that Kalshi made that Your Honor referenced were all about distinguishing election contracts from gaming contracts that would be subject to the special rule.

So all of that was not to say that these were categorically prohibited, that these were banned, that these were outside of the scope of the CEA. All of that was about saying with respect to election contracts, these aren't gaming contracts, and, therefore, they can't be subject to the special rule.

And our point here is that even if these contracts are gaming contracts, then what that means is that they fall within the reticulated detailed statutory scheme that Congress set out which says if they're gaming contracts, then yes, the CFTC can subject them to 90-day review, and if it concludes that they're contrary to the public interest, then it can ban them, but that does not mean that they're categorically out, they're outside of the scope of the CFTC's jurisdiction, and in fact, it would sort of be incoherent to think that that is what those arguments would suggest because, of course, if they're not subject to the CFTC's jurisdiction, then they can't be subject to 90-day public interest review because they're categorically out, and the whole point of counsel's -- of the argument in that case was that they were in, that they would be in, that they would be subject to 90-day public interest review as gaming contracts, not that they fell outside the scope of CFTC jurisdiction.

THE COURT: So let's drill down on that further. In Kalshi's DC circuit brief, Kalshi wrote: The classic example of an event contract is a contract on the outcome of a sporting event. As the legislative history directly confirms, Congress did

not want sports betting to be conducted on derivative markets.

So how do you explain that, and now you're saying there are all these consequences to satisfy the definition of a swap, when you previously argued there were no such consequences and previously said that sports betting contracts aren't swaps to begin with?

MR. HAVEMANN: So I do want to be clear, we did not say that they were not swaps to begin with, and although you're right that we said, look, would be gaming contracts and maybe Congress in 2010 when it acted might not have wanted these traded on DCMs, the key point is what the solution to that problem that Congress devised was, and the solution to that problem was not to subject these contracts to 50 different state gambling laws, but was instead to adopt the special rule. And the special rule is clear that this is not a categorical ban on gaming contracts, this is a discretionary -- delegation of discretionary authority to the CFTC to make a public interest call.

THE COURT: If Congress had wanted gaming contracts, sports betting to be conducted on derivative markets, would they not have made mention

of PASPA, WIRE Act, IGRA?

THE COURT: So they -- no, I don't think so. But what they did do was in Dodd-Frank, at the same time that they add swaps to the definition, to the CFTC's exclusive jurisdiction, they adopt the special rule and the special rule has an explicit reference in gaming. And so the idea that this wouldn't have been on Congress's mind or they couldn't have foreseen that a company might offer gaming contracts, it's just -- it's not correct because it's right there. It was contemplated.

THE COURT: Don't we have conversations and comments on the record from senators then about the intent not being to involve sports gaming? Is that Feinstein, Lincoln, and others?

MR. HAVEMANN: There is a statement by Senator Feinstein and Lincoln to that effect and Senator Lincoln filed an amicus brief in our case in the Third Circuit saying, yes, that is what we said at the time and the solution that we had to that problem was the special rule and the special rule gives the CFTC the power to do this, not 50 different states. So it's just a different question as to, you know, the expectations of individual senators, to the extent that that informs Your Honor's interpretation

of the statutory text, those conversations confirm that these senators expected the CFTC to have the authority.

And I would just note, you know, Your Honor references PASPA. So when Congress was having these discussions, to the extent that Your Honor is thinking about, well, what would Congress have expected in 2010, PASPA was in effect then. Right? So by and large, sports betting was unlawful everywhere in the country, except for Nevada and a handful of other places. The world after 2018, and certainly the world in 2026, looks very different from the world in 2010, and that may explain why, sure, even if individual senators may have expected the CFTC to exercise its discretion to prohibit sports-event contracts in the year 2010, facts on the ground have changed dramatically with 38 states approving sports betting in a way that does justify a different public interest determination today. And again, the key is that the way that Congress solved the problem and the special rule was by giving this authority to the CFTC, not by suggesting that these were out of the CFTC's authority and could be regulated as gambling by 50 different states.

THE COURT: So the CFTC and its rules, the

intent of Congress as set out in statute, we then have Loper Bright. So why must this Court give any deference at all to the CFTC's rules and regulations versus what's clearly intended by Congress in its statutes?

MR. HAVEMANN: Yeah, I agree that Your Honor should look to the statute. And I think Loper Bright said that you -- the agency's view can inform your understanding of the statute, but Your Honor, I agree, should look at the statute. In the statute, the special rule is totally clear. The CFTC, the commission, may make a public interest determination with respect to specific categories of contracts, including gaming contracts. So if Your Honor thinks that -- they are saying -- I think stepping back, the defendants' argument is, look, gaming is different than derivatives, everyone knows that there's gambling and everyone knows that there's derivatives, and the two are different and Congress couldn't possibly have thought what it was doing in 2010 was opening the door to this sort of conduct.

That's how I understand the defendants' argument to really boil down to. And I think, first, the special rule is very strong evidence that Congress was, in fact, thinking about this specific

issue and devising a specific solution and that solution was to give the CFTC power, not states. And then second, and also importantly, I think, I think that the idea that you have gambling and you have derivatives and those have always been understood to be different things, that's just not right. The way that --

THE COURT: Let me ask about that and I'm glad you brought that. If we're talking about whether these things are actually not separate, what would be the limiting principle for what could constitute a financial, economic consequence that would satisfy the definition of a swap? It's especially important because if your argument that any event, assuming the financial consequence requirement is met, can constitute a swap, the financial, economic, commercial consequence prong of the definition alone would serve as the limiting principle. Are we heading toward an absurd result if there's no limiting principle, if everything's a swap that relates to gaming or betting or an event?

MR. HAVEMANN: So no, I think that the definition of swap is broad but not limitless. Congress required there to be a potential financial, commercial, or economic consequence. So that is a

limit on the sorts of contracts that can be traded and we have people in Kalshi who take this very seriously and think about the economic consequences of the contracts and offer contracts for which there are economic consequences. So that's one point.

THE COURT: Let me ask, how is that decision made by Kalshi, what to seek to self-certify a contract on, Kalshi's definition of a financial, economic, commercial consequence?

MR. HAVEMANN: Kalshi looks to the question that the statute asks, which is is this an event that has a potential consequence for stakeholders, and there's some contracts that wouldn't, that we don't offer, and there are many contracts that do, that we do offer that we think will be popular and attract liquidity on our exchange. I mean, that's how Kalshi thinks about the issue.

And then in our self-certifications, we provide a description to the CFTC as to what we think those financial consequences are. We describe them to the CFTC. CFTC then has an opportunity to review. If the CFTC concludes that this is appropriate, it allows the contracts to trade and that is what it has done with respect to Kalshi's contracts.

I will also note that there are specific

exclusions to the definition of swap in the statute itself, which I think is -- you know, cautions heavily, the Supreme Court has said, against implying exclusions that Congress didn't offer. I think Congress intentionally defined the term swap broadly, and then it gave the CFTC and the SEC joint authority to, in the terms of the statute, further define swap, and that's in 15 U.S.C. Section 8302(b)(1), and this is an express delegation of legislative authority to these agencies. So this is not a Loper Bright situation. This is a situation where these agencies are exercising delegated authority by Congress. So this is a situation where their rules are binding, and what the CFTC and SEC said in the joint rule that they adopted shortly after Dodd-Frank was, yes, they acknowledged there are some instruments that when traded on exchanges bear resemblance to some instruments that people enter into in their everyday lives that no one has understood to be a swap. And what the CFTC and the SEC said in that rule is that consumers may engage in transactions relating to their personal activities without concern that such arrangements would be considered to be swaps, and then when we look at factors to distinguish what's a swap that has to be on exchange, what's not a swap

that's subject to state authority, and one of the factors you look to is is this traded on an organized market. And so I think the states -- or the defendants in this case and some of the other states in their other litigation made an argument that, well, wait a second, if Kalshi is right, if these are really swaps, then everything is a swap, and that means everything has to be on exchange, and that's just not correct. It's not correct under the CFTC regulation, which makes clear that there is a real distinction, and it's not correct under the terms of the statute itself because the statute itself distinguishes between contracts that happen on exchange and happen off exchange for purposes of state authority.

And I do want to make this point clear because I think it is important, there is the exclusive jurisdiction provision in 7 U.S.C. Section 2(a)(1), which says the CFTC has exclusive jurisdiction with respect to these contracts on designated contract markets and other exchanges. The very next sentence, which the defendants point to in their brief, says: "Except as hereinabove provided" -- so except as provided by the transactions over which the CFTC has exclusive

jurisdiction -- "nothing contained in this section shall supersede or limit the jurisdiction" -- of regulatory authorities under the laws of any state, or restrict state authorities from carrying out their duties and responsibilities in accordance with such laws. And so what that means is respect to on-exchange conduct, the CFTC has jurisdiction. With respect to off-exchange conduct, of course states can continue to subject sportsbooks and the like to their own regulatory regimes.

THE COURT: So let me ask about that. As it relates to 7 U.S.C. 2(e), which relates to the limitation on participation: It should be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is enter ed into on, or subject to the rules of a board of trade designated as a contract market under Section 7 of this title, so if you're saying that the state would still be left to regulate off-DCM trading, even ignoring the issue that if a swap must be on the DCM, how much sports betting currently occurs on the DCM, what's left for the states?

MR. HAVEMANN: I think that the savings clause that I read to Your Honor in Section 2(e) would protect that. Right? Nothing about the rest

of Section 2, including Section 2(e) limits the authority of states to regulate these contracts how they want.

THE COURT: What percentage of Kalshi's contract market is sports-related?

MR. HAVEMANN: I think it's a large percentage, but I don't have the exact number before me.

THE COURT: Between 80 and 90?

MR. HAVEMANN: I can confirm, Your Honor.

THE COURT: Please.

MR. HAVEMANN: Yes, I think it sounds like that's right.

THE COURT: Okay. So what is the financial, economic, commercial consequence of a currently listed contract on Kalshi, will the U.S. confirm that aliens exist before 2027?

MR. HAVEMANN: I mean, I think that if there were a confirmation of an alien landing, then that would have massive repercussions for the global economy.

THE COURT: How about are world leaders A and B going to hug when they meet?

MR. HAVEMANN: Yes. So this came up at a different hearing, Your Honor. That contract, as far

as I'm aware, has never been offered on Kalshi. It was self-certified but never offered.

THE COURT: And what about a certain temperature being reached in the city of Chicago, for example?

MR. HAVEMANN: That has significant consequences, Your Honor.

THE COURT: Chicago versus somewhere where corn or wheat, et cetera, might be affected by crop futures?

MR. HAVEMANN: Because weather has a huge consequence on economic activity, even in a city.

THE COURT: Weather, the importance of a degree?

MR. HAVEMANN: Yes, yes, yes, Your Honor, absolutely. I mean, the -- especially if you're talking about cold, you're talking about is it going to be a freezing winter in Chicago.

THE COURT: That's a specific question. That's a general question. Will it be a freezing winter in Chicago, will crops be affected, will there be a killing frost versus a market that asks will the temperature in Chicago today be above 34 degrees, yes or no.

MR. HAVEMANN: Yes.

THE COURT: What is the financial, economic consequence for that?

MR. HAVEMANN: There are massive implications for power and how much you have to pay for power. The matter of a degree --

THE COURT: On a day of a degree?

MR. HAVEMANN: Yes, yes, absolutely. For the city of Chicago where tens of millions of people live, if it's five degrees as opposed to six degrees, yes, that has implications for how much you pay -- how much families pay for power, you know, the utility companies and the like. And weather swaps are right there, they're right there in the text of the statute. And so -- and, I will add, that the defendants at least right now are not claiming authority to regulate any of the contracts that Your Honor has just referred to.

So I think that gets to the really difficult sort of intractable problems of saying, well, they can regulate it as long as they consider it gambling. They could say -- I can read to Your Honor the definition in -- the state law definition of what qualifies as gambling in the state of Connecticut. It is risking any money, credit, deposit, or other thing of value for gain, contingent in whole or in

part upon lot or chance. And so if the argument is anything they consider to be gambling is fair game, then that surely means at least all event contracts are fair game, and it may mean that all futures contracts are fair game. And I really do want to make sure I have an opportunity to make this point because I think this gets to the history and sort of intuition that the defendants have pointed to in their brief.

Many states at the turn of the 20th century regulated futures trading as gambling. They called it gambling in grain. This was not a secret. Many of these cases made it all the way up to the U.S. Supreme Court and the Supreme Court said, you know, state law, they can do what they want, they can define this however they want, quintessential derivatives, corn futures, gold futures, wheat futures, and the like, and they said, you know, this is cash settled, no actual commodity is changing hands, this is gambling, you're gambling on what the price of a commodity is going to be in the future and we want to regulate that.

So the CEA -- Congress and the CEA in 1936 regulates in this area. It makes a specific choice not to preempt these state laws by adding a savings

clause in the CEA saying state laws, fair game, and operate in parallel to this federal scheme. That is in effect for nearly three decades. Congress revisits the question of preemption in 1974 and it concludes that the parallel regimes state and federal enforcement is not working, it is resulting -- to use the words of one senator -- total chaos.

THE COURT: Connecticut's not talking about corn or wheat. They're talking about limiting their enforcement to sports betting. So let me ask if we're talking about limiting principles, would Kalshi make a market on whether or not player two at a blackjack table wins that hand?

MR. HAVEMANN: No.

THE COURT: Why not?

MR. HAVEMANN: Because there would -- it would be very difficult to argue that that's not gaming, be probably subject to public interest review, probably banned by the regulator, and probably not a swap, and that's because when you're talking about a transaction that has implications for the people in the transaction, but no extrinsic implications for people outside of the transaction, we do not understand the definition of swap to encompass that sort of financial consequence, because

if it did, then that text would really be superfluous. Every transaction has a consequence for the people who enter into it. So the only thing that Congress could have meant when it said potential financial, economic, or commercial consequences is consequences for the people outside of the transaction.

THE COURT: So again, as to 7 U.S.C. 2(e), what would be left for the states to regulate?

MR. HAVEMANN: The states, by virtue of the savings clause in Section 2(a), could still regulate sportsbooks, of course. That's by virtue of the savings clause in 2(a), and if there were any question about that, then it would be by virtue of the regulation promulgated by CFTC and SEC pursuant to the express delegation. So it's not a Loper Bright problem where the CFTC and the SEC say, well, we can distinguish transactions that people enter into in their everyday lives from the sorts of swaps that have to be traded on exchange by looking in part to whether or not they are traded on an organized market, and sports bets are not traded. Sports-event contracts are traded. Sports bets, you know, the bet is made between the sportsbook and the individual. That's not the case on Kalshi and the like.

So for all these reasons, I think you don't need to get to the regulation because we think that 2(a) and the savings clause does the work, but if you have even concerns about that, then you can look to the regulation and I think that the states can rest very easy that this would not mean -- this would not result in their parade of horribles. It would not mean that.

THE COURT: So the farmer can hedge or take a future against the risk of crop loss. UConn apparently is engaged in offsetting the cost of winning. Kalshi, as I understand it, has guidelines in place to prevent, for example, an athlete from making a market or betting or trading on whether or not they'll score X number of points, they'll leave the game early, they'll be injured; is that right?

MR. HAVEMANN: That's correct.

THE COURT: And you're leaving that to yourself, the CFTC is leaving that to Kalshi subject to audit and review?

MR. HAVEMANN: The first line of defense is Kalshi's own rulebook.

THE COURT: Preventing player A from betting on player A or something that goes on in player's A game?

MR. HAVEMANN: Right. The first line of defense is the rulebook subject to CFTC oversight. And the only thing I would add to that is that that's how the CFTC -- it's no different with respect to sports markets than with respect to the other transactions that it regulates.

THE COURT: So we have the athlete or the engaged party on the one hand, the farmer on the other. So what do you say to the point that traditionally, as in the case of the farmer, people most affected by the occurrence or nonoccurrence of an event were the ones that could and did engage in the swaps, presumably, as you've said, to offset some potential loss, but with Kalshi's sports-event contracts, the equivalents of those very people, the sports players, team managers, their families, are prohibited from engaging in these swaps? Doesn't that go toward the fact that these are not indeed swaps? Those most effected are excluded from hedging the risk.

MR. HAVEMANN: No, Your Honor. The fact that there are prohibitions on insider trading is, I think, a feature of the platform, not a bug, does not remotely suggest that these are not swaps. There is a broad ecosystem --

THE COURT: We're not calling the farmer an insider trader if he attempts to offset the risk of a killer frost.

MR. HAVEMANN: Well, but that's because the farmer doesn't have insider information that would allow him to manipulate the market in a way that would benefit him at the expense of other people. That's the difference. Whereas a player can miss a free throw and can throw a game in a way that does manipulate the market, does make the marketplace unfair, and that is the regulation that the CFTC and the CEA are honed in on, focused on. That is the way to ensure that this marketplace is fair to consumers, that they have a marketplace on which they can rely.

And I think that there is a suggestion in the defendants' briefs that the only people who have sort of a financial stake in these sorts of contracts are people who are prohibited from trading on it. Again, that's just not factually accurate. Beyond the players, beyond their family members, there are advertisers, there is UConn, there is the company Game Point Capital, there are online influencers who stand to make huge sums of money based on the number of views that they get with respect to particular athletes' performance and the like.

So the defendants, I think they are presenting sort of an intuition that really sports are sort of frivolous and they don't matter to anyone except maybe the players, and the reality of modern life in the United States is that sports have massive financial implications not just for players but for a much broader ecosystem.

THE COURT: So in anticipation of this undertaking, did this one-member CFTC hire a staff, enlarge its personnel, in anticipation of entering into enforcement of the sports market?

MR. HAVEMANN: I don't know, Your Honor. The CFTC is a federal regulatory body that oversees trillions of dollars in transactions on the platforms that it regulates. So I don't know if the CFTC believes it is necessary to hire up or do anything differently. Presumably, we will hear from the CFTC next week and they can indicate whether they think anything like that is necessary. But, you know, the fact -- the legal question that we have here is is this subject to the CFTC's exclusive jurisdiction or not, and how the CFTC exercises that jurisdiction, how it oversees these markets, I think that's important. We want them to be doing their job effectively.

THE COURT: Is the lack of an enforcement structure an indication that the CFTC did not intend to occupy this field at all or to not fully occupy the field?

MR. HAVEMANN: Well, again, I want to push back on the premise of Your Honor's question that there's a lack of enforcement structure. I don't --

THE COURT: So what is their enforcement structure as it relates to investigating, regulating, enforcing insider trading as it relates to sports betting, as opposed to traders in the normal sense? There is a difference.

MR. HAVEMANN: I mean, there is the potential for manipulation in all sorts of markets.

THE COURT: Yes. As to this market, the sports-event contracts market, what have they done, what have they undertaken, what efforts have they made, of which Kalshi is aware, to prepare for this undertaking? And if they've never done anything currently, isn't that an indication that Congress didn't intend for them to occupy this field, if at all, at least fully?

MR. HAVEMANN: Oh, no, Your Honor. I don't think so. I mean, the CFTC has discretion here.

THE COURT: So the question is what have they

done? Answer that, please.

MR. HAVEMANN: The answer is -- I mean, I know that they have been in frequent communication with Kalshi with respect to matters like auditing and the like. As to the specific nature of the enforcement, whether they've hired individual people or the like, the answer is I don't know the answer to that question. It's possible one of my colleagues does and I can stand up on rebuttal and try to answer that better.

But the high-level answer I would have for Your Honor is I do not think that sort of the discretionary actions that a federal regulatory agency takes with respect to doing its job under federal law is an indication as to what Congress intended in 1974 or what Congress intended in the year 2010 when it added swaps to the CFTC's exclusive jurisdiction.

THE COURT: So what are the specific Connecticut laws that conflict with the CEA requirements?

MR. HAVEMANN: Sure. There's a handful, Your Honor. The first is, as the defendants concede, Connecticut requires what they call bets have to be physically taken from people within the state of

Connecticut. That's impossible for a designated contract market. The whole point of a designated contract market is that you have a nationwide exchange. And so to limit that only for wagers or trades to only people within one state, it would result in 50 fractured markets, which is the opposite of what the CEA intended, impossible for a designated contract market. We made that point in our preliminary injunction motion. The defendants don't really have a response.

Moreover, Connecticut is even -- the Connecticut regime is different from any states regimes in a way that would make it even further impossible for Kalshi to operate in Connecticut because the State of Connecticut, I think as defendants note in their opposition, they have three licenses for people who can operate what they call sportsbooks in the state of Connecticut and those three licenses are taken. So they say, Kalshi, get a license and you can do this with a license, but we couldn't get a license.

THE COURT: When you say you couldn't get a license, which is a question I have for the state later, is the state making room for Kalshi to be licensed and operating under its regulatory

framework, and if not, what's that mean? We have the two tribes and we have the Connecticut Lottery Corporation. What efforts has Kalshi made to become a licensee and abide by the regulatory framework? I'll let you wait until your colleague assists.

MR. HAVEMANN: With respect to Your Honor's question, we believe that federal law does not require us to get a license.

THE COURT: So the answer to my question is Kalshi didn't seek a license?

MR. HAVEMANN: That is correct. Kalshi has not sought a license because federal law does not require it to, and, in fact, we think federal law would prohibit it from doing so.

THE COURT: So how can you make the argument that there's three licenses out there and not room for Kalshi if Kalshi hadn't asked for a room?

MR. HAVEMANN: Because the licenses are taken, Your Honor. So I don't know --

THE COURT: Has there been a request for a fourth license or a fifth license or a sixth?

MR. HAVEMANN: It's written into the statute, so it would require the Connecticut legislature to revise the statute to make room for that. And again, with respect to preemption, with respect to whether

it's impossible to comply with a state law, the possibility that a legislature could revise a state law to accommodate the activity that we are conducting, that would mean it's never impossible because there's always a possibility, I guess, that a state legislature could revise its state law to make it possible, but I don't think any court or certainly not the Supreme Court or the Second Circuit has ever understood that the possibility that a state legislature might revise a law is a basis for concluding that something is otherwise preempted can survive.

THE COURT: So Kalshi's argument is that, among other things, the CFTC is a gaming regulator?

MR. HAVEMANN: Yes, that's right, subject to the special rule. I mean, it's right there in the special rule that with respect to gaming contracts, those remain subject to the CFTC's jurisdiction when they are on a designated contract market, not when they are off exchange, but when they are on exchange, then even as to contracts that involve gaming, the CFTC has authority to make a public interest call.

THE COURT: Okay. Please.

MR. HAVEMANN: Your Honor's questions elicited many of the points that I was hoping to

make, but a couple final points on the public interest and on some of the points that I think the defendants have made with respect to irreparable harm and the public interest. It is clear under Supreme Court precedent that when an entity faces the risk of massive civil liability under a preempted state law, state enforcement under a preempted state law, that is irreparable harm.

In addition, we have the irreparable harm that they would require us to leave the state of Connecticut, which would cost us money which we could not recoup, if we were to win at the end of the day in this case. And then there are harms to our users who -- their positions would be removed. There are harms to users in other states because, of course, users in Connecticut are entering into transactions with users in other states. So this will have ripple effects beyond the state of Connecticut. All of that quintessential irreparable harm under Supreme Court precedent.

And then with respect to the balance of harms and the public interest, the Supreme Court -- many courts have said, look, in Supremacy Clause cases where you're dealing with a state law that's likely preempted, it's never in the public interest to

enforce a preempted state law. And what the defendants say in response is, well, but there are good reasons for these state laws. So I want to sort of address that legally and I want to address it factually.

Legally, that's true in every case. In every case, in every preemption case, a state has a law that it wants to enforce and it thinks that there are good reasons for enforcing that state law, but Congress made a different judgment, and under the Supremacy Clause, it's not an answer to say, well, even though Congress made federal law supreme, we think we ought to let the state enforce its laws because we think it has good reasons to do so. The Constitution answers that question and the answer is federal law is supreme.

And with respect to the facts, I think the defendants sort of paint a picture of we have regulated entities in the state of Connecticut and then we have Kalshi, which is unregulated and it's not abiding by the rules, and I really do want to push back on that impression. The question is not whether Kalshi is regulated or not. The question is who regulates it. And under federal law, we are regulated by the CFTC, which imposes all sorts of

limitations, obligations, consumer protections on Kalshi to protect the people on its exchange. Now, they point to other things. They point to things like voluntary opt-outs and position limits and the like. Kalshi does that too. Kalshi has position limits. Kalshi has voluntary opt-outs. So we are trying -- we are not trying to evade the law. We, from the very beginning of this company, have tried to comply with the law that we think applies to us and the disagreement that we have with the states is just what law applies to us. And in our view, the answer is clearly federal law, not 50 different state laws.

THE COURT: Is the argument then that the states have no regulatory and enforcement authority over Kalshi, that's left to the CFTC, even if, assuming that's an if, the CFTC does not take any action to police these gaming contracts or event contracts?

MR. HAVEMANN: So the answer is with respect to regulation of trading on designated contract markets, yes, it's exclusively federal, and that's right there in the text of the statute. Now, there are various carve-outs from that also in the text of the statute, and if Your Honor looks to 7 U.S.C.

Section 13a-2, that is a provision that is titled "Jurisdiction of States." So Congress thought about the role that it wanted states to have in this regulatory regime, and what it says in the first section of that provision -- it says generally states have the following authority, they can go after the following entities but not designated contract markets. And then it says in Subsection 7 of the same provision, nothing contained in this section shall prohibit an authorized state official from proceeding in state court on the basis of an alleged violation of a general, civil, or criminal fraud statute.

And so Congress thought about, okay, what do we want states to still be able to enforce in their state courts, what state laws do we want states to be able to enforce even with respect to DCMs, and the answer is general fraud statutes, civil and criminal, and there's legislative history that suggests that the reason Congress made that choice is because it didn't really understand the application of a fraud statute to be regulating derivatives trading. It's regulating fraud that's sort of exogenous to the exchange, but the idea that -- and this is after 1974. This is an amendment in 1978. Congress

thought about the role that it wanted states to have, carefully laid that out as excluding designated contract markets, specified a specific situation in which it wanted states to be able to still have this authority that excludes the conduct that the states are trying to regulate here, and the idea that somehow silently or without saying so, notwithstanding that every court has found preemption in the past 50 years and the like, that they silently intended to allow states to apply their state gambling laws, which are laws that had been quintessentially applied to futures contracts in the late 19th century and they did this all silently without saying so, that is what I think is really the implausible account and that is especially true when you look at the special rule and the fact that there is the reference to gaming in the special rule.

THE COURT: So as relates to 7 U.S.C. 2(a)(1)(A), Kalshi relies on the "except as hereinabove provided" language. Why is that language evidence that exclusive jurisdiction means we're preempting state laws as opposed to Congress making clear in what they are referring to as a saving clause, that they were not intending to supersede or limit any state laws?

MR. HAVEMANN: So the fact that the Congress uses the term "except as hereinabove provided" by the CFTC's exclusive jurisdiction, nothing about this provision will supersede or preempt states -- will supersede states, the fact that it's except as provided by jurisdiction, nothing supersedes states is strong evidence that Congress understood that the prior clause that it offset with the proviso does supersede states and it supersedes state authorities as well as federal authorities, and that's right there in the text of the statute. And then if Your Honor sort of gets into the legislative history here, there had been a prior version of the CEA that had a state law savings clause; that was stricken. Then it's very complicated with the House adds the state law savings clause and then the Senate adds the proviso "except as hereinabove provided," and there's a House and there's a conference report that says the whole reason we did this, the whole reason we added this proviso was to reject the interpretation of the CEA that the defendants are asking the Court to accept, that is to make clear that state laws as well as federal authorities are preempted.

THE COURT: Going back to an earlier question, are you aware of how much sports betting in

the country or in Connecticut right now happens on DCMs?

MR. HAVEMANN: Of the proportion of sports betting in Connecticut that happens on DCMs, I'm not aware of that, no.

THE COURT: Nationally?

MR. HAVEMANN: Nationally proportions?

THE COURT: Yes.

MR. HAVEMANN: No.

THE COURT: In terms of dollars?

MR. HAVEMANN: In terms of dollars, I'm sure I have that information. I don't have it at my fingertips, but I can provide it to you on rebuttal.

THE COURT: So as it relates to the CEA, the American Agriculture case involved affirmative conduct by the Chicago Board of Trade that the American Agriculture Movement didn't like, went to and it sued the Board of Trade. In analyzing whether that agriculture movement could bring state law claims or whether they were preempted, the Seventh Circuit found two other CEA provisions are helpful, but only to a limited extent. The first provided that nothing in that section shall supersede or limit the jurisdiction conferred on Courts of the United States or any state, that's 7 U.S.C. 2 and the cases

therein cited, but it then further relies on the following, having read this provision as a savings clause designed to preserve in the futures trading context at least some state law causes of action, an assessment with which we agree, the Court wrote, the savings clause resolves one of the two questions that were posed by the Court. It tells us that Congress did not intend to preempt the field of futures trading in its entirety and exclusively for the federal -- in the federal context.

Doesn't that case dictate that field preemption does not exist, since we're still left with a savings clause but still some room for the states?

MR. HAVEMANN: No, Your Honor, and the reason is it depends on how you define the field. So the Seventh Circuit in the American Agriculture case defined the field as the regulation of all derivatives trading.

THE COURT: And you're saying the field for field preemption is what?

MR. HAVEMANN: Is trading on designated contract markets, the regulation of trading on designated contract markets. So the Seventh Circuit in that case looked at the fact that Congress had

preserved a role for states in enforcing state laws with respect to off-exchange transactions, and then looked to the savings clause that Your Honor pointed to and said we think that that's enough to show that they didn't preempt this broader field of all derivatives trading. But then what the Seventh Circuit held in that case was a state law -- this is a quote -- that would directly affect trading on or the operation of a futures market -- and then there's an ellipses -- is preempted.

So with respect to the fields that we are talking about here, I think you can think of it as a conflict preemption because it conflicts with Congress's intent for this to be uniform, or you can think of it as field preemption with respect to the field of regulating trading on DCMs. I think the Seventh Circuit's decision in the American Agriculture case is -- squarely supports our position. There's -- and there are others that I'd be happy to refer Your Honor to. I would just note there are many other Court of Appeals' decisions that reach the same conclusion.

THE COURT: Getting back to maybe the third or fourth time of -- the representation is you're unaware, Kalshi's unaware, how much sports betting

takes place, how much, what percentage of the sports betting takes place on DCMs as opposed to off DCMs and Kalshi made no efforts to make that determination before deciding to enter the market?

MR. HAVEMANN: Well, before deciding whether to enter the market, right, Kalshi -- one of Kalshi's competitors moved into the market a few weeks before Kalshi did, but before it entered the market, there was no sports trading except for that competitor. So before it entered the market, it was all done -- it was all not done on DCMs. So with respect to that, I mean, there was entering a market that there was no DCM presence in.

THE COURT: And now, X number of months later, what percentage of sports betting, nationally would be fine, Connecticut if you have it, takes place on DCMs as opposed to off of DCMs? Kalshi doesn't know that?

MR. HAVEMANN: I'm sure Kalshi knows it. I just don't know it as I stand here before you, but I'm sure that I can get an answer for you on rebuttal.

THE COURT: And I'll expect that on rebuttal and I'll have a question about the saving clause because the question is for the savings clause to do

any work, there has to be something left for the states?

MR. HAVEMANN: Yes, indeed.

THE COURT: So if 99 percent of sports betting occurred on DCMs, that would leave the state no role to play in that regard?

MR. HAVEMANN: Yes. But the number -- I don't want to offer speculation without information, but I am sure that that is not the number and so I can talk about that, but yes, there is absolutely still much for states to regulate.

THE COURT: So in terms of self-inflicted harm, as the Court assesses irreparable harm, Kalshi's saying, obviously, didn't put yourself in a position of self-inflicted harm; is that right?

MR. HAVEMANN: We are saying that we did not put ourselves in a position of self-inflicted harm, that is correct.

THE COURT: But instead of seeking a declaratory judgment before entering this field, at least in the states that had a robust regulatory market, you could have brought these lawsuits before entering the market, sought a declaratory judgment, had it resolved and then entered the field without fear of losing whatever is invested so far. Why not

do that?

MR. HAVEMANN: Because there's no obligation under federal law to do that and that has never been the rule in preemption cases. In preemption cases --

THE COURT: I'm not talking about an obligation, but now since there have been some potentially negative consequences, at least in other jurisdictions, if we're assessing, especially in terms of that advisory of September 30, 2025, that says be prepared and make contingencies for the potentiality that what you intend to do, all of the DCMs, not Kalshi, might run up against certain state regulatory gaming -- why not seek to clear the field, for lack of a better word, by seeking a declaratory judgment that what you're doing there is not in conflict with Connecticut state or whatever state regulatory schemes?

MR. HAVEMANN: The only way to get into federal court with standing in this sort of case is to be faced with an imminent threat of enforcement. So we believe our conduct to be lawful nationwide. We are operating in many states without any indication that the state views us as violating state law. We received a cease-and-desist letter in the state of Connecticut that subjected us to civil

enforcement or potential criminal enforcement proceedings unless we took down these contracts immediately, and that when we brought -- that is when we were entitled to and that is when we had an opportunity to bring a suit to clarify the respective authority of the CFTC and the states in the case, and it is not a situation where Kalshi could have sort of roll out in one state and then roll out in another state and then roll out in another state. By its very nature, the company is a nationwide company. It has to be under federal law. So when it enters the market, it enters the market nationwide, and our view is we are entitled to do that, federal law entitles us to do that.

THE COURT: And so what percentage of your revenue or profits comes from sports-event contracts?

MR. HAVEMANN: This number is high. I believe it's in the 80 to 90 percent range, but I can get specific numbers for you on rebuttal, if you would like.

THE COURT: If we're talking about the cost of geofencing, the irreparable harm, and you talked about having to find out where everyone is, but if we're taking about cost and we're saying tens of millions of dollars, if that's compared to a value of

-- what's Kalshi's current value, $11 billion or so?

MR. HAVEMANN: Something like that, Your Honor, yes.

THE COURT: And plenty of other companies, for example, Sporttrade, have spent funds to implement this technology, and it's not new technology, how would this be irreparable harm as opposed to something that could be quantified in terms of geofencing out a jurisdiction? Others are doing it. Others have done it. Geofencing technology is not new. It's tens of millions compared to 11 billion.

MR. HAVEMANN: So it is still irreparable, even if it doesn't put a company out of business. The fact that other companies are doing it, they have a different model than us and that model requires them to do it. Our model does not require us to do it. And the question for purposes of irreparable harm -- and this is quite clear and the Supreme Court's precedent in this area -- is irreparable harm doesn't have to put a company out of business. Irreparable harm is not harm that, you know, is going to make it impossible for a company to operate. Irreparable harm asks, look, if this enforcement proceeding goes ahead while this case proceeds, will

a company, will an entity be subject to harm that it cannot get back at the end of the day if it wins. That is the question with respect to irreparable harm, and the answer here is yes, in myriad ways -- right -- the cost of geofencing, which there is no dispute, it's tens of millions of dollars, and we couldn't get it back if we are right. That's one.

THE COURT: Wouldn't you get it back by being able to continue to operate on the market if the position is prospective, finish up the markets, the trades that are on the Connecticut market, and then whittle it down until the last one is gone without making any new markets?

MR. HAVEMANN: No, but that's still -- right-- the cost of geofencing, tens of millions of dollars a year. We can't get that back. And then we'll have lost revenue in the state of Connecticut for as long as it takes for this Court to resolve the case, for the Second Circuit potentially to resolve the case and beyond, and that is lost business that we can't get back. In addition --

THE COURT: How much revenue, if that's been calculated, in the state of Connecticut?

MR. HAVEMANN: Right now, I know that there are -- when the declaration was filed, when the

preliminary injunction motion was filed, we had 24,000 users in the state of Connecticut, and the numbers, I believe, are nonpublic, but it's to the tune of tens of millions of dollars.

THE COURT: Does Kalshi allow individuals outside of the Continental United States to make contracts to accept trades?

MR. HAVEMANN: The answer to that is complicated and changing, so I don't want to make a misrepresentation.

THE COURT: Tell me the case right now.

MR. HAVEMANN: I believe the answer is -- I actually don't know. I don't know the answer right now.

THE COURT: What was the answer yesterday?

MR. HAVEMANN: I don't know the answer yesterday either.

THE COURT: Someone, I assume, will know. I will expect that answer on rebuttal because the question is -- I understood there to be limits depending on whether or not an individual is in the United States, within the United States. If that's the case, how is that done, some sort of technology that costs money and you're losing out on the market in that respect.

MR. HAVEMANN: Sure, yes. There are certainly differences between the sort of trading that is permitted within the United States and outside of the United States. I do know that. And then I also know that the way that they figure that out is not by geofencing, but rather by residency information that Kalshi has. Kalshi knows where its customers live, what their permanent address is. Right? And so Kalshi knows it has users in Connecticut. That's how I gave Your Honor the 24,000 number.

THE COURT: How does Kalshi know those things?

MR. HAVEMANN: Because we ask for them when people sign up for a Kalshi account and then we verify them before the account is confirmed.

THE COURT: How?

MR. HAVEMANN: Well, we ask for it when people sign up and then we have a know-your-customer protocol that is the sort of protocol that is common in this area, and we verify the information, and then when the information is verified, you can get an account and begin to trade.

THE COURT: So Kalshi has a know-your-customer protocol?

MR. HAVEMANN: That is correct.

THE COURT: Does it mirror that -- I'll get into that later with the state.

So in terms of operations across the country, is there any state where enforcement is active?

MR. HAVEMANN: Is there any state where enforcement against Kalshi is active?

THE COURT: Yes.

MR. HAVEMANN: There is in Massachusetts, but that is it.

THE COURT: And the preparations Kalshi's making, we've heard the money. What are the preparations?

MR. HAVEMANN: Kalshi will be prepared to comply with court orders. I mean, I'm a little bit constrained in what I can say in addition to that, but Kalshi will be prepared to comply with court orders, and what we hope to convey to this Court and other courts where this is in litigation is that the fact that we will be prepared for this does not mean it will not impose real harms on us.

THE COURT: So the restrictions on foreign trades is tied to the residency of the -- I don't know -- what's the word -- trader, market maker?

MR. HAVEMANN: I believe that's correct, Your

Honor.

THE COURT: So residency, not where they are at the time they make a market or engage in a trade?

MR. HAVEMANN: I believe that is correct, Your Honor.

THE COURT: And that is verified, I'm in country X that is not the United States, I'm in China, and I say, you know, but I'm from Connecticut? That is listed and it's verified by Kalshi?

MR. HAVEMANN: I believe that is correct, Your Honor, but I think the -- if I'm understanding Your Honor's question right, the reason Kalshi is able to do that and the reason why that is different than geofencing is it's based on residency. It's not a geofencing. It's not like we are doing geofencing already and so this would be easy.

THE COURT: So a United States resident abroad at the moment can make trades?

MR. GASSER: I believe that is correct.

THE COURT: What's your opinion on bond, I think it's asking for $250,000, please?

MR. HAVEMANN: We do not want a bond to be an obstacle to an injunction, and so we will be prepared to comply with whatever the Court orders. We think that 250,000 is too high. We do not think that they

have pointed to nonspeculative harm that would justify that, but I want to emphasize that we do not want the amount of the bond to be an obstacle.

THE COURT: Counsel, thank you very much.

MR. GASSER: Good afternoon, Your Honor.

THE COURT: Good morning, Counsel.

MR. GASSER: Your Honor, like my friend, I don't want to reiterate the briefs overly. I have a few points. I'm happy to answer, obviously, Your Honor's questions in any order.

But just a few things that the discussion with my friend brought up, I think at a high level with respect to the state's position about event contracts globally, I think it was made clear in our paper and, frankly, I think it was clear from the cease-and-desist letter, that the state does not take the position that all event contracts are gambling. There are exceptions to the gambling statute in the definitions of what gambling is that we don't believe are implicated in this case, but it's clear that we are not taking, and I've never taken, the position that all of Kalshi's business is gambling in violation of Connecticut law. And I think it has real implications for the irreparable harm piece as well as the public interest piece. It's not the case

that Connecticut is ordering Kalshi to shut down. It's simply a matter of these sports-event contracts that contravene Connecticut gambling statutes.

THE COURT: What's the pathway for Kalshi to participate in sports gaming in Connecticut?

MR. GASSER: There are the three master wagering licensees that are dictated by statute, as Your Honor noted, the tribes and the CLC, but those master wagering licensees can contract with other vendors, in this case obviously, Sports -- FanDuel, Fanatics, and DraftKings. As my friend mentioned, there's been no effort to determine what it would take to secure one of those positions as a contractor to one of the master wagering licensees.

THE COURT: That's through then with the consent of one of the three master wagers licensees and that's the only means?

MR. GASSER: That's my understanding currently. To comply with the gambling statute exception for sports wagering, right, it would have to be under the ambit.

THE COURT: Is that FanDuel with the Mohegan tribe, Sports King --

MR. GASSER: I always forget, Your Honor. I think it's DraftKings is Pequots.

THE COURT: DraftKings is the Pequots.

MR. GASSER: Fanatics is the CLC.

THE COURT: With the licensing corporation. So someone would have to agree, as opposed to there being a fourth licensee?

MR. GASSER: Presumably that's correct, Your Honor. I don't think it would require a statutory amendment. I think it would just be a question of when the contract comes up for renewal or how that would work.

THE COURT: And in your understanding, that's the only path for someone else to enter the gaming market in the state of Connecticut?

MR. GASSER: That is my understanding, Your Honor.

THE COURT: Okay. Go ahead, please.

MR. GASSER: And I further want to clarify, because I think it's important and it came up both in their reply brief and today, that Connecticut's position is not even that all sports contracts or event contracts relating to sports in any way violate the statute. I think it's clear that our analysis really is keyed to the definition of a swap and is it a transaction that is permitted under the federal framework. There are -- I believe it was actually in

the filing by Coinbase, but they gave the example of what happens if the playoffs or finals game occurs in a particular city, that's a closer question as to whether that's a swap, and our -- I don't think DCP understands its cease-and-desist letter to be encompassing that kind of thing.

What we're talking about really is the number of field goals at the Super Bowl, that sort of event that, frankly, I have a hard time understanding how Kalshi can say with a straight face that that has independent economic consequence, not whether the Super Bowl happens, not whether a team participates, but whether the number of points scored, the number of goals, the individual player achievements, things of that nature --

THE COURT: Attorney Gasser, I'm sorry to be rude. I should have thought ahead given how long the initial argument took with Kalshi and the time now. I'm just going to take a break of 15 minutes and come back, hear from the government, and move right into a rebuttal. I think things will move much more smoothly that way, especially in light that I want to leave room and time for the Coinbase arguments, so 15 minutes. We'll be back at five after 12.

(RECESS TAKEN, 11:50 to 12:08 p.m.)

THE COURT: Thank you. You may be seated. We are back on the record. We have all counsel.

Attorney Gasser, you may approach and begin when you're ready. Thank you.

MR. GASSER: Thank you, Your Honor.

Another point I just wanted to address, Your Honor, is the notion that Your Honor discussed with my friend about the CFTC's action and its role here. I think the crux of Kalshi's argument here is that the CFTC has not made a case-by-case determination to review Kalshi's sports-event contracts, and it appears that may be the case, although I'll note from the exhibits to the reply brief, they filed a response to a letter from the CFTC. I don't believe that we have the request by the CFTC, but the response to the letter indicating that the CFTC was at least interested in these contracts very early on.

Counsel mentioned that the fact that CFTC had failed to do an immediate review of the contracts was some indicia of the fact they were giving them a clean bill of health. The fact is that they began listing these contracts, if I remember, January 22nd or 23rd, of 2025, two or three days into a new presidential administration. I think to presume anything based on the failure to take immediate

action on a self-certified contract at that point is challenging.

I also just want to reiterate, while I don't think it's critical for our argument here, I think it's important that Regulation 40.11 is -- I think it's out of the Loper Bright situation. I think that we are dealing with a situation where CFTC almost literally cut and pasted what Congress permitted CFTC to determine as part of the special rule and said ipso facto those types of contracts are not permitted on CFTC-regulated exchanges. It's not just that the CFTC was saying that it reserves the right, as was given to it by Congress, to review on a case-by-case basis. It's saying, without as many words, we've determined these don't belong on exchanges. So for Kalshi to have offered them with that background is further evidence that the CFTC by not expressly taking immediate action is not blessing them in that regulatory context.

THE COURT: What does the State of Connecticut's gaming enforcement, anti-corruption framework look like?

MR. GASSER: In a broad sense, the statutes require gaming operators to take steps to address manipulation and insider trading, things of that

nature, inside information being used to manipulate the market unfairly, and those enforcement mechanisms for those both through DCP, and we would argue that there is Connecticut Unfair Trade Practices Act implications that just don't exist at the federal level.

THE COURT: What are the DCP's enforcement mechanisms?

MR. GASSER: Well, DCP has the right to take administrative action against a licensee, conduct hearings, and take licensure action against a licensee if it determines that that conduct is occurring. And it probably doesn't need saying, but that's DCP's job. That's what was entrusted to DCP by the Connecticut legislature specifically to avoid that kind of thing.

THE COURT: What's Consumer Protection's staffing in that regard for that purpose?

MR. HAVEMANN: Your Honor, I don't specifically know how many attorneys are dedicated to that. There is an entire division of gaming at DCP whose role includes this exact function. So this is not necessarily -- it's not a part-time obligation for DCP. There's people whose job this is, whereas to the CFTC, frankly, there's been no evidence as to

how many enforcement attorneys or agents there even are at the CFTC currently and no evidence that there has been any sort of enforcement action other than potentially sending a letter to a DCM that offered a contract that may have been suspect under 40.11.

THE COURT: What does Consumer Protection require its licensees to do in regards to cheating, corruption, fixing, things like that, if anything?

MR. GASSER: Your Honor, there are specific statutory and regulatory requirements. I don't have them all committed to memory, but there is a complex framework that was instituted by the legislature and DCP by regulation in order to address that conduct.

If I could turn Your Honor to the exclusive jurisdiction piece, my friend mentioned that part of the purpose for Section 2(a)(1)(A), the exclusive jurisdiction provision, is to prevent states from doing what he referred to as gambling in grain. We agree with that, but the in grain part is very important. Clearly, at the time, Congress made a determination that grain and other commodities were the kinds of things that needed to have a uniform federal statutory framework protected from state regulation. Congress has never made that determination with respect to gambling, sports

betting, and the indication from the legislative history, in addition to the text of the statute, is the exact opposite.

There's the colloquy from Senator Feinstein and Senator Lincoln specifically saying we don't want sports betting on our nation's exchanges, which, as the Court noted, Kalshi echoed not long after that.

THE COURT: But 2(a)(1)(A) does indicate, doesn't it, that Congress understood itself to have some effect to some extent on state laws?

MR. GASSER: No question, Your Honor. You will not hear us to say that states can do whatever they want with respect to things that are genuinely swaps. Our view is that in an area where the exclusive jurisdiction to CFTC was not express from Congress and there's some doubt about whether this was a subject matter that was entrusted to them, the tie has to go to the state. And I think the Martin court in Maryland did a really exhaustive discussion of this where it noted that even though CFTC may have -- and unquestionably does have a jurisdiction over swaps, in an area like this where the intent to withdraw jurisdiction from the state is not clear, then the state has to be allowed to act.

Another thing that my friend mentioned is

that in order for state law to apply to a DCM, I believe the expression was that it would impose a change that was totally different from how DCMs have operated for the last 50 years. This is all different from how DCMs have operated for the last 50 years. Everybody's understanding until, frankly, probably 18 months ago is that the DCMs were not federally regulated and protected sports-betting exchanges. And I think, frankly, the persuasive value of the cases interpreting the old -- the cases about soybeans, such as the American Agriculture case and potatoes and others, just don't capture the same factual scenario that we're here on, and I think, frankly, the cases -- maybe the universe of the cases that illuminate the issue are the ones involving Kalshi and its competitors and its partners over the last year.

THE COURT: Is the defense's position that a swap must be or should be -- should have inherent financial, economic, or commercial consequences?

MR. GASSER: No. I think that's a phrase that was used, I believe, by the Court in the second Hendrick case in Nevada. We don't rely on that. I think -- there are maybe other words better than inherent. I think, you know, certainly there has to

be some attention and weight given to the word associated other than just something that may follow from something else. So we don't -- we don't believe that it's a necessary consequence or a guaranteed consequence, but something that has some logical proximate relationship to the preceding event. So again, the occurrence of the Super Bowl, sure; the number of field goals during the Super Bowl, it just doesn't meet the test.

THE COURT: How do you reconcile the existence of the special rule with the argument that Congress never meant for the CFTC to regulate sports betting or gaming?

MR. GASSER: I don't know that argument is that CFTC has no authority to weigh in on contracts traded on exchanges to the extent they may involve gaming. It's really just that they are not a primary gaming regulator. Their jurisdiction is not exclusive. There could be cases where a state declines to consider certain conduct to be gambling or gaming and the CFTC takes another view and says, no, we do think that's gaming under whatever rubric, and clearly, CFTC would be within its statutory remit to make that decision.

THE COURT: So in terms of exclusive

jurisdiction or preemption, we have 7 U.S.C. 16(e) that contains the word preempt. Why isn't this express preemption, therefore, negating the presumption against preemption?

MR. GASSER: I'm sorry. If Your Honor could re-ask the question.

THE COURT: 7 U.S.C. 16(e) contains the word preempt. Why isn't this express preemption negating the presumption against preemption?

MR. GASSER: I don't think that the Court can construe that language in a vacuum. I think if we look at 16(h), for example, Congress specifically said where a -- states may not regulate the -- may not regulate swaps as insurance, and I don't think that, for example, with respect to 16(e), the Court -- Congress's decision to exclude from preemption necessarily implies an enhancement or an expansion of the exclusive jurisdiction provision in 2(a)(1)(A).

THE COURT: Go ahead, please, Counsel.

MR. GASSER: I just want to touch briefly, Your Honor, on the irreparable harm piece. My friend mentioned, as Kalshi has in its papers, that it expects to incur costs, they estimate apparently in the tens of millions of dollars, to implement

geofencing. But my friend also mentioned that once Kalshi geofences in one place, it essentially has to geofence everywhere, and as 30 days from last week, it has to geofence in Massachusetts. So they don't explain why any action this Court could take that would require or would permit the state to take action that would require geofencing would impose any new costs on Kalshi at all.

In terms of the dollar amount, you know, Your Honor discussed with my friend the issue of how many sports contracts Kalshi trades and the percentage of that compared to trades on sportsbooks and its other revenue. Kalshi, according to the reports, did a billion dollars in trading volume on Sunday. So for them to incur fives or tens of millions of dollars for compliance costs with a statute, we respectfully submit, should not be particularly compelling in support of their application, particularly not dispositive.

I'm happy to answer any other questions Your Honor may have. Beyond that, I'm happy to rest on the papers.

THE COURT: The defense is looking for forward-looking relief.

MR. GASSER: Yes, Your Honor.

THE COURT: And how would that look, no new contracts rather than undoing old contracts?

MR. GASSER: I think Massachusetts's stipulation that was entered, I believe, Friday is a workable framework. That's exactly what it says, Your Honor, no new contracts, no expansions of existing positions. And so it doesn't require Kalshi to take any action other than preventing expansion and new contracts.

THE COURT: Why does the Court -- why should the Court decide to impose a bond?

MR. GASSER: I think, Your Honor, particularly where the concern is enforcement against the state with respect to its sovereign duties in the public interest to protect the public, a bond is particularly important here. And in terms of the amount, the $250,000 bond, frankly, we believe is conservative. It's the amount of an application fee that a master wagering licensee's online gaming operator has to pay, and it's an infinitesimal fraction of the civil penalties that the state could seek under the Unfair Trade Practices Act in an enforcement action. So for those reasons both, we believe that a bond is appropriate and that that amount is appropriate.

THE COURT: So there's reference to the Tom Doherty case from the Second Circuit. There might be an argument that there are no reasonable substitutes to Kalshi as it relates to event contracts, and if you feel differently, what are they?

MR. GASSER: I think, as we discussed briefly before the break, one alternative is to become a licensed sports wagering operator in Connecticut.

THE COURT: They can only do that with the consent of a current licensee, as you said before the break, as opposed to on its own merit applying, being vetted, complying, and then being licensee number 4. That only happens if one of the current three licensees agrees to cut the pie into another slice.

MR. GASSER: I don't know about cutting the pie into more slices, but assigning the slices differently happens. I was reminded during the break that the initial online gaming operator for the CLC was SugarHouse, and so now there is DraftKings is a new -- excuse me -- Fanatics is a new entrant that apparently made a better deal, made a better offer to the CLC. And so it's certainly not the case that these are perpetual contracts and there's no way into this market. They probably couldn't set up operating tomorrow, but there's been no showing on their motion

as to what efforts, if any, they've made to try to explore this regulatory environment, and I believe their representation was there's been none.

THE COURT: Do the licenses allow for engagement with multiple entities?

MR. GASSER: I believe that they do, but I would want to confirm with Your Honor before I made a representation to that effect. There are different types of contracts that -- different types of entities that the master wagering licensee can enter into, for example, online gaming, for iCasino, and those can be different operators. I don't know for a matter of fact whether there can be multiple online wagering companies partnering with a particular master wagering licensee, but I'm happy to inquire into that, Your Honor.

THE COURT: Thank you. That's all I have, Counsel, if Attorney Nunes is going to step up.

MR. NUNES: May it please the Court, Assistant Attorney General Michael Nunes on behalf of the state.

Your Honor, just briefly on the public interest prong specifically, what Kalshi is advocating for with regards to the public interest prong is essentially an abdication of the third prong

into public interest if Your Honor determines that there is a high likelihood of success on the merits. Your Honor, there should be a separate analysis, completely distinct from the preemption analysis under the likelihood of success, as to whether a preliminary injunction is in favor of the public here.

And, Your Honor, we would argue that there are really two significant public interests that weigh in favor of denying Kalshi's preliminary injunction and preserving Connecticut's robust regulatory framework for sports wagering. The first is the public's compelling interest in protecting vulnerable populations from the exploitation of a harmful and addictive industry that was only recently legalized but otherwise traditionally governed by the state. And, Your Honor, the other --

THE COURT: Go ahead. Tell us the two.

MR. NUNES: -- is the public interest in tax revenue collected through the sports wagers.

THE COURT: As to the first.

MR. NUNES: As to the first, Connecticut requires -- Connecticut has multiple regulations requiring a multitude of problem gambling prevention for the master wagering licensees to provide, to

safeguard, to protect at-risk persons, including -- while Kalshi says they provide the self-exclusion option, they do not prohibit persons under the age of 21 from entering in sports wagers. Likewise, they do not have the same type of advertising prohibitions to deter predatory marketing in the industry. And, Your Honor, I would argue that these --

THE COURT: They don't have the same what?

MR. NUNES: The same restrictions regarding advertising prohibitions, such as advertising directly to individuals under the age of 21. I believe in our brief, we point out that Kalshi, in fact, would have violated that regulation by advertising directly to youth on Yale University's campus encouraging them to engage in the predictive markets industry.

THE COURT: So Kalshi does have an age restriction?

MR. NUNES: It does have an age restriction, I believe that is 18, but it's not individuals under 21, and I think given the risk to youth within this industry that has been pointed out in various studies and one of the studies that the state provides for in its brief, I think there is a significant interest that the public has in ensuring that those at-risk

youth are not engaging in this extremely addictive industry.

THE COURT: What sort of due diligence, vetting, research studies were relied upon in deciding that 21 is the magic number for gaming in Connecticut in person?

MR. NUNES: Your Honor, I do not have those studies on hand, to be frank with you. I understand that the legislature required studies to be done when gambling was legalized in Connecticut. I presume that there were some studies done to understand the age and, in particular, what age groups were most at risk.

THE COURT: It wasn't a carryover from alcohol because casinos at the time of in-person gaming served alcohol?

MR. NUNES: I'm not sure, Your Honor, on the exact answer to that. I believe, however, that there were studies done and I would assume that, according to those studies, they determined whether the age needed to rise or whether it should go down.

THE COURT: Do any of Connecticut licensees currently have online or ad-related gaming?

MR. NUNES: Yes, Your Honor.

THE COURT: How does the Consumer Protection

ensure that the licensees certify or verify the age of those who use the app or the online gaming platform?

MR. NUNES: Your Honor, I do not have that very specifically, but I understand that in order to engage on the apps, you have to provide your license, form of identification, to prove that you're over the age of 21. They have two-step authentication factors that ensure that it's the actual person who has the account is the one engaging in sports wagers on the platforms, Your Honor.

And so, Your Honor, Kalshi largely claims that -- I think their biggest argument as far as the public interest is that there will be harm to the public for those who have contracts that could be implicated. First of all, this harm is largely speculative. Kalshi has provided an estimate of 24,000 Kalshi members with a Connecticut residence; however, that number of these consumers -- the number of consumers with open sports-event contracts that would be affected if Kalshi had to cease the offering of sports-event contracts in Connecticut is completely unknown. They just have not provided that number and I believe they don't have that data.

And therefore, in balancing the public

interest at stake, the Court should determine whether the public interest favors protecting an unknown number of sports-event contracts among less than 24,000 Connecticut residents or if the public interest favors preserving the state's sports wagering regulatory scheme intended to provide safeguards against an otherwise addictive and harmful industry and the state's collection of revenue from sports wagers, both of which benefit the entirety of the Connecticut public as opposed to just the 24,000 Kalshi members.

THE COURT: You mentioned the protections. I asked brother counsel some questions about consumer protections, regulatory framework enforcement, staffing and what they require the licensees to do. Do you have answers to any of those questions?

MR. NUNES: I do not at the moment, Your Honor. I'm sure we can confer with counsel and hopefully get you a more specific answer to that.

THE COURT: Well, if the argument is that CFTC is not set up for this and they might not know what they're doing in this context and they may only just be ramping up this machinery and the infrastructure, what is Connecticut's?

MR. NUNES: Well, I would say the Department

of Consumer Protection, as my cocounsel said, has an entire department that specifically focuses on just gaming and, you know, regulates the master wagering licensees and their providers. And so to my understanding, as my cocounsel said, the CFTC does not have that type of division that would be solely responsible for regulating gaming and sports wagering as the Department of Consumer Protection does.

THE COURT: Thank you, Counsel. Go ahead, please.

MR. NUNES: Your Honor, if Your Honor has no further questions, that was all. I just -- Kalshi has not sufficiently shown that a preliminary injunction prohibiting the State of Connecticut from enforcing its sports wagering statutes and regulations would be favorable to the public interest. Thank you, Your Honor.

THE COURT: Could you remind me if I forget for rebuttal on enforcement mechanisms and did you have more on tax revenue?

MR. NUNES: As far as tax revenue, I believe we provided it in our brief, that in 2025, the state collected more than $25 million from the revenue relating to sports wagers specifically. So this is not an insignificant amount of money, Your Honor.

THE COURT: And that would not be collectible or be able to be collected from Kalshi and why not?

MR. NUNES: Because they are not subject to the tax that the master wagering licensees are subjected to, which I believe is 13 and three-quarters percent tax on the gross revenue of all sports wagers. So Kalshi, since it is not a licensee, is not subject to that tax, Your Honor. So it is essentially siphoning away from the State of Connecticut and the public.

THE COURT: Thank you, Counsel, and I'll look for you later on specifics as to enforcement mechanisms, additional regulatory enforcement, cheating, anti- corruption, et cetera.

MR. NUNES: Thank you, Your Honor.

THE COURT: Thank you.

Please, Counsel. Thank you.

MR. HAVEMANN: Good afternoon, Your Honor.

THE COURT: Good afternoon, Attorney Havemann.

MR. HAVEMANN: I have a few points in response to questions that Your Honor asked me during my initial remarks and then a few points in response to my colleagues' arguments and I will do my best not to test your patience.

On the numbers, so my high-level answer to Your Honor's question about the numbers and the relative numbers of DCM versus sportsbook, our estimate is that we are in the low single digits of total amount of positions or bets placed on sports, low single digits. So this is not a situation, I think Your Honor asked, if it's nine percent on Kalshi and one percent on sportsbooks, there's nothing left for states to regulate. It is essentially the reverse of that.

And the caveat that I want to give to those numbers is that it's actually sort of apples to oranges. It is, I am told, quite difficult to make a totally accurate representation because sportsbooks reports differently and they do not all report the same things. So they report something called handle, which is essentially one side of a trade, right, because they are betting against the house, and so handle is one side of that trade. Kalshi, as I noted earlier, operates an exchange between parties. So the -- Kalshi's numbers are, you know, both sides of the transaction.

THE COURT: And how did you arrive at the estimate?

MR. HAVEMANN: We crunched the numbers and

that is our best estimate.

THE COURT: That is the best estimate as of what day, today, this week, this month?

MR. HAVEMANN: As to today.

THE COURT: And has that grown over time?

MR. HAVEMANN: I'm sure it has. I mean, yes, because we started operating in the area last year, so yes.

THE COURT: And to what degree or what percentage has it grown, every month, every week, every six months, semiannually?

MR. HAVEMANN: It is cyclical, I think is the best way to answer the question. There are particular events on which there is a lot of trading activity, one of which was last weekend, many of which are elections. So in an election year, we would expect to have lot more trading volume on Kalshi. But yes, generally speaking, we are a growing company and we entered the sports-event contract market a little more than a year ago and we have grown.

THE COURT: Okay. Do you dispute the number of $1 billion in revenue nationally this Sunday, which was the date of Super Bowl Sunday?

MR. HAVEMANN: Yes. That's the amount

traded, but not revenue, not even close.

THE COURT: What's the transaction fee on a trade Kalshi charges?

MR. HAVEMANN: It varies by trade. So it is -- I don't have one number for you, but it is a relatively low percentage.

THE COURT: And what is the retention rate on new users?

MR. HAVEMANN: The retention rate on new users, I don't have that information, Your Honor. I'd be happy to provide it in a supplemental filing, but I don't know.

THE COURT: I've asked a couple of times what is Kalshi's decision-making structure rubric for deciding that a potential contract has financial, economic consequence, for example, two to three examples of the sorts of contracts that Kalshi has rejected.

MR. HAVEMANN: Sure. So there are a number of types of bet that sportsbooks offers that Kalshi does not offer because we don't think that there are economic consequences associated with it. So an example is, like, the color of the Gatorade shower, which I'm told is actually a fairly popular bet among sportsbooks, is it going to be yellow or red or blue.

We don't offer it because, as far as we can tell, there is no financial consequence associated with it. There are also a whole number of bets that sportsbooks takes with respect to specific scores, so is the score of this football game going to be different from the score in any football game that's ever occurred, and divorced from, you know, an outcome that would have an effect on the team or their sponsors, the score itself we don't view as having economic consequences. That's another example and that is the sort of decision-making process that we go through.

We self-certify. In the self-certification, there is a description of our view as to why there are economic consequences. The CFTC has an opportunity to review. CFTC has an opportunity to say we don't think this should be permitted or we do, in which case it lets it trade.

THE COURT: And again, has that ever happened?

MR. HAVEMANN: Except with the caveat that I noted earlier at the very outset, they asked for the demonstration of compliance. There has been no formal public interest review, that is right, but we are in, as I also noted earlier, frequent

communication with our federal regulator.

THE COURT: Thank you, Counsel. Please.

MR. HAVEMANN: With respect to the relative competence of the CFTC versus the state gaming regulator, Your Honor had asked a couple of questions to me about that, to my colleague about that. I think the answer that I heard from my colleague was that the state regulator has an enforcement division and that the enforcement division can take enforcement action and that they have sort of know-your-customer-type arrangements. The exact same thing is true with the CFTC. The CFTC has an enforcement division. The CFTC has express authority under the CEA to take enforcement action against people.

THE COURT: The gaming enforcement division?

MR. HAVEMANN: But it's not -- that's what I --

THE COURT: I'll ask for a yes or no and then you can explain.

MR. HAVEMANN: Sure. No. It is not specific to gaming, but what I would say is that the risks that the CFTC is looking for and that I think Your Honor noted in my earlier discussion, are not risks that would require gaming-specific expertise, and

here's why, the risks that they're looking for is the sort of unusual trading activity that would suggest that there's manipulation going on, someone has insider information that this is an improper insider trade or manipulative trade or a trade that is going to cause disruption, and that is a risk that is not unique to gaming or sports betting or whatever you want to call it, sports-event contracts. It is a risk that is inherent and exists in all of the markets that the CFTC oversees, and the CEA prescribes method for mitigating and eliminating those risks, and that method is first and foremost to make DCMs SROs, self-regulatory organizations that have rulebooks that they have to abide by, and that requires them to monitor for this sort of improper conduct.

Then they have to on a daily basis disclose all trading activity to the CFTC. The CFTC then has its own algorithms, it has its own oversight, and it crunches the numbers and if it sees anything untoward, anything that SRO itself has missed, then it has an enforcement division that can take appropriate action, and that includes action by the CFTC, it includes referral to the attorney general, it includes working with other authorities as

appropriate to deal with the problem.

So what I really want to push back on, Your Honor, is the suggestion that this would require some sort of different office or different expertise than what the CFTC already has because the nature of these contracts are different and the nature of the contracts that sportsbooks and the like are entering into and the nature of the risks that are inherent in these contracts are, therefore, different. It is not the risk that you have where there is a power imbalance between the company and its customers that give the company a real incentive and ability to take advantage of its customers. That's not the risk that you have on an exchange. The risk that you have on an exchange is there are bad actors who are taking advantage of insider information and that is the bread and butter of what the CFTC has done for the past 50 years, that is what they are good at, that is how they manage and oversee trillions of dollars' worth of assets in trading.

THE COURT: So what does Kalshi do to guard against insider trading and insider information?

MR. HAVEMANN: It has front-end and back-end safeguards, Your Honor. So it has front-end safeguards with respect to know-your-customer

requirements, it has anti-money laundering requirements, so it knows who is placing trades, knows who its customers are. Then it has a staff that the whole job of the staff is to look for suspicious trading activity and to monitor for it. And that staff -- a lot of it is automated, so they have algorithms running, they have computer programs running, and then they have a staff that takes a look at anything that's flagged and they investigate, they look into who is this person, is it possible they're a person who shouldn't be trading on this contract. There are rules in place with respect to every contract, about who may and who may not trade on a contract. And so if it's a violation of the rules, Kalshi can take action and kick people off its exchange, and if it's a violation of the rules, Kalshi can elevate it to the CFTC. The CFTC can take appropriate action, if that's required.

THE COURT: Is there a difference in the reporting requirements of the traders on -- for sports-event contracts versus other of Kalshi's predictive markets?

MR. HAVEMANN: The rules with respect to who can trade differ by contract. So it's true with respect to -- it's true -- the differences are within

the sports-event contracts category and then the same is true with respect to other types of contracts, like elections, like popular cultural things. So who can trade and who cannot trade depends on the nature of the contract. So with respect to elections, it's people who would have insider information with respect to elections. For particular sports games, it's people who have particular -- who would have particular information or particular incentive or particular ability to manipulate the contracts to their own advantage or to their family members' advantage.

So those rules differ, but what is the same is that there are rules with respect to who may trade and who may not trade with respect to all of these contracts, and then there is a system in place for monitoring for impermissible trading activity and for dealing with that problem when it arises.

THE COURT: There are past public statements by those higher up in the Kalshi hierarchy that, quote/unquote, Insider information make prediction markets actually more accurate, so it's not necessarily a bad thing, and if that was made, how do you reconcile that with what you're telling me now?

MR. HAVEMANN: They were absolutely not made

by people at Kalshi. I believe Your Honor is referring to people at Polymarket, and maybe there are others who have said that, but Kalshi has never said that and Kalshi does not believe it. There is, I think, pending legislation or at least legislation in the works to prevent insider trading on these sorts of contracts and Kalshi supports it because it is already a violation of our rules and we think the -- we want our exchange to be a place where people have confidence in. We do not want our exchange to be a place where people are worried that the person on the other side of the trade has information that they don't have. So it is very important to us, for fairness reasons and for business reasons, to make sure that this is a place that people can have trust in and have confidence in. And so no, we do not believe that insider information on our platform is a good thing.

THE COURT: And you rely on your own -- the registration verification of the identity of the person making the market and then the CFTC for its algorithmic enforcement mechanisms to look for unusual trades for something that may be an insider trade?

MR. HAVEMANN: We do it ourselves, so we

first have our own -- you know, it's very complicated algorithms and software to look for unusual trades. We have our own staff that conducts oversight of these trades. We then can go out and interview traders to figure out, you know, what's going on here with respect to suspicious activities. I'm told it is a felony to lie to a DCM that is investigating your conduct on the platform, and then we take appropriate action, and that can be -- sometimes it's a false alarm, and, in fact, I think usually it is a false alarm, but sometimes there is something real there and then we take appropriate action, which can be kicking the person off our exchange, up to the CFTC to take appropriate action, and then if it's a felony, then referral to the attorney general for further proceedings.

So all of which is to say that the distinctions between the state enforcement and the federal enforcement and whether the states would be better or not than us at this, or better or not than the CFTC at this, I think first, I would say that the particular staffing level of a federal agency, you know, I respectfully submit the question is under the text of a statute is this subject to the CFTC's exclusive jurisdiction, but to the extent that Your

Honor has concerns about whether or not this is within the institutional capability or competence of the CFTC, I really do think -- I want to convey to Your Honor that the sorts of things that they would be looking for, the sorts of protections that they would have in place are what they are already doing with respect to trillions of dollars of activity on their -- on these exchanges that they oversee.

Unless Your Honor has further questions, just a few points in response to my colleagues' points.

THE COURT: Please.

MR. HAVEMANN: I think that I heard my friend say that with respect to grain futures, that sure, that's out, that can't be regulated by the states because we think those are real derivatives and that's different from sports, but nothing about their legal theory in this case, right -- I mean, set aside swaps. Nothing about their theory of preemption would dictate that result, and, in fact, the very thing that they say, well, obviously that's not gambling, obviously that's legitimate derivatives trading, a hundred years ago, dozens and dozens of states said that looks an awful lot like gambling to me. That's --

THE COURT: Counsel, that's a point you've

made and I want to be mindful to give the staff a break before we have other arguments. Please, something new, if you have something else.

MR. HAVEMANN: Sure. So with respect to the special rule, I believe I heard my colleague say that in response Your Honor's question that the special rule still has work to do with respect to gaming and the special rule does not undermine their position because if a state declines to enforce state law with respect to a company, then the CFTC could come to a different conclusion and could ban it under the special rule. There is just nothing in the text of the special rule that suggests that's how it operates, that's only a one-way ratchet, and it's only prohibitive that they can't approve it, and the text says may. That means that they may, and if they have jurisdiction to ban it, they have jurisdiction to approve it.

Your Honor asked my friend about Section 16(e), and I'd very just briefly like to go into Section 16(e) because I do think it's important and I do think that it helps illustrate why we are right. Your Honor is correct that there is an express preemption provision in Section 16(e). That express preemption provision is built on and

predicated on Congress's understanding that of course Section 2(a)(1) already preempts state law with respect to on-DCM trade, and what Section 16(e) does is at the same time as Congress exempted certain transactions from the requirement to be traded on DCMs, it said with respect to some categories of those exempt transactions, state law is preempted there too. And there is a lot of evidence in the legislative history that Congress, of course, understood that the CEA already preempts state law with respect to on-DCMs and this is off-DCMs and that was critical to Congress's decision.

With respect to Your Honor's question about impossibility and could Kalshi get a license, so there is the point that there are these three licenses and I think that is a problem for the state, but in addition to the point that there are these three licenses, which are already taken, I mean, Kalshi to operate a nationwide exchange, I think it would be quite remarkable to say that for Kalshi to operate its nationwide exchange in every state including the state of Connecticut, it needs to abide by the state licensing schemes, and that means in this case getting permission from one of the two tribes or the lottery commission approval and that

that is the only way that Kalshi can operate a nationwide DCM. There's no precedent for that. So that's one problem for them.

The second problem for them is that Connecticut requires physical presence, and I think I already said to Your Honor why that makes sense with respect to sportsbooks, not possible with respect to DCMs which are necessarily national.

I think that's it, Your Honor, so unless Your Honor had further questions.

THE COURT: I don't, Attorney Havemann. Thank you very much.

And then I'll hear from Attorney Gasser or Nunes on the question of enforcement staffing, et cetera, and what's required of the licensees. Attorney Gasser.

MR. GASSER: Yes. Thank you, Your Honor. And if I may, Your Honor, I would just like to briefly correct, I don't recall whether I mentioned that during the Super Bowl Kalshi made a billion dollars in revenue. I certainly meant to say a billion dollars in trading volume.

THE COURT: Trading volume is what you said and I misspoke. Thank you, Counsel.

MR. GASSER: With respect to DCP's staffing,

I was informed that DCP's gaming division is actually its largest division. It has 64 employees in the gaming division that includes investigators, sworn law enforcement officers. There are six attorneys with DCP with responsibility -- not all full time, but they have enforcement investigative responsibility with respect to gaming functions. So it clearly is, as I mentioned before, not just a part-time effort for DCP.

With respect to specific measures that the statute and regulations require of the licensees, among other things, they require the operators to analyze data to look for suspicious activity. I understand that Kalshi contends it does that, but DCP requires licensees to do that and enforces against them if they don't. It actively prohibits participants in sporting events from participating in sports wagering. It actively works with an outside monitor, an outfit called IBIA, completely separate from any of the sports wagering licensees, to help ensure the integrity of the sports wagering market. So they're not requiring the sports wagering operators' word for it that they are internally taking measures to prevent market manipulation. The licensees have to pay for that service as part of

their fees to the state.

Among other things, DCP's employees look for complaints from consumers regarding conduct of the master wagering licensees or the sports betting operators if they have concerns about, for example, funds being deposited or things not going into their account the way they expect. They can contact DCP and somebody's job is to respond to those questions.

DCP has the ability if a market -- if they believe that a market or wager was inherently unfair to actually unwind that and require that the wagers be given back to consumers, which I think is a key measure that we haven't heard that Kalshi has the ability to do, let alone is required to do.

Furthermore, Your Honor, DCP collaborates with the sports leagues themselves, unlike the DCMs, and my understanding is that if there are particular categories of wagers that the sports league view as potentially susceptible to manipulation or unfairness, it will make sure that the licensees don't offer that type of contract.

Finally, Your Honor, the DCP is part of a multistate organization of states that look for suspicious conduct, suspicious activity, occurring in the betting markets full time. And so there is an

ongoing effort at all times to address concerns of manipulation, of points shaving, of all of these concerns that Your Honor has mentioned in the sports wagering markets, that simply doesn't exist at the federal level establishing, we believe, the fact that Congress never intended the CFTC to be a gaming regulator of this kind.

I'm happy to answer any other questions, Your Honor, but I have nothing further in response to Your Honor's inquiries from earlier.

THE COURT: Just one, if you know, and you might not. Of these 64 employees, as it relates to gaming, how many, if you know, are dedicated to sports?

MR. GASSER: That's easy. I do not know, Your Honor. I'm happy to ask quickly and get back to you, Your Honor, and file something.

THE COURT: No. That's fine. Unless you can find out in the next ten seconds. I want to leave time for a break before -- whoever is putting their hands up, I don't know if that's especially helpful.

MR. GASSER: Eight, Your Honor.

THE COURT: All right. Fifteen-minute recess, come out at ten after one and start promptly with the Coinbase arguments. Thank you all.

Counsel, thank you all very much. I'll forget my manners. Thank you very much for your preparation, for being here, for being here in person, for the briefing, for your preparation, for your expertise. It's easier to write with good briefing and it's easier to make decisions with great argument and we have both this afternoon. Counsel, thank you very much. Safe travels.

(Proceedings adjourned, 12:55 p.m.)

C E R T I F I C A T E

RE: KALSHIEX LLC v. BRYAN T. CAFFERELLI, ET AL.
No. 3:25-cv-02016-VDO

I hereby certify that the within and foregoing is a true and accurate transcript taken in the aforementioned matter to the best of my skill and ability.

/s/ Corinne T. Thomas

CORINNE T. THOMAS, RPR
Official Court Reporter
United States District Court
450 Main Street
Hartford, Connecticut 06103
(203) 809-0848